```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

------------------------------X  Docket#
GRACIE BAKED LLC et al.,       : 22-cv-04019-RPK-VMS
                               :
              Plaintiffs,      :
                               :
      - versus -               : U.S. Courthouse
                               : Brooklyn, New York
GIFTROCKET, INC.,              :
                               : December 4, 2024
              Defendant        : 5:06 p.m.
------------------------------X
```

```
        TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
            BEFORE THE HONORABLE VERA M. SCANLON
                UNITED STATES MAGISTRATE JUDGE
```

**A   P   P   E   A   R   A   N   C   E   S:**
**(VIA VIDEO/AUDIO)**


**For the Plaintiffs**:        **Raphael Janove, Esq.**
Janove PLLC
500 7th Avenue, 8th Floor
New York, NY 10018

**Liana Roza Vitale, Esq.**
Janove PLLC
979 Osos Street, Suite A5
San Luis Obispo, CA 93401


**For the Defendants**:        **Faris A. Rashid, Esq.**
**Gina Tonn, Esq.**
**Kshithij Shrinath, Esq.**
Greene Espel PLLP
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402


(Appearances continue on next page)


**Transcription Service**:        **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

### APPEARANCES CONTINUED

<u>**For the Defendants**</u>:     **Katherine Burghardt Kramer, Esq.**
                                    **Megan O'Neill, Esq.**
                                    **Kevin Westerman, Esq.**
                                    DTO Law
                                    305 Fifth Avenue, 12th Floor
                                    New York, NY 10016

3

Proceedings

1      THE COURT:  All right.  This case is *Gracie*
2  *Baked LLC v. GiftRocket* 22-cv-4019.

3          So let's start with plaintiff's counsel.

4      MR. JANOVE:  Good evening.  Raphael Janove and
5  Liana Vitale of Janove PLLC for plaintiffs.

6      THE COURT:  All right.  And how about
7  GiftRocket defendants?

8      MS. KRAMER:  Good evening, your Honor.  This is
9  Katherine Kramer of DTO Law, and I'm joined by my
10  colleagues Megan O' Neill and Kevin Westerman.

11      THE COURT:  Okay.  Just going down the docket
12  here.  All right.  How about for Sunrise?

13      MR. RASHID:  Good evening, your Honor.  This is
14  Faris Rashid from Greene Espel.  I'm joined by my
15  colleagues Gina Tonn and Kshithij Shrinath.

16      THE COURT:  Okay.  All right.  So we have a
17  stack of papers from you all.  I have some questions.
18  The one I have the most questions about, which we'll get
19  to in a minute, the request for the text messages for
20  which plaintiffs are claiming that there was a waiver of
21  the attorney-client privilege and obviously the
22  defendants are taking a different view.

23          But let's start with something maybe a little
24  bit easier, although this is out of order.  So there's
25  document 205 which was filed on November 1st, and this is

4

Proceedings

1    a request for the running of additional search terms.

2    The plaintiff is moving for GiftRocket to do this and one

3    question I have which is flagged on the docket was what

4    is the burden to GiftRocket at this point.  At least in

5    the letter on page 3 what plaintiff had said was

6    plaintiffs proposed that the above terms -- and I don't

7    even know how to pronounce these.  Anyway, however you

8    would say it, the ones that are identified on the first

9    page of the letter, the above terms were run on custodial

10   documents dated between July 1, 2022 and June 3, 2024 to

11   minimize the chance that terms hit on other earlier

12   corporate reorganizations of the GiftRocket defendants to

13   substantially reduce any potential burden.

14           Later on in the letter there was also a

15   suggestion of a way to avoid getting privileged documents

16   by noting who the recipients were.

17           But anyway, for GiftRocket side, what do you

18   know about how big a search this is, how long it would

19   take et cetera, et cetera?  What's the burden?

20           MR. WESTERMAN:  Good evening, your Honor.  This

21   is Kevin Westerman of DTO.  I have an answer to your

22   question on just the size of the review universe and also

23   a proposed compromise that can hopefully take this motion

24   off the docket.

25           So the review universe if we were to limit it

5

Proceedings

1    to July 2022 through June 2024, as the plaintiff

2    proposed, would bring it down to about 100,000 pages

3    which is still quite a bit to get through and would

4    impose an undue burden.

5            But in order to move things along, we would

6    propose the plaintiff's motion also mentions that they

7    are interested and want internal discussions between and

8    among GiftRocket employees --

9            THE COURT:  Right.

10           MR. WESTERMAN:  -- that discuss the

11   restructuring.  So if we were to limit the review

12   universe to that time period and also limit it to

13   instances where it's internal communications, so just

14   people with GiftRocket or Tremendous domain addresses are

15   on the to and from line, we believe that that will bring

16   that 100,000 page universe down to about 50,00 or maybe

17   slightly less pages.

18           And so while we still believe any additional

19   further review would be disproportionate to the needs

20   here, we kind of get the sense of where the Court might

21   be going with this based on the order and wanted to

22   propose that at the outset.

23           THE COURT:  Okay.  From plaintiff's side, have

24   you considered the proposal?

25           MR. JANOVE:  Just hearing the proposal for the

Proceedings

1    first time, I think well, that works for us.

2           THE COURT:  Okay.  So to put some bracketing

3    timelines on it on the defendant's side, what do you

4    think it would take for you to run the search, do the

5    review, provide it over to the plaintiff?

6           MR. WESTERMAN:  I would say 30 days would

7    typically be fine and then we're also running into the

8    holidays.  So possibly ask for a couple of extra days.

9    I'm looking, pulling out my calendar now.  I think June

10   6.  Not June 6.  January 6th would be manageable if that

11   works for the plaintiff.

12          THE COURT:  I was just going to say it's okay

13   because I assume that everybody would be reluctant to

14   give consent until you know if you're going to get a

15   little more time which, you know, I won't hide the ball

16   (indiscernible) a little more time.

17          All right.  So I'm going to take the 205 motion

18   as moot because you've come to a resolution as discussed

19   on the call today and the production by the defendants

20   will be made by January 26, 2025.  All right.  That's

21   that one.  I'm just looking through my folders here.

22          All right.  The one that I have the most

23   questions about or at least not sure where this should go

24   is 203 which is the motion related to the text messages

25   between Mr. (indiscernible) and Bentley and there's the

7

Proceedings

1  assertion of privilege.

2        So look, couple of questions. I might have

3  more questions, but I'm going to tell you what they are.

4  I think, unless we get clarification here, I think I want

5  some additional submission but among, and not in any

6  particular order, my questions are first, it seems like

7  from at least the defendant's perspective, this exchange

8  was done with the advice of counsel that the privilege

9  was being maintained. So the question right out of the

10 box is is that a waiver such that -- I understand the

11 defendant's position is no, there was no -- you know, the

12 privilege is still in place.

13        But assume that the privilege did not exist but

14 counsel thought it did exist between the two, both the

15 counsel in this case, and the Giftly counsel thought it

16 did and the parties, according to the information here,

17 had their conversations with that understanding. Is that

18 a waiver to the extent that the privilege was there and

19 even if it wasn't, did they have any intention of waiving

20 it such that -- I mean I think under those circumstances

21 where they understood it was okay, this is almost like

22 the cases where someone accidentally emails something and

23 they don't mean to let it go. They did what they could

24 to protect it and when there's a problem they re-call it,

25 and that's not a waiver. So that's one question.

8

Proceedings

1          I guess on the defendant's side I would like to
2  get to the more traditional approach to this.  What
3  exactly do you think the comment interest is here
4  responding to the plaintiff's description of, you know,
5  what the interrelationship here is.

6          And then the third point, and this is more of
7  a -- I'm trying to think of the incentive and reasoning
8  behind the privilege.  Honestly, what I find sort of
9  troubling/problematic here is plaintiff's claim is that
10  these communications between the two senior officers of
11  these two companies, the two CEOs, was not privileged
12  because they are not in the same lawsuit together.

13          But what seems difficult to reconcile is that
14  plaintiff had two of the same parties in the lawsuit at
15  the same time.  Plaintiff had the same counsel.
16  Plaintiffs know about both the GiftRocket and the Giftly
17  case.  And you know, presumably, there's nothing in the
18  record to suggest otherwise, the plaintiffs didn't split
19  themselves and say we're never going to think about the
20  other case.

21          So effectively, plaintiff created the situation
22  where plaintiff could easily share information about the
23  cases and in fact, you know, you put out a press release
24  talking about the fact that you were counsel in both
25  cases.  Again, you have the same parties and it seems

9

Proceedings

1  like it's a free-for-all, you could do whatever you want

2  with regard to the information that is being provided in

3  both of the cases.

4          Now, Giftly settled it seems like early early,

5  so this didn't go on for that long.  But it was certainly

6  envisioned that, you know, you'd be wearing both hats and

7  the same parties would be getting information from both

8  sides.  So it seems -- now I'm not exactly sure what

9  theory to apply but I'm not quite sure this is reasonable

10 or fair or the right understanding where there's free

11 flowing information on the plaintiff's side but not on

12 defendant's side when they are the other parties on the

13 other side, just you happened to file it as two separate

14 lawsuits.  I don't know, conceivably this could have been

15 one lawsuit it seems from the description.  And I don't

16 know that much about Giftly, but it seems from your

17 description that this is a kind of a mirror or copycat,

18 however you want to describe it, very, very similar and

19 enough that you could describe it in the press release as

20 being, you know, the defense is consumer interest in this

21 area.

