**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRACIE BAKED LLC, WECARE RG, INC., and MILLERCOBB LLC, on behalf of themselves and all others similarly situated, | |
| | Case No. 22-CV-4019 (RPK) (VMS) |
| Plaintiffs, | |
| v. | |
| GIFTROCKET, INC., TREMENDOUS, INC., NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES, BENJAMIN KUBIC, SUNRISE BANKS, N.A., GIFTROCKET, LLC, TREMENDOUS LLC, and TREMENDOUS PARENT, INC., | |
| Defendants. | |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR COMBINED CROSS-MOTION AND RESPONSE IN OPPOSITION TO DEFENDANT BENJAMIN KUBIC'S MOTION FOR SUMMARY JUDGMENT**</u>

**SERVED ON MARCH 6, 2025**

JANOVE PLLC
500 7th Avenue, 8th Floor
New York, NY 10018
(646) 347-3940

PODHURST ORSECK P.A.
2525 Ponce de Leon Blvd., Suite 500
Coral Gables, FL 33134
(305) 358-2800

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Introduction .................................................................................................................. 1

Background .................................................................................................................. 3

    I.     GiftRocket.com Falsely Advertises the Sale of "Gift Cards" to Millions of Unaffiliated Businesses Without Consent ................................................ 3

    II.    Benjamin Kubic is Hired as an Officer and V.P. of Business Operations ............. 4

    III.   Mr. Kubic is Responsible for and Supervises GiftRocket.com's Customer Support ................................................................................................... 6

    IV.   Mr. Kubic Finds a Solution to Allow GiftRocket.com to Continue to List Businesses ........................................................................................ 8

    V.    Mr. Kubic Ensures that GiftRocket Continues to Have a Banking Partner .......... 10

    VI.   Mr. Kubic Advocates for Investing in GiftRocket.com's Continued Operation .. 11

Procedural History ..................................................................................................... 13

Legal Standard ........................................................................................................... 13

Argument ................................................................................................................... 14

    I.     The Undisputed Facts Show that Mr. Kubic is Liable Under Multiple Theories . 14

         A.    Mr. Kubic is a Corporate Officer who Authorized and Approved of, and Directly Participated In, the Underlying Misconduct ............................... 17

         B.    Mr. Kubic is also Vicariously Liable because he has Authority to Bind GiftRocket with Third Parties .................................................... 21

         C.    Mr. Kubic is Contributorily Liable .......................................... 22

    II.    Plaintiffs—Not Mr. Kubic—Are Entitled to Attorneys' Fees. ............................ 23

Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Adelphia Supply USA*,
 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) ........................................................ 1, 15, 19, 22

*Bambu Sales, Inc. v. Sultana Crackers, Inc.*,
 683 F. Supp. 899 (E.D.N.Y. 1988) ................................................................................. 20

*BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*,
 77 F.3d 603 (2d Cir. 1996) .............................................................................................. 14

*Byrne v. Rutledge*,
 623 F.3d 46 (2d Cir. 2010) .............................................................................................. 14

*Calvin Klein Jeanswear Co. v. Tunnel Trading*,
 2001 WL 1456577 (S.D.N.Y. Nov. 16, 2001) ................................................................. 20

*Cardenas v. Edita's Bar & Rest., Inc.*,
 2021 WL 4480570 (E.D.N.Y. Sept. 30, 2021) ........................................................... 13, 14

*Cartier v. Aaron Faber, Inc.*,
 512 F. Supp. 2d 165 (S.D.N.Y. 2007) .............................................................................. 19

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ......................................................................................................... 14

*Cestaro v. Prohaska*,
 681 F. Supp. 3d 121 (S.D.N.Y. 2023) .............................................................................. 14

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,
 931 F.2d 1472 (11th Cir. 1991) ....................................................................................... 20

*Chanel, Inc. v. Veronique Idea Corp.*,
 795 F. Supp. 2d 262 (S.D.N.Y. 2011) .............................................................................. 17

*Coach, Inc. v. Richie's Playhouse Inc.*,
 2012 WL 12931146 (E.D. Mich. Mar. 9, 2012) .............................................................. 23

*Daimler AG v. A-Z Wheels LLC*,
 334 F. Supp. 3d 1087 (S.D. Cal. 2018) ........................................................................... 19

*Edmondson v. Velvet Lifestyles, LLC*,
 43 F.4th 1153 (11th Cir. 2022) ........................................................................................ 21

*EMA Fin., LLC v. NFusz, Inc.*,
 509 F. Supp. 3d 18 (S.D.N.Y. 2020) ................................................................................ 25

*Fashion Exch. LLC v. Hybrid Promotions, LLC*,
 2024 WL 4250359 (S.D.N.Y. Sept. 20, 2024) ................................................................. 24

*GAKM Res. LLC v. Jaylyn Sales Inc.*,
 2009 WL 2150891 (S.D.N.Y. July 20, 2009) ................................................................... 17

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
 176 F. Supp. 3d 137 (E.D.N.Y. 2016) ....................................................................... 2, 15, 16

*Johnson & Johnson v. Azam Int'l Trading*,
    2013 WL 4048295 (E.D.N.Y. Aug. 9, 2013)..........................................................14

*Johnson & Johnson v. Guilin Chung Fai Biotech Co.*,
    2018 WL 2078233 (E.D.N.Y. Jan. 16, 2018) ..............................................1, 14, 22

*KatiRoll Co. v. Kati Junction, Inc.*,
    33 F. Supp. 3d 359 (S.D.N.Y. 2014) .......................................................................15

*Kelly-Brown v. Winfrey*,
    717 F.3d 295 (2d Cir. 2013) .............................................................................15, 16

*Kuklachev v. Gelfman*,
    2009 WL 804095 (E.D.N.Y. Mar. 25, 2009)...........................................................20

*Lion-Aire Corp. v. Lion Air Installlation, Inc.*,
    2024 WL 3950122 (E.D.N.Y. Aug. 27, 2024)..........................................................20

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
    378 F. Supp. 2d 448 (S.D.N.Y. 2005) .....................................................................15

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015) .......................................................................20

*Manhattan Rev. LLC v. Yun*,
    2017 WL 11455317 (S.D.N.Y. Sept. 21, 2017).......................................................24

*May Flower Int'l, Inc. v. Tristar Food Wholesale Co. Inc.*,
    2022 WL 4539577 (E.D.N.Y. Sept. 28, 2022) ............................................15, 21, 22

*Pado, Inc. v. SG Trademark Holding Co. LLC*,
    537 F. Supp. 3d 414 (E.D.N.Y. 2021) .....................................................................15

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998) .......................................................................15

*Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*,
    2006 WL 7077215 (E.D.N.Y. Nov. 13, 2006).....................................................14, 23

*Scholastic, Inc. v. Stouffer*,
    221 F. Supp. 2d 425 (S.D.N.Y. 2002) .....................................................................24

**Rules**

Fed. R. Civ. P. 56..........................................................................................................13

Fed. R. Evid. 408 ..........................................................................................................25

**Treatises**

4 McCarthy on Trademarks and Unfair Competition § 25:23 (4th Ed.).....................1, 14

## INTRODUCTION

Joint liability under the Lanham Act is broad: it may "be imposed on '[a]ll those who, in pursuance of a common plan to commit an act which is tortious, actively take part in it, or further it by cooperation or request, or lend aid or encouragement, or ratify and adopt the acts done,' for they 'are as equally liable as the person who performs the tortious act itself.'" *Johnson & Johnson v. Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *11 (E.D.N.Y. Jan. 16, 2018) (citing 4 McCarthy on Trademarks and Unfair Competition § 25:23 (4th Ed.) and collecting cases). Courts in this Circuit regularly grant affirmative summary judgment as to a defendants' individual liability under the liberal standards of joint liability under the Lanham Act. *See, e.g.*, *Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 5696148, at *17 (E.D.N.Y. Sept. 30, 2019) (in a Lanham Act case, granting affirmative summary judgment as to liability of over a dozen individual defendants and otherwise denying remaining individuals' motions for summary judgment).

