Exhibit 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
GRACIE BAKED LLC, WECARE RG, INC., and
MILLERCOBB LLC, on behalf of themselves and
all others similarly situated,

                           PLAINTIFFS,

       -against-      Case No.:
                    22-CV-4019 (RPK)(VMS)

GIFTROCKET, INC., TREMENDOUS, INC.,
NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES,
BENJAMIN KUBIC, SUNRISE BANKS, N.A.,
GIFTROCKET, LLC, TREMENDOUS LLC, and
TREMENDOUS PARENT, INC.,

                       DEFENDANTS.
----------------------------------------X

            DATE: November 6th, 2024
            TIME: 10:03 A.M.

            EXAMINATION BEFORE TRIAL
of the Defendant, KAPIL KALE, taken by the
Plaintiff, pursuant to a Notice and to the
Federal Rules of Civil Procedure, held
virtually via Zoom videoconferencing,
before Kevin Haghnazari, a Notary Public of
the State of New York.

(1)  **A P P E A R A N C E S :**
(2)
(3)  JANOVE PLLC
(4)    Attorneys for the Plaintiff
(5)    GRACIE BAKED LLC, WECARE RG, INC., and
       MILLERCOBB LLC, on behalf of themselves
(6)    and all others similarly situated
       500 7th Avenue, 8th Floor
(7)    New York, New York 10018
       BY: RAPHAEL JANOVE, EDQ.
(8)        LIANA VITALE, ESQ.
           SAM SHARFSTEIN, PARALEGAL
(9)    File #: N/A
       raphael@janove.law
(10)
(11)
       DTO LAW
(12)   Attorneys for the Defendants
       GIFTROCKET, INC., TREMENDOUS, INC.,
(13)   NICHOLAS BAUM, KAPIL KALE, JONATHAN
       PINES, BENJAMIN KUBIC, GIFTROCKET, LLC,
(14)   TREMENDOUS LLC, AND TREMENDOUS PARENT,
       INC.
(15)   307 5th Avenue, 12th Floor
       New York, New York 10016
(16)   BY: KATHERINE KRAMER, ESQ.
           KEVIN WESTERMAN, ESQ.
(17)       MEGAN O'NEIL, ESQ.
       File #: N/A
(18)   kkramer@dtolaw.com
(19)
(20)   GREENE ESPEL, PLLC
       Attorneys for the Defendant
(21)   SUNRISE BANKS, N.A.
       222 South 9th Street, Suite 2200
(22)   Minneapolis, Minnesota 55402
       BY: GINA TONN, ESQ.
(23)   File #: N/A
(24)
(25)

K. KALE

(1)

(2)     A.      Kale.

(3)     Q.      That's what I thought.  Okay.

(4) So can you tell me, who is Benjamin Kubic?

(5)     A.      He is the Vice President of

(6) Business Operations at Tremendous.

(7)     Q.      When did you meet Ben Kubic?

(8)     A.      In 2021.

(9)     Q.      How did you meet him?

(10)     A.      We were, at the time, for

(11) Tremendous, we were hiring for a business

(12) operations leader.  Ben had actually

(13) interviewed at my former employer, at

(14) AngelList Talent.  At the time, Tremendous

(15) was very small, did not have a brand name.

(16) It was not easy for us to recruit.

(17)             And so I would constantly have

(18) conversations with my -- the CEO at

(19) AngelList Talent, asking me if he had met

(20) any people that wanted to hire, but, you

(21) know, didn't have the seats or roles for.

(22) And he mentioned Ben Kubic.  He was

(23) actually interviewing for my old role.

(24)             So we were introduced by him.

(25)     Q.      And who initially spoke to Ben

(1)                    K. KALE

(2)  Kubic, about this -- about his job at

(3)  Tremendous?

(4)       **A.     Myself and Nick Baum.**

(5)       Q.     Did Benjamin Presser speak to

(6)  Benjamin Kubic, in connection with Benjamin

(7)  Kubic's hiring?

(8)            **MS. KRAMER:  Objection to form.**

(9)        **Go ahead.**

(10)      **A.     I'm not sure.  I think -- it's**

(11)  **possible, but it was 3 years ago.  And**

(12)  **quite frankly, I don't remember.**

(13)      Q.     Who decided to hire Ben Kubic?

(14)      **A.     Myself and Nick Baum.**

(15)      Q.     Did you send Ben Kubic's

(16)  information to Jonathan Pines?

(17)      **A.     I don't remember.**

(18)      Q.     At the time Ben Kubic was hired

(19)  in 2021, the name of Tremendous was

(20)  GiftRocket, Inc., right?

