# EXHIBIT K

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
GRACIE BAKED, LLC, WECARE RG, INC., and
MILLERCOBB, LLC, on behalf of themselves
and all others similarly situated,

          PLAINTIFFS,

  -against-    Case No.:
         22-CV-4019 (RKP)(VMS)

GIFTROCKET, INC., TREMENDOUS, INC.,
NICHOLAS BAUM, KAPIL KALE, JONATHAN PINE,
BENJAMIN KUBIC, SUNRISE BANKS N.A.,
GIFTROCKET, LLC, TREMENDOUS, LLC, and
TREMENDOUS PARENT, INC.,
         DEFENDANTS.
-----------------------------------------X

    DATE:  January 21, 2025
    TIME:  9:53 A.M.

    DEPOSITION of the Defendant, GIFTROCKET, LLC, by a Witness, NICHOLAS BERNARD BAUM, taken by the Plaintiff, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of Lexitas, 420 Lexington Avenue, New York, New York 10017, before Sandra Sierra, a Notary Public of the State of New

## Page 2

York.

## Page 3

APPEARANCES:

JANOVE PLLC
  Attorneys for the Plaintiff
  GRACIE BAKED, LLC
  500 Seventh Avenue
  New York, New York 10018
  BY:  LIANA VITALE, ESQ.

DTO LAW
  Attorneys for the Defendants
  GIFTROCKET, INC., TREMENDOUS, INC.,
  NICHOLAS BAUM, KAPIL KALE,
  JONATHAN PINE, BENJAMIN KUBIC
  915 Wilshire Boulevard, Suite 1950
  Los Angeles, California 90017
  BY:  MEGAN O'NEILL, ESQ.
   -and-
  BY:  KEVIN WESTERMAN, ESQ.

GREENE ESPEL
  Attorneys for the Defendant
  SUNRISE BANKS
  222 South 9th Street, Suite 2200
  Minneapolis, Minnesota 55402
  BY:  GINA TONN, ESQ.

Also present:
Sam Sharfstein - Janove PLLC

    *   *   *

## Page 4

FEDERAL STIPULATIONS

    IT IS HEREBY STIPULATED AND AGREED By and between (among) counsel for the respective parties herein, that filing and sealing be and the same are hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 37

1  　　　　　　N. B. BAUM
2  　A.　Yes.
3  　Q.　What enhanced disclosures?
4  　A.　If you let me look at my
5  binder.
6  　Q.　Yes.  Just let us know what
7  you're looking at.
8  　A.　I am going to take a look at
9  the "Send a Gift" page.  I can see that
10 document numbers 1 through 9 are
11 screenshots from historical archive of our
12 "Send a Gift" page.  And we can see the
13 changes that took place and any disclosures
14 that might have been added to that page.
15 　Q.　Okay.  Why don't we walk
16 through and start with the first one.
17 　A.　So first one is 2015 --
18 　Q.　First the one -- sorry.
19 　　　　MS. VITALE:  The first one is
20 　　GR0050477.  This is Tab 1 in the
21 　　binder of documents that Mr. Baum
22 　　brought with him to the deposition
23 　　today.
24 　Q.　Okay.  What is this?
25 　A.　This is the page that a sender

Page 38

1  　　　　　　N. B. BAUM
2  would use to send a GiftRocket gift card.
3  And it is a form that collects information
4  about the recipient and the gift such as
5  the recipient's name, the amount, the
6  greeting card design, the message, a
7  suggestible business and the delivery
8  method to the recipient.  And so I think
9  the best way to do this is to compare the
10 different documents.  And --
11 　Q.　So what is the date of the one
12 we looking at?
13 　A.　First one is September 12th,
14 2015.
15 　Q.　Is this how the GiftRocket web
16 page would appear if you went to the "Send
17 a Gift Card" generic page on the website at
18 that point in time?
19 　A.　That's right.
20 　Q.　What if you went to the landing
21 page for a specific business?
22 　A.　It would be nearly identical.
23 　Q.　What would be different?
24 　A.　What would be different is that
25 the business information would be

