# EXHIBIT E

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

GRACIE BAKED LLC, WECARE RG, INC.,
and MILLERCOBB LLC, on behalf of
themselves and all others similarly situated,

    Plaintiffs,

        v.

GIFTROCKET, INC., TREMENDOUS,
INC., NICHOLAS BAUM, KAPIL KALE,
JONATHAN PINES, BENJAMIN KUBIC,
SUNRISE BANKS, N.A., GIFTROCKET,
LLC, TREMENDOUS LLC, and
TREMENDOUS PARENT, INC.,

    Defendants.

Case No. 22-CV-4019 (RPK) (VMS)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR *DAUBERT* MOTION TO
## EXCLUDE THE OPINIONS AND TESTIMONY OF DR. KEITH UGONE

*- Served on August 1, 2025 -*

Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

Matthew Weinshall (Admitted *pro hac vice*)
Dayron Silverio (Admitted *pro hac vice*)
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 500
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurtst.com

*Attorneys for Plaintiffs and the Proposed Classes*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

LEGAL STANDARD .............................................................................................................. 2

ARGUMENT ............................................................................................................................ 2

I.     Dr. Ugone's Improper and Unreliable Factual Narrative Should be Excluded .......... 2

     A.     Dr. Ugone's Biased and Incomplete Description about "How a GiftRocket Worked" and How GiftRocket.com Supposedly Did Not Confuse the Public ............................................................................................................... 3

     B.     Dr. Ugone's Factual Narrative that Consumers Liked GiftRocket Based on Delighted Consumer Survey Results Should be Excluded ........................... 6

     C.     Dr. Ugone's Various Mind-Reading Exercises Should Be Excluded ........... 10

     D.     Dr. Ugone's Claims That GiftRocket Benefitted Businesses by Using Their Information Without their Consent Should Be Excluded. ......................... 13

     E.     Dr. Ugone's Opinions About Whether Plaintiffs suffered "Economic Harm" Should be Excluded. ............................................................................... 16

     F.     Dr. Ugone's Arguments Regarding Blocked Businesses Spreadsheet Should Be Excluded ............................................................................................. 17

II.     The Court Should Exclude Dr. Ugone's Legal Conclusions, which are Improper and Based on His Inaccurate and Unreliable Presentation of the Facts ......................... 19

     A.     The Court Should Exclude Dr. Ugone's Arguments that Plaintiffs' Claims have Certain Legal Elements that are Satisfied Only by Certain Evidence .. 19

         1.     Dr. Ugone's "Economic Nexus" is an Incorrect Legal Argument That Artificially Creates Elements of Proof ..................................... 19

         2.     Dr. Ugone also Impermissibly and Incorrectly Opines on What is Required to Calculate Disgorgement ................................................ 22

     B.     Dr. Ugone's Statutory Interpretation of NY GBL is Improper and Incorrect ............................................................................................................... 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*3M Company v. CovCare, Inc.,*
    537 F. Supp. 3d 385 (E.D.N.Y. 2021) ............................................................. 22

*4 Pillar Dynasty LLC v. New York & Company, Inc.,*
    933 F.3d 202 (2d Cir. 2019) ..............................................................21, 22

*Belfiore v. Procter & Gamble Co.,*
    311 F.R.D. 29 (E.D.N.Y. 2015) ......................................................... 25

*Boccio v. Costco Wholesale Corp.,*
    2022 WL 970745 (E.D.N.Y. Mar. 30, 2022) ...............................................19, 21

*Cinar v. R&G Brenner Income Tax, LLC,*
    2024 WL 4224046 (E.D.N.Y. Sept. 18, 2024) ............................................... 23

*City of Almaty, Kazakhstan v. Ablyazov,*
    2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021)................................................3, 11

*Community Care Companions, Inc. v. Interim Healthcare, Inc.,*
    2025 WL 929407 (E.D.N.Y. Mar. 27, 2025)................................................. *passim*

*Ebbert v. Nassau County,*
    2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ................................................. 21

*Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.,*
    693 F. Supp. 3d 335 (E.D.N.Y. 2023) .....................................................2, 7, 13

*Fleischman v. Albany Medical Center,*
    728 F. Supp. 2d 130 (N.D.N.Y. 2010).......................................................... 7

*Geismar v. Abraham & Strauss,*
    109 Misc. 2d 495, 439 N.Y.S.2d 1005 (Dist. Ct. Suffolk Cty. 1981) ............................... 24

*Guido v. L'Oreal, USA, Inc.,*
    2013 WL 3353857 (C.D. Cal. July 1, 2013) ......................................................... 24

*Highland Capital Management, L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................. 11

*Hygh v. Jacobs,*
    961 F.2d 359 (2d Cir. 1992) .................................................................2, 21

*In re LIBOR–Based Financial Instruments Antitrust Litigation,*
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................... 11

*In re Longtop Financial Technologies Ltd. Securities Litigation,*
    32 F. Supp. 3d 453 (S.D.N.Y. 2014) ...................................................... 12

*In re Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II),*
    341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...................................................... 3, 6

*In re Rezulin Products Liability Litigation,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................... 11

*Intuit Inc. v. HRB Tax Group, Inc.,*
    2024 WL 5320392 (N.D. Cal. Dec. 3, 2024) ...................................................... 10

*JBrick, LLC v. Chazak Kinder, Inc.,*
    2023 WL 6372970 (E.D.N.Y. Sept. 28, 2023) ...................................................... 7

*Jensen v. Cablevision Systems Corporation,*
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) ...................................................... 3

*Kurtz v. Kimberly–Clark Corporation,*
    321 F.R.D. 482 (E.D.N.Y. 2017) ...................................................... 24

*Lane v. American Airlines, Inc.,*
    2024 WL 1200074 (E.D.N.Y. Mar. 20, 2024) ...................................................... 1, 2, 3

*Mirkin v. XOOM Energy, LLC,*
    2025 WL 16333 (E.D.N.Y. Jan. 2, 2025) ...................................................... 1, 11

*Montera v. Premier Nutrition Corporation,*
    111 F.4th 1018 (9th Cir. 2024) ...................................................... 24

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005) ...................................................... 2

*S.E.C. v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...................................................... 3

*Scott v. Chipotle Mexican Grill, Inc.,*
    315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................... 19, 20, 21

*Skillz Platform Inc. v. Papaya Gaming, Ltd.,*
    2024 WL 3526853 (S.D.N.Y. July 23, 2024) ...................................................... 22

*Souza v. Exotic Island Enterprises, Inc.,*

    68 F.4th 99 (2d Cir. 2023) ................................................................................. 22

*United Services Automobile Association v. Mitek*,
    2014 WL 12498207 (W.D. Tex. July 22, 2014) ........................................3, 8, 18

*U.S. v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ........................................................................ 19

*U.S. v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ......................................................................21, 22

*Yeend v. Akima Global Services, LLC*,
    2025 WL 959968 (N.D.N.Y. Mar. 31, 2025) ..............................................2, 21

