# Exhibit M

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3   _____

 4   GRACIE BAKED LLC, WECARE RG, INC., and

 5   MILLERCOBB LLC, on behalf of themselves

 6   and all others similarly situated,

 7          Plaintiffs,

 8      v.                          Case No.:

 9   GIFTROCKET, INC., TREMENDOUS,    22-CV-4019(RPK)(VMS)

10   INC., NICHOLAS BAUM, KAPIL KALE,

11   JONATHAN PINES, BENJAMIN KUBIC,

12   SUNRISE BANKS, N.A., GIFTROCKET, LLC,

13   TREMENDOUS LLC, and TREMENDOUS PARENT, INC.,

14          Defendants.

15   _____

16                   DEPOSITION

17   _____

18   WITNESS:              ELIZA BENTON

19   DATE:                 Tuesday, July 15, 2025

20   START TIME:           9:35 a.m., ET

21   END TIME:             11:48 a.m., ET

22   REMOTE LOCATION:      Remote Legal platform

23   PROCEEDINGS OFFICER:  Anna Callender

24   JOB NO.:              38273

25              C O N F I D E N T I A L
```

**CONFIDENTIAL**

CONFIDENTIAL

1              MR. MORTENSEN:  I'm objecting to the form

2    of the question, Rafi.

3    BY MR. JANOVE:

4        Q    Did Katie tell you how GiftRocket explicitly

5    advertised in Google search results, Buy a gift card to

6    business name or buy gift cards to business name?

7        A    No.

8              MR. MORTENSEN:  Objection.  Form.

9    BY MR. JANOVE:

10       Q    Did Katie tell you what the purpose of your

11   Declaration was supposed to be?

12             MR. MORTENSEN:  Objection.  Form.

13             THE WITNESS:  Not really.  No.

14   BY MR. JANOVE:

15       Q    Did she tell you that she was trying to use

16   your Declaration to prevent tens of thousands of

17   businesses from recovering money that GiftRocket made

18   from using their businesses without consent?

19             MR. MORTENSEN:  Objection.  Form.

20             THE WITNESS:  It -- no.

21   BY MR. JANOVE:

22       Q    Did Katie tell you that she's trying to use

23   your Declaration so that GiftRocket can list millions of

24   businesses on its website without asking them for

25   permission?

CONFIDENTIAL

```
 1                    MR. MORTENSEN:  Objection.  Form.

 2                    THE WITNESS:  No.

 3   BY MR. JANOVE:

 4        Q    Did Katie tell you about the Woodstock,

 5   Vermont, scam alert about GiftRocket?

 6                    MR. MORTENSEN:  Objection.  Form.

 7                    THE WITNESS:  I think you did.  I don't

 8   think she did.

 9   BY MR. JANOVE:

10        Q    Yeah.  I did.

11        A    Yeah.  Okay.  I was like, I know I heard it,

12   but I don't think it was from her.

13        Q    And you don't happen to know which Woodstock

14   businesses might have reported them to the Vermont

15   police?

16        A    I do not.

17        Q    I don't know geographically how far you are

18   from Woodstock.  That's what I was, you know, asking.

19             Did Katie tell you how much GiftRocket made

20   from Bar Antidote?

21        A    No.

22                    MR. MORTENSEN:  Objection.  Form.

23   BY MR. JANOVE:

24        Q    Did Katie tell you that GiftRocket had kept

25   money that was never redeemed for use at Bar Antidote?
```

CONFIDENTIAL

```
1               MR. MORTENSEN:  Objection.  Form.

2               THE WITNESS:  No.

3   BY MR. JANOVE:

4       Q    Okay.  And then let's just scroll up.  I want

5   to jump ahead.  If you see on page 1, February 14th,

6   Katie writes:

7            Actually, it may be easier if I come up to

8   Vergennes next week and we can review in person.

9            Do you see that?

10      A    Yes.

11      Q    And so it looks like, scrolling up, she came

12  to visit you in person on February 20th at 11:00 a.m.

13           Do you see that?

14      A    Yes.

15      Q    And on February 20th, did Katie come with a

16  printed declaration for you to sign?

17      A    Yes.

18      Q    Do you recall making any edits to the

19  Declaration at that meeting?

20      A    I don't believe so.

21      Q    And in between your January 10 and February

22  28th, 20th meeting with Katie, did you conduct any

23  separate investigation into GiftRocket?

