# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

GRACIE BAKED LLC, WECARE RG, INC., and MILLERCOBB LLC, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GIFTROCKET, INC., TREMENDOUS, INC., NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES, BENJAMIN KUBIC, SUNRISE BANKS, N.A., GIFTROCKET, LLC, TREMENDOUS LLC, and TREMENDOUS PARENT, INC.,

Defendants.

Case No.: 1:22-cv-04019-RPK-VMS

## **DEFENDANT GIFTROCKET, LLC'S OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. KEITH UGONE**

*Served September 9, 2025*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT .......................................................................................................................3

I.     PLAINTIFFS APPLY THE WRONG LEGAL STANDARDS INSTEAD OF THOSE APPLICABLE TO REBUTTAL EXPERT TESTIMONY AT CLASS CERTIFICATION, WHICH IS WHAT IS RELEVANT HERE..............3

II.     DR. UGONE'S REPORT PROVIDES NECESSARY FACTUAL BACKGROUND AND OFFERS EXPERT OPINIONS, NOT LEGAL CONCLUSIONS................................................................................................6

III.     THERE IS NO BASIS TO EXCLUDE DR. UGONE'S EXPERT OPINION THAT INDIVIDUALIZED INQUIRIES WOULD BE REQUIRED TO DETERMINE WHETHER GIFTROCKET DECEIVED OR DIVERTED ANY PUTATIVE CLASS MEMBER'S CUSTOMERS. ......................................8

      A.     Dr. Ugone's Opinions are Grounded in His Application of an Established Economic Framework that Plaintiffs Do Not Challenge. .................................................................................................8

      B.     Dr. Ugone Supports His Economic Framework by Analyzing and Synthesizing Business and Other Records.................................11

           1.     Dr. Ugone analyzes and presents Google Analytics and other website data Plaintiffs ignored.....................................11

           2.     Dr. Ugone analyzes and presents customer review data to rebut Plaintiffs' theories—data from many of the same sources on which Plaintiffs have repeatedly relied yet now deem to be "unreliable." ...............................................13

IV.     THERE IS NO BASIS TO EXCLUDE DR. UGONE'S OPINIONS THAT PLAINTIFFS' METHOD FOR CALCULATING AND APPORTIONING CLASSWIDE DISGORGEMENT IS UNRELIABLE AND YIELDS AWARDS WITH NO ECONOMIC NEXUS TO GIFTROCKET'S ALLEGED MISCONDUCT...............................................................................16

      A.     Dr. Ugone's Analysis of Financial Records is Helpful to the Court Because It Demonstrates Plaintiffs Do Not Accurately Measure Profits from Gift-Card Referrals—and that Doing So Would Require Many Individualized Inquiries. ...................................16

      B.     Dr. Ugone's Analysis of Financial Records Demonstrates Plaintiffs' Formula for Calculating Breakage Is Unmoored from Reality. ...............18

      C.     Dr. Ugone's Analysis of Financial Records Underscores Plaintiffs' Nonexistent Method for Calculating "Generic" Disgorgement.................19

D.     Dr. Ugone Applies His Economics Experience, Bolstered by Empirical Analyses, to Identify Differences Between Putative Class Members Plaintiffs Overlook, such as Those that Implicitly Consented to Being on GiftRocket ........................................................... 20

E.     Plaintiffs' Arguments that Dr. Ugone's Opinions Are "Wrong" Because the Court Can Order Classwide Disgorgement as Deterrence Are Irrelevant and Flawed. ....................................................... 23

V.     THIS COURT SHOULD CONSIDER DR. UGONE'S OPINION THAT PLAINTIFFS' G.B.L. CLAIMS SUFFER FROM THE SAME DEFECTS AS PLAINTIFFS' CLAIMS FOR DISGORGEMENT. ...................................... 24

CONCLUSION ................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*4 Pillar Dynasty LLC v. N.Y. & Co.*,
  933 F. 3d 202 (2d Cir. 2019)...............................................................24

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ...................................21

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ..................................................... *passim*

*Am. Empire Surplus Lines Ins. Co. v. J.R. Cont. & Env't Consulting, Inc.*,
  743 F. Supp. 3d 530 (S.D.N.Y. 2024).................................................5

*Belfiore v. Procter & Gamble Co.*,
  311 F.R.D. 29 (E.D.N.Y. 2015) .........................................................25

*Boccio v. Costco Wholesale Corp.*,
  2022 WL 970745 (E.D.N.Y. Mar. 30, 2022) ......................................8

*Bocoum v. Daimler Trucks N. Am. LLC*,
  2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) .......................................7

*Bowling v. Johnson & Johnson*,
  2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019).......................................5

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022)..............................................2, 23

*Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*,
  2025 WL 929407 (E.D.N.Y. Mar. 27, 2025)........................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................................... *passim*

*Equistar Chems., LP v. Westlake Chem. Corp.*,
  2016 WL 4394999 (E.D. Tex. Feb. 26, 2016) .....................................2

*Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*,
  693 F. Supp. 3d 335 (E.D.N.Y. 2023) .........................................15, 16

*Fleishman v. Albany Med. Ctr.*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010).............................................15

*Focus Prods. Grp. Int'l v. Kartri Sales Co.*,
  647 F. Supp. 3d 145 (S.D.N.Y. 2022).........................................23, 24

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009).................................................................10

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
    2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023).....................................................7

*Guido v. L'Oreal, USA, Inc.*,
    2013 WL 3353857 (C.D. Cal. July 1, 2013).......................................................25

*Haley v. Tchrs. Ins. & Annuity Ass'n. of Am.*,
    54 F.4th 115 (2d Cir. 2022)...............................................................................19

*Henkel v. Wagner*,
    2016 WL 1271062 (S.D.N.Y. Mar. 29, 2016).....................................................4

*Highland Cap. Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)...............................................................15

*Intuit Inc. v. HRB Tax Group*,
    2024 WL 5320392 (N.D. Cal. Dec. 3, 2024)......................................................15

*Joffe v. King & Spalding LLP*,
    2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019).....................................................4

*Johnson v. Nextel Comm'cns.*,
    780 F.3d 128 (2d Cir. 2015)..............................................................................18

*Joseph S. v. Hogan*,
    2011 WL 2848330 (E.D.N.Y. July 15, 2011)......................................................5

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .........................................2, 14, 15, 21

*Kronenberg v. Allstate Ins. Co.*,
    743 F. Supp. 3d 465 (E.D.N.Y. Aug. 5, 2024) ..................................................25

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017).......................................................................25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)...............................................................15

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015)..............................................................6, 13

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G.*,
    2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015).............................................4, 5, 20

*Mahaska Bottling Co. v. PepsiCo, Inc.*,
    441 F. Supp. 3d 745 (S.D. Iowa 2019) ...................................................................25

*Molly C. v. Oxford Health Ins., Inc.*,
    2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024) ....................................................5, 6

*Montera v. Premier Nutrition Corp.*,
    111 F.4th 1018 (9th Cir. 2024) ...............................................................................25

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    2015 WL 5766930 (E.D. Pa. Aug. 20, 2015) ...........................................................7

*Negron v. Cigna Health & Life Ins. Co.*,
    2021 WL 2010788 (D. Conn. May 20, 2021).............................................................5

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    638 F. Supp. 3d 227 (E.D.N.Y. 2022) .............................................................11, 14

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013).......................................................................6

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
    2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017).............................................................18

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
    2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018)...........................................................18

*Schechner v. Whirlpool Corp.*,
    2018 WL 6843305 (E.D. Mich. Oct. 30, 2018) ........................................................2

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................... *passim*

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
    2024 WL 3526853 (S.D.N.Y. July 23, 2024) .........................................................24