22          So I'm troubled by the fact that plaintiffs

23 are, according to plaintiffs, you -- (indiscernible) not

24 talking about it but it seems like from what you're

25 saying you're freely able to exchange information because

Proceedings

1    it's the same parties and the same lawyers.  And yet

2    somehow the defendants, who are the defendants in their

3    respective lawsuits with you who joined together in your

4    press release are not supposed to be talking and, you

5    know, they're waiving their privilege.  So I'm not sure

6    how that fits in the paradigm but it's troubling.

7              And then I'm going to get back around the -- if

8    you have this information now, great.  But this is part

9    of what I'd like to see in some additional submissions is

10   accepting plaintiff's description of what was going on

11   here, many of the cases have some connection to a

12   particular transaction or set of transactions between the

13   parties that are claiming the common interest privilege,

14   the common defense.  So taking the one case I was talking

15   about, the various alleged infringers, right, they were

16   all in the chain of distribution.

17             So I'm curious if you know about cases where

18   you don't have that contractual relationship between the

19   two parties that are claiming the joint privilege other

20   than obviously there was a historical contractual

21   relationship about having the same lawyers do some work

22   for both parties.  But, you know, that seems a bit old.

23             Anyway, so this is sort of musings on this

24   issue.  So let me hear from defendants.  Any reaction?

25   Or you can think about it and give me a supplemental

11

Proceedings

1   submission and I'll hear from plaintiff and the same

2   thing.

3          MS. O'NEILL:  Thank you, your Honor.  This is

4   Megan O'Neill on behalf of the GiftRocket defendants.

5          Well, I'd like to go to the second and the

6   third areas that you highlighted which is what is the

7   common interest because our view is that the analysis

8   does not need to go further than that under Second

9   Circuit law.

10          So here, the plaintiffs seem to be challenging,

11   and this seems to be the crux of the dispute, whether

12   there is a common interest or not.  And from our

13   perspective, it couldn't be more obvious that there is a

14   common interest.  Most of the cases have to do with a

15   non-litigation posture as your Honor referenced.  And so

16   perhaps there were writings in those cases, but here the

17   law is pretty clear you don't need a writing that

18   actually formalizes the agreement.

19          I personally have been part of many common

20   interest agreements as a class action defense lawyer and

21   it's not uncommon to have copycat suits filed by the same

22   plaintiff's counsel against several different defendants.

23   And it's very important to be able to share strategies in

24   those cases and not have it be a waiver of privilege.

25   And the common interest doctrine has always been the one

12

Proceedings

1    that all the defense counsel rely on in my experience.

2    So the common interest here being not just a similar suit

3    but nearly a copy and pasted lawsuit against two

4    different, you know, like a business model itself being

5    identical.

6             The plaintiffs have pointed to, you know, some

7    small differences in terms of the websites.  But the

8    theory of liability, the claims, the plaintiffs, all of

9    it were the same.

10            So here the common interest was -- you know, I

11   don't know what more in a submission we could actually

12   give the Court without waiving the privilege and that was

13   plaintiffs had pointed to -- they've claimed that my

14   declaration was inadequate but I can't say more without

15   waiving privilege.  I can't say what I talked to Davis

16   Wright and Tremain about other than to say that

17   everything was in furtherance of a common interest and

18   that we agreed there was a common interest and that the

19   privilege applied.

20            And so, you know, this is the tricky part about

21   privilege is there's not a lot you can say about why the

22   privilege applies other than the parameters and

23   boundaries which is what we're trying to do here.

24            But I don't really understand honestly why the

25   plaintiffs are seeking that.  It just seems aside from

13

Proceedings

1   just morbid curiosity what the CEO of each of the
2   defendants were saying to one another, how during the
3   litigation, not sort of ten years earlier, in terms of
4   that there was some allegation of conspiracy, which there
5   isn't, but actually what their comments were about how
6   they were going to defend the lawsuit, to me the
7   relevance of that, it's only relevant if they're talking
8   about the legal strategy which shows that if they're
9   talking about the legal strategy, they are engaged in a
10  common interest conversation.  If they weren't, we
11  wouldn't be alleging privilege over it, and we did
12  produce lots of text messages that didn't have to do with
13  that.  So we limited the scope so that we were very
14  circumspect.  So if it's another conversation, the
15  plaintiffs would already have it.

16          And so I'm a little bit at a loss because to me
17  the common interest seems so clear.  We are both, as your
18  Honor pointed out, like the same counsel is suing us in
19  the same -- with exactly the same words.  And so what
20  responses we are going to do is coordinated in many
21  cases.  Lawyers talk to each other.  Just speaking
22  hypothetically, lawyers speak in the defense of class
23  actions all the time about what strategies to best use
24  and how we think the courts will perceive them and how
25  one judge's reaction could affect another judge's

14

Proceedings

1  reaction.  And all of that is done under the umbrella of

2  privilege under the common interest doctrine.

3          So I think that that's the -- from our

4  perspective, while all of these -- I do appreciate that

5  your Honor is raising a lot of important concerns and

6  fairness considerations, but from our perspective under

7  Second Circuit law, the common interest doctrine very

8  clearly protects these conversations.

9          THE COURT:  Okay.  So maybe what you just

10 repeated in your letter, and I am not seeing what it is

11 that you're saying is the common interest.  Okay?

12 Because it's what you're saying very generally.  Most

13 businesses have an interest in defeating the plaintiff's

14 consumer-related class actions.  I mean that would be a

15 true statement and then get down more specifically to,

16 you know, financials, monetary transfer businesses, you

17 know, kind of including Tremendous and GiftRocket, right?

18         Yes, sure, it's generally the theme.  But you

19 can't be talking all the time because if you're talking

20 all the time, you have an antitrust problem.  It's just

21 not happening because you're competitors, right?

22 Supposedly like two of the bigger competitors in this

23 sphere.  So sure, lawyers can talk generally.  You could

24 go to, you know, in-house counsel conferences, you could

25 go to class action defense conferences and talk.

15

Proceedings

1        But here what supposedly is happening, you
2   know, and obviously everyone has a suspicious mind until
3   they actually see the text, but the information being
4   exchanged between two parties not in the same lawsuit who
5   are competitors but they can be with each other but
6   they're also presumably unhappy about the fact that they
7   have been sued and want to both defeat plaintiff's claims
8   in and of themselves in this case and also I would assume
9   hopefully define in a helpful way the law as it affects
10  your business.
11        Yes, that's generally true but common interest
12  suggest something more specific.  And the cases that
13  you're both citing are much tighter relationships between
14  the parties who are sharing the information.  So again, I
15  think the one that's helpful is the one that was cited
16  with regard to infringement because it wasn't that the
17  parties were identical, you know, more akin to the joint
18  tort (indiscernible) or something like that.  They were
19  in the chain.  They may have had different activities in
20  which they engaged in with regard to the distribution of
21  the allegedly infringing material.  But they still were
22  responding to the same or similar set of facts to the
23  same alleged violations that the plaintiff was describing
24  in the case.
25        And you know, I mean I hear that you're saying

Proceedings

16

1  this like lawyers talk all the time in class actions but

2  like what's the case law that says that that's okay and

3  still privileged.  I'm not saying it doesn't here.  It's

4  not in these letters so I don't even know what is it

5  where this issue has percolated up such that the court

6  weighed in on it.  Or I don't know, it's like analogous

7  because it is not -- you say it over and over in your

8  papers and now that there's a common interest but, you

9  know, the generalized common interest is not a common

10 interest that's sufficient to report a waiver.

11         And you know, as to you both being defendants,

12 you know, your clients being defendants against this

13 party, I would say that's not always, or these parties,

14 it's not always enough.

15         And my third kind of question or musing is

16 about well, you know, is it really fair the plaintiffs

17 have pursued, same plaintiff, same lawyers, same theory

18 against two of the larger competitors in the field and

19 then your folks can't talk?  It may be that that's a

20 reason, you know, it's good for them, it's good for you

21 but I don't know.

22         So anyway, even if you have to painstakingly

23 express this to me, I am not clear what it is that you

24 think the common interest is here other than being able

25 to successfully defend this lawsuit.

17

Proceedings

1     MS. O'NEILL:  Okay, your Honor.  Just so I -- I

2  want to make sure I respond to your question, I want to

3  make sure I understand it.

4          So is it your conclusion based on the case law

5  or otherwise that a joint legal strategy, formulation of

6  a coordinated legal strategy, two identical lawsuits

7  would not constitute a common interest privilege?

8  Because our reading of the case law is that very much

9  does and that it's not a generalized sort of we're both

10  like, you know, two companies and we're facing similar

11  issues.

12          And my reading of the case law is that those

13  are the cases where people tried to say hey, we just

14  though someday we might get sued and we were talking

15  about what might happen.  We've actually both been sued

16  at that same time on the same day and we're having

17  conversations about what our lawyers are saying to do.  I

18  don't see how that couldn't be a common interest because

19  we're sharing legal strategy about how to proceed in

20  identical lawsuits.  If that isn't a common interest, I

21  truly don't know what is.  It seems that the doctrine

22  doesn't even exist.

23          THE COURT:  Okay.  I mean this is not what the

24  cases that are cited in these letters are, or letter, is

25  about.  There's many more examples of either being in the

18

Proceedings

1  same lawsuit, being contractually connected by your

2  relationships, again going back to the infringers and the

3  chain of distribution, or there's some other corporate

4  relationship among the parties.

5          So I mean is there a particular case that you

6  think is helpful in the submission that describes the

7  common interest privilege in the way that you're

8  describing it?