Contrary to Mr. Kubic's self-serving assertions that he had little to do with GiftRocket.com, the undisputed evidence shows that he was a high-ranking employee and one of a handful of corporate officers that played a key role in the misconduct at issue here—supervising critical divisions such as operations, finances, customer support, and legal for multiple corporate entities engaged in the unlawful conduct. He was also intimately aware of constant complaints from confused customers and angry businesses. Despite this, Mr. Kubic consistently acted as one of the most vocal internal champions of the GiftRocket business line. He repeatedly described the GiftRocket business as "free money" and advocated for even more resources to be invested in the product line, even after this lawsuit was filed. *See, e.g.*, Janove Decl. Ex. 1[1] at 3 (May 2023 message from Mr. Kubic arguing "that we should put more focus on GR rather than less" and that

---

[1] Numbered exhibits refer to the exhibits to the Janove Declaration submitted with this memorandum.

shutting down the GiftRocket website was "hard to justify" because "it generates $2M a year").

He also played a key role in ensuring that GiftRocket.com continued operating. When two important aspects of its operations were threatened because both Yelp and Sunrise Banks no longer wanted to do business with GiftRocket, it was Mr. Kubic who found a new business database provider—Google—so that GiftRocket.com could continue to list businesses on its website without consent. Mr. Kubic did so with full awareness that this might violate Google's terms for "misuse of IP." And it was Mr. Kubic who found a new banking partner to replace Sunrise Banks.

Mr. Kubic does not deny that he engaged in any of the above activities, or that the GiftRocket business could not have functioned without him. Instead, he argues that he is somehow exempt from liability because GiftRocket's deceptive business practices began before he was hired and his GiftRocket-related activities did not take up a substantial amount of his time. But no authority supports these arguments, which would allow an individual to play a key role in violating the Lanham Act and then avoid liability simply because it only took a few minutes to accomplish the task, or the misconduct was originally someone else's idea. *See Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 173 (E.D.N.Y. 2016) (granting affirmative summary judgment as to individual's liability notwithstanding that others at the company "arguably had more significant roles in executing the operation").

The Court should deny Mr. Kubic's motion for summary judgment and—in connection with Plaintiffs' eventual affirmative summary judgment motions on liability following class certification—grant summary judgment in Plaintiffs' favor on the issue of Mr. Kubic's individual liability.[2]

---

[2] Plaintiffs are not currently asking the Court to determine whether Plaintiffs have proven their substantive claims. They expect to move for summary judgment on liability after class certification in accordance with the schedule set

## BACKGROUND

I.    **GiftRocket.com Falsely Advertises the Sale of "Gift Cards" to Millions of Unaffiliated Businesses Without Consent**

Since its inception in 2010, the GiftRocket.com website has used the names and information of millions of other businesses without their permission to market the GiftRocket product. 56.1 ¶¶ 1, 29, 31. GiftRocket[3] obtained the other businesses' names and information through Yelp and Google Places APIs. 56.1 ¶ 30. Using a classic "bait and switch" scheme, GiftRocket.com falsely suggested to users that they could buy merchant-branded gift cards and use them at the businesses displayed on the GiftRocket website, including Plaintiffs. 56.1 ¶ 31. However, the only way a GiftRocket recipient could use the gift at the "suggested" business would be to provide their bank account information, receive funds in the account, and then go spend the money at the business. 56.1 ¶ 32. There's no evidence in the record that anyone actually spent the money at a suggested business. 56.1 ¶ 33.

If recipients did not wish to provide their bank account information, they could instead redeem the gift for an actual gift card, but for different businesses than the one that was suggested, like Amazon or Target. 56.1 ¶ 34. GiftRocket made additional money from the funds diverted from the intended businesses to third-party merchant gift cards because GiftRocket received a lower price on them than they charged consumers, allowing them to net a profit on each transaction (*i.e.* a $100 Amazon gift card might have only cost GiftRocket $95). 56.1 ¶ 35. GiftRocket also made millions in "breakage" revenue from gift recipients who never redeemed their gift for use at a

---

by the Court. Plaintiffs are cross-moving now to obviate the need for duplicative briefing concerning Mr. Kubic's liability, as the arguments and evidence in opposing Mr. Kubic's motion are the same.

[3] Unless otherwise specifically noted, Plaintiffs use the term "GiftRocket" to refer to the corporate GiftRocket Defendants in this action, GiftRocket, Inc., Tremendous, Inc., GiftRocket LLC, Tremendous LLC, and Tremendous Parent, Inc. as they all are liable for the operations of GiftRocket.com and are alter egos. The activities of Mr. Kubic described in this memorandum all relate to the GiftRocket business line, regardless of which entity was his corporate employer at the time.

chosen business at all. 56.1 ¶¶ 36, 37. In these circumstances, GiftRocket kept the entire gifted amount and in no circumstances did GiftRocket share any profits with the "suggested" business listed on GiftRocket.com. 56.1 ¶ 36. On top of all these ways of profiting, GiftRocket charged service fees for each transaction, and made millions from those service fees alone. 56.1 ¶ 37.

In addition to direct profits from sales made in the names of other businesses, these other businesses' names and information were a primary mechanism through which GiftRocket drew customers to its website. 56.1 ¶ 38. In particular, listing millions of unaffiliated businesses on its website (without consent) allowed GiftRocket to present itself in Google search results as one of the top options for a "<business name> gift card" search. 56.1 ¶ 27; Ex. 2 at 17-18.

Thus, the use of other businesses' names and information via the Yelp feed was essential to GiftRocket's success—both as a primary driver of traffic to its website and through sales of fake "gift cards" to other businesses. In other words, the Yelp feed was the means by which Defendants misappropriated the information of the plaintiff class and used it to sell fake gift cards in their names, a mission-critical component of their unlawful business strategy. The other key component of GiftRocket's operations was its relationship with co-defendant Sunrise Banks ("Sunrise"), which in GiftRocket's words, was "critical" to GiftRocket.com's operation as it facilitated the financial transfers for the sale of GiftRocket's product. *See* 56.1 ¶ 28; Ex. 3.

Although GiftRocket.com existed before Mr. Kubic was hired at GiftRocket, as discussed next, he took on a key role in ensuring that GiftRocket.com continued to function when Yelp and Sunrise Banks terminated their relationship with GiftRocket.