(21)            **MS. KRAMER:  Objection to form.**

(22)        **Are you referring to the corporate**

(23)        **entity or the product?**

(24)            **MR. JANOVE:  The corporate**

(25)        **entity.**

(1)                    **K. KALE**

(2)        Q.    Okay.   Then that was a

(3)  miscommunication.   Any way, let's just do

(4)  clear yes, nos for the record, so we're all

(5)  on the same page for the transcript, so the

(6)  Court Reporter can write that down.

(7)        **A.    Got it (indicating).**

(8)        Q.    So when you hired Ben Kubic,

(9)  did you describe to him what his job

(10) responsibilities would be?

(11)       **A.    Yes.**

(12)       Q.    What did you tell him his job

(13) responsibilities would be?

(14)       **A.    I can recall some of them, but**

(15) **what I tell you now will not be**

(16) **comprehensive.  So before -- before I**

(17) **explain, I just wanted to provide that**

(18) **caveat.  We wanted someone who would be**

(19) **managing business operations-related**

(20) **functions.  And this entailed working with**

(21) **our support team, on operations there,**

(22) **working on bank partnerships, and working**

(23) **on finance and other sort of miscellaneous**

(24) **legal issues that may come up.**

(25)               **At the time, Nick was working**

(1)                    **K. KALE**

(2)    **sales and marketing, and I was primarily**

(3)    **working on product and engineering.  And**

(4)    **there wasn't someone who was available to**

(5)    **help with a lot of the back-office**

(6)    **functions, regarding running an early-stage**

(7)    **technology company.**

(8)        Q.    At the time you were

(9)    considering Ben Kubic for a role in 2021,

(10)   did Benjamin Presser still work for your

(11)   company?

(12)       **A.    I'm not 100 percent sure if Ben**

(13)   **-- the overlap (indicating), it would have**

(14)   **been a month or something, in that line, if**

(15)   **it had happened.  But, I think, yes.**

(16)       Q.    Did Ben Kubic inherent any of

(17)   Ben Presser's job responsibilities?

(18)       **A.    No.**

(19)       Q.    So you mentioned that Ben Kubic

(20)   helped take over operating the support

(21)   teams, right?

(22)       **A.    Yes, that support -- running**

(23)   **our support organization was one of the**

(24)   **aspects of the expectations for the role.**

(25)       Q.    Did the support include support

(1)                    K. KALE

(2)  related to GiftRocket.com?

(3)       A.    At the time, yes.

(4)       Q.    So you told Ben Kubic about

(5)  GiftRocket.com when you hired him, right?

(6)       A.    I don't remember.

(7)       Q.    And do you think he would have

(8)  learned of GiftRocket.com as part of the

(9)  hiring process?

(10)           MS. KRAMER:  Objection to form.

(11)      A.    Can you clarify what you mean?

(12)  Are you speaking about the corporate

(13)  entity, the business?  In what depth?

(14)      Q.    So you testified, right, that

(15)  Ben Kubic took over the support function,

(16)  and part of that support function included

(17)  support related to GiftRocket.com, right?

(18)           MS. KRAMER:  Objection to form.

(19)      A.    I specifically said that part

(20)  of Ben's job responsibilities coming in

(21)  would be managing some of our support

(22)  operations.  That's not quite what you're

(23)  restating.

(24)      Q.    Did those support operations

(25)  also include support for GiftRocket.com?

```
(1)                    K. KALE
(2)         A.      Sort of.  They -- they
(3)    technically did, but it was -- the person
(4)    who was managing support at the time, who
(5)    was one full-time employee, Jane, there was
(6)    a point where we had discussed that she
(7)    would -- she would -- she was also running
(8)    support for Tremendous, and there was a
(9)    point at which her manager changed from
(10)   Nick, to Ben, in order to better align for
(11)   Tremendous's support, under that.
(12)            As to the GiftRocket support
(13)   piece; I don't know.  I think you'd have to
(14)   ask Ben.  This is a while ago.
(15)        Q.      So Ben Kubic took over Nick
(16)   Baum's role and supervised Jane Chang?
(17)            MS. KRAMER:  Objection to form.
(18)        A.      You're asking if Ben Kubic
(19)   became Jane's manager, after Nick, at some
(20)   point; is that correct?
(21)            Is that your question.
(22)        Q.      Yeah.  With that formulation.
(23)        A.      Yes, Ben Kubic did become
(24)   Jane's manager, at some point.  I don't
(25)   remember the exact dates.
```

**K. KALE**

(1)

(2)    Q.    Who supervises Ben Kubic?