Page 39

1  　　　　　　N. B. BAUM
2  prefilled.  So there would be information
3  about the business including the name, the
4  address, the rating, the review count; I
5  think that is it.
6  　Q.　And where it says, "GiftRocket
7  Gift Card," would it instead say, for
8  example, "Gracie Baked" or whatever the
9  business name was?
10 　A.　It would include the business
11 name, that's right.
12 　Q.　And that would be the same for
13 any landing page for any specific business,
14 it would follow the same format; is that
15 correct?
16 　A.　That's correct.
17 　Q.　Okay.  Do you want to turn to
18 the next one, which is Tab 2 GR0050480.
19 What is this?
20 　A.　This is the same page, but how
21 it looked on April 26th, 2016.  And I don't
22 believe any enhanced disclosures had been
23 added yet.  So let's turn to the next one.
24 　Q.　All right, that is Tab 3
25 GR0050483?

Page 40

1  　　　　　　N. B. BAUM
2  　A.　And now we are looking at the
3  page on October 4th, 2017.
4  　Q.　Okay.
5  　A.　And you can see that there are
6  -- there is a specific disclosure, the
7  GiftRocket card disclosure you can see in
8  the middle of the page towards the right.
9  And it reads, "The GiftRocket Gift Card is
10 redeemed for money through the GiftRocket
11 website.  It is not accepted by any
12 third-party merchant and is not covered by
13 the CARD Act.  Value expires three years
14 after purchase and, if not redeemed, a $10
15 monthly fee applies starting on the 13th
16 month after purchase.  The fees are
17 refunded if the gift card is redeemed prior
18 to expiration.  The recipient will receive
19 the full initial value.  Please see the
20 terms and conditions for the terms and full
21 list of fees associated with GiftRocket
22 Gift Card."
23 　　　　In addition to this gift card
24 disclosure there is enhanced language about
25 how the product works at the top of the

Page 41

1  N. B. BAUM
2  page. This is first thing that a visitor
3  would see upon landing on this page which
4  says, "Personalize your cash gift card with
5  a beautiful design and message. Your
6  recipient receives a printable or email
7  certificate. See how it works for more
8  information." And the "how it works" would
9  include more detailed information about how
10 the recipient receives the funds.
11     Q.   What is the basis for your
12 statement that that's the first thing the
13 user would see when they went on the
14 website?
15     A.   My point is that it is towards
16 the top and in my opinion the most
17 prominently displayed text beneath the
18 title. So is it the first thing they would
19 see, that is dependant on the individual,
20 but it is prominently displayed on the
21 page.
22     Q.   It's displayed in the smallest
23 font size on the entire page, correct?
24         MS. O'NEILL: Objection to
25     form.

Page 42

1  N. B. BAUM
2     A.   It's displayed in font size
3  consistent with other font sizes --
4  numerous other font sizes across the page.
5  I don't know the specific sizes. But to me
6  it does not look substantially differently
7  sized than other font sizes on the page
8  other than the header.
9     Q.   Do you see that the header is
10 larger and in bold and it says, "Send a
11 gift card online"?
12     A.   Yes. Typically headers are
13 large and often bolder.
14     Q.   Who decided to add this
15 language to the GiftRocket website?
16         MS. O'NEILL: Objection to
17     form.
18     A.   Typically, how it worked is the
19 GiftRocket team would create language to
20 accomplish a goal in collaboration with our
21 partner bank, Sunrise, and Sunrise would
22 review the content and sometimes ask for
23 changes. This specific language, I am not
24 sure if it was first proposed by Sunrise or
25 by GiftRocket team, but generally for

Page 43

1  N. B. BAUM
2  disclosures the process was collaborative
3  with Sunrise.
4     Q.   When you say the GiftRocket
5  team, who are talking about?
6     A.   It would depend on the time,
7  but typically I was the individual who
8  worked most closely with Sunrise on these
9  types of efforts.
10    Q.   When you say "Sunrise," who at
11 Sunrise are you talking about?
12        MS. O'NEILL: Objection to
13    form.
14    A.   It depends on the time period.
15 We would have an account manager that most
16 requests in communication were routed
17 through and, specially for something like
18 disclosures, they might be working with a
19 compliance team, and so it's actually a
20 little bit of a tricky question when you
21 say for something like this who we are
22 working with. Because you have an account
23 manager that might be relaying information
24 from someone on the compliance team and we
25 don't necessarily know who that individual