**Statutes**

Lanham Act,
    15 U.S.C. § 1117 ..............................................................10, 15, 23, 24

# INTRODUCTION

Defendants cannot show that any of Dr. Ugone's opinions are admissible under Fed. R. Evid. 702, and the Court should exclude them. Dr. Ugone's Report ("Rep."), Ex. A[1] is a "would-be legal brief masquerading as an expert opinion, which is squarely inappropriate for expert testimony." *Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*, 2025 WL 929407, at *14 (E.D.N.Y. Mar. 27, 2025) (cleaned up). The Report begins with seventeen pages of background information, including nine pages presenting Defendants' view of "How a GiftRocket Worked" and a six-page "overview" of Plaintiffs' claims. (Rep. at 10–27, §§ V, VI and VII). Dr. Ugone then offers the following, supposedly expert, opinions: (a) Plaintiffs have not shown an "economic nexus" between Defendants' misconduct and the proposed damages (§§ VIII and IX) (the term "economic nexus" is undefined and Dr. Ugone does not explain its origins); (b) Plaintiffs have not shown that they were harmed by Defendants' conduct (Point X); and (c) Plaintiffs have not provided a reliable methodology for calculating disgorgement damages without individualized inquiries (§§ XI and XII). These are legal conclusions, not expert opinions. And no reliable data or methodology supports them.

As Dr. Ugone's testimony ("Tr.") Ex. B, makes clear, he conducted no independent analysis in connection with his report. Instead, his "expert" analysis consists of quoting and interpreting email messages and online reviews, reading the results of a survey designed and conducted by others, and using basic math and Excel features. The Court should "exclude[] those portions of [Dr. Ugone's] report that 'construct a factual narrative based upon record evidence.'" *Lane v. Am. Airlines, Inc.*, No. 18-CV-6110 (MKB), 2024 WL 1200074, at *19 (E.D.N.Y. Mar. 20, 2024). The remainder of Dr. Ugone's report offers a series of legal arguments about what the evidence purportedly shows and what it means, legally, for Plaintiffs' claims. These should also be excluded. *See Mirkin v. XOOM Energy, LLC*, 2025 WL 16333, at *2 (E.D.N.Y. Jan. 2, 2025) ("Nor may the expert 'supplant the role of counsel

---

[1] Alphabetical exhibits refer to the exhibits attached to the Janove Declaration in support of this *Daubert* Motion.

in making argument at trial, and the role of the jury [in] interpreting the evidence.'") (citation omitted). As another Court held in excluding similarly unreliable testimony by Dr. Ugone, he "provides no helpful guidance for a factfinder" because he "did not conduct any independent analysis or investigation." *See* Janove Decl. Ex. C, *United Services Automobile Association v. Mitek Systems, Inc.*, 12-CA-282, (W.D. Tex. July 22, 2014) ("Ugone Exclusion Order"). If not excluded, Dr. Ugone's testimony "would impermissibly 'tell the [fact-finder] what results to reach'" and "opine[] on an ultimate legal issue in the case." *Yeend v. Akima Glob. Servs., LLC*, 2025 WL 959968, at *6 (N.D.N.Y. Mar. 31, 2025) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992)).

## LEGAL STANDARD

"Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact.'" *Lane v. Am. Airlines, Inc.*, 2024 WL 1200074, at *4 (E.D.N.Y. Mar. 20, 2024) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005)). "The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*, 2025 WL 929407, at *9 (E.D.N.Y. Mar. 27, 2025), *reconsideration denied*, 2025 WL 1616585 (E.D.N.Y. June 6, 2025); *see also Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.*, 693 F. Supp. 3d 335, 344 (E.D.N.Y. 2023) ("The party that proffers the expert testimony or opinion bears the burden of establishing its admissibility by a preponderance of the evidence.") (quotations and citations omitted).

## ARGUMENT

I.     **Dr. Ugone's Improper and Unreliable Factual Narrative Should be Excluded**

An expert may not "simply rehash[ ] otherwise admissible evidence about which he has no

personal knowledge," and "[w]hile an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Lane v. Am. Airlines, Inc.,* 2024 WL 1200074, at *14 (E.D.N.Y. Mar. 20, 2024); *see Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 116 (E.D.N.Y. 2019) ("While it is within an expert's purview to rely on facts or data from the record to formulate his or her opinion . . . an expert may not use his or her report to construct a factual narrative based upon record evidence. . . . Interpreting admissible evidence without having personal knowledge or experience is improper."). Here, Dr. Ugone impermissibly "offer[s] a narrative history of the case" and "simply regurgitate[s] the evidence already available in the record." *City of Almaty, Kazakhstan v. Ablyazov*, 2021 WL 5154110, at *16 (S.D.N.Y. Nov. 5, 2021); *see also S.E.C. v. Tourre,* 950 F. Supp. 2d 666, 681 (S.D.N.Y. 2013) (an expert "cannot be a conduit for a factual narrative" or "invade the province of the jury by 'finding facts' that are in contention in this case"). Worse, in creating a one-sided narrative, Dr. Ugone overlooks the basics about how GiftRocket.com worked such as its search engine optimization strategy that used intentionally false statements, and "fail[s] to consider known contrary evidence," *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 247 (S.D.N.Y. 2018), such as Defendant Sunrise Banks N.A.'s continual analysis of the website and complaints related to GiftRocket.com that showed an unending pattern of customer confusion irrespective of the minor changes to the GiftRocket website that much of Dr. Ugone's report emphasizes.

### A. Dr. Ugone's Biased and Incomplete Description about "How a GiftRocket Worked" and How GiftRocket.com Supposedly Did Not Confuse the Public

Dr. Ugone's report begins with a lengthy and biased description of "How a GiftRocket worked." Rep. § VI. For example, Dr. Ugone emphasizes purported disclosures that in his own opinion—and not based on any independent analysis or study—are evidence that GiftRocket adequately explained to its customers what consumers were purchasing. *See, e.g.*, ¶ 30. Dr. Ugone then

parrots Defendants' argument that "GiftRocket's website went through many changes to its content design and language over the course of the Proposed Class Period." *Id.* ¶ 34. This merely regurgitates Defendants' evidence regarding meaningless, minor changes to the website, and their related (and incorrect) legal arguments that these slight changes, implemented uniformly, require some individualized inquiry. *See Cmty. Care*, 2025 WL 929407, at *11 n.23 (holding that "[w]hile an expert may lay a factual foundation for his or her opinion," an expert's background section cannot "contain[] his own conclusions interspersed with factual statements from the record"). For these reasons alone, this portion of the Report should be excluded.