24      A    I don't believe so.

25      Q    So you didn't look it up online or look at the
```

CONFIDENTIAL

1    -- like the court case, correct?

2        A    No.

3        Q    And after your February 20th meeting with

4    Katie, did you -- after February 20th meeting, before I

5    contacted you, did you conduct any additional

6    investigation into GiftRocket?

7        A    No.

8                MR. JANOVE:  Okay.  Let's take this

9    exhibit down.  And I'm now going to mark as Exhibit B.

10   This is Plaintiffs' 001015

11       (Exhibit B marked for identification.)

12   BY MR. JANOVE:

13       Q    This is the email thread between me and you

14   regarding GiftRocket.  And if you see the June 12th

15   email to you, I had written some questions and I kind of

16   bolded my summary of our conversation.

17       A    Yes.

18       Q    And you write, you know:

19            Please let me know if I have made any errors

20   in my summary or if there's anything you'd like to

21   correct.

22            Do you see that?

23       A    Yes.

24       Q    Also, I write:

25            As discussed, please find attached the Second

CONFIDENTIAL

1    Amended Complaint against GiftRocket.

2          Did you -- did you take a look at the Second

3    Amended Complaint?

4      A    I don't remember.

5      Q    Okay.  All right.  So I want to go to my, you

6    know, question 1:

7          Are you aware of how much money GiftRocket

8    made from selling GiftRocket's with suggested use to

9    Antidote?

10         And then you see my bolded response?

11     A    Yes.

12     Q    Can you just read it for a moment and let me

13   know if that's a correct recollection of what we

14   discussed?

15              MR. MORTENSEN:  Objection.  Form.

16              MS. JONES:  You want me to switch pages,

17   just let me know.

18              THE WITNESS:  Katie didn't tell you how

19   much money GiftRocket made from GiftRocket.  If you know

20   how much they made off you, you would like some of that

21   money.  I'll find out how much GiftRocket made if you

22   agree to keep that -- and you agreed to keep that fact

23   confidential.

24              Is that the right spot?

25   BY MR. JANOVE:

CONFIDENTIAL

```
1        Q    Yeah.  Is that -- is that a correct

2    recollection of what we discussed in your answer?

3        A    Yes.

4               MR. MORTENSEN:  Objection.  Form.

5    BY MR. JANOVE:

6        Q    Sitting here today, would you still like to

7    make -- would you still like some of the money that

8    GiftRocket made off of Bar Antidote sent to you?

9        A    Sure.

10              MR. MORTENSEN:  Objection.  Form.

11   BY MR. JANOVE:

12       Q    All right.  And then, you know, question 2.

13   It's about me sending the "SCAM ALERT."  Can you take a

14   look at the bold and let me know if that's correct, if

15   there's anything you would like to correct in that

16   summary?

17              MR. MORTENSEN:  Objection.  Form.

18              THE WITNESS:  Yeah.  No.  It's -- that's

19   what I remember.

20   BY MR. JANOVE:

21       Q    Okay.  Number 3 -- well, we already asked

22   about Carolyn Thompson, but is that also an accurate

23   summary?

24       A    Yes.

25       Q    How about Number 4?  Same thing, is that an
```

CONFIDENTIAL

1    accurate summary?

2                    MR. MORTENSEN:  Objection.  Form.

3                    THE WITNESS:  Yes.

4    BY MR. JANOVE:

5       Q    Same thing for Number 5, is that accurate?

6                    MR. MORTENSEN:  Objection.  Form.

7                    THE WITNESS:  Correct.

8    BY MR. JANOVE:

9       Q    And how about for Number 6?

10                   MR. MORTENSEN:  Objection.  Form.

11                   THE WITNESS:  Yes.  That's correct.

12   BY MR. JANOVE:

13      Q    Okay.  And also on that line, you also stated

14   that if other businesses had a bad experience with

15   GiftRocket, you wouldn't have an issue with those

16   businesses seeking money from GiftRocket.

17           Is that true sitting here today?

18      A    Yes.

19      Q    What if businesses had, let's say, a neutral

20   experience with GiftRocket, and they didn't know either

21   way if GiftRocket helped their business or not?  Would

22   you have any issue with those businesses getting

23   compensation from GiftRocket for using their name to

24   sell GiftRockets?

25                   MR. MORTENSEN:  Objection.  Form.

CONFIDENTIAL