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*,
    2017 WL 3394139 (E.D. Tex. Aug. 7, 2017) ...........................................................2

*Thomas v. YRC Inc.*,
    2018 WL 919998 (S.D.N.Y. Feb. 14, 2018)...........................................................22

*Tillman v. City of New York*,
    2024 WL 4710887 (E.D.N.Y. Nov. 7, 2024)..............................................................4

*Utd. Servs. Auto. Ass'n v. Mitek Sys., Inc.*,
    2014 WL 12498207 (W.D. Tex. July 22, 2014) ................................................22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................................5

*Yeend v. Akima Glob. Servs., LLC*,
    2025 WL 959968 (N.D.N.Y. Mar. 31, 2025) ..........................................8

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ...................................................................5

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .......................................4, 10, 14

**Statutes**

15 U.S.C. § 1117.................................................................................19, 23

**Other Authorities**

Fed. R. Civ. P. 26....................................................................................6

Fed. R. Evid. 702..................................................................................4, 6

# INTRODUCTION

Plaintiffs misapprehend the legal standards applicable here. They seemingly forget Dr. Ugone is a *rebuttal* expert at *class certification*—an issue on which they bear the burden of proof—not an affirmative expert testifying at a jury trial. Plaintiffs cite 34 cases, but tellingly, only one involved the partial exclusion of a defense expert at class certification—and under very different circumstances. Plaintiffs also rely on cases discussing expert testimony to a jury, despite the fact Dr. Ugone's opinions pertain only to issues to be decided by the Court. Plaintiffs even argue Dr. Ugone should have conducted his own surveys. But it is *Plaintiffs*, not Defendants, who needed to engage an expert to conduct surveys to support their theory of classwide harm because *Plaintiffs*, not Defendants, bear the burden at class certification to demonstrate the predominance of common questions—a burden they failed to meet.

Applying the proper legal standards, Plaintiffs' *Daubert* motion should be denied because Dr. Ugone, an economist and professor with over 40 years of experience, provides expert insight that will assist the Court in ruling on class certification. Dr. Ugone rebuts Plaintiffs' proposed damages model by identifying flaws in Plaintiffs' assumptions and methods. He explains how Plaintiffs' theories of liability clash with a well-established economic framework, and that Plaintiffs overlook the disparate economic motives and circumstances of putative class members and GiftRocket users, which he corroborates with empirical analyses of data from the record. He concludes individualized inquiries would be required to determine whether GiftRocket misdirected any putative class member's customers, and that there is no classwide economic nexus between Defendants' alleged wrongdoing and Plaintiffs' requested relief.

Because Dr. Ugone's opinions neither rely on "junk science" nor seek to usurp the role of the Court, Plaintiffs resort to mischaracterizing them. For example, according to Plaintiffs, Dr. Ugone's report is filled with legal conclusions and pure factual narrative. Not so. Dr. Ugone never

opines on whether class certification is appropriate. Rather, he applies economic principles and empirical analyses to identify individualized issues that Plaintiffs overlook. Dr. Ugone also does not engage in unnecessary narrative. Instead, he complies with Federal Rule of Evidence 702's requirement to articulate his factual assumptions, with which he "unites large and varied types of data to support a conclusion grounded in a field in which he has genuine expertise." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 134 (S.D.N.Y. 2022).

This Court should therefore deny Plaintiffs' *Daubert* Motion.

## BACKGROUND

Dr. Ugone is a professional economist with decades of experience in private practice, academia, and expert consulting. *See* Ugone Rep. ("Rep."), Ex. 1, at 1. He earned degrees in economics from the University of Notre Dame in 1977 (B.A.), University of Southern California in 1979 (M.A.), and Arizona State University in 1983 (Ph.D.). Rep. ¶ 19. Dr. Ugone "specialize[s] in the application of economic principles to complex commercial disputes," *id.* ¶ 17, with a particular focus on microeconomic principles, such as consumer behavior, *see* Kramer Decl., Ex. 1 (Ugone Dep. Tr.) 54:24–55:14. He frequently analyzes large databases. Rep. ¶ 18.

In the last 25 years, Dr. Ugone has testified as an expert in approximately 283 federal cases. *See* Rep., Ex. 2. Courts routinely admit his testimony. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *49 (S.D.N.Y. Jan. 30, 2025) ("No one disputes that Dr. Ugone is qualified to opine on the treatment of variables in economic modeling, nor, given his qualifications, would I credit such objections."); *Schechner v. Whirlpool Corp.*, 2018 WL 6843305, at *11 (E.D. Mich. Oct. 30, 2018) ("[Dr.] Ugone holds a Ph.D. in economics, with education and experience necessary to generally rebut the opinions of Plaintiffs' economist[.]"); *Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, 2017 WL 3394139, at *2 (E.D. Tex. Aug. 7, 2017) (holding Dr. Ugone qualified to testify as expert); *Equistar Chems., LP v. Westlake Chem. Corp.*,

2016 WL 4394999, at *4 (E.D. Tex. Feb. 26, 2016) (finding Dr. Ugone's "testimony to be sufficiently reliable as required by *Daubert* and [FRE] 702").

In this case, Dr. Ugone employs his "economics and damages quantification training and experience" to render opinions relevant to the Court's Rule 23 analysis. Rep. ¶ 6. He concludes "[i]ndividual inquir[ies] would be required to determine whether each putative Class member's customers were deceived or misdirected by GiftRocket resulting in harm to the putative Class members." *Id.* ¶ 11. This is because under the "standard economic framework of budget-constrained utility maximization," some GiftRocket users likely sought out GiftRocket precisely for its "suggested use" feature, not to buy any merchant-branded gift card. *Id.* ¶¶ 63–64; *id.*, App'x A. Thus, Dr. Ugone concludes that data on GiftRocket user experiences "does not support the claim that dissatisfaction and confusion with GiftRocket was universal." *Id.* ¶ 59; *see also id.* ¶¶ 51–58, 60–62, 94, 95, tbl.8, 135–56.

Dr. Ugone also concludes Plaintiffs' proposed formula for calculating classwide disgorgement, which was unsupported by any expert report, is unreliable. *Id.* ¶ 10. Among other things, Plaintiffs provide no method for identifying Defendants' profits. *See id.* ¶ 102–25. Plaintiffs also overlook different economic incentives and circumstances among putative class members, such as whether they had their own gift card programs. *See, e.g., id.* ¶¶ 12, 148–54. Thus, Dr. Ugone concludes there is no classwide economic nexus between Defendants' alleged wrongdoing and Plaintiffs' requested disgorgement. *See id.* ¶ 8. These same critiques apply to Plaintiffs' requested statutory damages. *See id.* ¶¶ 13, 155–58.

## ARGUMENT

### I. PLAINTIFFS APPLY THE WRONG LEGAL STANDARDS INSTEAD OF THOSE APPLICABLE TO REBUTTAL EXPERT TESTIMONY AT CLASS CERTIFICATION, WHICH IS WHAT IS RELEVANT HERE.

"The Second Circuit has distilled [Federal] Rule [of Evidence] 702's requirements into

three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (cleaned up). While the proponent of expert testimony has the burden of establishing these requirements by a preponderance of the evidence, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility[,]" and "only serious flaws in reasoning or methodology will warrant exclusion." *Tillman v. City of New York*, 2024 WL 4710887, at *1–2 (E.D.N.Y. Nov. 7, 2024) (cleaned up) (Kovner, J.); *see also* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("[T]he rejection of expert testimony is the exception rather than the rule.").