9          MS. O'NEILL:  Yes.  So we're happy to submit

10  something additional specifically focusing on the

11  question that your Honor has.  I think we may need to go

12  beyond the Second Circuit to all federal court precedent

13  because honestly this does not come up very often, this

14  doesn't get challenged very often.  Most of the time

15  these sorts of post litigation conversations are

16  understood to be privileged.  The parties don't -- I

17  don't usually have plaintiffs trying to get this

18  information knowing that it's about the litigation.

19  They're actually looking for information that's relevant

20  to the claims of the case.  What you say about being sued

21  in litigation to me is not relevant at all in the first

22  place.  But to the extent --

23          THE COURT:  That's a different argument.  I

24  mean you might be right --

25          MS. O'NEILL:  Yeah.  No, but I did --

19

Proceedings

1          THE COURT:  But it's different.

2          MS. O'NEILL:  I mean I did raise that.  And we

3     don't understand what the relevance of this is to begin

4     with other than to try to vitiate the privilege and get

5     access to my mental impressions and what I shared with my

6     client that he then shared which is the -- you know, to

7     me the only reason we're doing this is to make sure that

8     this sacrosanct privilege of work product, which is what

9     I share with my client, that then he, and what his

10    lawyers shared with him, and that that strategy does not

11    come out.

12          I don't see how the plaintiffs have any

13    entitlement to know that anyway, what my strategy was in

14    defending the case.  I see no relevance.  But to the

15    extent the Court does not agree with us on that, and I'm

16    just trying to prevent further briefing because I don't

17    think that there's any their there.  But again, we have

18    to do this because we need to prevent, you know, any sort

19    of waiver of work product or attorney-client privilege.

20          So relative to that, we're happy to put in more

21    briefing.  But I would say that just at a high level this

22    statement -- the reason that they're -- we didn't see

23    cases ever having someone assert this and having it not

24    be upheld.

25          So from that standpoint, I think it's on the

20

Proceedings

1   plaintiffs to say when people were sued under identical

2   lawsuits and their attorneys talked and said that there

3   was in fact an agreement and the parties spoke, still no

4   privilege existed because those parties didn't have a

5   common interest.

6           So what they cited are cases that say just

7   saying I want to prevail in litigation isn't enough, but

8   those weren't cases where they were sued in identical

9   lawsuits at the same time by the same parties on the same

10  thing.  So it's very different.

11          But we are happy to put in more things about

12  what constitutes a common interest because we think if

13  anything this does.

14          THE COURT:  All right.  What about the advice

15  of counsel question?  Your client shared the information

16  with the belief, based on their communications with their

17  attorney, that they were sharing it confidentially.  Even

18  if one were to say it was wrong given that they -- and

19  I'm not saying it is, I'm just trying to understand --

20  given that that was the understanding (indiscernible)

21  their attorney's insights, then did they waive the

22  privilege in those communications?  It's hypothetically.

23  The confidentiality I guess.

24          MS. O'NEILL:  Yeah.

25          THE COURT:  It's a little circular but --

21

Proceedings

1        MS. O'NEILL:  Yeah, it's a tough one.  Yeah.
2   It's a tough one to answer.  I mean there's clearly no
3   knowing waiver of privilege and I think that's what your
4   Honor is getting at and the law certainly protects
5   innocent waiver, as you noted with clawbacks and that
6   sort of thing.  So to the extent you can analogize that
7   certainly there should be no waiver that would prejudice
8   the holder of the privilege which is GiftRocket in this
9   case because there was no knowing waiver.  Yeah.
10       THE COURT:  And what about the idea that there
11  should be some balance here given that plaintiff, one
12  could argue the plaintiff structured this case in a way
13  to set it up so that they enjoy the benefits of being
14  able to share information but separated you two into two
15  different lawsuits even though they appear to be -- I
16  don't know if it's a copycat lawsuit when it's done by
17  the same person, you know, the same entity, but a mirror
18  lawsuit.  Does that affect the analysis here?
19       MS. O'NEILL:  Yeah.  Well, I certainly think
20  your Honor has broad discretion to deny a motion seeking
21  to obtain privileged material or, you know, I should say
22  material over which privilege has been asserted.  Your
23  Honor has many grounds on which you can deny such a
24  motion, one which is that in the scenario you're not
25  going to consider the privilege, you're considering

Proceedings

1  something else which is under a proportionality analysis,

2  under relevance, under the equities, all of the above

3  that in this scenario the plaintiff is seeking to gain

4  access to comments regarding litigation strategy and

5  that's not information that's discoverable.

6          THE COURT:  All right.  And just to circle back

7  to the point that you wanted to make that you think it's

8  not relevant, you want to just expand on that?  Yes, I

9  think our all understanding is hard without making

10  particular reference to certain texts, but still like --

11  I mean anything about the timing of this or how it

12  happened or limited number of parties to the

13  communications that, you know, I should take into

14  account?

15          MS. O'NEILL:  Sure.  So as I mentioned, we were

16  very -- we did produce many pages of text messages

17  between these two people at these tech startups.  These

18  are not major corporations, just to reiterate that.  So

19  at this company, we produced many pages of text messages

20  between the two and we only redacted a few of them

21  because they specifically referenced something covered by

22  the common interest doctrine meaning comments that

23  pertain to litigation strategies or thoughts shared by

24  their lawyers.

25          And there's no relevance to the claims in the

23

Proceedings

1   case.  What the case is about is how the plaintiffs were

2   purportedly injured by the business model or the website

3   for various things related to that comment that an

4   attorney who is representing the party would make about

5   how to defeat the lawsuit is not relevant to the claims

6   in the case.

7              THE COURT:  All right.  For plaintiff's side,

8   your thoughts?

9              MR. JANOVE:  So your Honor, I think you brought

10  up some interesting questions that would benefit from

11  some supplemental briefing.  So I would propose that we

12  could address this with some supplemental briefing.

13             It might also be held by some of the recent

14  deposition testimony and documents that we've discussed

15  with deponents regarding the relationship with Giftly and

16  GiftRocket that not only would touch on the existence or

17  lack thereof of a common interest privilege but touch on

18  to why these communications are relevant for this case.

19             So it's a long way of me saying I think

20  supplemental briefing is appropriate here.

21             THE COURT:  Do you think it should be

22  sequential or at the same time?

23             MR. JANOVE:  I think it might make sense that

24  we have a joint submission that addresses the three

25  questions you posed today.

24

Proceedings

1          MS. O'NEILL:  Your Honor, our preference would

2    be sequential just to make it a little bit simpler in

3    terms of the modifications.  We tend to have a lot of

4    back and forth each time someone replies to the other.

5    Actually, sequential briefing would be our strong

6    preference.

7          THE COURT:  All right.  We can do it at the

8    same time, not a joint letter, two separate letters.  If

9    I need a response to what the other side said, we'll let

10   you know.  But for now I just want to hear your thoughts

11   about issues that we raised on the plaintiff's side.  You

12   know, I don't really want to know about all of the facts

13   that you think are super important, but goes to this

14   relevance point because I think the key issue here is a

15   two-part question.  Is it privileged?  (Indiscernible)

16   privileged and is there any waiver?  Or if there was a

17   waiver, you know, was it not knowing and so it shouldn't

18   be -- at least to the confidentiality, it's not just

19   privileged given the possible scenarios.  There were

20   essentially given incorrect advice.  Maybe that is what

21   happened and maybe it isn't.  But you know, that's the

22   one scenario that one could see here.

23          All right.  So today is the 4th but obviously

24   late in the day here in New York.  So what are you --

25   what would you like to do in terms of submitting a

25

Proceedings

1  supplemental letter, each of you?

2          MR. JANOVE:  Would Friday the 13th work

3  (inaudible)?

4          THE COURT:  Good luck or bad luck?  Does that

5  work for the --

6          MS. O'NEILL:  I was going to suggest Tuesday of

7  next week.

8          THE COURT:  It's really on the plaintiff's

9  side.  So you're talking about the 10th and plaintiff,

10 you want the 13th?

11         MR. JANOVE:  Correct.

12         THE COURT:  All right.  Let's do the 13th.

13         MS. O'NEILL:  Your Honor, if we're going to do

14 the 13th, can we do the 17th?  Our entire team is flying

15 to Los Angeles for training and they'll be out of pocket

16 Wednesday through Friday of next week, so --

17         THE COURT:  Yes.

18         MS. O'NEILL:  -- we won't be able to do any

19 work.  That would be great.  Thank you.

20         THE COURT:  All right.

21         MS. O'NEILL:  I think that's a Tuesday, or

22 whatever the Tuesday is.

23         THE COURT:  Tuesday is the 17th.

24         MS. O'NEILL:  Perfect.  Thank you so much.

25         THE COURT:  Okay.  I'm doing this the old

26

Proceedings

1  fashioned way, I'm looking at the paper.

2          Oh, okay.  So from your status letter, I have a

3  couple of follow-up questions.

4          MS. O'NEILL:  Your Honor, I'm sorry, I forgot

5  to ask what would the page limit be for that because I

6  think that would be helpful to know.

7          THE COURT:  What do you all think you need?  I

8  mean I'd like you to be focused on the case law.

9          MS. O'NEILL:  Short and sweet.  Short and

10  sweet.  Three or four pages max?

11          THE COURT:  Yes, I think that would work.  So

12  let's do -- you're going to do four pages.  Okay.  All

13  right.  So that's for the 17th.