## II.    Benjamin Kubic is Hired as an Officer and V.P. of Business Operations

In June 2021, Benjamin Kubic began working at GiftRocket, Inc. as a corporate officer with the job title of "Vice President of Business Operations." 56.1 ¶¶ 3, 4; Ex. 4 ("Kubic Tr.")

15:09-14; 27:19-21; Ex. 5. Mr. Kubic referred to himself as "GiftRocket's new VP of Business Operations." 56.1 ¶ 19; Ex. 6 at 3 (Jan. 21, 2022 email: "I'm Ben Kubic, GiftRocket's new VP of Business Operations."). In 2021, Mr. Kubic had the second highest annual cash salary at $200,000—$50,000 more than the salaries of GiftRocket's co-founders and chief executives Nick Baum and Kapil Kale. 56.1 ¶ 23: Kubic Tr. 31:25-32:16, 34:10-16; Ex. 5. Mr. Kubic was also granted equity ownership in the business. 56.1 ¶ 16: Kubic Tr. 35:07-36:04; Ex. 5.

Although he joined the company as "Vice President of Business Operations at GiftRocket Inc.," GiftRocket does not have a  President of Business Operations—so Mr. Kubic is primarily responsible for running operations of the "finance, data, operations, customer support, [and] legal teams." 56.1 ¶¶ 24, 39;  Kubic Tr. 15:23-25; Ex. 7 ("Kale Tr.") 15:22-16:09. Mr. Kubic's Linkedin profile confirms that he has been in charge of the operations and finance teams. 56.1 ¶ 24; Ex. 8. Mr. Kubic also noted that when he joined GiftRocket, the team was so small that "you kind of knew what everybody else was working on." 56.1 ¶ 84; Kubic Tr. 199:05-8.

Only one month after beginning his employment, he signed GiftRocket's certificate of surrender submitted to the California Secretary of State in the capacity as a "corporate officer . . . authorized to sign on behalf of the foreign corporation." 56.1 ¶ 21; Kubic Tr. 26:23-27:21; Ex. 9. Mr. Kubic also signed contracts with Rippling, the professional employment organization providing payroll and benefits to the employees of all corporate defendants. 56.1 ¶ 22; Exs. 10-14.

GiftRocket, Inc. was renamed Tremendous, Inc. on or about December 2021. 56.1 ¶ 26; Ex. 15. After that—in an attempt to shield assets from an anticipated judgment in this litigation—Defendants restructured Tremendous, Inc. in June 2023 and created three new companies, GiftRocket LLC, Tremendous LLC, and Tremendous Parent, Inc. 56.1 ¶¶ 17, 92; Ex. 16.

Mr. Kubic led the corporate restructuring. 56.1 ¶ 86; Kubic Tr. 184:23-24; Ex. 17

("GiftRocket, LLC Tr.") 206:12-20; Ex. 18 ("Baum Tr.") 224:06-18, 226:03-10; *see also* Kubic Tr. 187:03-14; Baum Tr. 225:04-10, 227:12-14; Exs. 15 & 16. He became the Vice President of Business Operations and an executive officer at the newly created Tremendous LLC. 56.1 ¶¶ 4, 20; Kubic Tr. 28:06-25; Kale Tr. 8:03-8. His ownership interest switched from the former company to the newly created Tremendous Parent, Inc. 56.1 ¶ 95; Kubic Tr. 35:07-36:04; Ex. 19.

Like all of the corporate GiftRocket Defendants' officers and employees, Mr. Kubic's job duties remained exactly the same after the corporate restructuring. 56.1 ¶ 91; Baum Tr. 235:20-21. Tremendous LLC employed all the employees who previously worked on matters related to GiftRocket.com following the restructuring. 56.1 ¶¶ 90, 91; Baum Tr. 233:07-19; Ex. 16. Tremendous LLC also profited from GiftRocket.com because all the breakage revenue of unredeemed GiftRocket "gift cards" flowed to Tremendous LLC, and it also made a percentage off all new sales from the GiftRocket.com website. 56.1 ¶ 94; Baum Tr. 229:20-230:19, 238:01-7; Exs. 16 & 20. Thus, just as Mr. Kubic directly participated in the unlawful conduct as a high-ranking employee and officer of GiftRocket, Inc., he continued that same participation in the same unlawful conduct in his role at Tremendous, LLC.

## III.    Mr. Kubic is Responsible for and Supervises GiftRocket.com's Customer Support

When Mr. Kubic was hired in 2021, he took over running the support organization that included support related to GiftRocket.com. 56.1 ¶ 40; Kale Tr. 12:19-13:03. It did not require much time for Mr. Kubic to help make sure GiftRocket.com kept operating—but he did what was needed. As Mr. Kubic explained on October 20, 2021, there were no full-time employees involved with running GiftRocket.com or actively managing it, i.e. "[i]t's literally run by contractors." 56.1 ¶ 53; Kubic Tr. 56:11-16, 147:08-10; Ex. 21 at 4. But it was Mr. Kubic who managed the employees responsible for GiftRocket customer support, including Jane Chang and Emily Russell.

56.1 ¶ 41; Kubic Tr. 19:24-20:02, 24:16-20; Ex. 22 ("Chang Tr.") 15:21-24; Baum Tr. 170:14-22, 188:12-20; Ex. 23.

In this capacity, Mr. Kubic worked with operations manager Jane Chang in 2022 to remove business listings from GiftRocket.com after they demanded to be taken off the website. 56.1 ¶¶ 42, 44; Kubic Tr. 158:03-10, 163:04-7; *see, e.g.*, Ex. 24 at 2 (Mr. Kubic to Magnus von Koeller: "so you may receive a fun certified letter from some law firm in CO asking us to remove some local business from GiftRocket . . . You can disregard – we received another copy at the other mailing address and the business is already being removed"); Ex. 25 ("GR Remove"); Ex. 26 (Mr. Kubic to Ms. Chang: "Could you get the business removed from GR and let the owner know?"); Ex. 27 (Mr. Kubic to Ms. Chang: "Just forwarded you an email – can you get GiftRocket to take down a URL asap"); Ex. 28 (Mr. Kubic informing Sunrise Banks about removing a business); Ex. 29 (Sunrise emailing Mr. Kubic re business removal).

In connection with this work, Mr. Kubic asked Ms. Chang on February 7, 2022, "do we have any sort of page on GR letting business owners know where they can ask to have their businesses removed?" 56.1 ¶ 45; Ex. 30. Ms. Chang replied: "we do not … i think this is essentially because that's how GR makes money." *Id.*

In addition to fielding business complaints, Mr. Kubic also worked with Ms. Chang to address customer complaints about GiftRocket, including complaints made through attorneys general's offices. 56.1 ¶ 43; Ex. 31 (Ms. Chang to Mr. Kubic: "we received this consumer complaint for GR from the AG office as well. can i respond to this one directly?"); Ex. 32 (Mr. Kubic asking Ms. Chang: "Can you check in on the GiftRocket fraud board queue and let me know if we're backed up there? We're receiving a bunch of BBB complaints.").