(3)    **A.**    **Nick Baum.**

(4)    Q.    Do you have any role in

(5) managing Ben Kubic?

(6)    **A.**    **I do not play the role of his**

(7) **direct manager or supervisor, but in the**

(8) **organization, given -- given my role as a**

(9) **founder at a C-level executive, I do -- I**

(10) **don't supervise Ben, no.  But I do wield**

(11) **some influence.**

(12)        **We are on the same leadership**

(13) **team together, if that answers your**

(14) **question.**

(15)    Q.    Thanks.  So Ben Kubic is Vice

(16) President of Business Operations, right?

(17)    **A.**    **Yes, that is his role at**

(18) **Tremendous.**

(19)    Q.    Do you mean Tremendous, LLC?

(20)    **A.**    **I mean -- actually, I don't --**

(21) **I don't know for sure.**

(22)    Q.    Okay.  And does Tremendous have

(23) a President of Business Operations?

(24)    **A.**    **Not that I'm aware of.**

(25)    Q.    Has Tremendous tried to hire a

```
(1)                    K. KALE
(2)  President of Business Operations?
(3)              MS. KRAMER:  Objection to form.
(4)      A.    No.
(5)      Q.    Do you recall if Tremendous
(6)  ever put a job posting on LinkedIn for a
(7)  President of Business Operations?
(8)              MS. KRAMER:  Objection to form.
(9)      A.    I don't recall that.
(10)     Q.    Why is Ben Kubic only Vice
(11) President of Business Operations and not
(12) President of Business Operations?
(13)             MS. KRAMER:  Objection to form.
(14)     A.    You're asking me to -- I'm just
(15) trying to clarify the question.
(16)             Can you clarify what you mean?
(17)     Q.    Yes.  So Ben Kubic is Vice
(18) President of Business Operations.  Why is
(19) he not President of Business Operations?
(20)             MS. KRAMER:  Objection to form.
(21)     A.    Excuse my pause.  I'm just
(22) trying to interpret your question here.
(23)             The structure that we'd set up
(24) for how we run our team right now is that
(25) they're really -- there are only two
```

**K. KALE**

(1)

(2)     **C-level titles.  One is Nick, and then the**

(3)     **other is me.  Nick is a CEO, I'm the COO.**

(4)     **After that, all of the executives have**

(5)     **VP-level titles.  And so the -- we never**

(6)     **considered the possibility of giving people**

(7)     **president titles or VP titles or anything.**

(8)     **It's just, VP is what we stuck with, and I**

(9)     **think that's a common practice for**

(10)    **companies at our size.**

(11)         Q.    You testified that Nick Baum

(12)    supervises Ben Kubic, right?

(13)              MS. KRAMER:  Objection to form.

(14)         **A.    I testified that Nick is Ben's**

(15)    **manager.**

(16)         Q.    Who is the senior-most employee

(17)    at Tremendous?

(18)         **A.    Can you clarify at what point**

(19)    **in time and what time period and what you**

(20)    **mean by senior?**

(21)         Q.    All right.  Let's start in

(22)    2021.  As I understand it, you hired Ben

(23)    Kubic as Vice President of Business

(24)    Operations.  He then began managing Jane

(25)    Chang, right?

```
(1)                    K. KALE

(2)        A.     Yes.

(3)        Q.     And that was because he's

(4)   involved with business operations or

(5)   business --

(6)        A.     No, he's involved with the

(7)   partnerships, typically, ranging from our

(8)   bank partnerships, to any vendor

(9)   partnerships that we have.

(10)        Q.     Did you want his opinion on

(11)  what to do when transitioning from Yelp's

(12)  API, to Google's API?

(13)            MS. KRAMER:   Objection to form.

(14)        A.     I -- I don't know, and I'm not

(15)  sure I remember.

(16)        Q.     All right.  Let's turn to

(17)  GiftRocket 49781, which I'll ask the

(18)  reporter to mark as Exhibit 33.  Please

(19)  take a moment to read through it.

(20)        A.     Sure.  Give me a second.

(21)            Okay.

(22)        Q.     What is this document?

(23)        A.     This appears to be a slack

(24)  thread concerning the topic of

(25)  transitioning from the Yelp API, from
```

**K. KALE**

(1)

(2) **May 14th of 2023.**

(3)     Q.    At the top, you write, "Okay,

(4) then store the business's name for business

(5) removal requests."

(6)         Do you see that?

(7)     **A.    Here?**

(8)     Q.    Yeah, two, "Okay to store the

(9) business's name for business removal

(10) requests."