Page 44

1  N. B. BAUM
2  is. Sometimes we would communicate
3  directly with compliance folks or other
4  people at Sunrise. But the typical
5  communication would go through an account
6  manager.
7     Q.   All right. So going back to
8  the page that we're looking at in 50484.
9  The language on the right side of the page,
10 "Gift card disclosure," do you know who
11 drafted that language?
12     A.   It was collaborative between
13 GiftRocket and Sunrise. I don't know
14 specific individuals. I am sure that I was
15 involved to some extent.
16    Q.   Do you know who decided where
17 that language would appear on the
18 GiftRocket website?
19     A.   I don't recall who initially
20 proposed this location.
21    Q.   Do you know who determined the
22 font size and color that would be used?
23        MS. O'NEILL: Objection to
24    form.
25     A.   Generally GiftRocket would

11 (Pages 41 to 44)

Page 49

1    N. B. BAUM
2    the first sentence at the top of the page,
3    is a description at a high level of product
4    and how it functions. Specifically its
5    cash gift card with the design and message
6    and can be printed or emailed, and there is
7    a link to how it works.
8         To answer your question, yes, a
9    customer can check out without going to
10   "How It Works." Certainly there are other
11   ways for the customer to be educated about
12   the product and understand what they are
13   purchasing outside of explicitly going to
14   the "How It Works" page.
15       Q.   How would this page be
16   different if it was a landing page for a
17   specific business?
18       MS. O'NEILL: Objection to
19   form.
20       A.   The primary difference is that
21   the business information would be
22   prefilled; that includes the business name,
23   the address, the ratings, the review count.
24   Otherwise, the disclosure was still there,
25   though, and the template was the same.

Page 50

1    N. B. BAUM
2       Q.   What about the bold header that
3    says, "Send a gift card online," what would
4    that say if this were a landing page for a
5    specific business?
6       A.   During what time period?
7       Q.   During the period of time that
8    we are looking at here for October 4th,
9    2017.
10      A.   I don't know.
11       MS. O'NEILL: We have been
12   going over an hour so.
13       MS. VITALE: Do you want to
14   take a break?
15       MS. O'NEILL: Yeah, that is
16   good time to take a break.
17       MS. VITALE: That is fine.
18      Q.   Let me ask one more since we
19   are on this page. Why were these changes
20   made to the website at this point in time?
21       MS. O'NEILL: Objection to
22   form.
23      A.   To be clear, it was not
24   necessarily made on October 4th. It was
25   made before October 4th but after the

Page 51

1    N. B. BAUM
2    previous date that we have in this binder,
3    which is April 26th. And changes were made
4    as a result of collaboration with our
5    partner Sunrise Banks.
6       Q.   Were there changes made to
7    address concerns raised by Sunrise Banks?
8       A.   Yes.
9       Q.   Do you have a way of finding
10   out the exact date that these changes were
11   made?
12      A.   Let me look at my binder here.
13   Yes, and if you look at Tab 10.
14      Q.   This one is labeled GR0050642
15   and 643.
16      A.   Here we have the specific dates
17   that disclosures were added. So this is
18   actually a very nice summary and we don't
19   have to necessarily tab through every
20   single website iteration to give you a
21   timeline of what disclosure were added and
22   when.
23           The gift card disclosure that
24   we saw in the last "Send A Gift Card" page
25   we were reviewing, the October 2017 one,

Page 52

1    N. B. BAUM
2    the disclosure was actually added May 3rd,
3    2016.
4        MS. VITALE: Okay. Do you want
5    to take a break now?
6        MS. O'NEILL: Yes.
7        (Whereupon, a brief break was
8    taken.)
9        MS. VITALE: Mark this
10   Plaintiff's Exhibit 5.
11       (Whereupon, GR0036621 was
12   marked as Plaintiff's Exhibit 5 for
13   identification as of this date by the
14   Reporter.)
15      Q.   This is Exhibit 5. It's
16   GR0036621; do you recognize that document?
17      A.   I recognize the website pages,
18   generally.
19      Q.   What website page is this?
20      A.   It's multiple.
21      Q.   What is the first one?
22      A.   The first one is a business
23   listings page on GiftRocket. And on this
24   page it includes a list of different pages,
25   restaurants in Chicago, paginated results.