Dr. Ugone further improperly opines that the GiftRocket website "offered multiple opportunities for senders and recipients to read and understand the nature of the product and its functionality," and the disclaimers on GiftRocket.com. Rep. ¶¶ 138-42. No expertise or analysis informs this opinion. Dr. Ugone is not an expert in web design, how customers interact with websites, or whether their attention is drawn to certain web design elements or not. Tr. 61:13-62:8; 64:1-65:11. He did not consider whether customers' attention was drawn to the small, fine print disclaimers on GiftRocket's website, rather than the central language advertising "gifts" or "gift cards" next to businesses' names and information. Tr. 77:14-78:12; 271:13-23; 326:7-24. He did not consider whether any customer would have understood GiftRocket's opaque disclaimers. Tr. 326:7-24. He did not analyze actual evidence in the record showing that customers did not see or understand disclaimers. Tr. 341:23-342:3; 344:9-345:11. As he admitted, his analysis was simply pointing to "what was GiftRocket saying on their website[.]" Tr. 327:6-7; *see also* Tr. 77:14-78:12; 80:5-15; 83:2-7; 97:7-14; 271:13-23; 326:7-24. A juror can do this too.

Dr. Ugone did not review evidence that directly contradicts his speculation that changes to the website "may have remediated the issue." Rep. ¶ 144; Tr. 341:23-342:3. He failed to analyze actual documents by Sunrise Banks that concluded that there continued to be "clear confusion of customers

regarding what they are purchasing" and "attempts at website changes have made no impact on consumer understanding." Ex. D; Tr. 341:23-342:3. He did not conduct any analysis of whether the frequency and volume of complaints regarding customer confusion decreased after any of these changes were made to GiftRocket.com. Tr. 80:5-15; 83:2-7; 97:7-14; 344:9-14 (Q: Did you analyze any documents evaluating whether the changes made in 2019 affected consumer understanding? A: Yeah . . . I haven't seen any documentation on that."). Dr. Ugone did not analyze Sunrise Banks's monthly complaint logs, showing unending customer confusion related to the website. Tr. 344:15-345:11. He did not review other evidence directly contradicting his unfounded speculation that changes to the website or "updated disclosures may have remediated" customer confusion. *See, e.g.*, Rep. ¶ 144; Ex. E (Sunrise Banks: "GiftRocket [is] still receiving a large number of complaints regarding customers thinking they were buying an actual gift card, not what they actually got."); Tr. 345:14-349:16.

Worse, Dr. Ugone overlooked a strategy both central to GiftRocket.com's operation and to Plaintiffs' and the class members' claims: **SEO**. Dr. Ugone did not consider the actual language of how the website was coded—uniformly throughout the class period—so that millions of Google searches would result in facially false and misleading language of "Buy a gift card to [business name]," and "Gift Card to [Business Name]," paired with the business address, which GiftRocket customer service admitted was literally false. Ex. F; Tr. 97:7-14; 114:20-116:9; 330:3-8. Despite looking at analytics showing that users searching for the name of a business were directed to GiftRocket.com, Dr. Ugone admitted he did not understand what search results or SEO strategy caused a consumer to go to a website. *See* Rep. ¶ 135 & n. 219; Tr. 318:12-14 ("Q. But you didn't analyze how GiftRocket was designed to make certain search results use specific language? A. No, I didn't look at that."); *id.* 320:3-321:11 ("Q: you didn't analyze what language was actually used in those Google search results that directed someone to GiftRocket.com, correct? A: I would agree with that.").

Given that as Dr. Ugone acknowledges, nearly 70% of traffic to GiftRocket.com originated

from search results, including where a user simply searched for a business name (not even using the phrase gift card) and saw a literally false statement, his opinions on how GiftRocket "worked" or that customers "likely would not have been misled" is fundamentally incomplete and unreliable. *See* Ex. G; Rep. ¶¶ 135-36, 142 n.219; Tr. 322:13-324:4.

In sum, Dr. Ugone (1) is not qualified to speculate on how the GiftRocket website may or may not have been viewed or understood by the public, (2) has not conducted any independent analysis or study to determine how consumers may have reacted to the GiftRocket website and marketing, (3) ignores directly conflicting record evidence showing that the GiftRocket website and changes thereto were inadequate to reduce customer confusion, and (4) completely overlooked GiftRocket's SEO strategy, meaning he did not consider the deliberate and uniformly false statements explicitly advertising "Buy a gift card to [business name]" and "Gift Card to [business name]," which drove the majority of user traffic to the website. Dr. Ugone's opinions here "'should be excluded [because] it is speculative or conjectural" and because it is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *In re Mirena*, 341 F. Supp. at 241. Indeed, they are based on **no** methodology or study at all, only his subjective reading of a website, which parrots defendants' counsel's legal argument to the jury.

## B. Dr. Ugone's Factual Narrative that Consumers Liked GiftRocket Based on Delighted Consumer Survey Results Should be Excluded

Throughout his report Dr. Ugone opines that "a large fraction of senders and recipients were satisfied with GiftRocket's services." *Id.* ¶ 15; ¶¶ 50-54, 60, 68, 71,73,74,119,156. Dr. Ugone is not qualified to opine on this topic. Nor are his opinions based on any reliable data or methodology. Rather, his "expert opinion" amounts to (a) some basic math compiling survey results from an unreliable customer survey he did not design or analyze; and (b) his interpretation of what consumers meant in a handful of cherry-picked survey comments. These opinions should be excluded.

An expert must have "superior knowledge, education, experience, or skill with the subject

matter of the proffered testimony." *Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.*, 693 F. Supp. 3d 335, 353 (E.D.N.Y. 2023) (emphasis added). Dr. Ugone is not an expert in creating customer surveys or interpreting their results. *See* Tr. 41:9-42:4; 158:20-24 ("Q: But you don't have any expert experience in what response rate is needed to make a consumer survey reliable, right? A: I would not give an opinion on that."); *id.* at 41:9-42:4; 229:17-230:13. Defendants have offered no basis "from which the Court can conclude that [Dr. Ugone] possesses the requisite knowledge, education, experience, or skills to offer an expert opinion on" whether customers liked GiftRocket, much less whether a survey, which he did not conduct, demonstrates an absence of confusion. *See id.*; *see also JBrick, LLC v. Chazak Kinder, Inc.*, 2023 WL 6372970, at *7 (E.D.N.Y. Sept. 28, 2023) ("An expert qualified in one subject matter . . . does not thereby become an expert for all purposes.") (cleaned up). And Dr. Ugone's "expertise as an economist does not give him any specialized knowledge to discern the thought processes" of consumers that made purchases on GiftRocket.com. *See Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010). His opinions regarding the Delighted survey and its results should be excluded on this basis alone.

And even if he had relevant expertise, Dr. Ugone's opinions would still be inadmissible because he bases his conclusions on unreliable Delighted survey data that was compiled by GiftRocket. Tr. 230:23-231:11. The survey was sent to every person who purchased a GiftRocket as well as any recipient that *redeemed* a GiftRocket and merely "asked survey participants to rate the likelihood that they would recommend GiftRocket on a scale from 0 to 10." *Id.* It also allowed a user to provide an optional comment. *Id.* Dr. Ugone does not even attempt to argue that this survey was reliably conducted and had adequate controls, a representative sample, or anything an expert in the area might consider in creating a survey. Rather, he merely **repeats** the survey results without any analysis of whether the data is reliable, then concludes, based on those results, that customers liked GiftRocket and therefore were not confused about what it was selling. Tr. 34:11-21; 41:9-42:4; 106:17-22; 157:14-

18; 229:24-230: 13; 125:25-126:20.