```
 1                    THE WITNESS:  No.
 2   BY MR. JANOVE:
 3       Q    And you yourself would like, you know,
 4   compensation from GiftRocket for using Bar Antidote to
 5   make money, correct?
 6                    MR. MORTENSEN:  Objection.  Form.
 7                    THE WITNESS:  Yeah.  Sure.
 8   BY MR. JANOVE:
 9       Q    And you know that your Declaration is used to
10   prevent any business from receiving any compensation for
11   the millions that GiftRocket made from using businesses,
12   correct?
13                    MR. MORTENSEN:  Objection.
14                    THE WITNESS:  I honestly didn't really --
15   I did not know, did not think about it at the time, did
16   not realize what exactly this was.
17                    MR. JANOVE:  Okay.  We can take that
18   exhibit down.
19   BY MR. JANOVE:
20       Q    So as you testified it -- testified earlier,
21   Katie Kramer didn't tell you how GiftRocket.com listed
22   Bar Antidote on its website, correct?
23       A    Yes.
24                    MR. MORTENSEN:  Objection.  Form.
25   BY MR. JANOVE:
```

CONFIDENTIAL

1        Q    And she didn't tell you what language they

2   used in their advertising in relation to Bar Antidote,

3   correct?

4        A    Correct.

5             MR. MORTENSEN:  Objection.  Form.

6   BY MR. JANOVE:

7        Q    Can you answer, Eliza?  I think Erik talked

8   over you.

9        A    Oh.  Correct.

10       Q    And she didn't tell you how Bar Antidote might

11  have shown up in Google search results that listed

12  GiftRocket, correct?

13       A    Correct.

14            MR. MORTENSEN:  Objection.  Form.

15  BY MR. JANOVE:

16       Q    And Katie -- all right.  So based on Google

17  Analytics data produced in this case, there has been at

18  least one time that someone searching for the phrase

19  "Antidote Vergennes VT" saw a link in a Google search

20  result that went to GiftRocket.

21            Did Katie --

22            MR. MORTENSEN:  Objection.

23  BY MR. JANOVE:

24       Q    -- tell you about the Google search that may

25  have led someone from searching Bar or -- sorry.  Sorry.

CONFIDENTIAL

```
 1    Someone searching Antidote Vergennes VT, how that person

 2    searching that phrase arrived to GiftRocket?

 3        A    No.

 4              MR. MORTENSEN:  Objection.  Form.

 5    BY MR. JANOVE:

 6        Q    And Katie didn't say that GiftRocket sold

 7    actual gift cards to Bar Antidote, right?

 8        A    Right.

 9              MR. MORTENSEN:  Objection.  Form.

10    BY MR. JANOVE:

11        Q    That GiftRocket was out there selling gift

12    cards to the bar, right?

13        A    Right.

14        Q    So let's now turn to what I will mark as

15    Exhibit C.  This is GR_0020308.

16        (Exhibit C marked for identification.)

17    BY MR. JANOVE:

18        Q    And I'm going to show you an email exchange

19    between the business and GiftRocket.  And you'll see in

20    the black box, this is what GiftRocket's search results

21    would say for any particular business.

22              So take a -- take a minute to look, but I want

23    to start with the black box when you're -- when you've

24    digested the email.

25        A    Okay.
```

1    Q    So you see in the black image, this is how

2  GiftRocket's SEO, its search engine optimization

3  strategy, would make it so that if someone searched --

4  made a search regarding a business, they may have seen a

5  Google search result using this language.

6         So you see where it says "Buy a Paragary's

7  Restaurant Group Gift Card," it would have said, Buy a

8  Bar Antidote Gift Card – GiftRocket.

9         Do you see that?

10   A    Yes.

11              MR. MORTENSEN:  Objection.  Form.

12  BY MR. JANOVE:

13   Q    And GiftRocket does not sell gift cards to Bar

14  Antidote, correct?

15   A    Correct.

16   Q    And you see the description in the line below,

17  it says:

18         Buy a gift card to Paragary's Restaurant

19  Group.

20         So similar -- similarly, it would say, Buy a

21  gift card to Bar Antidote.  But you can't actually buy a

22  gift card to Bar Antidote on GiftRocket.com, correct?

23   A    Correct.

24              MR. MORTENSEN:  Objection.  Form.

25  BY MR. JANOVE:

```
1        A    Right.