In addition to the general rules governing expert testimony, other standards apply here. To start, Dr. Ugone is a *rebuttal* expert. That is, the purpose of his report is to rebut Plaintiffs' arguments for class certification, including Plaintiffs' methodology for calculating and apportioning relief. "That context is important" because "[t]he 'task of a rebuttal expert is different from that of an affirmative expert.'" *Aluminum Warehousing*, 336 F.R.D. at 29 (quoting *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G.*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015)). Rebuttal experts "have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007); *see also Joffe v. King & Spalding LLP*, 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019) ("[A] rebuttal expert need not identify alternative or better methodologies."). A rebuttal expert "needs only h[is] expertise and the 'method' identified at the beginning of h[is] report—namely, reviewing the documents in this case, along with [the Plaintiffs' arguments], and arriving at an opinion as to [the Plaintiffs'] analysis[.]" *Henkel v. Wagner*, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016).

In a highly unusual move, Plaintiffs moved for class certification, for which they bear the

burden of proof, without a supporting expert report. But that does not change Dr. Ugone's role as a rebuttal expert: "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Luitpold Pharms.*, 2015 WL 5459662, at *12. Again, "[t]here is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.* That is precisely what Dr. Ugone does here.

Furthermore, Dr. Ugone proffers his opinions in opposition to *class certification*, a distinction Plaintiffs overlook. To the extent *Daubert* applies at all, it is "cabined" at this stage.[1] *Aluminum Warehousing*, 336 F.R.D. at 29 (quoting *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019)). "The question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." *Negron v. Cigna Health & Life Ins. Co.*, 2021 WL 2010788, at *10 (D. Conn. May 20, 2021) (citation omitted). Indeed, "[t]he main purpose of *Daubert* exclusion"—"to protect juries from being swayed by dubious scientific testimony"—"is not implicated at the class certification stage where the judge is the decision maker." *Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). "[W]ithout the risk of poisoning the jury with misleading testimony of limited probative value . . . the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Joseph S. v. Hogan*, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011). "Thus, all doubts 'should be resolved in favor of admissibility.'" *Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *7 (S.D.N.Y. Nov. 21, 2024) (quoting *Am. Empire Surplus Lines Ins. Co. v. J.R. Cont. & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 537 (S.D.N.Y. 2024)).[2]

---

[1] The Second Circuit has not yet decided whether *Daubert* applies at the class-certification stage. *See, e.g.*, *Aluminum Warehousing*, 336 F.R.D. at 29.

[2] Plaintiffs repeatedly argue Dr. Ugone will "usurp the province of the jury[.]" Mot. 19. What jury? Class certification, including resolution of any factual dispute relevant to Rule 23, is a question for the Court. *See Wal-Mart Stores, Inc.*

## II.  DR. UGONE'S REPORT PROVIDES NECESSARY FACTUAL BACKGROUND AND OFFERS EXPERT OPINIONS, NOT LEGAL CONCLUSIONS.

Plaintiffs insist the Court should exclude Dr. Ugone's Report because it contains inaccurate factual narratives and legal conclusions. *See* Mot. 1–2. In doing so, Plaintiffs mischaracterize the nature of the Report and miscomprehend what Rule 702 requires.

***First***, Plaintiffs conflate Dr. Ugone's factual *assumptions* with his *opinions*. An expert report must contain "the facts or data considered by the witness in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). Even Plaintiffs' own authority makes clear experts may "testify about the factual *assumptions* they relied upon in forming their opinions[.]" *Cmty. Care Companions, Inc. v. Interim Healthcare, Inc.*, 2025 WL 929407, at *11 n.23 (E.D.N.Y. Mar. 27, 2025). And "lay[ing] a foundation . . . necessarily requires restating facts in evidence." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016). Dr. Ugone does just that here.

For example, Dr. Ugone describes how GiftRocket works. *See* Rep. ¶¶ 24–34. He does so to "provide the foundation" for his later application of a standard economic framework to GiftRocket's business model. *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013). Additionally, Dr. Ugone analyzes and charts voluminous data about how users interacted with GiftRocket, *see* Rep. ¶¶ 53–61, 94–95; *id.* ¶ 53, tbl.2; *id.* ¶ 95, tbl.8, which goes beyond mere narrative and serves to assist the Court— is the function of an expert. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015) (finding economist properly "combed through [voluminous] sales reports, compiled and aggregated the data . . . and presented it in a more readily understandable format").

***Second***, Plaintiffs' arguments that Dr. Ugone's factual assumptions are incorrect are

---

*v. Dukes*, 564 U.S. 338, 350–51 (2011). "[T]here is no risk of jury confusion." *Molly C.*, 2024 WL 4850813, at *2 (cleaned up).

irrelevant to the issue of admissibility. *See, e.g., GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2023 WL 6614486, at *41 (S.D.N.Y. Sept. 20, 2023) ("Whether [expert]'s factual assumptions support his conclusion is appropriate fodder for cross-examination but is not a ground for exclusion."); *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *16 (S.D.N.Y. Mar. 28, 2022) (holding argument that "factual assumptions are insufficient because they are contradicted by other evidence in the record . . . go[es] to the weight, not admissibility, of the expert's testimony").

*Third*, Dr. Ugone asserts expert opinions, not legal conclusions. Critically, unlike in the cases Plaintiffs point to where experts improperly opined on ultimate issues, Dr. Ugone "does not conclusorily declare that class certification would be inappropriate, or provide an unadorned conclusion that the proposed class is inadequate or that questions relating to individual class members predominate over common questions."[3] *Aluminum Warehousing*, 336 F.R.D. at 32 (denying motion to exclude expert at class certification). Instead, Dr. Ugone focuses on predicate issues, such as whether Plaintiffs "provide an analytical framework that can be used to demonstrate [their theory of harm] with common evidence[.]" *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5766930, at *3 (E.D. Pa. Aug. 20, 2015). This testimony is "routine" and "do[es] not come close to the line" of impermissible legal conclusions. *Aluminum Warehousing*, 336 F.R.D. at 33. Further, Dr. Ugone's "use of the term[] 'individualized inquiry' . . . in his report do[es] not transform his empirical and economic analysis into 'testimony stating ultimate legal conclusions.'" *Id.* (citation omitted).

By contrast, in *Scott v. Chipotle Mexican Grill*, on which Plaintiffs rely, the defendant's expert "opine[d] whether class certification [wa]s possible," and admonished that certain liability

---

[3] Dr. Ugone could not have been clearer that he does not opine on what the law does or does not require. *See, e.g.*, Ugone Dep. Tr. 45:5–7 (A: "[W]henever I talk about a nexus or a connection, it's always from an economic perspective."); *id.* at 45:23–46:4 (A: ". . . I'm looking at it from an economic perspective, and then the attorneys, the judge, the trier of fact will take that information and slot it in where it's supposed to be slotted in.").

determinations "would likely result in considerable error[.]" 315 F.R.D. at 48. Plaintiffs also rely on *Yeend v. Akima Glob. Servs., LLC*, 2025 WL 959968 (N.D.N.Y. Mar. 31, 2025), but there, defendant's expert "sp[oke] directly" to whether plaintiffs had proven "essential elements of [their] claims," *id.* at *6; *see also Boccio v. Costco Wholesale Corp.*, 2022 WL 970745, at *10–*11 (E.D.N.Y. Mar. 30, 2022) (redacting expert opinion about ultimate issue that "display was defectively designed which was the proximate cause of Plaintiff's injuries"). Here, Dr. Ugone never opines whether class certification would be proper or erroneous. Nor does he opine whether Plaintiffs have proven elements of their claims. Rather, he applies his economics expertise to identify individualized inquiries Plaintiffs ignore.