14          All right.  Looking at your letter of the 2nd

15  which is on the docket at 215, so you have this dispute

16  about the Florida subpoena.  Do you have any update on

17  what's going on?  This is for the South State Bank in the

18  Middle District of Florida.

19          MS. KRAMER:  So your Honor, this is attorney

20  Katherine Kramer from DTO for the GiftRocket defendants.

21          The case is still pending.  The plaintiff filed

22  a motion to transfer.  We filed a motion to quash.  I

23  expect that South State Bank is also going to file a

24  motion to quash in opposition to the motion to transfer

25  and then it's just pending with the judge in Florida.

27

Proceedings

1      THE COURT:  Okay.  All right.  And then there's

2 this back and forth about the Philadelphia Pennsylvania

3 deposition.  So with regard to the non-party witnesses,

4 do they have some association with the business?  Did

5 they want to do the deposition by Zoom?  Or what is it

6 that they're looking for?

7      MR. JANOVE:  Your Honor, we had -- the

8 depositions were noticed for all three witnesses on the

9 same day so we were coordinating all three witnesses just

10 to do it at a convenient location for them which was the

11 same location as the WeCare 30(b)(6).  So we were

12 scheduling those all three for the same day.  We wanted

13 to do it at that same location.  If they want to split it

14 up just to let us move on from this, we can have those

15 two witnesses, you know, appear remotely, the non-

16 witnesses, and then on a separate date Danny Buchnik can

17 come to Philadelphia just to help us move on from it.

18      I've been trying to coordinate it as it was

19 noticed for all three people on the same day.  That made

20 it a little more complicated.

21      THE COURT:  (Inaudible) --

22      MS. O'NEILL:  Your Honor, this is --

23      THE COURT:  Hang on one minute.

24      MS. O'NEILL:  Sorry, your Honor.

25      THE COURT:  I get the fact that the lawyers

28

Proceedings

1    have certain preferences.  What is it that the non-party

2    witnesses want to the extent that you know?

3            MR. JANOVE:  The non-party witnesses want to be

4    deposed at a convenient location, right next door to Cafe

5    Ole or via Zoom.

6            THE COURT:  All right.  Defendant's counsel?

7            MS. O'NEILL:  Thank you, your Honor.  So we had

8    proposed doing them all in one day to minimize a burden

9    on the witnesses rather than -- we've had several -- most

10   of our witnesses, four at this point, have been

11   no-parties and they've all gone seven full hours on the

12   record.  We were looking to minimize and just do a couple

13   of hours.  But we do want to take them in person.  And

14   there are various reasons that one of those people we

15   would like to do in person.  But those two have been

16   subpoenaed in the Eastern District of Pennsylvania that

17   we were planning on, you know, moving in that district

18   for compliance since the plaintiff has stated they won't

19   appear for the depositions.

20           You know, we did propose remote depositions for

21   all witnesses after the plaintiff raised this issue and

22   the plaintiff said no just for these and not for two

23   other witnesses that they could choose, you know, remote

24   or in person which is how it typically works and we were

25   fine with that.  But it can't be a different set of rules

29

Proceedings

1  for defense witnesses and a different set of rules for

2  plaintiff's witnesses which is the concern here because

3  that does seem to be the position that plaintiffs are

4  taking.

5           So yeah, so while this -- it's a bit misleading

6  to say the location as the WeCare deposition.  I was not

7  able to travel to take that deposition in person so we

8  took it remotely so the plaintiff was in his own office

9  for that.  That was not the location of the deposition.

10 I took it virtually.

11          So you know, the plaintiffs, we actually had

12 moved the location from the Eastern District of New York

13 down to Philadelphia to be within the geographic area

14 where all of the witnesses reside and said look, we'll

15 just take it for a couple of hours.

16          If we do end up having to split them up this

17 way, you know, they probably won't be all on the same

18 day.  That was all part of our proposed compromise.

19          But again, our paramount concern is that one of

20 those witnesses, for reasons that I prefer not to get

21 into because I think we should just be able to rely on

22 the Federal Rules of Civil Procedure and also we're happy

23 to bring this before the Eastern District of

24 Pennsylvania, but there is a particular non-party witness

25 that we have concerns about being in the location that

30

Proceedings

1  the plaintiffs are insisting the deposition be taken for

2  various reasons.  So that's why we'd like to take it on

3  mutual turf and that's why I said, you know, a law office

4  that is not far at all from where the plaintiffs reside.

5  Sorry, the plaintiff.  The only one that's before your

6  Honor.  Sorry, the plaintiff.  I want to be clear.

7  There's affiliated witnesses and then there's the actual,

8  one of the actual plaintiffs.

9           THE COURT:  Okay.  So Danny Buchnik is the

10 party witness?

11          MS. O'NEILL:  Yes.  And that's the one that's

12 before you, your Honor.

13          THE COURT:  Okay.  The problem --

14          MS. O'NEILL:  Or will be before you.

15          THE COURT:  The problem with all this dancing

16 around is, you know, you want to do this in Philadelphia,

17 which is fine, although maybe the judge will kick it

18 here.  You run the risk of running out of time for all

19 the procedural maneuvering with your hoped-for witness.

20 So it might make sense for you all to come to an

21 agreement about it.

22          Okay.  So focusing on Danny Buchnik who you're

23 supposed to do this on Friday?  Is that right?  This is

24 December 6th?

25          MS. O'NEILL:  It is set for December 6th, yes.

31

Proceedings

1     THE COURT:  And on plaintiff's side, what do
2  you want to do with him?

3     MR. JANOVE:  So first --

4     THE COURT:  I mean we're getting into all of
5  this, you know, extended motion practice in Pennsylvania,
6  then his deposition is just going to go forward.  So
7  where do you want to do his deposition?

8     MR. JANOVE:  So my proposal was just so we can
9  move on they can take Danny in person as a party witness
10  and the other two witnesses remotely for their
11  convenience.  But we -- so we can do Mr. Buchnik in
12  Philadelphia if that's what the defendants prefer.  It
13  just can't be the same day as the non-party witnesses.

14     But I did speak to Mr. Buchnik.  He has had
15  something that came up with work.  December 6th doesn't
16  work.  But he can come to Philadelphia on December 10th
17  in the afternoon at 3 p.m.

18     THE COURT:  All right.  It's a set of dominoes
19  here.  All right.  Now you want to do him on the 10th and
20  you're agreeing to do it in person with the noticed
21  location.  Was the purpose of him being an afternoon
22  witness was because you were going to be doing multiple
23  depositions?  So going back to defendant's counsel, I
24  guess can you do the 10th?  Do you still envision him as
25  being an afternoon witness?  What's the situation?

32

Proceedings

 1          MS. O'NEILL:  No, unfortunately for the reasons

 2  I mentioned earlier, we're --

 3          THE COURT:  Training?

 4          MS. O'NEILL:  Our lawyers, yeah.  They're

 5  flying to the west coast on the 10th.  So that's why we

 6  had all of these depositions going through the 9th

 7  instead.  Perhaps the ninth would work, but the 10th

 8  won't.

 9          THE COURT:  All right.  Do you know what his

10  story is?

11          MR. JANOVE:  I can see if the 9th works but --

12  I'll check with him if the 9th works.  But I mean I was

13  hoping that I could offer the 3 p.m. in Philadelphia, you

14  know, meet me halfway and just do the non-party witnesses

15  remotely on a different date.

16          MS. O'NEILL:  We can do the 9th and the second

17  part, we can do the 9th and we would start in the morning

18  because we're not going to stack all three in the same

19  day then and we can just have a normal deposition time.

20          MR. JANOVE:  All right.  Well, not sure if he's

21  available in the morning.

22          THE COURT:  All right.  Why don't you check

23  with him?  All right.  What we're leaving off here is

24  with regards to this witness, the first choice for your

25  mutual availability is sometime again in the hierarchy of

33

Proceedings

1    the morning better than the afternoon on the 9th.  And if

2    he's not available that day, then get other dates for the

3    week of the 16th.  I guess for the rest of the month.

4    And then you all should coordinate when you can do it.

5    And travel is not -- I get the training.  You know,

6    people are going to be doing other things.  But their

7    availability to travel is not enough of a reason not to

8    go ahead with the deposition.  Somebody will have to do

9    it.  I hope you can come to an agreement as to doing

10   this.  You know again, Zoom being -- you know, if there's

11   not a date for doing it in person then do it remotely.

12   But any which way, you need to do it by the end of the

13   year.

14            MS. O'NEILL:  Thank you, your Honor.  We do

15   have --

16            THE COURT:  All right.  And that --

17            MS. O'NEILL:  Your Honor, we do --

18            THE COURT:  Go ahead.

19            MS. O'NEILL:  I was just going to say we do

20   have lots of other days that we could do.  I mean we

21   picked the 6th because that's the day they gave us.  And

22   I would just reiterate that if our witnesses, meaning the

23   defense witnesses, must appear in person, I would ask the

24   Court to make clear that it cannot be the case that

25   plaintiffs insist on remote depositions but refuse to

34

Proceedings

1   take them of our witnesses.

2          THE COURT:  All right.  I'm not --

3          MS. O'NEILL:  It's just out of the spirit of

4   fairness.  It's just not fair, your Honor.

5          THE COURT:  It's not, it's not.  That's not how

6   this is going to work.  You know, the parties and the

7   non-parties are different.  There are different

8   considerations for different witnesses.  And you know,

9   you basically have about two months to wrap up this case.