Mr. Kubic was also consistently involved in a variety of other matters related to

GiftRocket's customer support and compliance programs. These included learning about "compliance functions" for GiftRocket.com and the Tremendous business line and working with GiftRocket employees to complete compliance work for Sunrise Banks, and later assuming compliance officer responsibilities from Ms. Chang. 56.1 ¶¶ 46, 48; Kubic Tr. 152:24-153:07; GiftRocket, LLC Tr. 239:08-16; Chang Tr. 90:07-16; Exs. 33–36. In addition, he also directed and worked with Ms. Chang and Ms. Russell on other aspects of operating GiftRocket.com, including organizing holiday customer support coverage for GiftRocket.com, 56.1 ¶ 47; Ex. 37; circulating customer complaint logs, 56.1 ¶ 51; Ex. 38; and changing the placement of text on GiftRocket.com, 56.1 ¶ 49; Ex. 39. He also directed raising GiftRocket's Better Business Bureau rating from its grade of D-minus. 56.1 ¶ 50; Ex. 40 (Mr. Kubic to Ms. Russell: "If we do have unanswered complaints from a while back, we should backfill answers to all of them, since people continue to look at BBB for to determine legitimacy."); Ex. 41 (Mr. Kubic to Ms. Russell: "Can you look into what it would cost us to buy an A+ rating from BBB for both Tremendous and Giftrocket?"); Ex. 42 (Ms. Russell to Mr. Kubic: "I've responded to all of the old GiftRocket BBB complaints and submitting responses to unanswered complaints shot our rating up to A+ from a D-.").

## IV.    Mr. Kubic Finds a Solution to Allow GiftRocket.com to Continue to List Businesses

Mr. Kubic was directly responsible for attempting to maintain and then replacing the Yelp feed through which GiftRocket.com was able to trade on the names and information of other businesses to drive traffic to its website and sell fake gift cards. 56.1 ¶ 62. As early as October 20, 2021, Mr. Kubic understood that GiftRocket "ties into Yelp" and that GiftRocket used the Yelp API to get data on businesses such that "you can pick the place you think your friend should spend the gift at." 56.1 ¶ 63; Kubic Tr. 49:09-12, 50:08-10; Ex. 21 at 3-4. In May 2023, when Yelp

stopped allowing GiftRocket to use its information feed, it was Mr. Kubic who tried to reverse Yelp's decision. He repeatedly asked Yelp about the possibility of preserving GiftRocket's access to the Yelp API if GiftRocket moved to a paid subscription because "generally we'd be happy to continue using the Yelp API." 56.1 ¶ 70; Kubic Tr. 227:02-9; Ex. 43. In May and June 2023, Mr. Kubic participated in discussions about GiftRocket's response to the cancellation of the Yelp API with GiftRocket's CEO and COO and other senior members of the company. 56.1 ¶ 64; Kubic Tr. 116:24-117:011, 117:15-20, 220:05-16; Baum Tr. 263:11-20; Exs. 44 & 45.

Then, when Mr. Kubic was unable to persuade Yelp to allow GiftRocket to continue to access the Yelp API, he led the effort to find a replacement business data set so that GiftRocket.com could still list businesses and sell "gift cards" in the businesses' names. 56.1 ¶ 65; Kubic Tr. 220:17-21, 224:04-15; Baum Tr. 265:09-12; Ex. 46 (Mr. Kubic discussing Google Places with Mr. Baum and noting "I've also reached out to a few business database providers").

In May 2023, Mr. Kubic proposed that Google Places API would replace the Yelp API. 56.1 ¶ 66; Kubic Tr. 222:23-223:16, 225:21-22. As part of his analysis, he reviewed the Google Places API's Terms of Service to determine whether they would "prohibit the GR use case" and observed that "there are some general terms around misuse of IP that I'm sure they could rely on to shut us down if they wanted to." 56.1 ¶ 67; Ex. 46. Despite this risk, Mr. Kubic proposed proceeding with the Google Places API as a "drop in replacement for Yelp" API. 56.1 ¶ 68; Kubic Tr. 226:06-10; Ex. 47. In addition, Mr. Kubic and Mr. Baum discussed a "[n]ightmare scenario" where Google would become aware of this litigation, with Mr. Kubic strategizing how to avoid the ramifications of a potential third-party subpoena sent by Plaintiffs to Google such as the one Plaintiffs sent to Yelp, and concluding that it is likely "low risk" that Google would cancel GiftRocket's API access as Yelp did because "we're paying for Google's API, and as far as I saw,

- 9 -

there is no prohibition on using it the way we're using it for GR" and recommending that GiftRocket "follow Google's display requirements to a T." 56.1 ¶ 69; Ex. 48.

Mr. Kubic then played a key role in overseeing the transition from Yelp to the Google Places API. 56.1 ¶ 71. On May 10, 2023, Mr. Kubic was consulted on the potential deletion of Yelp data in the aftermath of the cancellation of the Yelp API. 56.1 ¶ 72; Kale Tr. 44:19-45:08; Ex. 49. Shortly afterwards, on May 12, 2023, Mr. Kubic expressed concern that the removal of Yelp data may result in the disintegration of GiftRocket's business blocks, stating that "we really don't want some business reaching out again complaining that we added them back to the site." 56.1 ¶ 73; Ex. 50. On May 14, 2023, Mr. Kubic "agree[d]" with the idea that GiftRocket can retain the business name and Yelp slug for "businesses where [GiftRocket] can't find a match via Google Places, but have a Gift associated with them." 56.1 ¶ 74; Ex. 51. He also "agree[d]" with the idea that GiftRocket can retain the "business' name for business removal requests" and asked if GiftRocket "ha[s] a backup of the DB from today" before any tables of data from Yelp are deleted. 56.1 ¶ 75; Ex. 52.

Finally, on May 14, 2023, Mr. Kubic advocated for the deletion of data related to "businesses that are unassociated with any gift, removal-request and for which we do not have Google Places data" because of the possibility "Yelp has any fake businesses in their DB to figure out who's using their data." 56.1 ¶ 76; Ex. 53. Following the transition to the Google Places API, GiftRocket had roughly one million businesses in its database for which new business landing pages on GiftRocket.com and search engine results can be created for. 56.1 ¶ 77.

## V.    Mr. Kubic Ensures that GiftRocket Continues to Have a Banking Partner

Mr. Kubic also became the primary point of contact with Defendant Sunrise Banks. 56.1 ¶ 78; Kubic Tr. 252:12-25. When Sunrise received business and customer complaints about

- 10 -

GiftRocket, Sunrise would forward them to Mr. Kubic. 56. 1 ¶ 42; Ex. 28. As with Yelp, when Sunrise Banks ended its relationship with GiftRocket, Mr. Kubic attempted to convince them to continue the relationship. 56.1 ¶ 82; Kubic Tr. 262:21-24; Ex. 54 (Mr. Kubic writing to Sunrise Banks employees that "it's a lot of engineering and operational work for us to move our infrastructure to a new bank" and asking Sunrise Banks if "it made sense to revisit this wind-down decision given that both sides have already committed to a longer term relationship?").