(11)    **A.    Yes, I see that's the top of**

(12) **the thread.**

(13)    Q.    And then the next message from

(14) you end with the sentence, "Again, this is

(15) a piece of information requested by someone

(16) outside the scope of Yelp, so this seems

(17) reasonable to me."

(18)        Do you know what that refers

(19) to?

(20)    **A.    Give me a second to process,**

(21) **before I answer this.**

(22)    Q.    Sure.

(23)    **A.    Okay.  So to explain this, I**

(24) **requested that we delete all data**

(25) **associated with him, that we had taken --**

(1)                    K. KALE

(2)    that we had -- they had provided us through

(3)    air API.  Now, this created an issue where

(4)    if a business had requested that they be

(5)    taken down, if we deleted the business

(6)    data, then we might lose a record of the

(7)    request to just have this taken down.

(8)            So this is a discussion of,

(9)    does the businesses take out request to

(10)   proceed the request from Yelp, to delete

(11)   all of their data?

(12)           I think, in this case, we came

(13)   to the conclusion that, yes, we should

(14)   store limited attributes about the

(15)   business, if there is ever a takedown

(16)   request associated with it.

(17)       Q.    So you didn't delete all of the

(18)   Yelp content, then?

(19)           MS. KRAMER:  Objection to form.

(20)       A.    No, we did not, because in this

(21)   case, this content was originally provided

(22)   by -- through -- through the Yelp API.  But

(23)   we deemed that the business had sent us

(24)   requests, and, therefore, it was -- we

(25)   could use the business name.

(1)                    **K. KALE**

(2)            **Actually, you know what, Raphe,**

(3)    **I'm not totally sure how to answer that**

(4)    **question, based on -- just looking through**

(5)    **this.  But I think the answer is no.**

(6)        Q.    Okay.  Thanks.  Can you also

(7)    scroll down -- or no need to scroll down,

(8)    but to the message starting at 8:41 a.m.,

(9)    can you read that for me?

(10)        **A.    B. Kubic, Ben Kubic/NB,**

(11)    **Nicholas Baum, WDYT.**

(12)        Q.    What does WDYT stand for?

(13)        **A.    It stands for what do you**

(14)    **think.**

(15)        Q.    So you asked Ben Kubic for his

(16)    thoughts regarding saving some of the Yelp

(17)    data, right?

(18)        **A.    Yes.**

(19)        Q.    Why did you ask Ben Kubic for

(20)    his opinion?

(21)        **A.    I'm trying to speculate -- I'm**

(22)    **trying to think about -- about this.**

(23)    **Generally, it went to Ben for things**

(24)    **regarding data deletion or things related**

(25)    **to legal, as he was also the liaison for,**

(1)                    K. KALE

(2)    you know, the -- our -- our in-house

(3)    attorney had reported to him.

(4)              So from -- for the topic of

(5)    data deletion, specifically, and, also,

(6)    things related to compliance, I'll call it,

(7)    it seems like his opinion it valuable.  It

(8)    seemed like his opinion was valuable.

(9)        Q.    So his opinion is valuable,

(10)   also related to GiftRocket.com, then,

(11)   right?

(12)              MS. KRAMER:  Objection to form.

(13)       A.    I said that his opinion was

(14)   valuable related to partnerships and data

(15)   deletion, which was sort of a compliance

(16)   issue.  I didn't make any specific

(17)   statement about whether it was important to

(18)   GiftRocket.com.  I think there are a number

(19)   of GiftRocket decisions, where we -- we

(20)   would not necessarily consult him.

(21)       Q.    All right.  Let's go down to

(22)   the message from Ben Kubic at 3:10 p.m.

(23)              Can you read that for me?

(24)       A.    It says, "Before we drop any

(25)   tables, do we have a backup from the

(1)                    **K. KALE**

(2)   **database of today, just in case?"**

(3)        Q.     What is the database that Ben

(4)   Kubic's referring to?

(5)           **MS. KRAMER:  Objection to form.**

(6)      **A.     He's referring to the**

(7)   **GiftRocket production database.**

(8)        Q.     What is the GiftRocket

(9)   production database?

(10)     **A.     It's where production data for**

(11)  **GiftRocket is stored, ranging from gifts**

(12)  **that had been sent, including amounts and**

(13)  **so on, to fraud reviews, to anything**

(14)  **related to the production website, that's**

(15)  **where -- that's our primary data store.**

(16)       Q.     Does that database include the

(17)  businesses that are listed on

(18)  GiftRocket.com?