Page 53

1        N. B. BAUM
2    Q.  How would a page like this be
3  generated on a GiftRocket website?
4    A.  GiftRocket code base includes a
5  template for how to construct this page and
6  that template would include static content,
7  like the title, I guess there is some
8  dynamic text in the title, but there is a
9  disclosure, "The GiftRocket Gift Card is
10 redeemable online for money.  You suggest
11 where the recipient spends the money.  Like
12 a restaurant gift card, it demonstrates
13 your thoughtfulness, yet it allows the
14 recipient to spend the money wherever they
15 chose.  See more about how the GiftRocket
16 Gift Card works."  That is static; that
17 would be hard coded.  And then the business
18 listings are dynamic, and -- so there would
19 be code about how to render each one
20 individually.  And the actual information
21 that is in there would be dependant on what
22 the search is.  So here we have a number of
23 different listings of restaurants in
24 Chicago, and this data is derived from Yelp
25 from their listings.

Page 54

1        N. B. BAUM
2    Q.  How does it decide which
3  restaurants in Chicago to display on the
4  search?
5    A.  During what period of time?
6    Q.  Well, this from February 2017.
7  How did it decide which restaurants to
8  display in the website?
9    A.  Uh-mm.  It would be displayed
10 in the same order that Yelp would display
11 it.  So using Yelp's API we would initiate
12 a query for restaurants in Chicago,
13 Illinois.  Yelp would return a set of
14 business listings in a specific order.  And
15 so the order that you see on GiftRocket, on
16 this page, matches the order in which Yelp
17 would have returned their results.
18    Q.  Do you know how Yelp determines
19 which order the results would be presented
20 in?
21    A.  I can speculate, but I don't
22 know.
23    Q.  What do you speculate?
24       MS. O'NEILL:  Objection to
25    form.  I instruct you to not

Page 55

1        N. B. BAUM
2  speculate in the deposition.
3    Q.  Do you have an understanding of
4  how Yelp presented the order of the search?
5    A.  I don't know.
6    Q.  Is there a way you could go
7  back and now check which restaurants would
8  have been presented on a page like this in
9  2017?
10       MS. O'NEILL:  Objection to
11    form.
12    A.  No.
13    Q.  At the time in 2017 was there a
14 way for GiftRocket to know which
15 restaurants were being presented on a
16 suggested "Restaurants in Chicago" page?
17       MS. O'NEILL:  Objection to
18    form.
19    A.  At the time, yes.
20    Q.  How would you know?
21    A.  Well, we could query the Yelp
22 API and it would have the ordering.
23    Q.  Did GiftRocket get permission
24 from any of these restaurants to list them
25 on the website?

Page 56

1        N. B. BAUM
2       MS. O'NEILL:  Objection to
3    form.
4    A.  Yelp, Google Places, those
5  types of business listing services don't
6  themselves reach out to millions of
7  businesses for permission; GiftRocket did
8  not.
9    Q.  Do you see at the top in bolded
10 it says, "GiftRocket Gift Cards for
11 restaurants"?
12    A.  Yes.
13    Q.  Is that the same phrase that
14 would have appeared at the top of every
15 city search page on the GiftRocket website?
16       MS. O'NEILL:  Objection to
17    form.
18    A.  No.
19    Q.  How would it have been
20 different for different pages?
21    A.  Restaurant's dynamic and that
22 would be replaced with the category of the
23 search.
24    Q.  So every location page would
25 have a header that says, "GiftRocket Gift