Dr. Ugone did not even investigate or understand the basics about how the Delighted survey works. He testified that he knew nothing about how GiftRocket chose who would receive the survey, when the survey was sent to consumers, and in which format it was sent to consumers (*i.e.*, via email or otherwise). Tr. 145:5-25; 146:8-10 ("I don't know how they decided . . . who to survey"); 146:15-16 ("I don't know the timing."). He did not even know that GiftRocket excluded from the survey people who had not yet redeemed their gift cards until he was shown 30(b)(6) testimony at his deposition. Tr. 147:2-148:9.

Instead of conducting independent analysis or investigating how the survey data was generated, Dr. Ugone reaches his conclusions by "simply summarizing the contents of the [survey]—what it said and did not say—without applying purported industry knowledge or past experience with similar [surveys] in a way that would assist a jury in interpreting that evidence at trial." *See Cmty. Care*, 2025 WL 929407, at *11. He just adds up score responses from a GiftRocket spreadsheet and states that the resulting percentages indicate that consumers liked GiftRocket. Tr. 159:17-160:9 ("Q: . . . it was just adding up the responses? A: Correct, correct."). This Court should exclude Dr. Ugone's opinions based on the Delighted survey because, just like in other circumstances where his opinions have been excluded, he "relies entirely on a spreadsheet provided to him" from the party, and "did not conduct any independent analysis or investigation." *See* Ugone Exclusion Order.

Of course, analysis of the survey reveals that it would be unreliable for multiple reasons. *First*, the survey was sent at the time of purchase—meaning *before* the buyer realized they had been duped (because the realization didn't come until after the intended recipient tried to redeem the gift card and realized it was not, in fact, a gift card). Tr. 144:14-153:13; Ex. H at 99:5-10. *Second*, only a very small, not statistically significant fraction of users even completed this survey; in other words, the sample size is too small to be reliable. Tr. 229:17-23 ("Q: [A]nd this is 2,000 responses out of how many

universal GiftRockets were sold? A: …I would have to look, but it's in the hundreds of thousands."); *Id.* at 155:5-157:6 ("Q: And this is 12,130 responses [for GiftRockets using specific businesses] out of how many people that were asked?...we're talking well over hundreds of thousands of potential responses, right? A: Yeah…I will agree with that."). Dr. Ugone did not analyze how many people responded to this survey compared to how many were asked, and whether the miniscule response rate would allow for a reliable inference of the experiences of the hundreds and hundreds of thousands of users that did not respond. Tr. 155:12-158:5, 159:11.

*Third*, GiftRocket specifically excluded from the survey pool the recipients who were most likely to be dissatisfied with the transaction. Specifically, the survey pool leaves out the 23.5%—or 150,438—of GiftRocket recipients who did **not** redeem their gift card, thus excluding respondents who were most likely to report low satisfaction rates. Rep. Ex. 6; Exhibit H at 100:8-16; Tr. 148-151:22, 151:23-142:5 ("Q: So, if a recipient never redeemed the GiftRocket, we wouldn't know whether they would recommend GiftRocket or not, right? A: They would not be part of the survey.").

*Fourth*, the survey also excludes 8,406 customer reviews that could not be matched with actual GiftRocket transactions; as a result, nearly 41% of reviews were not included in this analysis. Tr. 164:6-165:7. Dr. Ugone conducted no analysis as to why these survey responses could not be analyzed or whether a consumer survey could be reliable if almost half of the responses were disregarded. *See id.*

*Fifth and lastly*, the survey questions don't address the relevant issues here: the survey does not ask consumers if they thought they were purchasing a gift card through GiftRocket; if they thought the businesses were affiliated with GiftRocket or authorized the use of the business on the website; or if customers patronized the business for which they bought a GiftRocket. *See* Tr. 142:13-144:4; 306:19-308:12. And there is no way to know why customers left specific ratings. Indeed, just last year a California federal court rejected the same argument Dr. Ugone advances here in an expert opinion analyzing the same type of survey. The court held that a post-purchase survey asking customers

whether they recommended a company's product could not be relevant evidence as to whether certain types of advertising is material and "impacts purchasing decisions." *Intuit Inc. v. HRB Tax Grp., Inc.*, 2024 WL 5320392, at *14 (N.D. Cal. Dec. 3, 2024) ("The problem for the Court is that this evidence gives a sense only of what consumers thought or did *after* choosing to use TurboTax Live Assisted as their tax preparation product, but it does not tell the Court whether those consumers chose the product *because of* the expert final review. In other words, the evidence does not go to whether the expert final review, specifically, impacts customer purchasing decisions.").[2] So too here. Dr. Ugone speculates that if people liked GiftRocket they could not have been misled into purchasing a GiftRocket product. But that only shows "what consumers thought or did *after*" right after purchasing a GiftRocket, not whether they were tricked into visiting GiftRocket.com because of false statements like "Buy a gift card to [specific business]." Even if consumers ultimately liked GiftRocket, that is not an excuse under the Lanham Act to use a class member's information without consent for Defendants' own profit.

### C. Dr. Ugone's Various Mind-Reading Exercises Should Be Excluded

Dr. Ugone has no expertise that would allow him to say with authority what customers meant in their reviews and comments about GiftRocket. As Dr. Ugone testified, he is no mind reader and just looked at the words in the document, such as in emails, survey responses, or online comments. Tr. 166:15-19 ("Q: So, when you conclude that those comments indicate that customers were satisfied with GiftRocket, that's just based on the text of the comments themselves, right? A: Correct."). Any lay person, as Dr. Ugone admitted, is *equally* capable of reading those same words and developing a subjective opinion about what they meant. *Id.* at 214:24-215:18; 180:17-25 ("We can . . . read the same words, but I can't say what was in her mind."); *see also id.*, 208:22-209:15; 213:9-22; 220:18-221:4). The

---

[2] The motion to strike Dr. Ugone's report was denied without prejudice. His argument about the consumer survey was advanced by Intuit subsequently in the case, although his report was not. *See* 24-cv-00235, ECF No. 103 (Aug. 12, 2024 N.D. Cal.).

Court should therefore exclude his opinions on whether and why customers were dissatisfied with GiftRocket. *See, e.g.*, Rep. § VIII.