2        Q    Not something like, buy a gift card to Bar

3   Antidote using your Yelp information, correct?

4        A    Correct.

5             MR. MORTENSEN:  Objection.  Form.

6   BY MR. JANOVE:

7        Q    And when you write:

8             As a business owner, I was happy to have

9   additional free marketing for my business that might

10  bring customers to the restaurant.

11            So, again, you did not know what the actual

12  marketing for Bar Antidote said --

13       A    Right.

14       Q    -- related to GiftRocket --

15            MR. MORTENSEN:  Objection.  Form.

16  BY MR. JANOVE:

17       Q    -- right?

18       A    Yes.  No.  I did not know what -- what they

19  were saying.

20       Q    And Katie did not tell you whether anyone

21  actually patronized your business because of GiftRocket?

22       A    Correct.

23            MR. MORTENSEN:  Objection.  Form.

24  BY MR. JANOVE:

25       Q    And when she said free marketing, Katie didn't
```

1    tell you about the fact that GiftRocket made money from

2    Bar Antidote?

3                    MR. MORTENSEN:  Objection.  Form.

4                    THE WITNESS:  Correct.  Or false

5    marketing, I guess.

6    BY MR. JANOVE:

7        Q    Right.  That she didn't say they were

8    advertising buy a gift card to Bar Antidote when their

9    internal email said, We don't sell gift cards to

10   businesses, right?

11       A    Right.

12                   MR. MORTENSEN:  Objection.  Form.

13   BY MR. JANOVE:

14       Q    And she didn't explain that that's why

15   customers and businesses demanded removal from

16   GiftRocket or otherwise complained about it being a

17   scam, right?

18       A    Correct.

19                   MR. MORTENSEN:  Objection.  Form.

20   BY MR. JANOVE:

21       Q    Or that was the genesis of the police alert in

22   Woodstock for, you know, gift card scam, right?

23       A    Right.

24                   MR. MORTENSEN:  Objection.  Form.

25   BY MR. JANOVE:

1      Q    And when you say my experience having my

2    business listed on GiftRocket.com was positive, and I

3    have no objection to GiftRocket using my business name

4    on their website, when you say it was positive, that is

5    solely based on what Katie said GiftRocket might have

6    provided Bar Antidote?

7      A    Yes.

8      Q    And when you say, I have no objection to

9    GiftRocket using my business name on their website,

10   Katie did not actually tell you or show you how they

11   used your business name on their website, correct?

12     A    Correct.

13              MR. MORTENSEN:  Objection.

14   BY MR. JANOVE:

15     Q    And then when you write, I have never had a

16   negative experience with a customer in relation to

17   GiftRocket or any other negative experience connected to

18   GiftRocket, that was based solely on what Katie told

19   you, correct?

20     A    Yes.

21              MR. MORTENSEN:  Objection.

22   BY MR. JANOVE:

23     Q    Have you ever had a positive experience in

24   relation to GiftRocket?

25     A    No.

Page 17 of 186
CONFIDENTIAL

1          Q      Has GiftRocket provided you or your business

2    with any concrete benefit?

3          A      Not that I'm aware of.  No.

4          Q      Do you want -- well, you're not operating it,

5    but would you -- would you want your business to remain

6    on GiftRocket's website, or if you started a new

7    business, would you like it to be on GiftRocket?

8          A      No.

9          Q      If GiftRocket were to attempt to list any

10   business that you might start in the future, would you

11   want to ask GiftRocket -- would you -- would you want

12   GiftRocket to ask your business first if they consented

13   to being listed on the website?

14         A      Yes.

15                MR. MORTENSEN:  Objection.  Form.

16   BY MR. JANOVE:

17         Q      And sitting here today, as you understand,

18   Katie is trying to use your Declaration to prevent

19   businesses from receiving any compensation from

20   GiftRocket, right?

21         A      Right.

22                MR. MORTENSEN:  Objection.  Form.

23   BY MR. JANOVE:

24         Q      Knowing what -- knowing what you know now, do

25   you -- do you want to withdraw your Declaration?

```
1        A    Yes.

2                MR. MORTENSEN:  Objection.  Form.

3  BY MR. JANOVE:

4        Q    Are you going to email Katie and ask her to

5  withdraw it?

6        A    If that's what you -- I need to do.

7        Q    Well, she'll read this transcript, so she can

8  say that.  So my understanding is that, yes, you want to

9  withdraw your Declaration, correct?