## III. THERE IS NO BASIS TO EXCLUDE DR. UGONE'S EXPERT OPINION THAT INDIVIDUALIZED INQUIRIES WOULD BE REQUIRED TO DETERMINE WHETHER GIFTROCKET DECEIVED OR DIVERTED ANY PUTATIVE CLASS MEMBER'S CUSTOMERS.

Plaintiffs' class certification motion is based on the flawed assumption that every GiftRocket sold was the result of a diverted sale, i.e., that Defendants duped customers of every business in the putative class into purchasing GiftRockets rather than gift cards directly from the business. According to Plaintiffs then, the businesses in the putative class are entitled to profits from *every* single GiftRocket sold. *See, e.g.*, Mot. 21–24. Dr. Ugone disagrees, concluding that determining whether GiftRocket deceived or misdirected any putative class member's customers would require an individualized inquiry. Rep. ¶ 11. But while Plaintiffs base their class certification theory on a small and non-representative sample of customer complaints,[4] Dr. Ugone bases his rebuttal opinion on decades of experience, economic theory, and empirical analyses.

### A. Dr. Ugone's Opinions are Grounded in His Application of an Established Economic Framework that Plaintiffs Do Not Challenge.

---

[4] Plaintiffs' Motion for Class Certification cites about 1,100 customer complaints, *see* Janove Decl. ISO Class Cert., Exs. 5, 18, 20, 24, 25, 26, 28, 29, out of over *one million* GiftRockets sold, *see* Rep. ¶ 82.

Plaintiffs' portrayal of GiftRocket as a bait-and-switch scheme clashes with well-established economic theory. As Dr. Ugone explains, under "the standard economic framework of budget-constrained utility maximization," "the option to redeem a gift as a direct cash transfer generally is more beneficial to the recipient (i.e., gives them a higher level of utility) than a traditional gift card from a single business or store (which functions as a form of in-kind transfer)." Rep. ¶¶ 63 & 63, n.114; *id.*, App'x A, ¶ 1. Indeed, "[a]cademic studies in economics have shown that gifts offering flexible redemption options—such as cash transfers or gift cards from general-purpose retailers offering broad product variety—tend to provide greater satisfaction to recipients compared with traditional, more restrictive, gift cards." *Id.* ¶ 64. "A rational consumer chooses to buy the bundle of goods and services that maximizes their utility (or satisfaction), conditional on that bundle being affordable within their budget." *Id.*, App'x A, ¶ 2. From an economic perspective, therefore, GiftRocket's "suggested use" feature was not a bait and switch, but rather a desirable feature that users intentionally sought out. *See, e.g.*, *id.* ¶¶ 62–64. As Dr. Ugone explained, that a GiftRocket recipient did not use their funds at a suggested business does not necessarily demonstrate a diverted sale, but rather "the product functioning as intended by the seller and as expected by both the sender and the recipient." *Id.* ¶ 62(c).

Plaintiffs assert no bases to exclude Dr. Ugone's application of economic theory to GiftRocket's business model. Nor could they. Dr. Ugone is an experienced economist and professor plainly qualified to testify regarding the application of economic theory to market actors. *See, e.g.*, *id.*, Exs. 1 & 2. And his economic framework is relevant and significant to the Court's Rule 23 analysis: if Plaintiffs' theory of classwide liability and harm runs contrary to an established economic framework, then one would expect Plaintiffs to support their allegations with strong empirical data and expert testimony. But they do not.

To demonstrate the significance of the budget-constrained utility maximization framework, Dr. Ugone charts various changes to GiftRocket's website throughout the putative class period. Among other changes, GiftRocket removed the term "gift card" from various page titles and added additional disclosures about how GiftRocket worked. Rep. ¶ 34, tbl.1; *id.*, Exs. 4 & 5; *id.* ¶ 146. Absent "the benefit of [Dr. Ugone's] experience or specialized knowledge," it might "not be apparent" why removing or adding some words on a website is relevant to the Court's Rule 23 analysis. *Scott*, 315 F.R.D. at 45 (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)). Indeed, Plaintiffs entirely ignore these website changes in their Motion for Class Certification. But Dr. Ugone's analysis assists the Court by identifying that many of the website changes "indicate[d] a GiftRocket is distinct from a traditional gift card," Rep. ¶ 141, and thus spoke directly to the "rational consumer" seeking to "maximize[] their utility" by choosing a gift option more flexible than merchant-branded gift cards. *Id.*, App'x A, ¶ 2.

In an attempt to exclude his analysis, Plaintiffs argue Dr. Ugone, an economist, should have conducted consumer surveys to measure the impact of website changes on consumer confusion. Mot. 5–6. But Plaintiffs misapprehend Dr. Ugone's role. Again, Dr. Ugone is a *rebuttal* expert. Here, he provides an economic framework to rebut Plaintiffs' arguments for class certification, including by highlighting Plaintiffs' disregard for changes to giftrocket.com over time. Dr. Ugone "[has] no burden to produce models or methods of [his] own"; he "need only attack" Plaintiffs' methods (or lack thereof). *Zyprexa*, 489 F. Supp. 2d at 285. *Plaintiffs*, not Defendants, should have conducted a survey of the impact of website changes because *Plaintiffs*, not Defendants, bear the burden at class certification to demonstrate the predominance of common questions over individualized inquiries.[5]

---

[5] Plaintiffs also characterize GiftRocket website changes as "meaningless" or "minor" in part because a Sunrise Banks document purported to indicate persistent consumer confusion. *See* Mot. 4–5. But as Dr. Ugone explained during his

**B.      Dr. Ugone Supports His Economic Framework by Analyzing and Synthesizing Business and Other Records.**

Dr. Ugone's application of a standard economic theory alone would sustain his opinion regarding the existence of individualized issues. *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 638 F. Supp. 3d 227, 295 (E.D.N.Y. 2022) (finding expert's testimony "acceptable" based solely on "theoretical understanding of how platforms and ecosystems work"). But Dr. Ugone goes further by bolstering his theory with "qualitative and quantitative evidence specific to this litigation," *Aluminum Warehousing*, 336 F.R.D. at 31, which he packages "in a manner that streamlines [its] presentation[.]" *Scott*, 315 F.R.D. at 45 (cleaned up).

*1.      Dr. Ugone analyzes and presents Google Analytics and other website data Plaintiffs ignored.*

According to Plaintiffs, a "central" thesis of their claims is search-engine optimization ("SEO"). Mot. 5. They allege Google search results for GiftRocket used the term "gift card" in conjunction with specific business names, therefore misdirecting "consumers who are searching for real gift cards to a particular business to the GiftRocket website." *See, e.g.*, Rep. ¶ 35 (quoting Compl. ¶ 64). Dr. Ugone directly addresses Plaintiffs' SEO theory by reviewing Google Analytics and GiftRocket website traffic. *See, e.g.*, Rep. ¶¶ 36(a), 94, 135. Notably, Plaintiffs entirely ignore Google Analytics data in their Motion for Class Certification. This is unsurprising, as it requires an expert to digest. The data spans hundreds of thousands of rows across more than 50 spreadsheets—more than the Court or counsel could efficiently or accurately analyze by themselves. *See* Kramer Decl. ¶ 3. But Dr. Ugone helpfully presents relevant data points in a simple

---

deposition, that Sunrise Banks document (concerning a period in 2018) predates many of the website changes Dr. Ugone identifies, including removal of the term "gift card" from page titles later in 2019. *See* Janove Decl., Ex. D, at SB042875; Ugone Dep. Tr. 338:16–341:11; Rep. ¶ 34, tbl.1; *id.* ¶ 146. In any event, Plaintiffs are simply arguing about the import of these website changes, which has no bearing on the admissibility of Dr. Ugone's expert report.

chart and numbered paragraphs, highlighting that:

- over 26% of GiftRocket website sessions did not originate from Google, *see* Rep. ¶ 94;

- "[a]t least 31 percent of unique organic Google searches did not include (a) the terms 'gift' and 'card,' or (b) the words 'vouchers' or 'certificate,'" *id.* ¶ 135; and

- 5.1% of GiftRocket's traffic originating from Google involved generic searches for GiftRocket (i.e., "giftrocket," "gift rocket," and "giftrocket.com"), not any putative class member, *id.* ¶¶ 94 & 95, tbl.8.