10  So whatever it takes to move it forward is what you need

11  to do.  This is why I was --

12         MS. O'NEILL:  No.  Thank you.

13         THE COURT:  I'm not going to address the non-

14  party witnesses.  It would --

15         MS. O'NEILL:  Oh, I'm not asking you to, your

16  Honor.  I'm sorry if that's what you thought I was

17  saying.  What I was saying is that plaintiff's counsel

18  just said if we had --

19         THE COURT:  I got it, I got it.

20         MS. O'NEILL:  This is a plaintiff's witness.

21  This is a party witness.  That's all we're talking about,

22  your Honor.

23         THE COURT:  I heard you.  I'm telling you I'm

24  not adopting the blanket rule that you're saying.  And

25  I'm also telling you all that you really need to work out

35

Proceedings

1   the dates for these witnesses.  And if you get into

2   motion practice over this in Pennsylvania, then maybe

3   it'll move quickly.  Obviously Florida is taking a while.

4   And it's not going to be a reason to extend the discovery

5   schedule.  So you know, work it out.

6            One thing I do want to raise, there is a

7   footnote going to, what is it, the sale of the cafe?  Do

8   I have this right?  And the suggestion that there's a

9   conflict between the parties, a live issue, what's the

10  situation?  It's footnote 1.  That's a letter --

11           MS. O'NEILL:  Yes.

12           THE COURT:  -- at 215, so it's on page 3.

13           MS. O'NEILL:  Yes, your Honor, that's our

14  footnote for GiftRocket.  Yeah, so this will lead to the

15  issue regarding Anna, the non-party witness.  But this is

16  a person who purchased the -- WeCare is one of the

17  plaintiffs.  They own Cafe Ole.  They're one of the

18  parties that's got claims here against GiftRocket.  Cafe

19  Ole was purchased by Anna during -- very recently, a few

20  months ago.

21           And there is a dispute about whether the sale

22  agreement would have included the claims present in this

23  litigation.  And we're not really sure what to do because

24  it's a fairly novel issue to have a conflict related to a

25  third party so but just feel very uncomfortable taking

36

Proceedings

1  the deposition of someone about the transaction where

2  they're being defended by the lawyer who represents the

3  person on the other side when the transaction is actually

4  what's at issue and what's covered.

5          So raising that for the Court but not really

6  sure what to do about it because we raised it with

7  plaintiff's counsel.  We don't think it's a potential

8  conflict.  We think it's a very clear conflict of

9  interest but we're not really sure what to do about it.

10  That's why it's in the footnote.

11          THE COURT:  Let's start with what the parties,

12  or the party, non-party thinks about this.  I mean is

13  there any view that the plaintiff's counsel is aware of

14  that (indiscernible) documents is -- or the parties are

15  unclear, the parties to the sale transaction are unclear

16  as to what they bought and sold?

17          MR. JANOVE:  No, your Honor.  As

18  (indiscernible) testified as a 30(b)(1) and 30(b)(6)

19  witness, he did not sell his claims in this lawsuit to

20  Anna.  Anna did not purchase the claims in this lawsuit.

21  As you know, I think becoming a named plaintiff in any

22  sort of class action is not something that people take

23  lightly.  Also, she's just a barrister at the cafe who

24  saved some money with her sister to buy it.  She wasn't

25  getting involved in litigation.  So there is no conflict.

Proceedings

1    She can just testify to the same if we agree on the

2    location for that testimony to occur.  May I also note

3    that --

4              THE COURT:  Just to back up to what you see the

5    lawsuit as being for you.  Is there an end period for the

6    class at this point or no?

7              MR. JANOVE:  Well, so there's certainly a body

8    of case law that's developed about what happens when a

9    class representative individual claim for injunctive

10   relief becomes moot and whether --

11             THE COURT:  Right.

12             MR. JANOVE:  -- they still have standing to

13   seek classwide injunctive relief.  The law has become

14   generally clear that the standing to seek classwide

15   relief, injunctive relief, is measured to the time of

16   filing the complaint.

17             So maybe that WeCare, since it sold its cafe,

18   no longer has an individual claim for injunctive relief,

19   it still has standing to bring a claim for injunctive

20   relief on behalf of the class.

21             THE COURT:  All right.  I'm not going to try to

22   resolve this one now but I guess like the other side of

23   that question, okay, it doesn't have -- assume for the

24   sake of this discussion that plaintiff's claims were

25   going to be successful.  From the date of sale forward,

38

Proceedings

1   wouldn't the cafe, as owned by the purchaser, be the

2   beneficiary of whatever relief there would be for the

3   period of time of the ownership?  So in your, you know,

4   in your wildest dreams, right, I know you're like fine

5   tuning this, but you know, you think there would be some

6   damages that could flow from this and then there could be

7   injunctive  -- this meaning the lawsuit -- and then there

8   could be injunctive relief and that would be split I

9   suppose between the different periods of ownership,

10  right?

11          So while they didn't, I think what you're

12  saying, they didn't sell the claims up through the date

13  of sale, they also didn't retain them as they might, I

14  mean I'm not agreeing with any of this, but as they

15  might be still accruing from the date of sale, you know,

16  to the present and into the future depending on how long

17  this all takes.  Right?

18          I mean there's no retaining some interest.  I

19  read the sale.  I mean they didn't retain any interest in

20  future damages or future claims, right?

21          MR. JANOVE:  Do you mean WeCare having

22  additional claims that might accrue post April 20 --

23          THE COURT:  Yes.  '24, yes.

24          MR. JANOVE:  Yeah, 2024.  Yeah.  No.  And

25  WeCare had been de-listed from GiftRocket's website

39

Proceedings

1   shortly after this lawsuit was filed.

2           THE COURT:  Okay.  So you think there may not

3   actually be any problem, any ongoing problem.  Okay.

4           All right.  Look, in terms of this deposition,

5   the fact that the defendants envision that there's a

6   conflict with the plaintiff and the other parties don't

7   believe there's a conflict and they have a mutual

8   understanding of the significance of their agreement,

9   then there is not a conflict at this point.  If it

10  becomes a life issue that the interpretation of the

11  agreement should be different from what the parties

12  think, then maybe there would be a problem.  But I don't

13  see this as an issue to slow down the work or compromise

14  the representation of either of these folks.  Okay.

15          MS. O'NEILL:  Your Honor?  Your Honor, if I can

16  just take 20 seconds on that which is we're not

17  questioning in any way what the plaintiff's

18  interpretation of the agreement was or what Anna, the new

19  purchaser.  Our only point is that if there's a sale

20  agreement and the question for the lawyer is does this

21  entitle me to recovery in a lawsuit, the person who has

22  to answer that is your lawyer who's interpreting the

23  legal impact of that contract.  And if the lawyer

24  represents both sides, then they cannot give advice that

25  would not be subject to a conflict of interest because if

40

Proceedings

1  they said here, you get a claim under it or you don't get
2  a claim under it because as you said you saw the bill and
3  it says all assets tangible and intangible including
4  goodwill which the plaintiff in the complaint say they're
5  seeking.

6          So for all of those -- those are the reasons we
7  raise it.  I just wanted to make clear we felt like we
8  had to raise it and as officers of the court, it's
9  uncomfortable to take a deposition of someone under those
10 circumstances.  But we don't need to discuss it further
11 but we just wanted that on the record.

12         THE COURT:  All right.  But to take the
13 plaintiff's point, obviously your client is taking the
14 position there are no valid claims here but given the de-
15 listing, is there any possibility that there are accruing
16 claims for the cafe?

17         MS. O'NEILL:  The fact -- I agree that the cafe
18 has never had standing from the very beginning because as
19 the plaintiff, WeCare testified they don't believe anyone
20 ever saw them, there's no basis to think saw them on the
21 website.  So agreed as to all of that.  There were no
22 damages at any point in time.  But the plaintiff is in
23 fact seeking damages.

24         So what if in the hypothetical world that there
25 was a settlement, for example, related to Cafe Ole's

41

Proceedings

1    supposed damage?  Who would those funds go to?  Would it

2    be the prior owner or the person who purchased all the

3    assets in Cafe Ole?  I certainly know what my legal

4    opinion would be.  So that's where this came up.

5            THE COURT:  Okay.  Let's just circle back to

6    the question that I asked plaintiff's counsel which is to

7    his knowledge, and having listened to the issue with the

8    two of them, do they have any disagreements as to their

9    understanding of the sale of the assets and what that

10   entails?  That would encompass any benefit from a lawsuit

11   which based on the facts here seems to be time bound

12   anyway, but this is an issue in many a case but according

13   to plaintiff's counsel is representing that these two

14   parties do not have a disagreement.  They do not have a

15   live conflict.  If something changes in their view, then

16   maybe they would but they don't have it now.

17           All right.  Let's talk about the schedule.  We

18   have the letter from Sunrise who I guess is the most

19   sympathetic in terms of the timeline here related to this

20   excitement.

21           I think it seems to me there's more work to be

22   done than necessarily what's described in this letter but

23   given the work that you have to do, so we just added the

24   briefing.  You have the agreed upon production of the

25   results of the search and some other dates from earlier

Transcriptions Plus II, Inc.

42

Proceedings

1    today.  You have identifying a 30(b)(6) deponent for

2    deposition.  This will happen in January.  That's by the

3    23rd of December.

4            Producing documents about plaintiff's financial

5    and business structure, that's the same date.

6            Producing documents about Tremendous from

7    defendant, that's also by the 23rd.

8            And then letting me know that you have firmed

9    up your 30(b)(6) depositions by January 3rd.

10           And then the damages supplement is I think --

11   really it should require some significant thinking on the

12   plaintiff's part.  That's also by January 3rd.