When the effort to continue partnering with Sunrise Banks proved unsuccessful, Mr. Kubic pursued alternative banking partners to ensure the GiftRocket line of business could continue uninterrupted. 56.1 ¶ 79; Kubic Tr. 87:02-4 ("Were you in charge of looking for a new banking partner? [Mr. Kubic:] Yes."); Baum Tr. 18:05-21. Mr. Kubic then replaced Sunrise with its new banking partner SouthState Bank, and he is now the primary point of contact between GiftRocket and SouthState Bank. 56.1 ¶ 80; Kubic Tr. 86:03-8, 137:17-19, 271:05-12; Chang Tr. 165:01-6; Kale Tr. 51:15-20; Baum Tr. 19:15-18; Ex. 55).

On April 8, 2022, Mr. Kubic signed the Master Disbursement Services Agreement between SouthState Bank and Tremendous, Inc., which committed GiftRocket to paying SouthState for the bank's facilitation of the sale of "gift cards" on the website. 56.1 ¶ 81; Ex. 56. Mr. Kubic was also involved with the transfer of the value of "gift cards" sold on GiftRocket.com from Sunrise Banks to SouthState Bank. 56.1 ¶ 83; Kubic Tr. 266:09-23, 267:22–268:11; Ex. 55 at 4 (Mr. Kubic confirming "GR business was transferred over to [SouthState]"), Ex. 57-58 (emails with Mr. Kubic and Sunrise regarding the transitioning of funds), Ex. 59.

## VI.    Mr. Kubic Advocates for Investing in GiftRocket.com's Continued Operation

Mr. Kubic repeatedly expressed his support for the GiftRocket line of business when others sought to shut it down. 56.1 ¶ 52. In October 2021, when Magnus von Koeller, a senior engineer,

proposed that "we should probably shut it down at some point," Mr. Kubic responded that GiftRocket was "pretty much free cash right now," because it was "literally run by contractors . . . And brings in maybe $10M in volume a year." 56.1 ¶¶ 53, 54; Ex. 21 at 4.

A few weeks later, when Mr. von Koeller messaged Mr. Kubic about technical issues believed to be related to the fraudulent use of GiftRocket.com and observed that "this makes me question the whole GiftRocket business even more" even though "y'all are always walking around saying its free money," Mr. Kubic responded that even if there were issues that required attention, "it's still good money." 56.1 ¶ 54; Ex. 60 at 3. In 2022, Mr. Kubic continued to describe GiftRocket to Mr. von Koeller as a "pretty decent business," linking to analytics about GiftRocket's revenues. 56.1 ¶ 55; Ex. 61.

In December 2022, Mr. Kubic boasted that he had convinced Mr. von Koeller to support GiftRocket.com and add additional resources. 56.1 ¶ 57; Ex. 62 at 5 ("I showed Magnus [von Koeller] the GR dashboard Rafay built, and now he's onboard with keeping GR. And putting engineering resources behind it next year."); *see also* Kubic Tr. 109:05-13, 147:17-20. Mr. Kubic also noted that GiftRocket.com was profitable because of its "insane" breakage rates—pure profits kept by Defendants when a gift recipient did not redeem the gift. 56.1 ¶ 58; Kubic Tr. 95:11-24 ("the breakage from the program was high."); Ex. 62 at 5.

Even after Plaintiffs filed this lawsuit, Mr. Kubic continued to champion the GiftRocket business line. In May 2023, he stated that there is "more evidence that we should put more focus on GR rather than less" and that shutting down the GiftRocket website was "hard to justify" because "it generates $2M a year." 56.1 ¶ 59; Ex. 1 at 3. He also attempted to convince the founders to hire a general manager to focus specifically on GiftRocket.com. 56.1 ¶ 60; Kubic Tr. 114:12-15, 147:21-25; Ex. 1 (Mr. Kubic to Mr. von Koeller: "Nick was semi-convinced by my

- 12 -

argument to hire a GM…"). Mr. von Koeller responded with the observation that "we *are* investing in GiftRocket though" because "You're [Mr. Kubic] doing legal work and in-hous[e] support." 56.1 ¶ 61; Ex. 4, Kubic Tr. 115:23-116:05; Ex. 1 at 3 (emphasis in original).

## PROCEDURAL HISTORY

Mr. Kubic previously moved to dismiss for lack of personal jurisdiction, asserting that he "has **exclusively worked** on other business lines since he joined the company two years ago" and had nothing to do with GiftRocket.com. ECF No. 88-1 at 1 (emphasis added). Judge Scanlon rejected that argument, holding that "where an individual corporate defendant allegedly directs the tortious acts of the company, including in New York, courts in New York may exercise long-arm jurisdiction over that defendant" and stating that "[p]laintiffs have the better argument as to whether jurisdictional discovery should be permitted." *See* ECF No. 136 at 3. Mr. Kubic then abandoned his personal jurisdiction challenge, presumably to avoid jurisdictional discovery.

Moreover, Judge Scanlon noted that Plaintiffs "believe that . . . Mr. Kubic [was a] member of senior management that likely interacted with Sunrise Banks as well as the Tremendous entities." *Id*. As demonstrated above, Plaintiffs allegations have been proven correct. The evidence therefore refutes Mr. Kubic's new assertion that "[t]he factual record is undisputed as to Mr. Kubic's lack of involvement with the GiftRocket product." Deft's Mem. at 1.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cardenas v. Edita's Bar & Rest., Inc.*, 2021 WL 4480570, at *3 (E.D.N.Y. Sept. 30, 2021) (Kovner, J.). The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of

material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where, as here, cross motions for summary judgment are filed, [courts] evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (citation and quotations omitted).

In assessing the record, the court considers views "the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Id.* (cleaned up). However, "[a] conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact." *Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. 2023) (citation omitted); *see also BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (district courts may properly discount affidavits that merely contain "self-serving conclusions").

## ARGUMENT

## I.   The Undisputed Facts Show that Mr. Kubic is Liable Under Multiple Theories

Joint liability under the Lanham Act is broad: it may "be imposed on '[a]ll those who, in pursuance of a common plan to commit an act which is tortious, actively take part in it, or further it by cooperation or request, or lend aid or encouragement, or ratify and adopt the acts done,' for they 'are as equally liable as the person who performs the tortious act itself.'" *Johnson & Johnson v. Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *11 (E.D.N.Y. Jan. 16, 2018) (citing 4 McCarthy on Trademarks and Unfair Competition § 25:23 (4th Ed.)); *see Johnson & Johnson v. Azam Int'l Trading*, 2013 WL 4048295, at *12 (E.D.N.Y. Aug. 9, 2013); *Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*, 2006 WL 7077215, at *10 (E.D.N.Y. Nov. 13, 2006), *aff'd*, 279 F. App'x 42 (2d Cir. 2008); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 173 (S.D.N.Y.

- 14 -

1998).

In addition to this general standard enunciating the broad scope of joint liability under the Lanham Act, courts have also identified "several theories" where "[a] corporate officer may be held liable."[4] *See May Flower Int'l, Inc. v. Tristar Food Wholesale Co. Inc.*, 2022 WL 4539577, at \*3 (E.D.N.Y. Sept. 28, 2022) (Kovner, J.). As a result, courts in this Circuit regularly grant affirmative summary judgment as to individual liability under these various alternate theories. *See, e.g.*, *Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 5696148, at \*17 (E.D.N.Y. Sept. 30, 2019) (in a Lanham Act case, granting affirmative summary judgment as to liability of over a dozen individual defendants and otherwise denying remaining individuals' summary judgment motions).