(19)          **MS. KRAMER:  Objection to form.**

(20)     **A.     It's a complicated question to**

(21)  **answer, but I think the way that you're --**

(22)  **you're describing is, like, yes, there is a**

(23)  **table of businesses that are -- that is**

(24)  **stored in that production database.  But,**

(25)  **again, that's -- that table is like a cash**

**K. KALE**

(2)    Q.   Yes.  I think, actually, let's

(3)  come back to this topic later, or we might

(4)  do this topic when we have your 30(b)(6)

(5)  testimony in January, but for now, let's

(6)  take down the -- take this down as

(7)  Exhibit 10.  All right.  All right.  Now,

(8)  I'd like to turn to a new exhibit,

(9)  GiftRocket 49725, which we'll mark as

(10)  Exhibit 34.

(11)          **MS. KRAMER:  Raphe, just to be**

(12)      **clear, we haven't designated a**

(13)      **witnesses yet for the 30(b)(6)**

(14)      **depositions.  So if you're assumption**

(15)      **that you'll be able to ask a couple**

(16)      **of additional questions in January,**

(17)      **maybe, maybe not, but we haven't made**

(18)      **that designation yet.**

(19)          **MR. JANOVE:  Yeah, no, we'll**

(20)      **ask someone during the 30(b)(6)**

(21)      **testimony, you know, regardless.**

(22)          **THE WITNESS:  I'll look -- I'll**

(23)      **look forward to the E-invites.**

(24)          **MR. JANOVE:  All righty.**

(25)    Q.   All right.  Please take a

(1)                        K. KALE

(2)    minute to read this document.

(3)              What is this document?

(4)        **A.    Hold on a second.  I'm still**

(5)    **reading through it.**

(6)        Q.    Okay.

(7)        **A.    Okay.  Raphe, your question**

(8)    **was, what is this document?**

(9)        Q.    Yes, what is this document?

(10)           **MS. KRAMER:  Have we had a**

(11)         **chance to scroll through the whole**

(12)         **thing?**

(13)           **THE WITNESS:  I have not.**

(14)         **Thank you.  Okay, it's just one more**

(15)         **line.  Got it.**

(16)           **This appears to be a discussion**

(17)         **about finance.  It's a discussion**

(18)         **between Ben Kubic and Katie Perrin,**

(19)         **who is an accountant, about some --**

(20)         **some of the finance logistics between**

(21)         **Tremendous, LLC, the parent company**

(22)         **and, extensively, GiftRocket, LLC.**

(23)        Q.    Is Katie Perrin an accountant

(24)    that is employed by Tremendous, LLC?

(25)        **A.    I'm not sure if she's employed**

```
(1)                      K. KALE
(2)    by Tremendous, LLC, or Tremendous Parent,
(3)    Inc.
(4)         Q.    Let's go to the top, where Ben
(5)    Kubic asks, "SSB is asking for a narrative
(6)    of what's in the intercompany transfers on
(7)    Tremendous, LLCs balance sheets.  Can you
(8)    give me some language there?"
(9)              Do you see that?
(10)   A.    I do.
(11)        Q.    What do you think that SSB
(12)   refers to?
(13)             MS. KRAMER:  Objection to form.
(14)        A.    SSB refers to South State Bank.
(15)        Q.    Is Ben Kubic in charge of the
(16)   relationship with South State Bank?
(17)             MS. KRAMER:  Objection to form.
(18)        A.    I think the term, in charge of,
(19)   is complicated.  But he is our primary
(20)   representative with that relationship.
(21)        Q.    Thank you.
(22)        A.    You're welcome.
(23)        Q.    All right.  Let's go down to
(24)   Katie's response, where she says, "Mostly
(25)   cash transfers between entities because
```

```
(1)                    K. KALE

(2)    parent Co isn't revenue generating and GR

(3)    doesn't generate enough to cover its

(4)    obligations at this point (DTO).  We

(5)    occasionally have to transfer cash from

(6)    Tremendous, LLC, to parent Co/GR, that

(7)    creates an intercompany receivable."

(8)            Do you see that?

(9)        A.    I do.

(10)       Q.    When it says "GR doesn't

(11)   generate enough to cover all its

(12)   obligations at this point (DTO)," what do

(13)   you understand that to mean?

(14)           MS. KRAMER:  Objection to form.

(15)       A.    I don't know.

(16)       Q.    Do you think DTO is referring

(17)   to your Defense Counsel?

(18)           MS. KRAMER:  Objection to form.

(19)       A.    Yes.

(20)       Q.    What obligations does

(21)   GiftRocket, LLC, currently have?

(22)           MS. KRAMER:  Objection to form.

(23)       A.    I'm not sure.  Like, I think

(24)   this is referring to paying the legal fees.

(25)       Q.    Does this mean that GiftRocket
```