Page 153

1      N. B. BAUM
2  they are.
3      MS. O'NEILL:  Well, if Nick is
4  not aware of what the document is, I
5  am not testifying.  So if he's not
6  aware of what it is, that is the
7  answer.  And if you have a basis to
8  think that he is supposed to be
9  educated then we can go off the
10 record and talk about that.  But I am
11 not going to testify about what the
12 document says.  That would be
13 inappropriate.
14     MS. VITALE:  Right.
15  Q.  So you don't know anything
16 about this document?
17  A.  It looks like a list of
18 potential projects.
19  Q.  Potential projects for who?
20  A.  For the company.
21  Q.  Do you know who would have
22 prepared a list like that?
23  A.  I don't know who prepared it.
24  Q.  It says there's a fee structure
25 change in April of 2026; do you know

Page 154

1      N. B. BAUM
2  anything about a fee structure change in
3  April 2016?  I am sorry, not 2026.
4   A.  There was a fee structure
5  change.
6   Q.  What was the change to the fee
7  structure?
8   A.  I don't know the specific
9  numbers.  There was a change in the fee for
10 a subsize of users.
11  Q.  Why was that change made?
12  A.  To increase profit.
13  Q.  What subside users were
14 targeted in that change?
15  A.  Individuals using it as a
16 payment mechanism for adult services.
17  Q.  So GiftRocket was aware of
18 people using it as a payment mechanism for
19 adult services and then they increased the
20 fees for those specific payments; is that
21 correct?
22  A.  Yes.
23  Q.  Do you see it says, "SEO
24 optimization six percent increase in your
25 overall sessions"?

Page 155

1      N. B. BAUM
2   A.  Yes.
3   Q.  Do you know what that is
4  talking about?
5   A.  Seems like there was a six
6  percent increase in overall sessions.
7   Q.  Do you know if that is tied to
8  SEO optimization?
9   A.  Do I know how it was tied to
10 the SEO optimization?
11  Q.  Right.  I am asking because
12 they are in the same row of the Excel
13 spreadsheet?
14  A.  SEO contributes to the overall
15 number of sessions.  That is how they could
16 be related.
17     MS. VITALE:  All right.  Put
18     that one away.
19     MS. O'NEILL:  It is almost
20     2:30.  Why we don't take a break.
21     MS. VITALE:  Yes.
22     MS. O'NEILL:  Great.
23     (Whereupon, a brief break was
24     taken.)
25 BY MS. VITALE:

Page 156

1      N. B. BAUM
2   Q.  We are going to switch topics
3  away from the Excel spreadsheets and talk
4  about Topic 2, database of businesses.
5      We talked earlier about the web
6  pages and you were explaining to me that
7  some of the information on the GiftRocket
8  web page was pulled from Yelp, correct?
9   A.  Yes.
10  Q.  How did that process work where
11 information was pulled from Yelp to display
12 on the GiftRocket web page?
13     MS. O'NEILL:  Objection to
14     form.
15  A.  We had an API integration with
16 Yelp.  We were able to submit queries via
17 the API, and Yelp would return search
18 results information, business information.
19 And we had, as I mentioned, the template
20 web pages where some of that information is
21 static and then there is room for dynamic
22 business information and it's from the Yelp
23 API queries that we were able obtain the
24 business information that would be
25 presented within those templates, and then

Page 157

```
 1            N. B. BAUM
 2   rendered for fee site visitors.
 3       Q.   What would trigger the pulling
 4   of information from Yelp API?
 5           MS. O'NEILL:  Objection to
 6       form.
 7       A.   Either an individual or a web
 8   crawler, such as Google or Bing, browsing,
 9   accessing a page for which we needed
10   business information to render it.  So
11   earlier we looked at an exhibit that had
12   listings of businesses, a set of them.
13   Assuming someone clicked the "next" button
14   within the pagination, we would need to
15   have the set of business information for
16   the next set of results, and so that could
17   be a query to Yelp to obtain that
18   information.  Or another example is, if
19   someone clicked on an individual business
20   listing and went into a business landing
21   page, that could introduce a query to Yelp
22   for that business information.
23       Q.   And it would populate the same
24   template landing page for every business
25   but the information that came from Yelp
```