As a general rule, 'inferences about the intent or motive of parties or others lie outside of the bounds of expert testimony.'" *Mirkin v. XOOM Energy, LLC*, 2025 WL 16333, at \*5 (E.D.N.Y. Jan. 2, 2025) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)). So "none of [Dr. Ugone's] speculation" that customers understood what GiftRocket was, liked GiftRocket, took certain actions because of what a consumer reported in a survey "is admissible either." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469–70 (S.D.N.Y. 2005). Such opinions "consist simply of inferences that [Ugone] draws from" the consumer survey and consumer comments, and "no expert may supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Id.* Here, Dr. Ugone quotes positive reviews online, then interprets the authors' meaning. Rep. ¶ 55; *see also* ¶¶ 56-59. Dr. Ugone does not even try to explain what specialized training or knowledge he has in online customer reviews, or why expert testimony would be needed to interpret basic customer feedback. Cherry-picking customer quotes to support the narrative that people like GiftRocket is not expert testimony.

Moreover, no help from any "expert" is required to read and understand simple consumer reviews and emails. Expert testimony "must remain limited to 'defining any complex or specialized terminology' that would be helpful in the jury's independent assessment of the documents as well as 'drawing inferences that would not be apparent without the benefit of experience or specialized knowledge.'" *City of Almaty*, 2021 WL 5154110, at \*16. Neither requirement is present here. Dr. Ugone's interpretation of these comments are not based on "'scientific, technical, or other specialized knowledge' as required by Rule 702(a)," and the meaning of such comments "'address issues of fact that [the trier of fact] is capable of understanding without the aid of expert testimony.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 490 (S.D.N.Y. 2018) (excluding expert

opinions regarding meaning of written communications for lack of "specialized knowledge [the expert] drew upon to conduct her review of trader communications" and because "acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise.") (alterations omitted) (citing *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 460 (S.D.N.Y. 2014)).

Putting all that aside, Dr. Ugone's conclusions based on selected reviews are inherently unreliable because they are based on an unreliable data set—a fact Dr. Ugone completely ignores. Dr. Ugone did not review any documents concerning—and testified that he was not even aware of—GiftRocket's pay-per-review program. Tr. 170:25-171:10 ("Q: Did you know that GiftRocket paid users $10 to leave a positive review on Trust Pilot? A: Yeah, I don't know one way or the other. Q: Do you recall reviewing any evidence regarding GiftRocket's pay-for-a-review program. A: I don't recall that, no."); *see also id.* 173:9-20; 177:8-178:14; 185:14-18. GiftRocket customer support would target individuals who had given GiftRocket a high rating on the Delighted customer survey and then offered them $10 to put a review on TrustPilot. Ex. I; Tr. 179:9-183:23. Obviously, paying customers who gave positive feedback to post reviews would skew online reviews in Defendants' favor. No one paid customers to post the many online comments calling GiftRocket a scam.

Dr. Ugone then makes the impermissible legal argument, again based on simply reviewing customer comments, that class members were uninjured by customers that were upset at GiftRocket and not at the class members themselves. Rep. ¶ 66. None of this is proper expert testimony. No expertise or reliable methodology supports Dr. Ugone's conclusions, which are just based on reading texts of comments. Tr. 220:18 ("Q: So . . . when you say your conclusion that there is dissatisfaction is unrelated to the alleged misconduct, that's your interpretation of comments in the Delighted survey . . .? A: . . . when you say interpretation of, I'm using the words that are . . . in the survey."); 223:23-24:5.

His inexpert readings are also obviously wrong. For instance, Dr. Ugone concludes that users are not taking issue with the misconduct alleged in the complaint when they make negative comments such as ""[i]t looks like you charged me $9.50 to send money to someone. This is a terrible deal."; "[the sender] could have just sent a check and avoided [the] fees."; or "[GiftRocket] charge[s] an outrageous service fee for something that can be done for free." Rep. ¶¶ 66-67. But Dr. Ugone overlooks that these users all purchased GiftRockets to a specific business, and then realized it was not a gift card but an expensive money transfer service. Tr. 214:25-217:6.

In sum, all of Dr. Ugone's "'subjective belief[s] [and] unsupported speculation'" about what consumers thought about GiftRocket "should be excluded pursuant to FRE 702." *See Fantasia*, 693 F. Supp. 3d at 345.

### D. Dr. Ugone's Claims That GiftRocket Benefitted Businesses by Using Their Information Without their Consent Should Be Excluded.

The Court should also exclude Dr. Ugone's unsubstantiated assertions that customers spent money at suggested businesses. No expertise or reliable methodology supports these conclusions. Defendants have never identified even a single instance in which one out of millions of GiftRocket recipients is actually known to have spent the gifted funds at the suggested business.

Ignoring this, Dr. Ugone quotes two customer-service emails, which he interprets as "evidence in the record [that] show[ing] that some customers reported spending their GiftRocket funds at the suggested businesses." Rep. ¶ 62(d) & n.63; *see also* ¶ 54 & n.97 (citing customer responses to support his conclusion that "Delighted Customer Feedback data indicate that some recipients used GiftRocket funds at the suggested business," and that businesses benefited as a result.); Rep. ¶ 62(b) ("In fact, evidence from customer reviews . . . indicates that some customers **did** spend the funds at the suggested business.") (emphasis in original). Dr. Ugone also quotes verbatim survey response comments such as "My children suggested where they would like to treat me and it was great" to conclude that this gift recipient actually spent money at the restaurant that GiftRocket suggested—

*i.e.*, for the truth of the matter asserted. *Id.* n. 97. This is nothing more than "inadmissible hearsay masquerading as expert opinion," and must be excluded. *Cmty. Care*, 2025 WL 929407, at *12; Tr. 168:11-169:20 ("Q: So, . . . the customer said they did spend the money at the business, and you're accepting that for the truth of what the customer is saying, right? A: . . . I will agree with that, yes.").

Again, Dr. Ugone has no specialized expertise in interpreting basic language in customer surveys and emails; a lay person can do it themselves. And quoting straightforward emails where customers write that they have an "intent" to or "will use" the gifted funds at the suggested businesses could not establish that customers actually did so in any event.[3] Dr. Ugone does the same elsewhere in the report, quoting verbatim select survey comments to support his claim that some consumers "were repeat customers." Rep. ¶ 60. But he conducts no analysis and offers no reliable data supporting his speculation that some customers might have become repeat customers of a class member or even spent more money at a specific business than the GiftRocket amount. Rep. ¶ 96; Tr. 190:5-8 (Q: "Did you conduct a study regarding GiftRocket consumers to see who was repeat purchasers? A: No."); 190:9-192:2. All of these unreliable opinions should be excluded. (Dr. Ugone's related legal argument—that if a customer theoretically spent the gifted funds at a suggested business, that business would not have suffered injury under the Lanham Act for the unauthorized use of the business's information without consent—should also be excluded for the reasons discussed in Section II below.)