10       A    Correct.

11       Q    And if a class is certified in this case, you

12  would like to receive compensation for Bar Antidote,

13  correct?

14       A    Correct.

15               MR. JANOVE:  Thank you.  I have no other

16  questions.

17               Anything for Defendants or Sunrise?

18                    EXAMINATION

19  BY MR. SHRINATH:

20       Q    Hi.  Ms. Benton, I'll just ask a couple of

21  quick questions.  My name is Kshithij Srinath.  I'm an

22  attorney with Greene Espel, and I'm representing one of

23  the defendants in the matter, Sunrise Banks.

24               MR. SHRINATH:  Oh.  Apologies, Mr.

25  Mortensen.  Did you --
```

CONFIDENTIAL

```
 1                    MR. MORTENSEN:  I -- sorry.  It just

 2    kicked me off for a minute.

 3    BY MR. SHRINATH:

 4        Q    Have you ever heard of Sunrise Banks?

 5        A    No.

 6                    MR. SHRINATH:  Okay.  No further

 7    questions.  Thanks.

 8                    THE PROCEEDINGS OFFICER:  Anything else?

 9                    MR. JANOVE:  And so, actually, Eliza,

10    just so you know, in terms of next steps, you'll get a

11    copy -- we'll send you a copy of the transcript.

12                    And then there's a thing called "Errata."  So

13    you'll just review and sign it.  And if you see any

14    errors, you can mark, like I said this word, not that

15    word.  Then you just review it for correctness.

16                    THE WITNESS:  Okay.

17                    MR. JANOVE:  So, Anna, what -- roughly

18    time speaking, when should -- I'll send it to Eliza when

19    -- when do you think -- well, we're not paying for

20    express, so just the standard delivery, and I'll send

21    her the errata form.

22                    You're on mute, so.

23                    THE PROCEEDINGS OFFICER:  I'm sorry.  Say

24    that one more time?

25                    MR. JANOVE:  So just -- we can go off the
```

CONFIDENTIAL

1    record now.  You can just talk to me about --

2                        THE PROCEEDINGS OFFICER:  Sure.  I just

3    want to confirm transcript orders.  You said that you

4    would just like regular delivery?

5                        MR. JANOVE:  Yeah.  Just regular

6    delivery.  And then I was going to send it to Eliza with

7    the errata form so she can complete it.

8                        So I just wanted to give her a --

9                        THE PROCEEDINGS OFFICER:  Sure.

10                       MR. JANOVE:  -- rough ETA when she can

11   review the transcript, review if she has any edits, and

12   then sign and send it back.

13                       THE PROCEEDINGS OFFICER:  So I would

14   consult with Remote Legal about exact time and date when

15   you'll receive it.  But usually it's within 7 to 10

16   business days.  Usually.

17                       MR. JANOVE:  Okay.  Cool.

18                       So, Eliza, I'll just give you a heads-up

19   when we have the transcript and the form.  Then you can

20   just review it, sign.

21                       THE WITNESS:  Okay.

22                       THE PROCEEDINGS OFFICER:  And does any

23   other attorney want to order a transcript before we get

24   off?

25                       MR. MORTENSEN:  We -- well, I just --

1   defendants have some -- or Defendant GiftRocket has some

2   questions, too.  Although we will be ordering a

3   transcript as well.

4                THE PROCEEDINGS OFFICER:  Okay.  So we

5   want to keep going, then?

6                MR. MORTENSEN:  Yes.  Although --

7                THE PROCEEDINGS OFFICER:  All right.

8                MR. MORTENSEN:  -- Eliza, how -- do you

9   want to take a couple-minute break?  Do you mind if we

10  take a couple-minute break, just so I can use the

11  restroom before I have a few questions for you?

12               THE WITNESS:  Sure.  Yeah.  As long as

13  it's quick.  I have to get to actual work, so.

14               MR. MORTENSEN:  Great.

15               THE PROCEEDINGS OFFICER:  All right.  The

16  time is --

17               MR. MORTENSEN:  Maybe just two minutes?

18               THE PROCEEDINGS OFFICER:  Yeah.

19               The time is 10:34 a.m., and we are off

20  the record.

21       (Off the record.)

22               THE PROCEEDINGS OFFICER:  Okay.  The time

23  is 10:37 a.m., and we are on the record.

24               MR. MORTENSEN:  Thank you.

25                        EXAMINATION