These findings are relevant and significant to the Court's Rule 23 analysis because, consistent with Dr. Ugone's economic framework, they suggest "many users intentionally sought out GiftRocket and further indicate that many were not searching for a specific business when visiting the site." *Id.* ¶ 94. Critically, if a user never intended to purchase any merchant-branded gift card, or if a user never even saw Google results in the first place, then Plaintiffs' SEO theory would not apply; GiftRocket never "misdirected" that user via Google results.[6]

Plaintiffs do not argue the Google Analytics data is unreliable. Nor do they contend Dr. Ugone's analysis is inaccurate. Plaintiffs instead argue Dr. Ugone is not qualified to offer any opinions related to or based on Google Analytics. Mot. 15. But this imposes "an overly narrow test of [Dr. Ugone's] qualifications." *Aluminum Warehousing*, 336 F.R.D. at 34 (collecting cases) (cleaned up). As part of his economics practice, Dr. Ugone frequently performs analyses "using large databases of information and complex computer models." Rep. ¶ 18. So too here.[7]

---

[6] Plaintiffs' counsel's own statements and questions during Dr. Ugone's deposition underscore these individualized inquiries: "We -- we saw documents about the search engine optimization, so that *if* someone searches business name gift card, they ***might*** see a result saying buy a gift card to business name GiftRocket, correct?" Ugone Dep. Tr. 204:16–21 (emphasis added). That is precisely Dr. Ugone's point: not every GiftRocket user encountered the website via Google, and not every user who encountered GiftRocket via Google necessarily saw the term "gift card."

[7] Under Plaintiffs' approach to qualifications, parties would be required to engage different experts *ad absurdum* for every program, application, website, etc. involved.

### 2. Dr. Ugone analyzes and presents customer review data to rebut Plaintiffs' theories—data from many of the same sources on which Plaintiffs have repeatedly relied yet now deem to be "unreliable."

Plaintiffs' class certification motion relies on GiftRocket customer reviews and communications as purportedly evidencing mass confusion and deception. Dr. Ugone rebuts Plaintiffs' assertion that classwide harm can be shown based on their cherry-picked customer reviews by collecting reviews himself from prominent third-party websites (i.e., TrustPilot, BBB, Sitejabber, and Yelp), *see* Rep. ¶¶ 55–61, GiftRocket customer service emails, *see id.* ¶¶ 62(d) n.113, 101 n.75, and Delighted, a company GiftRocket commissioned to gauge customer sentiment, *see id.* ¶ 53. These reviews reveal the existence of a substantial number of GiftRocket users who:

- had positive opinions about GiftRocket, *see, e.g.*, *id.* ¶ 53;

- understood and appreciated GiftRocket's "suggested use" feature, *see, e.g.*, *id.* ¶ 54;

- spent funds at suggested businesses, *see id.* ¶¶ 54, 101; and

- used GiftRocket multiple times, *see id.* ¶ 60.

These findings are relevant and significant to the Court's Rule 23 analysis because they suggest "it is not reasonable to assume that senders and recipients universally would have been confused or deceived by the product and would have projected any such negative sentiment onto putative Class members." *Id.* ¶ 61. In short, "the broader data does not support the claim that dissatisfaction and confusion with GiftRocket was universal." *Id.* ¶ 59. Unsurprisingly, Plaintiffs attempt to discredit Dr. Ugone's reliance on customer reviews.

Plaintiffs argue Dr. Ugone's reproduction of customer reviews is pure narrative, involving no expertise. *See* Mot. 11. Plaintiffs are wrong. Dr. Ugone's empirical analysis of Delighted data goes well beyond narrative. *See, e.g.*, Rep. ¶¶ 53, 71–73; *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 504 (finding expert properly combed through and presented voluminous data). More

fundamentally, however, Plaintiffs miss the point. Dr. Ugone does not reproduce customer reviews for the sake of reproducing them. Rather, he does so as "corroborative evidence" to support his broader rebuttal analysis "informed by the [Delighted] survey data, academic literature, and [economic] expertise," *that dissatisfaction and confusion with GiftRocket was not universal.* *Payment Card*, 638 F. Supp. 3d at 286. "The fact that a lengthy and sophisticated analysis contains some relatively simple steps does not mean that the analysis is no longer the proper subject of expert testimony." *Id.* at 312.

Next, Plaintiffs argue Dr. Ugone's reliance on customer reviews is unreliable and an improper attempt to testify about consumer perception without the requisite expertise.[8] *See* Mot. 10–13. Plaintiffs repeatedly insist Dr. Ugone should have conducted his own representative consumer survey, *see id.* 6–10, they are wrong. As a rebuttal expert, Dr. Ugone did not need to offer opinions about *how many total* GiftRocket customers were satisfied with the product based on these reviews. That would have been a task for Plaintiffs (specifically, their nonexistent expert). Dr. Ugone's role, in contrast, was more limited: examine Plaintiffs' method of showing classwide confusion and deception (customer complaints) and identify any flaws. He did exactly that, pointing to variables Plaintiffs overlooked (positive customer reviews that comport with his budget-constrained utility maximization framework). Again, as a rebuttal expert, Dr. Ugone "ha[s] no burden to produce models or methods of [his] own[.]" *Zyprexa*, 489 F. Supp. 2d at 285. Thus, Plaintiffs' insistence that representative consumer surveys were necessary begs the question: how do *Plaintiffs,* who bear the burden at certification, excuse their own failure to conduct such surveys?

*In re Keurig Green Mountain* is illustrative. In that case, Dr. Ugone submitted an expert

---

[8] As to the latter, economists regularly rely on customer reviews, *see* Rep. ¶ 22, and, as a microeconomist, Dr. Ugone has experience in consumer behavior. *See, e.g., id.* ¶ 17; *id.*, App'x A; *id.*, Ex. 1 at 19.

report rebutting plaintiffs' damages model. *See* 2025 WL 354671, at *43–*44. The plaintiffs sought to exclude parts of Dr. Ugone's report as improper "consumer perception" opinion about "the extent to which consumers would be confused by false statements allegedly made[.]" *Id.* at *49. The court rejected these arguments, explaining Dr. Ugone's opinions were aimed at "the methodological soundness of [the plaintiffs'] damages model rather than consumers' perception." *Id.* The court noted Dr. Ugone "is qualified to opine on the treatment of variables in economic modeling," and "[t]he thrust of [his] opinion" was that Plaintiffs "erred" by failing to account for certain variables and instead treated consumers as a "monolithic block." *Id.* So too here.

Plaintiffs' cases are easily distinguishable. In *Intuit Inc. v. HRB Tax Group*, 2024 WL 5320392 (N.D. Cal. Dec. 3, 2024), the court weighed whether certain customer-review evidence was sufficient to show likelihood of success on the merits, *not* whether a rebuttal expert could rely on such evidence as part of a broader theoretical and empirical analysis. *See id.* at *14.[9] And in Plaintiffs' other cases, the courts excluded expert testimony seeking to prove or disprove elements of plaintiffs' claims. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 490 (S.D.N.Y. 2018); *Fleishman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 167–68 (N.D.N.Y. 2010); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–70 (S.D.N.Y. 2005). By contrast, Dr. Ugone relies on customer reviews to *rebut* Plaintiffs' *own* reliance on—and conclusions drawn from—those *same types* of reviews, not to ultimately disprove any element of Plaintiffs' claims.