13           So you know, the Florida matter up in the air.

14   If you turn the Pennsylvania issue into something, that's

15   also up in the air.  And to the extent you're doing any

16   other depositions which I'll ask you about in a second, I

17   think you have an awful lot of work to do in the next

18   part of the year.

19           So taking into account the Sunrise concern plus

20   the work that you all need to be doing, I think extending

21   this to mid-February is the outside of reasonableness

22   given the age of the case.  So I'm going to say all of

23   this discovery needs to wrap up by Valentines Day.

24           Okay.  Do you anticipate any other disputes

25   about depositions?  I mean have you been -- outside of

43

Proceedings

1    the 30(b)(6), the fact witnesses.

2              MR. JANOVE:  Speaking for plaintiffs, we don't

3    anticipate -- we have 30(b)(6)'s for the GiftRocket

4    defendants, a 30(b)(6) for Sunrise, and a couple of other

5    fact witnesses that should all be done in January.

6              THE COURT:  All right.  How about for --

7              MR. RASHID:  Your Honor, this is --

8              THE COURT:  Sorry.  Go ahead.

9              MR. RASHID:  I apologize.  I didn't mean to

10   speak over you.  This is Faris Rashid for Sunrise, and we

11   also do not anticipate any disputes related to

12   depositions.

13             THE COURT:  Defendant?

14             MS. KRAMER:  Your Honor, this is Katherine

15   Kramer of DTO for the GiftRocket defendants.  I had a

16   question about the Court's order on the 30(b)(6) topic

17   and we appreciate it, it seemed like the Court took a

18   very close look at everything.  I wanted clarification of

19   whether the limitation applies to all three of the

20   corporate defendants or if the Court had in mind some

21   distinctions between the GiftRocket LLC and then, for

22   example, the Tremendous Parent, which is really just a

23   holding company that's been in existence for a year and a

24   half.  If the limitations of topic were intended to be

25   consistent across the board between those three or if the

44

Proceedings

1   Court was thinking perhaps we would just have fewer than

2   three 30(b)(6) depositions?

3            THE COURT:  I think I'm immediately going to

4   put that back to you.  I mean I have no idea what it's

5   going to take in terms of the number of witnesses or who

6   the witnesses are.  Right?  I mean if you talk about

7   broad categories, you have the technology folks, the

8   finance people, the strategy people, the history of these

9   transactions, and maybe -- you know, I don't know where

10  the restructuring falls in all that.

11           So I don't know if I'm answering your question.

12  What I don't know is for all three companies, you know,

13  taking your point that the parent is now the relatively

14  recent, in this current structure is relatively recent

15  invention, and at least from the descriptions you

16  provided, that's not where the tech people are housed,

17  right?  The ones who are figuring out how to use

18  (indiscernible).  Whether it's still happening or not,

19  that's a different question.  But for example, there's an

20  AI question, there's a Yelp question, there was a web

21  design question.  I don't know if it's the same person

22  for these different entities or not.

23           So there's no one who knows.  The information,

24  is the information the same across the entities?  I don't

25  know that all of the questions are relevant to all the

45

Proceedings

1  entities given what you have described in your various

2  papers of what it is that they do.

3           Maybe for me to understand your question you

4  can give me an example of what you're concerned about in

5  terms of across the entities.

6           MS. KRAMER:  Sure.  I think the concern is the

7  plaintiffs served three identical sets of topics on three

8  different entities and it doesn't really make sense to me

9  that all three entities would then provide witnesses to

10  testify on the same things.  But it may be that, you

11  know, we can look everything over and we have a meet and

12  confer that's now been scheduled with the plaintiffs for

13  next week.  So maybe we can take the order, the Court's

14  guidance into account and talk this over with the

15  plaintiffs.

16           We've also now finished the fact witness

17  depositions for essentially everybody at the company that

18  has knowledge.  So there's been a good opportunity for

19  the plaintiffs to learn the facts.  So we'll I think

20  perhaps just have some conversations with them.  If the

21  Court doesn't have further guidance on this issue, it may

22  be that we just need to talk amongst the parties and

23  figure out a reasonable approach that doesn't overburden

24  the witnesses and you know, what we're trying to avoid is

25  just duplicative preparation and discovery because that

46

Proceedings

1    seems --

2            THE COURT:  Okay.  So maybe --

3            MS. KRAMER:  That doesn't make sense to me.

4            THE COURT:  Let me tell you as far as I went,

5    and if this means that, you know, even if you don't work

6    it out you have another question -- what I looked at were

7    the demands that were made and thought about it in

8    connection with the overall lawsuit and whether it was a

9    reasonable balance of what the issues are that are

10   important and central to the case.  And then there are

11   others that are more peripheral, may be relevant, but

12   also seemed burdensome.  And so, you know, they were

13   peripheral and burdensome.  You know, they fell on the

14   no, you don't have to do this.  But the objections were

15   pretty much blanket objections to various facets of these

16   questions.

17           And so what I did not try to parse, and if it

18   turns out that this is relevant, is -- I'm going to say

19   two things.  I did not try to parse if the place where a

20   particular topic is most appropriately or even relevantly

21   addressed and it's not addressed in another entity, it

22   wasn't addressing that the other entity should come up

23   with a witness.

24           So let me just give you an example.  I'll go

25   back to what I was trying to use as a description or give

47

Proceedings

1    a description of.  But take the web design.  That would

2    seem like something for this case that is primarily

3    something relevant to GiftRocket.  Maybe Tremendous, the

4    parent company, the holding company, has some information

5    about that but not necessarily.  And Tremendous is doing

6    the monetary transfers, you know, the sort of separated

7    entity.  You know, that seems like it's a really

8    different set of questions how they are doing their

9    website and is it relevant.

10           Now, maybe you're using the same tech company,

11   tech people, tech supervisors and somebody could be

12   providing information across the cases, you know, how the

13   tech department is run.  Maybe because these companies

14   started together, maybe there is a legacy computer system

15   that is relevant to understanding how, just by way of

16   example, you know, the Yelp, culling of the Yelp

17   information was happening.  But I'm not trying to create

18   a false basis for exploring information that is not

19   relevant, is not housed in the particular company and

20   really is not relevant to this.

21           And the reason I say all of that is because it

22   is possible, right, in the 30(b)(6) land to have somebody

23   be the representative of the company, learn the

24   information, and then testify and that would satisfy the

25   30(b)(6), you know, requirement.  If you decide that's

48

Proceedings

1   how you want to proceed, that's one thing, but I am not

2   suggesting that that be imposed so you have three

3   duplicate depositions that really the information is only

4   relevant to one company (indiscernible) and one company

5   and there's a witness that is the person who really knows

6   what that is.

7           So I think, you know, the motion practice

8   didn't try to parse out the different companies, but if

9   that's something that you all can't come to an agreement

10  about, then you should raise that.  Not trying to create

11  essentially made up witnesses here.  It just wasn't part

12  of what you -- this is basically a bifurcation.  Yes,

13  relevant and not so burdensome that it shouldn't be

14  produced or not relevant or too burdensome, doesn't need

15  to be produced.

16          So you know, that's as far as this went.  If

17  there's another level of analysis that you think would be

18  appropriate and needs to be factored in, then I think,

19  you know, to the extent you can't come to an agreement

20  about the witnesses you should raise that hopefully

21  quickly which is part of the point of having the

22  witnesses identified and the schedule set.  And you know

23  who's being produced for what reason and for what

24  understanding.

25          And you know, I will just pick up on one thing

49

Proceedings

1  you said which was referenced by way of a case that Judge

2  Pollak had.  Since there's already been deposition

3  testimony that can be adopted by mutual agreement and

4  obviates the need for a particular examination, that

5  could help you really move through this.  You have had

6  high level people already deposed so you may have the

7  best information that's available.

8          So the short answer to your question is I

9  didn't think that through and didn't see it in the

10 papers.  If I missed it, you can raise it.  If you missed

11 it or at least didn't anticipate it and you want to raise

12 it, that's fine.  This is definitely not an exercise in

13 creating more work.

14         MS. KRAMER:  Understood, your Honor.

15         THE COURT:  Any thoughts?

16         MS. KRAMER:  No, I appreciate that very much

17 and I think that the Court certainly took on analyzing

18 these issues beyond what the parties had asked for at

19 this point in time but I think what we were anticipating.

20 So it's very helpful to have that guidance.

21         It sounds to me like what your Honor had in

22 mind was that you were trying to narrow it down to

23 relevant topics with the idea that then the parties would

24 try to divvy those topics up among the most relevant

25 entities.  So it's not that those topics would then be

50

Proceedings

1    topics for each of the three entities but essentially

2    what your Honor is trying to do is narrow it down and say

3    hey, these are the relevant issues, now go take these and

4    figure out should it be GiftRocket, should it be

5    Tremendous, should it be Tremendous Parent.  Is that what

6    your Honor had in mind?

7              THE COURT:  Yes, except to the extent that

8    information that's housed, for example, in GiftRocket,

9    you know, might be, you know, you need to work out

10   whether that was binding for Tremendous, something like

11   that.  But yes, I want you to do it efficiently.  And

12   again, that's the point of trying to get the schedule set

13   up and clarified sooner rather than later.

14             You know, I think you all generally agree on

15   what's relevant except for the big picture, not big

16   picture, but big points that whether the restructuring

17   was meant to divert assets or hide out or something.  And

18   you know, plaintiffs are suggesting they should be

19   allowed to explore it.  I gave you some leeway in terms

20   of the documents, you know, but not in terms of

21   depositions.  You know, if the lay of the land changes

22   and that analysis should change, you could raise that

23   issue.  But otherwise I think, you know, you're all

24   exploring the same topics really, at least in terms of

25   whether there is or isn't liability here.