Generally speaking, an officer may be held liable where they are a "'moving, active, conscious force behind the defendant corporation's infringement.'" *Pado, Inc. v. SG Trademark Holding Co. LLC*, 537 F. Supp. 3d 414, 427 (E.D.N.Y. 2021) (Kovner, J.) (quoting *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 173 (E.D.N.Y. 2016) and *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014)). An officer is considered "a moving, active, conscious force" in two scenarios: (1) where the officer was "a direct participant in the infringing activity"; or (2) where the officer "authorized and approved the acts of unfair competition." *KatiRoll Co.*, 33 F. Supp. 3d at 367 (cleaned up).

In addition, an officer can be vicariously liable where "the defendant and the infringer . . . have authority to bind one another in transactions with third parties." *See May Flower*, 2022 WL 4539577, at \*3 (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013)). And an officer can be contributorily liable when it "continued to supply an infringing product to an infringer with

---

[4] As Mr. Kubic's motion concedes, the standards for individual liability under the Lanham Act also govern his liability under Plaintiffs' state law claims. *See* Deft's Mem. at 15; *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005); *May Flower*, 2022 WL 4539577, at \*3.

knowledge that the infringer is mislabeling the particular product supplied." *Id.* (cleaned up).

Plaintiffs have established Mr. Kubic's individual liability under each theory. First, Mr. Kubic is directly liable as an officer of GiftRocket who must have approved of the infringing act and was also a direct participant in the infringing activity. Second, he is vicariously liable because he had the authority "to bind" GiftRocket in contracts with third parties that enabled GiftRocket.com to continue operating. Third, he is contributorily liable because he advocated for, and enabled, GiftRocket.com to continue its unlawful use of businesses' names and information.

Mr. Kubic's Motion does not meaningfully engage with the record or the law. Instead, it relies heavily on the mistaken premise that because he did not devote a substantial amount of time to GiftRocket.com, he cannot be held liable. No authority supports this position. To the contrary, individuals violate the Lanham Act even if other defendants spent more time violating the law. *See Innovation Ventures,* 176 F. Supp. 3d at 155 (granting affirmative summary judgment as to individual's liability notwithstanding that others "arguably had more significant roles in executing the operation"). If Mr. Kubic's legal theory were correct, an individual could play a key role in violating the Lanham Act and then avoid liability because it only took a few minutes to accomplish the task. That is not the law.

As Mr. Kubic described it, GiftRocket was "pretty much free cash right now," because it was "literally run by contractors." Ex. 21. But Mr. Kubic (and the other individual defendants) cannot avoid liability by outsourcing work to contractors and then disclaiming responsibility for their actions. Notably, when GiftRocket needed someone to keep GiftRocket.com functioning, it was Mr. Kubic who acted to ensure that GiftRocket.com could find a new business database and continue to misuse business names and information. Regardless of whether Mr. Kubic spent a majority of his time on other work, he was an active, moving force behind the GiftRocket website.

A.    **Mr. Kubic is a Corporate Officer who Authorized and Approved of, and Directly Participated In, the Underlying Misconduct**

The undisputed facts show that Mr. Kubic was a "moving, active, conscious force" behind Defendants' violations of the Lanham Act and unfair competition laws, both as a corporate officer who authorized and approved the acts of unfair competition and as a direct participant. *See Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 267 n.3 & 272 (S.D.N.Y. 2011) (granting affirmative summary judgment as to individual liability and applying joint and severally liability because it was undisputed that the officer "authorized and approved the acts of unfair competition which are the basis of the . . . corporation's liability") (cleaned up); *GAKM Res. LLC v. Jaylyn Sales Inc.*, 2009 WL 2150891, at *6 n.3 (S.D.N.Y. July 20, 2009) (granting affirmative summary judgment because individual defendant "authorized and approved the acts of unfair competition which are the basis of the . . . corporation's liability") (cleaned up).

Here, it is undisputed that Mr. Kubic was an officer of GiftRocket, Inc. and Tremendous, Inc. and is currently an officer of Tremendous LLC. 56.1 ¶ 20. And there is no genuine dispute of material fact that he authorized and approved GiftRocket.com's operations. When he joined GiftRocket Inc., he was one of the highest paid employees at the company, and he became responsible for running the operations of the "finance, data, operations, customer support, [and] legal teams." 56.1 ¶¶ 16, 23, 24; Kubic Tr. 15:23-25, 26:23-27:21, 34:10-16; Kale Tr. 15:22-24; Exs. 5 & 9. He plainly had knowledge of the GiftRocket business line from his earliest days at the company because when he joined it was so small that "you kind of knew what everybody else was working on." 56.1 ¶ 84; Kubic Tr. 199:05-8. And Mr. Kubic repeatedly fought back when others at the company proposed shutting down GiftRocket.com, insisting that it should continue operating even after this litigation was filed, as it was "free cash" and proposing that additional resources should be spent developing the GiftRocket business. 56.1 ¶ 52; Kubic Tr. 109:05-13, 114:12-15;

147:17-25; Exs. 1, 21, 62.

Not only does the undisputed evidence show that Mr. Kubic was corporate officer that authorized and approved the acts at issue, it also reveals that he was a direct and significant participant in ensuring that GiftRocket.com continued to falsely market "gift cards" using businesses' names and information without consent. Mr. Kubic supervised the GiftRocket customer support employees and personally received customer complaints and business removal requests. 56.1 ¶¶ 40-42; Kubic Tr. 19:24-20:02, 24:16-20; Chang Tr. 15:21-24; Baum Tr. 170:14-22, 188:12-20; Exs. 23-28. He even asked his direct report Ms. Chang whether the GiftRocket website contained information for businesses requesting to be removed and was informed that it did not "because that's how GiftRocket makes money." 56.1 ¶ 45; Ex. 30.

Further, when the GiftRocket business was threatened by the loss of access to the Yelp API, it was Mr. Kubic who stepped in to ensure the website could continue to use other businesses' information to market the GiftRocket product. He attempted to convince Yelp to continue its relationship with GiftRocket. 56.1 ¶ 70; Kubic Tr. 227:02-9; Ex. 43. When that failed, he personally investigated and recommended the adoption of Google Places API, even though he recognized that Google might "shut us down" because of GiftRocket's "misuse of IP." 56.1 ¶ 67; Ex. 46. He also explored whether Google might terminate its relationship with GiftRocket if it found out about this litigation, and repeatedly discussed with high-level team members alternate solutions to Yelp to allow GiftRocket.com to continue to list businesses. 56.1 ¶¶ 64, 66-69; Kubic Tr. 116:24-117:11, 117:15-20, 220:05-16, 222:23-223:16, 225:21-22, 226:06-10; Baum Tr. 263:11-20; Exs. 44-48. In addition, he provided key insights on the mechanics of the switch from Yelp to Google Places. 56.1 ¶ 71; Kale Tr. 44:19-45:08; Exs. 49-53. Mr. Kubic's involvement thus directly created roughly one million new business landing pages on GiftRocket.com and in search

- 18 -

engine results. 56.1 ¶ 77; *see Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1106 (S.D. Cal. 2018) (granting affirmative summary judgment on liability for individual who was "personally involved in committing the acts" by listing infringing products on websites).