Page 158

```
 1            N. B. BAUM
 2   would be there; is that correct?
 3       A.   It would be relevant to the
 4   business, right.
 5       Q.   Is there any way that
 6   GiftRocket would know which landing pages
 7   had been created in the process you just
 8   described?
 9       A.   What do you mean by a created
10   landing page?
11       Q.   Well, how would you describe
12   it?  What is the right word?  The process
13   you were describing where a
14   business-specific landing page is generated
15   dynamically --
16       A.   Uh-mm.
17       Q.   If "created" is not the right
18   word, should I say --
19       A.   Loaded.
20       Q.   Okay.  Does GiftRocket have any
21   way of knowing which business-specific
22   landing pages have been loaded?
23       A.   So we maintain a businesses
24   table that cached data originally from
25   Yelp, and if a business page had been
```

Page 159

```
 1            N. B. BAUM
 2   accessed, you would cashes that data.  Now,
 3   we don't know the landing page was loaded
 4   by a crawler like Google or an individual
 5   when it's just looking at the businesses
 6   table.  The businesses' table at one point
 7   had approximately ten million businesses in
 8   it.  But it's highly unlikely that
 9   individual that accessed ten million
10   business -- separate business landing
11   pages.
12       Q.   The business table that you're
13   describing is that something that
14   GiftRocket still has a copy of?
15       A.   Yes.
16       Q.   What form is this stored in?
17   What is the file name?
18       A.   I don't know.
19       Q.   But if I ask for the businesses
20   table, you would know what I am talking
21   about?
22       A.   Yes.
23       Q.   You say it had ten million
24   businesses in it.  Does it have fewer
25   businesses now?
```

Page 160

```
 1            N. B. BAUM
 2       A.   Yes.
 3       Q.   Why does it have fewer
 4   businesses now?
 5       A.   When we switched from using the
 6   Yelp API to Google Places, we complied with
 7   a Yelp request to remove Yelp data and we
 8   dropped about eight million businesses from
 9   the table.
10       Q.   Did GiftRocket ever create a
11   local save of the local business
12   information from Yelp?
13       A.   What do you mean by "local
14   save"?
15       Q.   Meaning the dynamic pull that
16   you're talking about, where the information
17   is coming from Yelp.  Did GiftRocket ever
18   have something similar, other than Yelp,
19   where it maintained the same data so that
20   it could access the data without having to
21   pull it from Yelp?
22       A.   That is what I just described
23   with the businesses table.
24       Q.   Okay.  That is all of the exact
25   same information that would be pulled from
```

```
                                                      Page 161
 1              N. B. BAUM
 2      Yelp was included in the businesses table;
 3      is that correct?
 4          A.   I don't know if it includes all
 5      of the information that Yelp returned but
 6      it included the relevant information that
 7      was necessary to quickly render the
 8      information for -- it substantially
 9      decreased the latency in the process of the
10      rendering the page by caching that
11      information in the database versus hitting
12      Yelp's API every single time someone landed
13      on the business page.
14          Q.   And so if you wanted to know
15      what businesses were stored in the database
16      when it had ten million businesses, is that
17      information maintained by GiftRocket?
18          A.   Are you asking whether ten
19      million businesses are retrievable, is that
20      the question?
21          Q.   Yes.
22          A.   We were able to recover a
23      backup that included the Yelp information
24      prior to deletion, so, yes.
25          Q.   Okay.  And all of the
```

```
                                                      Page 162
 1              N. B. BAUM
 2      businesses that are listed in that
 3      collection of information are businesses
 4      where a landing page was generated because
 5      either crawling or viewing or some other
 6      reason, but a page landing was generated
 7      for them; is that correct?
 8          A.   That's right.  Vast majority
 9      would be the crawlers but, yes.
10          Q.   How do you know that vast
11      majority would be the crawlers?
12          A.   Because Google would
13      methodically go through and include all the
14      pages on GiftRocket, whereas individuals
15      had interest only in a small subset of
16      businesses that they would get.  So Yelp
17      maintains a local business directory that
18      is extraordinarily large, and the vast
19      majority -- a large, large number of those
20      businesses aren't relevant for gifting.  A
21      doctor's office, a dentist office, a
22      hardware store, restaurants, where
23      primarily the type of business to which
24      individuals would send gifts.
25          Q.   Can you tell by looking in your
```

```
                                                      Page 163
 1              N. B. BAUM
 2      database whether any entry was generated by
 3      a crawler as opposed a specific visitor?
 4          A.   No.
 5          Q.   Does having a large of number
 6      of pages that Google can crawl improve
 7      GiftRocket ending in the Google search
 8      results?
 9          A.   I don't know.
10          Q.   Who would know the answer to
11      that question at GiftRocket?
12              MS. O'NEILL:  Objection to
13          form.
14          A.   I don't think anyone at
15      GiftRocket would know that question.
16      Google-breaking algorithms are notoriously
17      a blackbox and they provide general
18      guidance.  But it is not clear from my
19      understanding or any conversations that I
20      have had internally with a team that having
21      more businesses will necessarily make pages
22      rank higher.
23          Q.   Will having more page indexes
24      make pages rank higher?
25          A.   I don't know.  I think it
```

```
                                                      Page 164
 1              N. B. BAUM
 2      depends on the quality of the page.
 3      Generally, Google is trying to assess the
 4      quality of your website and pages on it.
 5      So if there were pages that would be
 6      relevant to potential visitors, it can take
 7      good content, then maybe.  But if there
 8      were pages that Google deemed would not be
 9      relevant to individuals and generally maybe
10      cast the website as being one that is not
11      high value, then I could see it have low
12      rankings across the board.
13          Q.   Was it GiftRocket's goal to
14      list websites that improved its rankings?
15          A.   Yes.
16              (Whereupon, GR0038075 was
17          marked as Plaintiff's Exhibit 24 for
18          identification as of this date by the
19          Reporter.)
20          Q.   I show you a document
21      GR0038075; do you recognize this document?
22          A.   Yes.
23              MS. O'NEILL:  Objection.  This
24          is outside of the scope.
25              MS. VITALE:  Should wait and
```