Similarly, no expertise or reliable methodology supports Dr. Ugone's argument that GiftRocket.com provided free promotional advertising for class members and "that the promotional effect (and the resulting benefits) to putative Class members may be substantial (and likely would negate Plaintiffs' claim of a loss of reputational or goodwill value)." *Id.* ¶ 93. Defendants have provided

---

[3] This premise is particularly suspect in the context of gifting, where recipients frequently dissemble out of respect for the feelings of the person who gave them the gift—another fact ignored by Dr. Ugone that renders his opinion unreliable.

no authority that a Lanham Act defendant can defend violations of § 43(a) by claiming the unauthorized commercial use and false and misleading statements using plaintiffs' name and information was, in their own view, beneficial to plaintiff. Presenting this incorrect argument about "free advertising" in the guise of expert analysis does not change the absence of supporting authority. The position is legally untenable. If a violator could excuse making false and unauthorized statements about a specific business (by name and address) and product (gift card) by invoking the old adage, "any publicity is good publicity," there would be no Lanham Act claims for false advertising and unfair competition.

But even if this were a viable argument from a legal perspective, Dr. Ugone is not qualified to opine on internet marketing or "free promotional" activity from a website. Tr. 54:16-56:5; 263:15-20. He is not an expert in website traffic referrals, search engine optimization, search engine results, or Google Analytics. *Id.* at 264:11-265:23, 316:25-317:17. And he has not conducted any independent study or analysis to determine whether any class member benefited from GiftRocket.com. *Id.* at 263:15-20.[4] Dr. Ugone simply parrots the findings of Google Analytics data that he writes "suggest that many users intentionally sought out GiftRocket and further indicate that many were not searching for a specific business when visiting the site." Rep. ¶ 94. He then uses that data to "theorize that Customers who arrived at GiftRocket without searching for a specific business" might have used GiftRocket's browse function to discover businesses, so GiftRocket might have acted "as a form of free promotion." Rep. ¶ 95. And he does not conduct any study or analysis on actual consumer spending behavior for his speculation that GiftRocket might have particularly benefitted businesses without actual gift cards. Rep. ¶ 99.

---

[4] He makes bold claims that "because the recipient of a GiftRocket that suggested a business would become aware of the business," Rep. ¶ 93. GiftRocket benefited that specific businesses, without even considering whether or not a customer heard of the business *before* visiting GiftRocket.com (the most likely outcome since the substantial majority of all of GiftRocket.com's web traffic came from Google search results).

Lastly, Dr. Ugone claims that "evidence in the record contains examples of businesses that were pleased to be suggestable on GiftRocket," reciting verbatim two declarations of business owners. Rep. ¶¶ 98-99. These business owners never heard of GiftRocket.com until defense counsel contacted them, and whatever probative value these declarations might have, the fact finder can weigh it. Dr. Ugone simply quotes their declarations—which apparently were written by defense counsel, and which the declarants have since asked to **withdraw**—and conducts no analysis. Tr. 277:7-9("Q: You just read the words on the page? A: "Yes."); Ex. J at 1 ("I have never heard of Gift rocket before now. . . . I sent the email requesting to be withdrawn immediately"), at 3 ("Unfortunately I do not remember a partnership at all and the fact any money being made. I also have not been provided any proof of income or referrals or marketing from GiftRocket"); Ex. K at 3 ("I have never heard of GiftRocket"); Ex. L; Ex. M, Benton Tr. 28:9-32:7, 32:9-16 ("Q: And you know that your Declaration is used to prevent any business from receiving any compensation for the millions that GiftRocket made from using businesses, correct? A: . . . I did not know, did not think about it at the time, did not realize what exactly this was."); 52:24-53:2 ("Knowing what . . . you know now, . . . do you want to withdraw your Declaration? A: Yes.").

Dr. Ugone also merely cites emails from just three other businesses— which he interprets as "many businesses"—that either consented or did not view being listed on GiftRocket as a "disadvantage." Rep. 101; Tr. 278:9-25. Three to five businesses that questionably endorsed GiftRocket until they learned more about it (and aren't even members of the class) is weak evidence for an argument that businesses' accepted GiftRocket's "free promotion." But regardless, Dr. Ugone provides no expert analysis; he just reads the plain text of emails.

### E. Dr. Ugone's Opinions About Whether Plaintiffs suffered "Economic Harm" Should be Excluded.

As discussed later in this brief, Dr. Ugone defines "economic harm" narrowly and then claims that Plaintiffs and the class members have not suffered such harm. Besides being improper legal

argument as demonstrated below, Dr. Ugone does not conduct any expert analysis of potential "economic harm" but merely recites documents in the record.

For instance, Dr. Ugone argues that Plaintiff Millercobb LLC did not suffer "economic harm" because the customer who thought she had purchased a GiftRocket (a) had her money refunded by Defendants, and then (b) ultimately patronized Millercobb's business, buying a gift certificate in a lesser amount ($90 instead of $100). Rep. ¶¶ 76–77, 79. This is an incorrect understanding of the law and what constitutes harm and justifies disgorgement. Regardless, it is "simply a restatement of facts in the record" and should be excluded. *See Cmty. Care*, 2025 WL 929407, at *10. In a valiant attempt to explain how this series of events does not evidence that GiftRocket caused MillerCobb $10 in lost sales, Dr. Ugone opines that if the GiftRocket was not refunded the recipient may still have spent that $10 elsewhere. Rep. ¶ 77 n.142. Of course, this proves Plaintiffs point—the purchaser wanted to direct $100 worth of business to MillerCobb, but GiftRocket diverted the sale. More saliently, none of this is based on any special expertise or reliable methodology by Dr. Ugone.

Dr. Ugone then points out that all three Plaintiffs have positive online reviews on their Yelp accounts and makes the incorrect argument that the absence of a negative review related to GiftRocket means their reputation was not harmed. Rep. ¶¶ 78-79. Again, he has no expertise in this area and no expert analysis was conducted as to how being associated with what is frequently referred to as a "scam" or is used for pornography might have harmed a local bakery, café, and massage spa. Tr. 124:16-125:21 And no expert analysis is required to help the factfinder to look at Yelp reviews and see that they are positive. Defense counsel—not Dr. Ugone—can make the specious argument that a negative Yelp review of a class member that also mentions GiftRocket is required to show injury.

**F.    Dr. Ugone's Arguments Regarding Blocked Businesses Spreadsheet Should Be Excluded**

The Court should also exclude Dr. Ugone's opinion summing up a spreadsheet to argue that Plaintiffs "substantially overstate the number of businesses that requested removal according to

GiftRocket's data" and therefore "have failed to demonstrate that Class-wide harm with a nexus to the Alleged Misconduct occurred that would warrant an overall disgorgement monetary remedy." Rep. ¶ 80. This (losing) argument should be made by Defendants, not an "expert."

Once again, Dr. Ugone "relies entirely on a spreadsheet provided to him" from the party and "did not conduct any independent analysis or investigation," so his testimony "would not help the jury to understand the evidence or to determine any fact in issue." *See* Ugone Exclusion Order; *see also*, Tr. 240:9-12 ("Q: And this is all just based on the GiftRocket business removal spreadsheet, right? A: Correct."). GiftRocket has a spreadsheet of over 34,000 removal requests from the website. Dr. Ugone claims that after he de-duped GiftRocket landing pages owned by the same businesses, and removed those associated with Allstate agents, there remained "approximately 4,600 businesses" that demanded removal. Ugone ¶ 86 n.155 ("I used functions available in Excel"). Defendants could have included this argument in their legal brief, but they cannot present basic administrative work as an expert opinion. Tr. 245:17-20.