Notably, *Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.*, 693 F. Supp. 3d 335

---

[9] Moreover, the *Intuit* customer reviews did not speak to the relevant issue: whether a certain product feature factored into customers' purchasing decisions. *See* 2024 WL 5320392, at *14. Here, by contrast, the customer reviews Dr. Ugone points to, including the data from Delighted, plainly addressed the relevant issue of whether customers understood how GiftRocket functioned, because many reviews included appreciation for the "suggested use" feature. *See, e.g.*, Rep., Ex. 18; *id.* ¶ 58.

15

(E.D.N.Y. 2023), supports Dr. Ugone's criticisms of Plaintiffs' theory. The court there "[wa]s not persuaded that individual, online commentary . . . can serve as an adequate source of data supporting generalized conclusions" about consumer sentiment. *Id.* at 355. Yet that is precisely what Plaintiffs are trying to do here.

## IV. THERE IS NO BASIS TO EXCLUDE DR. UGONE'S OPINIONS THAT PLAINTIFFS' METHOD FOR CALCULATING AND APPORTIONING CLASSWIDE DISGORGEMENT IS UNRELIABLE AND YIELDS AWARDS WITH NO ECONOMIC NEXUS TO GIFTROCKET'S ALLEGED MISCONDUCT.

Dr. Ugone attempts to calculate classwide disgorgement using Plaintiffs' own proposed "formulas." But he finds that doing so is impossible because the formulas are incomplete. Using his experience and expertise in quantifying and calculating damages, Dr. Ugone identifies key details Plaintiffs omit from their formulas. He also identifies differing economic incentives and circumstances among putative class members that Plaintiffs overlook, even though those incentives and circumstances would likely impact whether and how much putative class members could recover.[10] There is no basis to exclude this portion of Dr. Ugone's report.

### A. Dr. Ugone's Analysis of Financial Records is Helpful to the Court Because It Demonstrates Plaintiffs Do Not Accurately Measure Profits from Gift-Card Referrals—and that Doing So Would Require Many Individualized Inquiries.

Plaintiffs' formula for calculating a "specific" disgorgement amount for each putative class includes "whatever percentage GiftRocket retained" when GiftRocket recipients opted to redeem their GiftRockets for third-party branded gift cards (e.g., Amazon or Home Depot).[11] In their example calculation in their class certification motion, however, "Plaintiffs do not show a

---

[10] Remarkably, as Plaintiffs admit, Dr. Ugone discovered a computational error in Plaintiffs' example disgorgement calculation that Plaintiffs have since corrected. *See* Rep. ¶ 106(c); Mot. 23 n.5. This further undermines Plaintiffs' attacks on Dr. Ugone's expertise. *See Aluminum Warehousing*, 336 F.R.D. at 35 (rejecting challenge to expert opinion where expert "identified a mistake" that opponent subsequently corrected).

[11] "[W]hen a recipient chose one of these options, GiftRocket may have received some compensation from the gift card merchant. As a hypothetical example, if the recipient of a $100 GiftRocket chose to redeem an Amazon gift card, the recipient would have received an Amazon gift card for the full amount of $100 and Amazon also would have paid a 'referral' to GiftRocket that may have depended upon the amount of the gift card." Rep. ¶ 44 n.77.

calculation of this component." Rep. ¶ 103(b). Dr. Ugone, however, did attempt to figure this out.

By reviewing GiftRocket's financial records, Dr. Ugone identified *145,170 GiftRockets* redeemed at *104 different third-party merchants*, each one of which set its own referral rate. *See* Rep. ¶ 116. He then rebutted Plaintiffs' disgorgement "formula" by identifying major flaws: (1) "Plaintiffs offer no analysis of what amounts or percentages GiftRocket received as discounts from these different third-parties"; and (2) Plaintiffs do not identify a repository of contracts between GiftRocket and third-party merchants setting referral percentages throughout the putative class period. *See id.* Thus, Dr. Ugone explained that determining GiftRocket's income from any gift-card referral would require identifying, for each of the 145,170 GiftRockets, the applicable merchant, the contract governing the discount rate, and the value of the GiftRocket. *See id.* During his deposition, Dr. Ugone helped Plaintiffs' counsel to understand:

> Q: . . . [F]or every Gift Rocket that was sold on December 1, 2024 with a suggested use to a business, the gift card discount rate would be the same?
>
> A: For a particular business for that moment in time, but there could be different contracts for different years and different contracts with different vendors.
>
> Q: So, to calculate the amount of profit from a gift card discount, you look to the discount rates that GiftRocket had with any merchant, correct?
>
> A: You'd have to look at the individual contracts that might be in place at any moment in time, and might be in place for a different moment of time. We have whatever the putative class period is from 2016 to January 1st, 2025. So, that's a lot of years and there's a lot of different contracts and a lot of different merchants. . . .
>
> Q: . . . So, if I want to know how much money Gift Rocket made off of Barnes & Noble gift cards using suggested businesses in October of 2023, I would find a contract that said Barnes & Noble is selling gift cards to GiftRocket at a 2 percent discount, for example, right?
>
> A: Well . . . You need to know the merchant, you need to know the contract, you need to know the period of time the contract covers, and you need to know the value of the gift card that's being purchased. And then if you have all that information for a particular transaction with a gift card, you can do that calculation, but you would have to do that for each of the transactions to see which contract, which time period, what was the value, and those are all individual inquiry issues.

Ugone Dep. Tr. 299:5–301:4. This is classic expert testimony that there is no basis to exclude.

Plaintiffs challenge this aspect of Dr. Ugone's report by arguing his analysis is irrelevant because individualized damages calculations cannot defeat certification. *See* Mot. 23. But the problem Dr. Ugone identifies is not just the existence of many individualized calculations; it is the *absence of evidence* to carry out those calculations, which is crucial to the Court's class certification analysis. *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 1331288, at \*8, \*12 (S.D.N.Y. Apr. 4, 2017) (denying certification: "[I]n light of the extensive class and other discovery in which the parties have already engaged, the Court cannot deem [Plaintiffs'] vague references to additional datasets . . . and 'possible' further analyses sufficient to carry [Plaintiffs] across the figurative 50-yard line" at certification.). In any event, individualized damages issues are "factor[s] [courts] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues[.]" *Johnson v. Nextel Comm'cns.*, 780 F.3d 128, 138 (2d Cir. 2015) (cleaned up). While "damages issues *alone*" may be "insufficient to defeat predominance," their presence here with other issues are "too much for the class vehicle to bear[.]" *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1750595, at \*19 (S.D.N.Y. Apr. 11, 2018) (emphasis added).

### B. Dr. Ugone's Analysis of Financial Records Demonstrates Plaintiffs' Formula for Calculating Breakage Is Unmoored from Reality.