51

Proceedings

1        All right.  So a couple of things to look back

2   at the rest of the schedule for a second.

3        So back in the September order I believe it

4   is -- I think this is the most -- hold on a second, let

5   me just --

6        MR. JANOVE:  Your Honor --

7        THE COURT:  All right.  Go back -- but I want

8   to say in the September order I had a requirement that by

9   the 18th you were going to put in a letter with regard to

10  class certification, motion practice, and expert

11  discovery.  That was tied to some other deadlines.  So

12  wondering what you think.  Should that be pushed out or

13  are you in a position knowing you're going to wrap up in

14  mid-February?  And also, I believe Judge Kovner had an

15  order for you to give her some dates.

16        MS. KRAMER:  Your Honor, I think with the case

17  schedule one of the things that we haven't gotten any

18  sort of indication from the plaintiffs on is whether or

19  not they intend to have any experts.  And I know that's a

20  question that we've raised in our papers.  That would go

21  into figuring out what the remainder of the case schedule

22  might be.  I don't know if the plaintiffs have anything

23  to say about that.

24        THE COURT:  What is going on?  You need to show

25  your cards.  What's the deal?  What is your thought about

52

Proceedings

1  whether you're using experts?  I mean well, I can imagine

2  several topics.  I don't know if you're going to do it or

3  not but what's the story?

4         MS. KRAMER:  Is that a question to the

5  plaintiff?

6         THE COURT:  Yes.  I'm sitting here with baited

7  breath.  Experts or no experts?

8         MR. JANOVE:  Your Honor, I think on the expert

9  decision it's probably unlikely but we do want to see the

10  documents that you just ordered production of today, the

11  full financial scope and full financial production that

12  we haven't yet gotten before we make a final decision on

13  that.

14         MS. KRAMER:  Your Honor, I just don't see how

15  this remaining handful of nonessential documents is going

16  to make or break the plaintiff's decision on whether or

17  not they're going to have experts because we need to be

18  able to figure out what the plaintiff's case is.  And

19  honestly, that's why we're asking for clarification on

20  what's the damages theory.  How do you have standing?

21  How do you have damages?  What's the harm if you have

22  businesses that nobody ever saw and nothing ever happened

23  with them?  You know, what's the case?  We've been

24  litigating this for a long time.

25         THE COURT:  Right.  All right.  I mean okay, if

53

Proceedings

1    it's not clear to the plaintiffs, I mean I think there's

2    merit to the defendant's request that you clarify the

3    demands.  Obviously, that's why I'm having you do the

4    Rule 26 supplementation.  But then it becomes I think

5    depending on what area you're pursuing, you know, some

6    case law would require experts especially if you're doing

7    a market analysis which I don't know if you are or you're

8    not.  Or you're doing a sampling analysis.

9          So yes, I guess I'm really open to what it is

10   that the defendants are saying in terms of

11   conceptualizing this case.  You know, whether you decide

12   the information is useful enough to be fruitful, you

13   know, that's a different question than conceptually what

14   kind of experts are you thinking about?  What are they

15   going to testify about?  You know, all the sort of

16   initial disclosure that experts would provide at least in

17   part.  I'm not even talking about the level of, you know,

18   here's the list of their former testimony or their

19   articles.  I'm talking about what areas are you going to

20   use experts in or not because obviously there is a

21   question that defendants keep asking which I think is two

22   parts, right?  It's like are you pursuing disgorgement?

23   Are you pursuing a theory of individual harm to

24   reputations?  You know, all of this is linked.  I think

25   this has been obvious for a while that we're getting

Proceedings

1    super close to you having to commit to what is the class

2    certification theory, you know, what are you looking for,

3    and also to the judge deciding the standing issue which

4    is overlapping, you know, whether ultimately linked or

5    not.  It could be linked or it could just overlap but,

6    you know, have two separate analogies but at least

7    touching on some of the same concerns, right?  And I'm

8    stating the super obvious, right?  But even over the

9    course of this litigation the Supreme Court has become,

10   and the circuit, has become more focused on what is an

11   actual damage or what kind of harm is compensable

12   especially in statutory claims which is part of your case

13   here.

14            All right.  I think this really has to get put

15   to a resolution.  So I think the way we had it, the way I

16   put it in was that by January 3rd you're going to

17   supplement the initial disclosures so that defendants

18   have some idea of the damages theory that you're

19   pursuing.  So I think that goes hand in hand with the

20   experts.

21            So I think really the way to do this would

22   be -- and this case, question after question piles up if

23   we don't know if you're doing the experts, right?

24   Because if there's no experts and you're not using

25   experts particularly in the class cert motion, you could

55

Proceedings

1  move ahead with that.  Maybe you're even moving ahead

2  with summary judgment.  You know, I'm not sure if you'd

3  like to talk about that with Judge Kovner.  And then, you

4  know, if you're using the experts, then it's a real

5  question do you need them for the class certification

6  motion or not?  Are they damages experts and you could be

7  making your class cert motion while the expert discovery

8  is happening?  You know, there's several permutations all

9  of which we are all sitting here with baited breath.

10 What's the deal?

11             MR. JANOVE:  So your Honor, if I could just

12 illustrate why the production of the full set of

13 financials might help inform this decision for one

14 discrete theory of relief is that under the Lanham Act

15 we're going to seek disgorgement of defendant's profits.

16 Right?  And by the statutory text, us as plaintiffs have

17 the burden of showing defendant's profit from the

18 unlawful activity.  And that could be just as

19 straightforward as, you know, pointing to simple

20 financial statements, simple financial documents, data

21 regarding gift card redemptions on GiftRocket.com or on

22 the Tremendous business line.  Or depending on the cost

23 analysis or how convoluted these financial documents may

24 or may not be, it is possible that we might need some

25 additional expert help in carrying that burden to show

56

Proceedings

1   profit.

2          So without having seen those documents yet, I

3   can't for sure a whether or not an expert is going to be

4   required for us to carry our burden on the Lanham Act to

5   prove defendant's profits.  But I think --

6          THE COURT:  All right.  I'm not really sure I

7   follow.  I don't know.  I'm not sure if that's persuasive

8   or not.

9          But look, the document production that you're

10  concerned about is coming basically on the same schedule

11  that your damages analysis needs to be updated and

12  expanded.  So I think that to the extent you want to put

13  off committing to whether you're going to have experts --

14  look at the calendar here.

15         Just before I pick the dates, please remind me

16  or point me on this docket where the most recent order

17  from Judge Kovner was because I think you have to give

18  her an update as well.  Is that right?  She wanted a

19  proposed schedule for something.  Am I imagining this?  I

20  thought you had a conference with her, that there was an

21  order.

22         MR. JANOVE:  Correct.  We had a conference

23  where she -- after the conference she overruled the

24  discovery objection and at the conference she said she

25  will be ruling on the other outstanding, the motion to

57

Proceedings

1   dismiss which she did --

2           THE COURT:  All right.  Okay.  This is the

3   11/13 order.  Right?  So the Court will adjudicate

4   standing with respect to the second amended complaint

5   based on the existing filing and the existing R&R because

6   discovery will close, will soon close.  Defendants do not

7   intend to file further a motion to dismiss, instead

8   anticipate filing a motion for summary judgment before

9   class certification.  The parties will propose a case

10  schedule and joint letter to Judge Scanlon within five

11  days of the close of discovery which is currently

12  scheduled for 12/13.

13          THE COURT:  Okay.  So is this still the case

14  that the summary judgment motion practice is going to

15  happen before -- you know, we're running through the

16  various permutations and obviously the standing issue is

17  over all of this.  But for defendants, are you still

18  pursuing that schedule?

19          MS. KRAMER:  Your Honor, the docket in this

20  case is obviously a bit lengthy.

21          THE COURT:  The 11/13/24 order from Judge

22  Kovner says that she'll deal with the standing issue

23  based on the current record and that you are going to,

24  defendants, were going to file summary judgment motions

25  before class certification.  Is that still the working

58

Proceedings

1   plan?

2           MS. KRAMER:  Yes, I believe so.

3           THE COURT:  Okay.  All right.  So let's go back

4   to plaintiff.  I was going to ask you focusing on the

5   question of expert discovery in connection with damages

6   and class cert to the extent you're envisioning

7   particular experts, are they necessary for the summary

8   judgment motion?  What I'm trying to get at is what's the

9   schedule here.  Right?  You're finishing --

10          MR. JANOVE:  Yeah.  No, so --

11          THE COURT:  -- in February, finishing fact

12  discovery in February.  Are you then moving on to the

13  summary judgment motion practice because any expert

14  discovery is about damages?  Like what --

15          MR. JANOVE:  So we envision after the close of

16  discovery moving for class cert.  We can work on the

17  timing when defendants bring their summary judgment

18  motion.  I think the summary judgment motions are related

19  to individual liabilities with certain defendants and to

20  the standing of just two of the plaintiffs.  But that's

21  not an issue.  The summary judgment won't affect the

22  class cert motion.  So you know, our proposal would be --

23          THE COURT:  I'm sorry, but what was the

24  conversation with Judge Kovner?  I mean I don't have the

25  transcript but what it says is that the defendants

59

Proceedings

1   instead anticipate filing motions for summary judgment

2   before class certification.  And I'm not following how it

3   wouldn't affect class certification because based on your

4   description of the motion -- okay.