Similarly, when the GiftRocket business was threatened by the loss of Sunrise Banks as a banking partner it was Mr. Kubic who tried to convince Sunrise to continue the relationship and then found a new banking partner to take its place. 56.1 ¶¶ 79, 82; Kubic Tr. 87:02-4, 262:21-24; Ex. 54. Moreover, Mr. Kubic also directed GiftRocket employees to raise GiftRocket's D- rating from the Better Business Bureau, which was caused by negative and unanswered customer complaints and which Plaintiffs pointed out in their pleadings as evidence of customer confusion. 56.1 ¶ 50; Exs. 40-42; ECF No. 29 at ¶¶ 87-89.

After the restructuring in June 2023, which Mr. Kubic led, he continued to directly participate and authorize the unlawful conduct as Tremendous LLC's Vice President of Business Operations and one of its executive officers. 56.1 ¶¶ 4, 20. As the individual who fostered the creation of this new entity, along with his positions as its Vice President of Business Operations and an executive officer, Mr. Kubic was directly involved in, authorized and approved of Tremendous LLC's decision and efforts to continue GiftRocket.com's misconduct.

In sum, at every instance when GiftRocket might have ceased its infringing conduct, Mr. Kubic found ways to ensure that it could continue. No reasonable juror could conclude that he did not know of, authorize, and directly participate in GiftRocket's infringing activities. *See Abbott Lab'ys*, 2019 WL 5696148, at *17 (granting affirmative summary judgment as to liability because even if individual defendant "was not involved in the day-to-day business, emails and documents plainly show that he directed, authorized, and supervised the [infringement]"); *Cartier v. Aaron Faber, Inc.,* 512 F. Supp. 2d 165, 170 (S.D.N.Y. 2007) (granting affirmative summary judgment

on liability because individual defendant was "personally" involved in the infringing activity).

Mr. Kubic mistakenly suggests that a director *must* be "a sole shareholder and employee" to impose individual liability on this basis. Deft's Mem. at 7. But the law of individual liability does not contain any such "sole" requirement. Courts merely recognize that it is logical to infer that a company's sole officer would have authorized or participated in the company's misconduct. That does not mean liability attaches *only* to a sole officer. Even Defendants' own authorities recognize that liability "could be reasonably inferred" where "the individual defendant was *an* officer or shareholder of a smaller, privately-held company," just like GiftRocket. *See Steven Madden, Ltd. v. Jasmin Larian, LLC*, 2019 WL 294767, at *5 (S.D.N.Y. Jan. 22, 2019) (emphasis added).[5] Regardless, there is no need to "infer" anything here. The record is rife with evidence of his Mr. Kubic's direct involvement.

Plainly, this is nothing like Defendants' authorities *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 502 (S.D.N.Y. 2015) or *Kuklachev v. Gelfman*, 2009 WL 804095, at *5 (E.D.N.Y. Mar. 25, 2009), where merely relying on an individual's formal title at the company was insufficient. Nor is it like *Lion-Aire Corp. v. Lion Air Installlation, Inc.*, 2024 WL 3950122, at *18 (E.D.N.Y. Aug. 27, 2024), where plaintiffs "brought forth no evidence to substantiate" that the defendant had "control over the selection and use of [the infringing marks]." Nor is it like Defendants' authorities involving very low-level employees who carry out some infringing act at their superiors' direction. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1474, 1478 &, n.8 (11th Cir. 1991) (a non-employee who "sometimes sold

---

[5] The phrase "sole shareholder" originates from a case citing *Bambu Sales*, a 1988 decision from this District. *See Calvin Klein Jeanswear Co. v. Tunnel Trading*, 2001 WL 1456577, at *6 (S.D.N.Y. Nov. 16, 2001) ("As its sole corporate officer and employee, Defendant Zimberg unarguably served as the 'moving, active, conscious force.'") (quoting *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 91 (E.D.N.Y. 1988)). But *Bambu Sales* created no "sole" shareholder requirement. There, the court granted affirmative summary judgment as to the individual liability of two managers and the president of the defendant corporation. *See* 683 F. Supp. 899 at 914.

merchandise" at defendant's store not liable because "[n]o evidence connects him to the purchase or promotion of the counterfeit goods"); *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1164 (11th Cir. 2022) ("There is no evidence in this record that Mrs. Dorfman knew about, was actively involved in, ratified, or was a moving force behind the unlawful activity.") (emphasis added). Mr. Kubic—the second highest paid executive in the company, and one who repeatedly went to bat for the GiftRocket business—is not a low-level employee simply carrying out orders.

**B.    Mr. Kubic is also Vicariously Liable because he has Authority to Bind GiftRocket with Third Parties**

Defendant Kubic is also vicariously liable for GiftRocket's acts of infringement because the "defendant [Kubic] and the infringer [GiftRocket, Inc. and the corporate defendants] . . . have authority to bind one another in transactions with third parties." *See May Flower*, 2022 WL 4539577, at *3. Just one month after joining the company, Mr. Kubic signed GiftRocket, Inc.'s certificate of surrender submitted to the California secretary of state as a "corporate officer . . . authorized to sign on behalf of the foreign corporation." 56.1 ¶ 21; Kubic Tr. 26:23-27:21; Ex. 9. Mr. Kubic also signed contracts with SouthState Bank (on behalf of Tremendous, Inc.) and with GiftRocket's co-employer Rippling (on behalf of GiftRocket, Inc. and Tremendous LLC), committing GiftRocket to pay for banking and professional employment services so that GiftRocket.com could still operate. 56.1 ¶¶ 22, 81; Ex. 10-14.

In short, it is undisputed that Mr. Kubic is a high-ranking employee and corporate officer who has the authority to sign on behalf of the corporate defendants and commit them to pay for services essential to keep GiftRocket.com operating because he has done just that. Mr. Kubic's Motion simply ignores this theory of liability. *See* Deft's Mem. at 7. Accordingly, "[t]here are no genuine disputes of fact . . . [Mr. Kubic has] authority to bind [the corporate defendants] in transactions with third parties, and is therefore vicariously liable." *Abbott Lab'ys*, 2019 WL

5696148, at *18 (granting affirmative summary judgment where individual defendant "had authority to sign checks and authorize payments on [infringer's] behalf").

### C.    Mr. Kubic is Contributorily Liable

Finally, Mr. Kubic is liable on a theory of contributory liability because, as detailed above, he ensured GiftRocket.com's continued operations being fully aware that that GiftRocket was listing other businesses on its website without their consent, and that it was deceiving customers into believing they could buy "gift cards" to those business. *See May Flower*, 2022 WL 4539577 at *3 (contributorily liability attaches where the individual "continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied") (cleaned up). In a striking admission, when Mr. Kubic suggested the switch from Yelp to using Google Places' business database, he recognized that Google might "shut us down" because of GiftRocket's "misuse of IP." 56.1 ¶ 67; Ex. 46.