Page 273

```
 1              N. B. BAUM
 2
 3       PLAINTIFF'S EXHIBITS
 4
 5   EXHIBIT   EXHIBIT              PAGE
 6   NUMBER    DESCRIPTION
 7    18       GR0005624            141
 8    19       GR00595              142
 9    20       GR0014042            145
10    21       GR00014896           148
11    22       GR0016319            149
12    23       GR0016337            151
13    24       GR0038075            164
14    25       GR0000465            188
15    26       GR0004429            188
16    27       GR0004465            188
17    28       GR0014478            188
18    29       GR0032895            198
19   29-A      PLTFS000149          212
20    125      GR0000967            207
21    30       PLTFS000139          251
22    31       GR0000349            255
23    32       GR0006966            258
24    33       GR0007066            259
25    34       GR0000518            263
```

Page 274

```
 1              N. B. BAUM
 2       PLAINTIFF'S EXHIBITS
 3
 4   EXHIBIT   EXHIBIT              PAGE
 5   NUMBER    DESCRIPTION
 6    35       GR0005631            268
 7    36       Binder Tabs 1-29     269
 8
 9
10   (Exhibits retained by Court Reporter.)
```

Page 275

```
 1              N. B. BAUM
 2              I N D E X
 3
 4   EXAMINATION BY              PAGE
 5   MS. VITALE                   5
 6
 7
 8   INFORMATION AND/OR DOCUMENTS REQUESTED
 9   INFORMATION AND/OR DOCUMENTS    PAGE
10   Copy of the GiftRocket file    83
11
12
13   QUESTIONS MARKED FOR RULINGS
14   PAGE LINE QUESTION
15   (None)
```

Page 276

```
 1              N. B. BAUM
 2           C E R T I F I C A T E
 3
 4   STATE OF NEW YORK   )
 5                       : SS.:
 6   COUNTY OF KINGS     )
 7
 8       I, SANDRA SIERRA, a Notary Public for
 9   and within the State of New York, do hereby
10   certify:
11       That the witness whose examination is
12   hereinbefore set forth was duly sworn and
13   that such examination is a true record of
14   the testimony given by that witness.
15       I further certify that I am not
16   related to any of the parties to this
17   action by blood or by marriage and that I
18   am in no way interested in the outcome of
19   this matter.
20       IN WITNESS WHEREOF, I have hereunto
21   set my hand this 2nd day of February 2025.
22
23              _____
24
25                  SANDRA SIERRA
```