Dr. Ugone's impermissible conclusions about what the evidence shows are also not supported by the cherry-picked and unreliable data he cites. Dr. Ugone only identified **six** examples of businesses that found out they were listed on GiftRocket.com and consented, in contrast to the thousands that actually requested removal. Rep. ¶ 87.  Even if the true number of businesses that demanded removal is 4,600, and not 34,000, this evidence shows it is far more likely that a business who found out it was listed on GiftRocket.com would demand removal rather than consent to being listed. Dr. Ugone addresses this obvious flaw in his reasoning by hypothesizing that businesses might have seen themselves on GiftRocket.com and been "content" to being listed. Rep. ¶ 88. This is pure speculation. He has no training or experience in how businesses might react to being listed without consent. He did not conduct any study or analysis to determine how many businesses actually were aware they were listed on GiftRocket.com and took no action Tr. 253:2-21 ("A. I can't speak to businesses that

may or may not have been aware."). He has no evidence or analysis to assume that if a business did not reach out to GiftRocket.com to request removal, it was fine with being listed on the website. Tr. 253:22-254:3 ("Q: And you didn't conduct any study asking businesses how they would have reacted if they knew they were listed on GiftRocket.com, correct? A:I didn't – I didn't do that sort of survey, no"). In any event, the fact finder can make these inferences without any assistance from Dr. Ugone.

## II. The Court Should Exclude Dr. Ugone's Legal Conclusions, which are Improper and Based on His Inaccurate and Unreliable Presentation of the Facts

Not content to usurp the province of the jury by opining on the facts, Dr. Ugone's report also "contains numerous inadmissible conclusions of law." *Boccio v. Costco Wholesale Corp.*, 2022 WL 970745, at *10 (E.D.N.Y. Mar. 30, 2022). When he is not reading minds or quoting at length from documents Defendants believe are favorable, Dr. Ugone spends the remainder of his report arguing that Plaintiffs and the class members must prove certain facts to prove injury or seek disgorgement, and then he opines that the facts in the record do not support injury or disgorgement. Dr. Ugone has gone far beyond simply 'opin[ing] on an issue of fact within the jury's province,'" and instead has "'give[n] testimony stating ultimate legal conclusions based on those facts." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). These improper legal opinions should be excluded.

### A. The Court Should Exclude Dr. Ugone's Arguments that Plaintiffs' Claims have Certain Legal Elements that are Satisfied Only by Certain Evidence

#### 1. Dr. Ugone's "Economic Nexus" is an Incorrect Legal Argument That Artificially Creates Elements of Proof

Dr. Ugone impermissibly posits legal elements of Plaintiffs' claims that must be satisfied by a certain type of evidence for Plaintiffs and class members to prevail—none of which are actually relevant or go to class certification. Throughout the opinion, Dr. Ugone argues that "a claimed disgorgement figure should have an economic nexus to the Alleged Misconduct," and that "Plaintiffs have failed to establish a link between their first category of monetary remedy (*i.e.*, disgorgement of

GiftRocket's profit from sales of GiftRockets with a suggested use) and GiftRocket's Alleged Misconduct." Rep. ¶ 48; *see also, e.g., id.* ¶¶ 7, 13, 48-50, 69, 104, 155 and §§ VIII-XI.

Dr. Ugone essentially relabels as an "economic nexus" requirement the same incorrect arguments Defendants have been making for years now, namely that Plaintiffs and class members cannot prove injury or recover disgorgement unless they can show (a) that an identifiable customer of Plaintiffs or the class members was actually confused, Rep. ¶¶ 49, 104, 143, 147; (b) that Plaintiffs or the class members actually suffered a diverted sale or can quantify injury to their reputation—actual harm or "quantum of harm"—and such injury must be related to a specific customer's dissatisfaction or confusion with GiftRocket.com, *Id.* ¶¶ 7, 62-64, 79, 81, 88, 91, 98, 126, 154, 156; (c) that Plaintiffs and class members must quantify and then disprove any purported beneficial affect from GiftRocket.com for allegedly providing them with free advertising, *id.* ¶¶ 90-101, 127, 148-154; (d) that Plaintiffs and class members must take into account differences about how their businesses operated to quantify injury and calculate disgorgement, *id.* ¶¶ 12(a), 148-154; (e) that Plaintiffs must disprove Defendants' baseless contention that a large number of customers liked GiftRocket and may have preferred to buy GiftRocket's product rather than patronize a class members' business directly, *e.g.*, Rep. ¶¶ 7, 62-64, 71-74, 118-20, App'x A; and (f) that Plaintiffs must prove that the disgorgement remedy is not a windfall, Rep. ¶¶ 12, 75, 110 117, 125, 150.

All of these are improper legal arguments about the requirements for Plaintiffs and the class members to prevail on their claims. As a result, Dr. Ugone "has overstepped his authority." *Scott*, 315 F.R.D. at 48. While Dr. Ugone can "identify variations in the evidence or record evidence overlooked . . . his expert opinion on what that means for the plaintiffs' case is impermissible." *Id.* (excluding expert opinion opposing class certification where expert argued that a "one-size-fits-all" liability determination would result in error, that "individual experiences" needed to be taken into account, that evidence must be examined "on a week by week basis," and extrapolations based on

representatives' experiences to the class members would be erroneous). Here, Dr. Ugone impermissibly opines "as to what factors are relevant to legal conclusions"—such as what is required to show harm to a class member or to prove disgorgement, like actual confusion, economic harm to reputation, or actual diversion of sales. *See id.*

Dr. Ugone even goes a step further, arguing the evidence weighs in favor of Defendants' arguments, offering unreliable opinions that customers "likely would not have been misled," "would not have been confused," and businesses not being injured or even helped by Defendants' "free" advertising." *See, e.g.*, Rep. ¶¶ 51, 79, 92, 94; *Scott*, 315 F.R.D. at 48 (noting expert opinions on "how much weight should be afforded to the evidence" are improper). As a result, Dr. Ugone's testimony "would impermissibly 'tell the jury what results to reach'" and "opines on an ultimate legal issue in the case." *Yeend v. Akima Glob. Servs., LLC*, 2025 WL 959968, at *6 (N.D.N.Y. Mar. 31, 2025) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992)); *Ebbert v. Nassau Cnty.*, 2008 WL 4443238, at *12 (E.D.N.Y. Sept. 26, 2008). Rather than mere fact statements, these ultimately are "conclusions of law"—that Plaintiffs have not proven their claims based on his assessment of the evidence—and "'[s]uch statements usurp both the role of the trial judge in instructing the jury as to the applicable law and the role of the jury in applying that law to the facts before it.'" *Boccio*, 2022 WL 970745, at *10 (cleaned up) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