Another component of Plaintiffs' "specific" disgorgement formula Dr. Ugone addresses is "breakage" (i.e., the value of unredeemed gifts). Rep. ¶ 102. Under Plaintiffs' model, putative class members would receive the full amount of any unredeemed GiftRocket sold for suggested use at their business. *See* Mot. for Class Cert. 23. Dr. Ugone exposes a flaw: Plaintiffs wrongly assume GiftRocket realized all unspent funds as income immediately. *See* Rep. ¶ 109. In reality, however, GiftRocket realized income by imposing $10 monthly maintenance fees on GiftRockets (many of which had no expiration date) after 13 months of inactivity, and if the GiftRocket was redeemed

before expiration, the fees were refunded. *See id.*

Dr. Ugone provides an example to demonstrate the problem with Plaintiffs' approach:

[S]uppose a GiftRocket was sent suggesting business named A for $100 and the data shows that this GiftRocket has been assessed $20 in "maintenance fees." Plaintiffs appear to be claiming (in this example) $100 to be awarded to putative Class member A as disgorgement —because this is the total amount of the unredeemed GiftRocket— even though GiftRocket only has assessed $20 in "maintenance fees." Moreover, it is still possible that the recipient of the gift will redeem the GiftRocket for its full amount and spend the $100 at Class member A. In that case, GiftRocket would not keep the $20 in "maintenance fees." This would net putative Class member A $100 in disgorgement although there were no revenues or profits earned by GiftRocket through maintenance fees.

*Id.* ¶ 110. "In summary, Plaintiffs' proposed Class-wide methodology to calculate disgorgement of breakage fails to provide a complete or reliable approach or an approach that would circumvent the need for individual inquiry." *Id.* ¶ 113.

Unable to challenge Dr. Ugone's qualifications to interpret GiftRocket's balance sheets or his methodology in doing so, Plaintiffs again argue Dr. Ugone's analysis is irrelevant because the Lanham Act provides "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Mot. 23 (quoting 15 U.S.C. § 1117). They miss the point. That Defendants bear the burden of showing their expenses *at trial*—even assuming refunds are "deductions" Defendants must ultimately prove—does not relieve Plaintiffs *at class certification* of presenting a *classwide* disgorgement model based on how GiftRocket actually realized revenues. *See Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 122 (2d Cir. 2022) (vacating grant of certification and stating issues "do not carry 'less weight' on the class certification issue simply because the defendant will bear the burden of proof at the merits stage").

### C.  Dr. Ugone's Analysis of Financial Records Underscores Plaintiffs' Nonexistent Method for Calculating "Generic" Disgorgement.

In addition to "specific" disgorgement, Plaintiffs also seek "generic" disgorgement in the form of "the remainder of the profits of giftrocket.com for sales of GiftRocket products that did

not use a specific business's name." Rep. ¶ 121 (quoting Mot. for Class Cert. 24). As Dr. Ugone points out though, "Plaintiffs offer no further explanation on how to calculate the 'profits of GiftRocket.com' from sales without a suggested business." *Id.* By further analyzing Defendants' financial records, Dr. Ugone identifies periods where GiftRocket did not realize profits, and other periods where profits are unclear. "For example, the only period when a profit and loss statement specific to GiftRocket LLC is available is from July to December of 2023. During this period, GiftRocket LLC shows an operating loss of $1.03 million. For prior periods in the Proposed Class Period, while the profit and loss statements of Tremendous show a positive operating income, this income is not specific to the GiftRocket product." *Id.* ¶ 123. Plaintiffs do not make any attempt to account for these diverging periods of profitability.

Again, Plaintiffs do not challenge Dr. Ugone's qualifications to interpret Defendants' financial records or his methodology. Instead, they characterize these opinions as "improper legal arguments" because they argue Dr. Ugone criticizes their "fail[ure] to take into account all the evidentiary requirements he believes must be met." Mot. 24. This is complete fiction. Dr. Ugone never asserts what Plaintiffs must prove. Instead, he points out problems with Plaintiffs' proposed methodologies for classwide relief, namely, that they seek classwide disgorgement and yet do not explain how to identify profits throughout the putative class period. This is not a legal conclusion; it is quintessential expert testimony. *See, e.g.*, *Luitpold Pharms.*, 2015 WL 5459662, at *12 ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.").

### D. Dr. Ugone Applies His Economics Experience, Bolstered by Empirical Analyses, to Identify Differences Between Putative Class Members Plaintiffs Overlook, such as Those that Implicitly Consented to Being on GiftRocket

In addition to identifying flaws in Plaintiffs' methods for calculating disgorgement, Dr. Ugone also identifies disparate economic incentives and circumstances among putative class members. This is "within the scope of [Dr. Ugone's] expertise as a rebuttal damages expert[.]"

*Keurig Green Mountain*, 2025 WL 354671, at *50 (denying motion to exclude Dr. Ugone).

For example, as Dr. Ugone identifies, Plaintiffs do not account for businesses without their own gift card programs, which stood to *benefit* from GiftRocket. *See* Rep. ¶ 152. Plaintiffs write this off as speculation. Mot. 13–14. But they ignore Dr. Ugone's 40 years of economics experience, *see* Rep. ¶¶ 17–19, which he employs to explain his opinion: "[P]otential customers of businesses without a traditional gift card program did not have a substitute product. In this way, GiftRocket provided senders a way to direct spending towards businesses that otherwise would not have been possible given the absence of traditional gift cards for these businesses." *Id.* ¶ 152; *cf. In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (explaining "[d]eference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics . . . [b]ecause these disciplines 'require the use of professional judgment'") (citation omitted).

Dr. Ugone also criticizes Plaintiffs' failure to account for putative class members that implicitly consented to being a suggestion option for GiftRocket purchasers. *See* Rep. ¶ 88. Plaintiffs again call Dr. Ugone's opinion speculative, *see* Mot. 18–19, but his explanation is grounded in his extensive microeconomics experience: "GiftRocket made businesses suggestable using functionalities from either Yelp or Google Places, so businesses did not need to take any action to be suggested in a GiftRocket. Therefore, if a business was content with being suggestable on GiftRocket . . . one would not expect to observe that business taking any action." Rep. ¶ 88.

Dr. Ugone further supports his opinion by analyzing records of businesses that requested to be removed from GiftRocket's suggested use feature. After de-duping businesses with multiple locations, he concludes that, over 8.5 years, there were only 4,600 such requests, *id.* ¶¶ 83–86, a miniscule fraction of the *millions* of businesses users could have suggested, and far fewer than the

34,000 requests Plaintiffs imply GiftRocket received, *see* Mot. for Class Cert. 9. That information

is pertinent to the Court's Rule 23 analysis because if GiftRocket had caused the mass confusion

Plaintiffs claim, one would have expected many more businesses to have requested removal. That

relatively few businesses did so indicates many implicitly consented to users gifting money to

friends or family on giftrocket.com and suggesting recipients spend funds at their businesses,

rebutting Plaintiffs' contention that consent does not involve individualized inquiries. *See id.*

¶ 88.[12]

Plaintiffs argue Dr. Ugone's analysis is unreliable because he "did not conduct any

independent analysis or investigation[.]" Mot. 18 (quoting *Utd. Servs. Auto. Ass'n v. Mitek Sys.,*

*Inc.*, 2014 WL 12498207 (W.D. Tex. July 22, 2014) ("*USAA*")). Specifically, Plaintiffs argue the

low number of removal requests may have been because many businesses did not know about

GiftRocket. *See* Mot. 18. But this alternative-explanation argument goes to weight, not

admissibility. *See, e.g., Thomas v. YRC Inc.*, 2018 WL 919998, at *7 (S.D.N.Y. Feb. 14, 2018)

("[A]lternative factual scenarios that an expert has not considered in rendering an opinion goes

only to the weight and credibility . . . not [] admissibility."). Moreover, because *Plaintiffs* bear the

burden at class certification, the onus was on them to conduct surveys or marshal other evidence

demonstrating implicit consent is *not* an individualized issue. They did not.[13]

Plaintiffs' reliance on *USAA* is misplaced. The court there excluded Dr. Ugone's

---

[12] Dr. Ugone also relies in part on declarations of absent class members. *See* Rep. ¶ 100. Plaintiffs attempt to discredit that evidence by arguing that, after contacted by Plaintiffs' counsel, those declarants regretted providing those declarations. *See* Mot. 16. As an initial matter, this is not a *Daubert* issue. If anything, Plaintiffs' discovery into those declarants only underscores individualized inquiries regarding implicit consent. For example, at her deposition, Eliza Benton (owner of Bar Antidote, a putative class member) agreed she did not have an issue with GiftRocket provided that purchasers "understood that it wasn't a gift card that they could use directly at [Bar Antidote]." Kramer Decl., Ex. 2 (Benton Dep. Tr.), at 84:1–10.