5        All right.  The baseline is class

6   certification happens first and there's obviously all of

7   the strategic analysis that everybody can go through,

8   whether you know, the summary judgment is going to be

9   dispositive for the class or if it's better to have class

10  certification and then the summary judgment because then

11  the class is bound.

12       Okay.  Putting aside those considerations, at

13  least what you just said is the defendants are

14  challenging two of the -- you think they're going to just

15  challenge two of the three class reps.  So then you'd be

16  making a class cert soon just for the sake of this.  If

17  they're successful, then you are moving with only one

18  class rep which, you know, you can do but that's --

19       Let's switch the focus to defendant for a

20  second.  What is it that you are looking for and does

21  anybody recall exactly what the conversation was with the

22  district judge?  That would be helpful.

23       MR. JANOVE:  Yes, your Honor.  This is

24  Katherine Kramer.  The conversation with the district

25  judge was about how to make this efficient because we

60

Proceedings

1    were still at the point of potentially filing motions to

2    dismiss for some of the parties.  And we said that

3    doesn't really make sense to do that because then we

4    would just be challenging the pleadings and at this point

5    we basically know all the facts because we're pretty

6    close to the end of discovery.  So we agreed that instead

7    of filing a motion to dismiss we would be able to do a

8    partial summary judgment motion --

9           THE COURT:  Okay.

10           MS. KRAMER:  -- and we'd be able to do that

11    without the pre-motion conference process and essentially

12    cover that in the conference that we had with her.  So

13    that's what we had in mind.

14           And essentially some of the arguments that we

15    would have otherwise made about, you know, standing and

16    issues like that that have been raised in the motions to

17    dismiss that have been filed already on behalf of some of

18    the defendants, I expect that we would raise those.  I

19    think it's entirely possible that we'll have summary

20    judgment motions across the board, but we'll see.  The

21    idea was that we would be able to do partial summary

22    judgment motions and we'll figure that out without being

23    bound to a limited number of that.

24           But I think that the idea was that we would

25    then file the summary judgment motion before class

61

Proceedings

1  certification because I think that it would, the ruling

2  on the summary judgment would have a huge impact.  You

3  know, potentially the whole case would be gone if the

4  summary judgment across the board is granted and then

5  there is no class to certify because there's no case.

6        THE COURT:  Okay.  Just so I'm clear, is the

7  summary judgment motion practice that you discussed with

8  Judge Kovner, is that only the partial summary judgment

9  which is essentially a proxy for the motion to dismiss?

10 All you're talking also about what I'll call the global

11 summary judgment motion?

12        MS. KRAMER:  Well, we wanted to just leave our

13 options open for that.

14        THE COURT:  Okay.

15        MS. KRAMER:  So it's not limited to partial

16 summary judgment, but partial summary judgment is

17 possible.

18        THE COURT:  Right.  On the defendant's side, I

19 guess -- you can't really answer the question because it

20 goes back to the plaintiff.  You need to know what your

21 story is with regard to experts and are those experts

22 relevant to -- would they know what they're testifying

23 about or proposed to testify about?  Then defendants

24 could make a decision about partial summary judgment,

25 complete summary judgment, when it should happen, and

62

Proceedings

1  everybody would understand the theory of the class

2  certification with much greater clarity.

3       So all right, I think to move this forward we

4  have the dates for the production I think.  Plaintiffs,

5  you need to commit.  Are you having experts and if so,

6  what are they testifying about?  So you're going to have

7  that information by January 3rd.  You can look through

8  it.  I think by January 24th the plaintiff -- and I'm

9  assuming just the way this case has gone that if

10  plaintiffs are having the initial moving experts, if

11  you're having experts at all, that you need to do at

12  least the initial disclosure which is who the experts are

13  and what it is they're going to testify about.  And then

14  I think we could revert to something closer to the

15  schedule that we had before which is you all can propose

16  the expert schedule and then I think you also need to

17  know the expert discovery schedule and then the motion

18  practice schedule.

19       And I think on the defendant's side, one

20  question here is are you making an early -- basically

21  filling out what you were saying to the district judge,

22  and early, early-ish partial summary judgment motion once

23  the fact discovery is done?  Are you waiting for expert

24  discovery?  This is becoming a complete bottleneck here

25  not knowing what's happening and trying to figure out

63

Proceedings

1    where to go.

2            All right.  You have the interim dates.  You

3    have February 14th is really the absolute close of fact

4    discovery.  So unless something completely unexpected

5    happens, you should expect that that's the close of fact

6    discovery.

7            And then by January 24th, the plaintiffs will

8    receive from -- I'm sorry.  Plaintiffs will give the

9    information that I just said about the experts and the

10   topic and what's the names of the experts.  And I'm just

11   trying to sync this up with what Judge Kovner was asking

12   for.

13           And then I think once we know that, let's say

14   by February 7th there's a joint letter with the schedule,

15   expert discovery, dispositive motion practice, class cert

16   motion practice, and that should probably go to both

17   judges.

18           And then since I don't know everything that you

19   covered, I don't know what was exempted from a pre-motion

20   conference letter or what would need a letter, so you're

21   going to have to fill in those details.

22           All right.  I think that's a working schedule

23   here.  I have the information that you gave me.  We'll

24   enter an order on the issues that are in the status

25   letter.  If you have issues that come up along the way,

64

Proceedings

1  preferably you'll let me know by a joint letter, but you

2  know, let me know as quickly as you can so that we can

3  deal with it so it can be resolved within the discovery

4  time period.

5          All right.  I'm going to raise one other thing

6  before I let you go.  Any reigniting of settlement

7  discussions?  You know, we kept getting tempting

8  suggestions which I am absolutely not picking up to know

9  what happened with Giftly and how you all could get

10 there.  Any thoughts now that you've done the discovery

11 or will be moving towards finishing it that you want to

12 have more settlement discussions?  You think mediation

13 would be helpful?  If yes, any interest in private

14 mediation or court mediation?  As always, there's

15 deafening silence.  So let's start with  --

16          MR. JANOVE:  Uh --

17          THE COURT:  -- defendants on this one.  I heard

18 plaintiff's counsel.  Go ahead.  Plaintiff's counsel,

19 your thoughts about that?

20          MR. JANOVE:  Oh, yeah.  I mean we made a demand

21 a few weeks ago and haven't heard back.  So we're

22 assuming that settlement discussions aren't going to make

23 any progress, aren't making progress at this moment.

24          MS. O'NEILL:  Hi, your Honor.  This is Megan

25 O'Neill for the GiftRocket defendants.  You know, I think

65

Proceedings

1  that the door is always open.  I think this isn't

2  probably the best time in terms of we're teeing up a lot

3  of motion practice at this stage of the case.  But like I

4  said, the door is always open so it's not closed.  I

5  think though that the experience with the cancelled

6  mediation has soured that quite a bit.  So meaning I

7  would absolutely want to go to mediation but for what had

8  happened last time.

9          So I'm not sure that our clients are -- they

10  certainly have not closed the door to settlement but I

11  don't think there's a reason to order mediation at this

12  point given the history.

13          THE COURT:  I'm not going to order it.  I mean

14  this is obviously a two to tango, but to the point that

15  was made earlier, you know why summary judgment instead

16  of a motion to dismiss because you already know

17  everything, or almost everything there is to know.  So it

18  seems like everybody would be in a stronger position to

19  evaluate the possibility of your definition of success,

20  succeeding, or you know, loss and what the exposure is

21  and whether there's an interest in protecting against

22  that early in the day.  So whatever metaphor you want to

23  use for talking about how to come to a resolution short

24  of dispositive motion practice and trial.

25          Like I'm sure this has been an expensive case.

66

Proceedings

1  The experts are probably not going to make the amount of

2  money (indiscernible) but you are moving to the motion

3  practice in the next couple of months and you have the

4  information you need.  So it might make sense to have the

5  conversation.  It's up to you all what you want to do.

6         MS. O'NEILL:  All very good points, your Honor.

7  I think once we have the plaintiff's theory of the case

8  articulated a little more clearly, that might be a good

9  time to think about doing that again.  I think we're

10  still lacking some information.  So once we have that,

11  you know, maybe that'll be a better time.  So like I

12  said, the door is not in any way closed.  You know, we

13  just are not in the same ballpark at the present moment.

14         THE COURT:  Okay.  On that point, just to go

15  back to plaintiff, you know, you had in your letters

16  expressed reluctance about committing to a damages theory

17  and suggesting you need more information, whatever.

18  Obviously, you haven't made a decision in that regard.

19  But you could satisfy the order or you could be even more

20  complete and really showing your hand on the analysis

21  maybe short of the need for the experts so that you could

22  get this conversation going because I think the

23  fundamental point on the defendant's side is what is

24  their realistic exposure?  Obviously they say none but to

25  the extent you have helpful analysis, it would be a good

67

Proceedings

1 idea to start sharing it because it is going to come out

2 anyway.  Okay.

3          MR. JANOVE:  Your Honor, we didn't include that

4 type of analysis in the demand we made a few weeks ago

5 that we're not hearing back from, but your point is well

6 taken and we can certainly make it more clear to the

7 GiftRocket defendants.

8          THE COURT:  Okay.  All right.  That's all we

9 have here.  So thanks very much and have a good week.

10 Take care.  Bye.

11          MS. O'NEILL:  Thank you, your Honor.

12          MS. KRAMER:  Thank you so much.

13          MR. JANOVE:  Thank you, your Honor.

14                    (Matter concluded)

15                         -oOo-

16

17

18

19

20

21

22

23

24

25

68

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **6th** day of **December**, 2024.

_Mary Greco_
Transcriptions Plus II, Inc.