*        *        *

In sum, the evidence conclusively demonstrates that Mr. Kubic was a moving, active, conscious force behind GiftRocket's unfair competition and is also vicariously and contributorily liable. Beyond just these three specific theories, more generally, the undisputed evidence shows that his conduct falls well within the overarching liberal standard for Lanham Act joint liability: that liability "be imposed on '[a]ll those who, in pursuance of a common plan to commit an act which is tortious, actively take part in it, or further it by cooperation or request, or lend aid or encouragement, or ratify and adopt the acts done,' for they 'are as equally liable as the person who performs the tortious act itself.'" *See Johnson & Johnson,* 2018 WL 2078233, at *11 (citation omitted).

When others proposed to shut down GiftRocket.com, it was Mr. Kubic who repeatedly

- 22 -

insisted that GiftRocket was "free cash." In fact, Mr. Kubic specifically advocated for devoting *more* resources to the GiftRocket business line. And, critically, when the key mechanism through which GiftRocket misappropriated other businesses' names and information was shut off, it was Mr. Kubic who tried to reverse the decision and then investigated, proposed, and helped to implement an alternate way to ensure that the GiftRocket website could continue to list names of other businesses without authorization. Similarly, when GiftRocket's key business partner Sunrise Banks declined to continue the relationship, it was Mr. Kubic who tried to get the decision reversed and then found a substitute banking partner to ensure GiftRocket could continue to offer fake gift cards to businesses. Mr. Kubic took these actions despite full knowledge of the repeated customer complaints and business removal requests related to GiftRocket.com.

## II.    Plaintiffs—Not Mr. Kubic—Are Entitled to Attorneys' Fees.

The Court should also reject Mr. Kubic's request for attorney's fees. As an initial matter, attorneys' fees can be awarded to a "prevailing party," and Mr. Kubic should not be one.

Even in the unlikely event that the Court were to grant Mr. Kubic's motion, there are no "exceptional circumstances" here that would merit an award of attorney's fees. The evidence more than sufficiently establishes that Mr. Kubic "participated in [the alleged Lanham Act violation] to show that plaintiff's claim was not brought in bad faith." *Santana Prods., Inc.*, 2006 WL 7077215 at *10. Defendants' fiction that Plaintiffs brought suit in bad faith and to harass Mr. Kubic after the Parties' failed mediation is not supported by any facts. Plaintiffs have a clear and good-faith basis to hold him liable. *See Coach, Inc. v. Richie's Playhouse Inc.*, 2012 WL 12931146, at *4 (E.D. Mich. Mar. 9, 2012) ("Plaintiffs have set forth information about Mrs. Kelley that they recently learned during discovery and that supports their request to amend the complaint to add her as a defendant. The Court does not find support for Defendants' contention that Plaintiffs'

proposed amendment is really just an 'attempt to harass and pressure Richard Kelley by using Defendant's wife as leverage to enhance the settlement offer.'").

Plaintiffs' conduct is nothing like the misconduct in Defendants' authorities where (a) facts uniquely in a plaintiffs' control showed their claims were "objectively unreasonable and frivolous," *Manhattan Rev. LLC v. Yun*, 2017 WL 11455317, at *6 (S.D.N.Y. Sept. 21, 2017), (b) plaintiffs repeatedly ignored court's discovery orders, offered zero evidence of actual confusion, "blatantly" misread circuit precedent, "and repeatedly [sought] reconsideration of Court orders," *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2024 WL 4250359, at *4 (S.D.N.Y. Sept. 20, 2024), or (c) a plaintiff created "fraudulent documents and testimony," *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002), *aff'd*, 81 F. App'x 396 (2d Cir. 2003).

In reality, it is Mr. Kubic who has repeatedly pursued losing arguments and created unnecessary legal work. Mr. Kubic filed a meritless motion to dismiss for lack of personal jurisdiction—which he withdrew after Judge Scanlon ordered jurisdictional discovery. Then he filed the instant meritless and premature motion for summary judgment without even consulting with Plaintiffs about the timing or attempting to achieve an efficient schedule. *See* ECF No. 241 at 3-5. No separate or additional merits discovery was needed to address the claims against Mr. Kubic, and he is represented by the same counsel as the other GiftRocket Defendants.

Despite this, Mr. Kubic, after filing his bare bones and baseless motion for summary judgment, sent Plaintiffs a "settlement demand" asking that each Named Plaintiff pay him the exorbitant amount of $40,000 each—an amount Mr. Kubic and defense counsel know is financially ruinous for most small business owners including the Named Plaintiffs, whose financial records were produced to them. He also demanded Plaintiffs' counsel pay him $150,000 "for a total of $250,000, along with a voluntary dismissal with prejudice, in exchange for a withdrawal of Mr.

Kubic's motion for summary judgment and request for fees." Ex. 63. It is unfathomable how Mr. Kubic could have incurred $250,000 in legal fees when his motion is barely 17 pages and contains hardly any record evidence.

Defense counsel's emails also stated: "Please note that the settlement demand above is far less than Mr. Kubic intends to seek upon prevailing on his motion for summary judgment. . . . Please confirm once you've communicated this settlement demand to your clients, as required by New York Rule of Professional Conduct 1.4 . . . and please provide a response to this settlement demand within 7 days." Counsel later followed up asking: "Can you please confirm you communicated the settlement demand below to your clients?"[6]

Defense counsel's emails speak for themselves in terms of what Mr. Kubic hopes to accomplish with this motion. These facts all support an award of attorney's fees in favor of Plaintiffs, who remain undeterred by Mr. Kubic's ploys.

## CONCLUSION

For the foregoing reasons, this Court should deny Mr. Kubic's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment on individual liability.

---

[6] Fed. R. Evid. 408 does not preclude Plaintiffs' discussion above. *See, e.g.*, *EMA Fin., LLC v. NFusz, Inc.,* 509 F. Supp. 3d 18, 27–28 (S.D.N.Y. 2020) ("Evidence of a settlement agreement 'can fall outside Rule 408 if it is offered for 'another purpose,' i.e., for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle.'"); *see also* Order (Scanlon J.), (Sept. 5, 2024) (denying GiftRocket Defendants' motion to strike Plaintiffs' filing for purportedly violating Fed. R. Evid. 408).

Respectfully Submitted,


By: */s/ Raphael Janove*
Raphael Janove                                 Dayron Silverio (Admitted *pro hac vice)*
**JANOVE PLLC**                                Matthew Weinshall (Admitted *pro hac vice*)
500 7th Avenue, 8th Fl.                         **PODHURST ORSECK P.A.**
New York, NY 10018                             2525 Ponce de Leon Blvd., Ste. 500
(646) 347-3940                                 Coral Gables, FL 33134
raphael@janove.law                             (305) 358-2800
                                               ds@podhurst.com
                                               mweinshall@podhurst.com

Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law


Dated: March 6, 2025                           *Attorneys for Plaintiffs and the Proposed*
                                               *Classes*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 8,400 words, including footnotes but excluding text specified in Rule 7.1(c).

Dated: March 6, 2025

_/s/ Raphael Janove_

Raphael Janove