As an aside, Dr. Ugone's legal opinions are wrong for the reasons explained in Plaintiffs' briefing on class certification (and multiple other motions). Showing actual customer confusion is not required to prove injury or seek disgorgement. The Second Circuit "permits a district court to award a defendant's full profits based solely on deterrence" and therefore plaintiff need not actually identify someone "who wished to buy the plaintiff's goods [that has] been actually misled into buying the defendant's." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 213–14 (2d Cir. 2019). Harm to reputation need not be quantified because the likelihood of confusion constitutes irreparable harm

to reputation as it "threatens [plaintiff] with a loss of goodwill and control over its reputation." *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 403 (E.D.N.Y. 2021). And a plaintiff can sustain a false advertising claim by demonstrating that Defendants "proximately caused actual or ***likely*** 'economic or reputational' injury." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 120 (2d Cir. 2023) (emphasis added). Further, given Defendants' literally and deliberately false statements, all class members are entitled to the same presumptions of customer confusion, injury and deception. *See* Br. at 3, 18,19,21; Reply at 11.

That a customer might have liked GiftRocket or preferred GiftRocket with a "suggested use" to a class member instead of simply spending money at that class member's business is irrelevant. *See Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2024 WL 3526853, at *3 (S.D.N.Y. July 23, 2024) ("The defendants argue that the plaintiff's claim of injury is too conclusory, particularly because there may be several reasons why consumers would choose to play Papaya games rather than Skillz games. . . . While a difficulty in quantifying its monetary losses may prevent it from obtaining an award of damages, it would not prevent that it from obtaining injunctive relief and disgorgement, which it has also sought."). And there is no legal authority for the argument that a defendant can violate the Lanham Act but then claim a defense that somehow the false and misleading marketing, which are at the core of the Lanham Act violation, were actually "free advertising" or "free promotions" that benefitted a plaintiff. Nor is there any legal authority that a plaintiff must affirmatively prove the remedy they seek is *not* a windfall. Whether there is any windfall is simply an equitable consideration the Court takes into account when fashioning relief, *See 4 Pillar Dynasty*, 933 F.3d at 214.

## 2. Dr. Ugone also Impermissibly and Incorrectly Opines on What is Required to Calculate Disgorgement

On top of advancing Defendants' meritless legal arguments in the guise of an "economic nexus" framework, Dr. Ugone also makes improper and irrelevant legal arguments regarding Plaintiffs' actual disgorgement calculations. Using Plaintiffs' method of calculating service fees—which

Defendants charged uniformly across all GiftRockets in the amount of two dollars plus five percent of the gifted amount, Dr. Ugone easily calculates service fees as $30 in total for The Dead Rabbit.[5] Rep. ¶ 106. And Dr. Ugone acknowledges that this same formula can be applied across each class member to calculate how much Defendants made from each class member. Tr. 300:16-24.

However, Dr. Ugone criticizes this method for not calculating "refunds" or taking into the potential deductions if an unredeemed balance is eventually redeemed. Rep. ¶¶ 106–113; Tr. 284:3-11. But under the Lanham Act, for disgorgement, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117. Plaintiffs do not need to deduct for potential refunds for sales after the fact; Defendants can, which is a simple calculation based on Defendants' own records, which Dr. Ugone himself conducted in his report.

Dr. Ugone also makes the legal argument that Plaintiffs' proposed calculation of disgorgement based on gift card discounts requires individualized inquiry, precluding class certification. Rep. ¶ 114-16. This is a poor legal argument, as individualized calculations of damages do not preclude certification. *See Cinar v. R&G Brenner Income Tax, LLC*, 2024 WL 4224046, at *7 (E.D.N.Y. Sept. 18, 2024) (Kovner, J.) What is important here is that the methodology to calculate the gift card discount amount is the same for each class member—identify which third party gift card was sold using a class member's information, and the applicable discount rate to the transaction. Tr. 303:12-304:17. For instance, when GiftRocket sells a GiftRocket using a class member's business name, the recipient can choose to receive an actual gift card to Amazon instead. If someone purchased a $100 Gracie Baked

[5] Plaintiffs' opening motion for class certification reported $32 in service fees due to a transcription error. $30 is correct using the same proposed methodology in Plaintiffs' opening motion and as further explained in the Janove Reply Decl. in support of class certification. The fact that Dr. Ugone was able to easily spot this typo and calculate the correct amount confirms that this same calculation can be performed without difficulty for each class member.

"gift card" from GiftRocket, and the recipient redeemed it for a $100 Amazon gift card, GiftRocket would make an additional $2.50 from the transaction, since Amazon sold that $100 gift card to GiftRocket at a 2.5% discount. Tr. 297:13- 298:12.

Dr. Ugone also takes issue with "generic disgorgement"—Plaintiffs' argument that that the court may equitably enhance the disgorgement award, as is well established by Second Circuit precedent. *See* Br. 24; Reply 15,18. Dr. Ugone criticizes Plaintiffs' generic disgorgement argument for failing to take into account all the evidentiary requirements he believes must be met. Rep. ¶¶ 121-25. Again, these are irrelevant and improper legal arguments. The Court can weigh whether the equities favor enhancing the disgorgement award. Dr. Ugone's opinion on these equities should be excluded.

### B.    Dr. Ugone's Statutory Interpretation of NY GBL is Improper and Incorrect

Dr. Ugone goes so far as expressly interpreting statutory language, arguing under the text of the New York General Business Law, class members must prove what their actual damages are and then show the claimed statutory damages are more than the actual damages. *See* Rep. ¶ 158 ("Plaintiffs provide no evidence that (a) there were any actual damages to any putative Class members or (2) whether such actual damages may or may not be greater than $550"), ¶ 158 n.235 (quoting NY GBL statutes); *see also id.* ¶¶ 155–57. Dr. Ugone cannot testify about his interpretation of a legal statute and the application of the facts to the law.

This is also simply incorrect, as courts routinely award GBL statutory damages without a showing of actual damages because no such showing is required. *See* Br. at 25; Reply at 12; *Geismar v. Abraham & Strauss*, 439 N.Y.S.2d 1005, 1008 (Dist. Ct. 1981) (rejecting defendant's argument that a plaintiff must prove actual damages to receive GBL statutory damages); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 550 (E.D.N.Y. 2017); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 70 (E.D.N.Y. 2015) (same); *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1041 (9th Cir. 2024); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *16 (C.D. Cal. July 1, 2013).

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Ugone's report and testimony in its entirety.

Respectfully submitted,

By: _/s/ Raphael Janove_
Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

Matthew Weinshall (Admitted _pro hac vice_)
Dayron Silverio (Admitted _pro hac vice_)
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 500
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurtst.com

Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

_Attorneys for Plaintiffs and the Proposed Classes_

Dated: August 1, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 8,723 words, including footnotes but excluding text specified in Rule 7.1(c).

Dated: August 1, 2025

*/s/ Raphael Janove*

Raphael Janove