[13] Plaintiffs assert that "[e]ven if the true number of businesses that demanded removal is 4,600, and not 34,000, this evidence shows it is far more likely that a business who found out it was listed on GiftRocket.com would demand removal rather than consent to being listed." Mot. 18. They offer no statistical support whatsoever for this assertion.

*affirmative* expert report because it purportedly relied entirely on a single spreadsheet prepared by a different expert without independent analysis. *See* 2014 WL 12498207, at *1. Putting aside the accuracy of the court's finding, this case is very different. Dr. Ugone's "report unites large and varied types of data to support a conclusion grounded in a field in which he has genuine expertise." *Capri Sun GmbH*, 595 F. Supp. 3d at 134. This includes the data about putative class members requesting removal from GiftRocket's suggested-use feature, which Dr. Ugone de-dupes and incorporates into his broader opinion based on his economics experience and expertise.[14]

### E. Plaintiffs' Arguments that Dr. Ugone's Opinions Are "Wrong" Because the Court Can Order Classwide Disgorgement as Deterrence Are Irrelevant and Flawed.

According to Plaintiffs, Dr. Ugone's report is "wrong" because the Court can simply disgorge all of GiftRocket's profits and award them to the class for deterrence purposes. *See* Mot. 21. But Plaintiffs' *disagreement* with Dr. Ugone's opinion does not provide a basis to exclude it. This Court must concentrate only on an expert's "principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

More fundamentally, even if the Court were to determine disgorgement could be awarded for deterrence purposes as Plaintiffs contend, it would still have to confront the individualized inquiries Dr. Ugone identifies. *Any* award of disgorgement is an inherently equitable remedy requiring the Court to balance equitable factors. *See* 15 U.S.C. § 1117(a) (conditioning disgorgement on "principles of equity"); *Focus Prods. Grp. Int'l v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 250–51 (S.D.N.Y. 2022). Thus, before awarding disgorgement under any theory to any class member, the Court must determine and weigh whether the putative class members benefitted

---

[14] Plaintiffs suggest Dr. Ugone's method of de-duplication was not sophisticated enough to constitute expert testimony. *See* Mot. 18. But an expert is exactly the appropriate person to analyze a spreadsheet with 34,000 entries to assist the Court. And if the analysis was so simple, why did Plaintiffs not perform any themselves?

from GiftRocket, *see supra* § IV.D, whether the class member implicitly consented to being suggestable, *see id.*, whether the GiftRocket was refunded, *see id.* § IV.B, and whether GiftRocket was profitable when the GiftRocket was sold, *see id.* § IV.C. Any disgorgement remedy that fails to account for these variables could result in an inequitable windfall—as even Plaintiffs concede. *See* Mot. 22 ("Whether there is any windfall is simply an equitable consideration the Court takes into account when fashioning relief[.]"). Yet their disgorgement model does not account for these variables. Further, even if some subset of deceived or confused GiftRocket users were sufficient to disgorge all of GiftRocket's profits, the Court would still equitably have to apportion that disgorgement among putative class members. Plaintiffs offer no methodology for doing so.

Plaintiffs' reliance on *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2024 WL 3526853 (S.D.N.Y. July 23, 2024), is unavailing (and further, unrelated to *Daubert*). *Skillz* involved a motion to dismiss in a false advertising action between two direct competitors. The court found the plaintiff plausibly alleged entitlement to disgorgement because it "plausibly allege[d] that [it] ha[d] lost players to [defendant] because of [defendant]'s unfair competition." *Id.* at *3. Unlike in *Skillz*, Plaintiffs here have proposed classes with hundreds of thousands or even millions of putative members. As Dr. Ugone identifies, it is not even clear for any given class member whether Defendants realized profits "fraudulently us[ing] the [putative class member]'s mark" in the first place. *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F. 3d 202, 212 (2d Cir. 2019) (cleaned up).

In sum, Plaintiffs cannot hide behind deterrence to avoid the individualized inquiries Dr. Ugone identifies.

## V. THIS COURT SHOULD CONSIDER DR. UGONE'S OPINION THAT PLAINTIFFS' G.B.L. CLAIMS SUFFER FROM THE SAME DEFECTS AS PLAINTIFFS' CLAIMS FOR DISGORGEMENT.

The same principles Dr. Ugone applies to Plaintiffs' disgorgement model also apply to Plaintiffs' G.B.L. claims: They fail to propose a method to determine whether putative New York

class members suffered diverted customers or any other harm. *See* Rep. ¶ 156(b). And, critically, as Dr. Ugone emphasizes, Plaintiffs proffer no model for measuring actual damages (versus disgorgement). *See id.* ¶ 158. This is relevant to the Rule 23 analysis because, were Defendants found liable to one or more businesses in the putative class, it would be unclear based on Plaintiffs' model whether the class member would be entitled to actual or statutory damages. *See* G.B.L. §§ 349(h), 350-e (providing actual damages or statutory damages, "whichever is greater").

Although Plaintiffs assert Dr. Ugone is making a legal conclusion and "interpreting" the G.B.L. (Mot. 24), a damages expert must "inherently rely on making assumptions about underlying legal theories." *Mahaska Bottling Co. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 756 (S.D. Iowa 2019). Dr. Ugone does exactly that: He states his assumption, provided by counsel, that Plaintiffs must develop *some* classwide yardstick of actual damages to measure against statutory damages. *See* Rep. ¶ 158; *Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465, 502 n.34 (E.D.N.Y. Aug. 5, 2024) (explaining that, because the G.B.L. provides for actual or statutory damages, "whichever is greater," it "require[s] the Court to compare . . . actual damages to the statutory award") (cleaned up).[15] "Plaintiffs here have provided no method for trying to do that across the class." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' *Daubert* Motion.

---

[15] Plaintiffs rely on consumer class actions where there were no doubts the statutory awards would exceed actual damages. *See, e.g.*, *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 503 (E.D.N.Y. 2017) (observing actual damages (price premium) for flushable wipes were likely "quite small compared to" statutory damages); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 70 (E.D.N.Y. 2015) (price-premium case involving flushable wipes); *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1041 (9th Cir. 2024) ("low-cost product"); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *1, *12 (C.D. Cal. July 1, 2013) (price-premium case involving product sold for $5.99/bottle).

Respectfully submitted,

Dated: September 9, 2025

*/s/ Megan O'Neill*

Megan O'Neill (admitted PHV)
Erik P. Mortensen (admitted PHV)
DTO LAW
702 Marshall Street, Suite 640
Redwood City, CA 94063
Telephone: (415) 630-4100
Facsimile: (415) 630-4105
moneill@dtolaw.com
emortensen@dtolaw.com

Katherine Burghardt Kramer
Grace E. Schmidt
DTO LAW
307 5th Avenue, 12th Floor
New York, NY 10016
Telephone: (213) 335-6999
Facsimile: (213) 335-7802
kkramer@dtolaw.com
gschmidt@dtolaw.com

*Attorneys for Defendant GiftRocket LLC*