# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

GRACIE BAKED LLC, WECARE RG, INC., and MILLERCOBB LLC, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GIFTROCKET, INC., TREMENDOUS, INC., NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES, BENJAMIN KUBIC, SUNRISE BANKS, N.A., GIFTROCKET, LLC, TREMENDOUS LLC, and TREMENDOUS PARENT, INC.,

Defendants.

Case No. 22-CV-4019 (GRB) (VMS)

## PLAINTIFFS' OPPOSITION TO THE GIFTROCKET DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

—served on January 20, 2026—

Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

Matthew Weinshall (Admitted *pro hac vice*)
Dayron Silverio (Admitted *pro hac vice*)
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 700
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurst.com

*Attorneys for Plaintiffs and the Proposed Classes*

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ................................................................. 1

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ............................................................................................................ 4

    I.      Plaintiffs Gracie Baked and Café Ole Have Article III Standing ........................... 4

          A.     Gracie Baked and Café Ole suffered concrete harm .................................. 4

          B.     Gracie Baked and Café Ole faced imminent harm. .................................... 8

    II.     Café Ole Did Not Sell Its Claims ........................................................................... 9

    III.    Defendants' Additional Arguments Fail ............................................................... 10

          A.     The record supports all three Plaintiffs' false affiliation claims. .............. 10

          B.     The evidence supports all three Plaintiffs' false advertising claims. ......... 18

          C.     Plaintiffs will prevail on their claims for injunctive relief. ....................... 22

          D.     Plaintiffs' state law claims may proceed. .................................................. 22

    IV.    Plaintiffs' Claims for Injunctive Relief Are Not Moot. ........................................ 23

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
    414 F.3d 400 (2d Cir. 2005) ................................................................. 10

*3M Co. v. CovCare, Inc.*,
    537 F. Supp. 3d 385 (E.D.N.Y. 2021) ............................................. 5, 23

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
    933 F.3d 202 (2d Cir. 2019) .......................................................... 5, 21

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
    777 F. Supp. 3d 253 (S.D.N.Y. 2025) .................................................. 8

*American Footwear Corp. v. General Footwear Co. Ltd.*,
    609 F.2d 655 (2d Cir. 1979) .............................................................. 12

*Azuz v. Accucom Corp.*,
    2025 WL 2807653 (N.D. Ill. Oct. 2, 2025) ......................................... 6

*Baldwin v. Univ. of Pittsburgh Med. Ctr.*,
    636 F.3d 69 (3d Cir. 2011) ................................................................. 9

*Bohnak v. Marsh & McLennan Companies, Inc.*,
    79 F.4th 276 (2d Cir. 2023) ................................................................ 9

*Burberry Ltd. v. Euro Moda, Inc.*,
    2009 WL 1675080 (S.D.N.Y. June 10, 2009) ................................... 22

*C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*,
    2022 WL 2704506 (E.D.N.Y. July 12, 2022) .................................... 13

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
    2003 WL 21056809 (S.D.N.Y. May 8, 2003) ................................... 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................ 4

*Chanel, Inc. v. WGACA, LLC*,
    2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) ...................................... 4

*Chen-Oster v. Goldman, Sachs & Co.*,
    251 F. Supp. 3d 579 (S.D.N.Y. 2017) ................................................ 8

*City of L.A. v. Lyons*,
    461 U.S. 95 (1983) .............................................................................. 9

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ................................................ 9

*Controls Se., Inc. v. QMax Indus., Inc.*,
    2024 WL 2163477 (W.D.N.C. May 14, 2024) ................................... 5

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
   508 F.3d 641 (11th Cir. 2007) ...................................................................... 5, 7, 8

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003) ................................................................................................. 12

*Del. & Hudson Canal Co. v. Clark*,
   80 U.S. 311 (1871) ................................................................................................... 8

*Elnicky Enters., Inc. v. Spotlight Presents, Inc.*,
   1981 WL 48202 (S.D.N.Y. July 17, 1981) .......................................................... 17

*Empresa Cubana del Tabaco v. Culbro Corp.*,
   399 F.3d 462 (2d Cir. 2005) ............................................................................... 12

*Fac. v. New York Univ.*,
   11 F.4th 68 (2d Cir. 2021) .................................................................................... 9

*Farez-Espinoza v. Napolitano*,
   2009 WL 1118098 (S.D.N.Y. Apr. 27, 2009) ..................................................... 23

*Flushing Bank v. Green Dot Corp.*,
   138 F. Supp. 3d 561 (S.D.N.Y. 2015) ............................................................ 15, 16

*Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*,
   647 F. Supp. 3d 145 (S.D.N.Y. 2022) ................................................................. 5

*Forschner Grp., Inc. v. Arrow Trading Co. Inc.*,
   30 F.3d 348 (2d Cir. 1994) ............................................................................. 12, 13

*Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*,
   933 F. Supp. 2d 655 (S.D.N.Y. 2013) ................................................................ 23

*Genesee Brewing Co. v. Stroh Brewing Co.*,
   124 F.3d 137 (2d Cir. 1997) ............................................................................... 12

*Ghost L.L.C. v. Ghost Fitness NYC, LLC*,
   2025 WL 2487826 (E.D.N.Y. Aug. 29, 2025) .................................................... 22

*Goldwyn Pictures Corp. v. Goldwyn*,
   296 F. 391 (2d Cir. 1924) ..................................................................................... 8

*Gracie Baked LLC v. GiftRocket, Inc.*,
   2025 WL 3706651 (E.D.N.Y. Dec. 22, 2025) ...................................................... 4

*Hudson Furniture, Inc. v. Mizrahi*,
   2023 WL 6214908 (S.D.N.Y. Sept. 25, 2023) ..................................................... 10

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
   960 F.2d 294 (2d Cir. 1992) ............................................................................... 17

*Joshua Meier Co. v. Albany Novelty Mfg. Co.*,
   236 F.2d 144 (2d Cir. 1956) ............................................................................... 13

*Klein v. Qlik Techs., Inc.*,
   906 F.3d 215 (2d Cir. 2018) ............................................................................... 23

*Knight First Amend. Inst. v. U.S. Citizenship & Immigr. Servs.*,
   30 F.4th 318 (2d Cir. 2022) ........................................... 11

*Lehrman v. Lovo, Inc.*,
   790 F. Supp. 3d 348 (S.D.N.Y. 2025) ................................ 11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .................................................... 21

*Liquid Controls Corp. v. Liquid Control Corp.*,
   802 F.2d 934 (7th Cir. 1986) .......................................... 13

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
   19 F.4th 58 (2d Cir. 2021) .......................................... 5, 7

*Montgomery v. Noga*,
   168 F.3d 1282 (11th Cir. 1999) ........................................ 7

*Murphy Door Bed Co. v. Interior Sleep Sys.*,
   874 F.2d 95 (2d Cir. 1989) ........................................... 12

*Museum of Mod. Art v. MOMACHA IP LLC*,
   339 F.Supp.3d 361 (S.D.N.Y. Sep. 28, 2018) ........................ 23

*Neurological Surgery Prac. of Long Island, PLLC v.*
   *United States Dep't of Health & Hum. Servs.*,
   145 F.4th 212 (2d Cir. 2025) ......................................... 24

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................ 22

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008) ................................ 16

*OffWhite Prods., LLC v. Off-White LLC*,
   480 F. Supp. 3d 558 (S.D.N.Y. 2020) ................................. 7

*Paddington Corp. v. Attiki Importers & Dists., Inc.*,
   996 F.2d 577 (2d Cir. 1993) .......................................... 17

*Parks LLC v. Tyson Foods, Inc*,
   863 F.3d 220 (3d Cir. 2017) .......................................... 13

*Pegasystems Inc. v. Appian Corp.*,
   633 F. Supp. 3d 456 (D. Mass. 2022) ................................ 24

*Pinkhasov v. Vernikov*,
   2024 WL 2188356 (E.D.N.Y. May 15, 2024) ......................... 23

*Prior v. Innovative Commc'ns Corp.*,
   207 F. App'x 158 (3d Cir. 2006). ..................................... 10

*Recovery Tr. v. Goldman, Sachs & Co.*,
   748 F.3d 110 (2d Cir. 2014) .......................................... 15

*Romag Fasteners, Inc v. Fossil, Inc.*,
   590 U.S. 212 (2020) .................................................. 11

*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*,
   88 F.4th 103 (2d Cir. 2023) ........................................................................... 9

*Souza v. Exotic Island Enterprises, Inc.*,
   68 F.4th 99 (2d Cir. 2023) ................................................................. 17, 21

*Spring Mills, Inc. v. Ultracashmere House, Ltd.*,
   689 F.2d 1127 (2d Cir. 1982) ..................................................................... 17

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009) ........................................................................ 18

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................... 5, 7

*Travel Leaders Grp., LLC v. Corley*,
   2019 WL 6647319 (S.D.N.Y. Dec. 5, 2019) ................................................ 20

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) .................................................................................. 11

*Ultra Recs. LLC v. Ultra Int'l Music Publ'g*,
   2025 WL 602943 (S.D.N.Y. Feb. 25, 2025) ................................................ 22

*United States v. Torkington*,
   812 F.2d 1347 (11th Cir. 1987) ................................................................... 5

*Walker v. Thompson*,
   404 F. Supp. 3d 819 (S.D.N.Y. 2019) ......................................................... 11

*Yale Elec. Corp. v. Robertson*,
   26 F.2d 972 (2d Cir. 1928) .......................................................................... 8

**Statutes**

15 U.S.C. § 1116 ......................................................................................... 23

15 U.S.C. § 1125 ........................................................................... 6, 11, 15

**Other Authorities**

4 McCarthy on Trademarks and Unfair Competition (5th ed.) ............................ 6, 14

Mark P. McKenna, Testing Modern Trademark Law's Theory of Harm,
   95 Iowa L. Rev. 63 (2009) ........................................................................... 9

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 4

**INTRODUCTION AND BACKGROUND**

Plaintiffs Gracie Baked LLC ("Gracie Baked"), WeCare RG, Inc. ("Café Ole"), and Millercobb LLC ("Dimensions") have been injured by the GiftRocket Defendants' marketing of fake gift cards to their businesses. 56.1 ¶¶ 169–88. From its inception, GiftRocket's strategy was to falsely "position" its product "as a gift card," Ex. 23, so that it could steal customers who wanted to buy an actual gift card to other businesses. GiftRocket's founders struggled as entrepreneurs because they "seem[ed] hapless and don't get anything done." Ex. 42. But they eventually found a way to make money without doing anything: "append 'gift cards' to local business names domains on yelp and make a landing page" and "SEO the shit out of every gift card keyword we could come up with" so that GiftRocket would rank "#1 for 'online gift cards.'" Exs. 41 & 43.

The local businesses at issue were not consulted. GiftRocket used their Yelp information without their consent as part of a search engine strategy that drew millions of visitors to the GiftRocket website and made GiftRocket "rank as a top result for ~1m businesses," and as the number two result for individuals searching for "<business name> + gift card." Ex. 64 at 7. Its business partner Sunrise Banks repeatedly warned GiftRocket that marketing the product as a gift card "is a UDAAP [Unfair, Deceptive, or Abusive Acts or Practices] risk as well as a reputational risk" and that "bottom line, [GiftRocket] should not advertise it as a card and not include business images or names they do not have express consent to use." Ex. 24. But GiftRocket already knew this, because its consumers were constantly complaining that the website language tricked them into thinking the product was an actual gift card that could be used at the chosen merchant. And one of the "[m]ost common issues" addressed by GiftRocket's customer support team was "angry" businesses demanding to be removed from GiftRocket.com. *See* Ex. 97.

In fact, Defendants intentionally designed their website so that customers looking for

Plaintiffs and other businesses would be misdirected to GiftRocket.com with search results links labeled "Buy a [Business Name] Gift Card" followed by a sentence repeating "Buy a gift card to [business name]," and identifying the business by name and address:



56.1 ¶¶ 20–24, 89–91. Once a user clicked on the link, they were taken to a business landing page on GiftRocket.com; the landing page was populated with the business's name, address, and information from Yelp, and repeated misleading language about supposed "gift cards" for sale. 56.1 ¶¶ 20, 73 –76; Ex. 63 ("I am very angry. Google directed me to the GiftRocket site to purchase a *Sweetgreen gift card*. When I purchased the giftrocket it specifically said it could be used on your site to purchase a Sweetgreen gift card."). If a user was on a mobile device, they would see a page prominently advertising "Buy a Gift Card for [business name]." 56.1 ¶ 76. Starting in April 2019, the desktop version—which previously was the same as the mobile version—stated instead "Buy a [Business Name] Gift" right below a navigation flow that said, "Gift Cards > [Location] Gift Cards > [Category of Business] > [Business Name]." 56.1 ¶ 75.

As a member of Sunrise Banks' compliance team described it, GiftRocket "feels like a bait and switch--I am going to tell you I am giving you a gift card, but really it is not. Definitely falls into the deceptive practice section of UDAAP." Ex. 100. The email also noted that GiftRocket "of course do[es] not want to change because only by including 'gift card' do they get to the top of the list in all the Google searches." *Id.* Similarly, a GiftRocket employee explained that GiftRocket

did not have a website telling businesses how to request removal because listing businesses without their consent was "how [GiftRocket] makes money." Ex. 96. Defendant's deceptive marketing resulted in nearly 16 million visitors to the GiftRocket website, and more than 70% of those users originated from search results. 56.1 ¶¶ 21, 90.

If there was any doubt that GiftRocket's profits were driven almost exclusively by its misleading advertising and misuse of other businesses' information, those doubts were removed after Plaintiffs sent Yelp a subpoena, and Yelp then terminated GiftRocket's access to its API. 56.1 ¶ 91. This caused GiftRocket's sales to decline by about 75% (even though it replaced Yelp with Google Places and was still purporting to sell giftcards to other businesses), confirming that **at least 75% of Defendants**' sales were driven by its misuse of other businesses Yelp information. 56.1 ¶ 91; GR Defts' Ex. N; Baum Decl. ¶ 30.

Despite this, Defendants seek to evade liability and keep millions of dollars in ill-gotten gains with specious arguments that the law provides Plaintiffs no protection against Defendants' deceptive advertising. Judge Scanlon has already rejected many of Defendants' misguided theories, all of which fail for the reasons stated below. First, Plaintiffs have suffered concrete injuries and Defendants' reliance on *Transunion* is both legally and factually misplaced. The relevant common law analogue for Lanham Act injuries is that of the common law of unfair competition, not the tort of defamation at issue in *Transunion*. *See, e.g.*, ECF No. 152 at 10-15. On the facts, this is a public website intentionally designed so that users will see search results with Plaintiffs' information and get tricked to visiting GiftRocket.com. And the evidence supports a finding that users did search for and view webpages related to Plaintiffs. Second, Plaintiffs' claims fit squarely within the plain language of the Lanham Act, and there is no "protectible mark" requirement beyond misuse of Plaintiffs' information. *See, e.g.*, ECF Nos. 74, 96, 106 at 5, 181,

275, 279. Third, the evidence supports a finding that all Plaintiffs suffered false advertising injury in the form of diverted sales and reputational harm, and Dimensions has even identified a specific diverted sale. ECF Nos. 275, 279. Finally, the GiftRocket Defendants' mere promise not to relaunch the website—after shutting it down nearly 2.5 years into this litigation while still, in their own words, "vigorously" defending their conduct,[1] and while retaining the means to easily restart it—does not render Plaintiffs' claims moot. ECF Nos. 275, 279.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of showing 'the absence of a genuine issue of material fact.'" *Gracie Baked LLC v. GiftRocket, Inc.*, 2025 WL 3706651, at *3 (E.D.N.Y. Dec. 22, 2025) (Brown, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In assessing the motion, the court "must construe all the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in that party's favor' and against the motion." *Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931, at *5 (S.D.N.Y. Mar. 28, 2022) (cleaned up).

## ARGUMENT

### I. Plaintiffs Gracie Baked and Café Ole Have Article III Standing

Defendants admit that Dimensions has standing, but incorrectly argue that Gracie Baked and Café Ole did not suffer "any concrete, actual injuries" or "face imminent harm."

#### A. Gracie Baked and Café Ole suffered concrete harm.

Defendants argue that Plaintiffs must definitively show that GiftRocket's misuse of their businesses Yelp profiles on its website "was actually read and not merely processed." Mot. at 10.

---

[1] *See* Forbes, *How Private Equity-Owned Companies Quietly Pocketed Class Action Payouts* (May 21, 2025).

This is irreconcilable with Lanham Act precedent holding that a plaintiff establishes injury solely with unauthorized use and likelihood of confusion, *i.e.* the law does not require a showing of actual confusion and instead hinges on the theoretical, "potential" consumer's likelihood of confusion. *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007) (under "likely to confuse test" the "relevant audience is the purchasing public," which includes "potential" direct purchasers of the passed-off good and indirect purchasers of the passed-off good) (cleaned up). Indeed, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act." *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 222 (S.D.N.Y. 2022). Rather, the Act "'permits a district court to award a defendant's full profits based solely on deterrence'" even if a plaintiff does not actually identify someone "who wished to buy the plaintiff's goods [that has] been actually misled into buying the defendant's." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 213–14 (2d Cir. 2019).

The law of unfair competition has always been that a plaintiff suffers a concrete and irreparable injury in the form of loss of control, when, without its consent, another business trades on its reputation or goodwill. *See, e.g.*, *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 403 (E.D.N.Y. 2021). As Plaintiffs explained in prior briefing, *see* ECF Nos. 152 at 10-19; No. 275 at 18-19, this type of injury qualifies as a concrete harm for Article III purposes because it "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'" *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 63 (2d Cir. 2021) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); *see* 4 McCarthy on Trademarks and Unfair Competition § 24:2 (5th ed.) ("[A] plausible pleading of a likelihood of confusion is also a plausible pleading of an intangible injury . . . to reputation."); *Controls Se., Inc. v. QMax Indus., Inc.*, 2024 WL 2163477, at *4 (W.D.N.C. May 14, 2024) (finding Lanham Act standing

even absent "evidence from a single person or entity stating that it was confused or misled about [defendant's] product photos or marketing claims… or that any actual or prospective customer even viewed" them).

None of Defendants' authorities addressing concrete harm for standing purposes involve Lanham Act claims.[2] Defendants, instead, misinterpret *Transunion* as mandating that defamation law injury requirements apply here rather than the historical common-law analogue of unfair competition. But even if *Transunion* somehow imported the common law of defamation into the standing analysis for Lanham Act claims, Gracie Baked and Café Ole have marshalled compelling evidence that someone did actually or likely see their businesses on GiftRocket.com or in a Google Search result that linked to GiftRocket (contrary to Defendants' inaccurate assertion that "there is no evidence . . . that anyone saw [them] on giftrocket.com," Mot. at 10).

Record evidence shows that users were directed to GiftRocket.com at least three times after searching for "gracies gift card," and at least one time after searching for "gracie's gift certificate." 56.1 ¶ 25. And at least one user visited GiftRocket.com after searching for "where can i buy cafe ole gift certificate in Philadelphia," and another user visited GiftRocket.com after searching "café ole gift card." *See* 56.1 ¶ 25. The most reasonable inference from this evidence that Plaintiffs' businesses *were* viewed on the GiftRocket website, as well as in the misleading Google search results derived from the website.

In addition, other evidence supports a finding that Plaintiffs' businesses were viewed in Google or other search engines' search results, regardless of whether a user actually ended up clicking the link and visiting GiftRocket.com. From its inception, GiftRocket's entire marketing

---

[2] *Azuz v. Accucom Corp.*, 2025 WL 2807653 (N.D. Ill. Oct. 2, 2025) involved an Illinois Right of Publicity Claim and there was no evidence to suggest anyone but plaintiff and counsel saw plaintiff on the website, and no evidence that the defendant's website was intentionally designed to make individuals like plaintiff be viewed in search results.

strategy was built around using other businesses' names without their consent on Defendants' heavily trafficked public website. 56.1 ¶¶ 17–25, 89–92. Defendants' search engine strategy makes it rank "as a top result for ~1m businesses," as the number two result for individuals searching for "<business name> + gift card," and as the top search result for "online gift cards." Ex. 64 at 7; *see also* Ex. 46 at 3 ("What is GiftRocket's strategic importance to Tremendous? It's primarily SEO. GiftRocket ranks really well for a very long-tail of queries, like '[business name] gift card.'"); 56.1 ¶ 24. Even in its early days, GiftRocket received between 50,000 and 100,000 visitors per month. 56.1 ¶ 21. Over time, it has received nearly 16 million visitors. Ex. 9. Based on the number of visitors and search result rankings, the most reasonable inference is that Plaintiffs' businesses were viewed on GiftRocket.com or in search results.

These are not "'theoretical possibilities of confusion.'" Mot. at 11 (quoting *OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 564–65 (S.D.N.Y. 2020)).[3] It is the most logical inference based on record evidence of how GiftRocket.com was intended to operate— listing businesses without consent to divert web traffic to its website. There is no comparison between the facts of this case and information contained in a private file (*Transunion*); or technically public mortgage records that no one had any reason to review (*Maddox*); or a logo printed on an electric component where it "cannot be viewed without first removing the opaque plastic housing units that completely cover the circuit boards in question," which are "normally mounted as high as possible in attics, roofs, and exterior walls to reduce transmission interferences." *Custom Mfg.*, 508 F.3d at 650.[4]

---

[3] *OffWhite* involved two similarly named businesses operating in different sectors and the reference to 'theoretical possibilities of confusion' addressed that. It did not address any purported Lanham Act requirement about identifying a specific viewer of a defendant's widespread false advertising targeting Plaintiffs' customer base.

[4] The correct Eleventh Circuit analogue would be *Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999) where "[p]ointing to the plaintiff's trial testimony that users 'never would even know that [its mark] was on there,'" the

Defendants' new argument that "unfair competition was historically predicated on fraud," and related attempt to import the reliance element of a traditional fraud claim, does not cure the deficiencies in their standing analysis. *See* Mot. at 11 (citing *Goldwyn Pictures Corp. v. Goldwyn*, 296 F. 391, 401 (2d Cir. 1924)). *Goldwyn*'s passing reference to "fraud" referred to the type of "fraud" that forms the basis of an unfair competition claim—such as where "[o]ne who has no valid trade-mark may nevertheless complain of another who *attempts* to pass off his own goods as the goods of his rival"—just like how GiftRocket tries to sell its product as a "gift card" of Plaintiffs' businesses. *See Goldwyn Pictures*, 296 F. at 401. That is because "[t]he court acts to promote honesty and fair dealing, and because no one has a right to sell his own goods as the goods of another. . . . . The court seeks to protect the purchasing public from deception…." *Id*.[5]

### B. Gracie Baked and Café Ole faced imminent harm.

Defendants' arguments that Plaintiffs cannot obtain an injunction because they cannot prove imminent harm, *see* Mem. at 12, fail for similar reasons.[6] "The requirement of imminent injury 'does not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. Rather, an allegation of future injury is sufficient where the injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 777 F. Supp. 3d 253, 270 (S.D.N.Y. 2025) (quoting

---

defendants argued that the jury verdict against it should be overturned. *Id*. at 1301–02. "In rejecting this argument, [the Eleventh Circuit] relied on evidence that . . . . the express reference to [plaintiff] . . . was readily accessible and intended for viewing by users—support[ing] the likelihood of consumer confusion." *Custom Mfg.*, 508 F.3d at 652. The GiftRocket website and search results are readily accessible and intended for viewing.

[5] Defendants' other authority discussed the standards for a protectable trademark and did not state or mean that the only wrong is the "sale of goods." *See Del. & Hudson Canal Co. v. Clark*, 80 U.S. 311, 322–23 (1871). And Defendants' citation to a law review article for the contention that "pure reputational harm" was not the "relevant harm for 'unfair competition,'" *see* Mot. at 12, finds no support in that article itself. Instead, the article supports Plaintiffs' position, recognizing various harms, including loss of control of reputation, which "'is an injury, even . . . [without] diver[sion of] any sales.'" Mark P. McKenna, Testing Modern Trademark Law's Theory of Harm, 95 Iowa L. Rev. 63, 87 (2009) (quoting *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)) (L. Hand, J.).

[6] "Standing is generally determined when the complaint is filed." *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589 (S.D.N.Y. 2017). This section addresses facts and risk as they existed at that time.

*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023)). "[A]lleged injury arising from the increased risk of harm *is* cognizable for standing purposes." *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 289 (2d Cir. 2023) (court's emphasis). *Bohnak* is instructive. There, the plaintiff, a victim of a data breach, had standing to sue even though "she has not alleged any known misuse of information in the dataset." *Id.* at 289. That is because the publication of her private information to third parties put her at a "substantial likelihood of future harm." *Id.* Similarly, here, Defendants operated a highly-trafficked website that listed Plaintiffs' businesses and was intentionally designed to make sure search results showed Plaintiffs' business information to third parties, affiliating them with and linking them to GiftRocket.com.[7] That easily shows imminent harm.

## II.     Café Ole Did Not Sell Its Claims

Defendants continue to argue that Café Ole's claims are moot because it sold them, even though all parties to the transaction have rejected Defendants' self-serving interpretation of their agreement. *See* 56.1 ¶ 180; *cf. Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) ("The paramount goal of contract interpretation is to determine the intent ***of the parties.***") (emphasis added). Defendants' interpretation is also wrong. They point to vague language in the purchase agreement that refers to the sale of all "tangible and intangible assets." *See* Mot. at 13. But they ignore other language in the contract expressly limiting the scope of the sale only to *tangible* assets. *See* GR Defts' Ex. K § 1.02 ("ASSETS INCLUDED IN THE TRANSACTION. All ***tangible*** assets currently owned by Seller and used in the business."). Given the ambiguity, the "integration clause . . . does not preclude the use of extrinsic evidence … to determine parties'

---

[7] Defendants' authorities are completely inapposite, involving generalized fears of a risk of a future terrorist attack or a police stop. *Cf Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 150 (E.D.N.Y. 2017); *City of L.A. v. Lyons*, 461 U.S. 95, 108 (1983). Nor is there an "uncertain future action that would need to occur" or a lack of any sort of "concrete plan[]" that could harm plaintiffs. *Fac. v. New York Univ.*, 11 F.4th 68, 77 (2d Cir. 2021).

intent." *Prior v. Innovative Commc'ns Corp.*, 207 F. App'x 158, 162 (3d Cir. 2006).

## III. Defendants' Additional Arguments Fail

### A. The record supports all three Plaintiffs' false affiliation claims.

#### 1. Plaintiffs have satisfied any "protectible mark" requirement.

Defendants are liable under the plain language of § 43(a)(1)(A). They used Plaintiffs' specifically-identifying information (name and actual address) paired with false and misleading descriptions of the GiftRocket product in a way that was likely to (and did) cause confusion and deceive consumers into believing that GiftRocket was selling gift cards to Plaintiffs' businesses, *i.e.*, that there was an "affiliation, connection, or association" between GiftRocket and the victimized Plaintiffs, or about the "origin, sponsorship, or approval" of the GiftRocket product. *See* 15 U.S.C. § 1125(a).

While not disputing that Plaintiffs satisfy the statutory requirements as stated in § 43(a)(1)(A), Defendants argue that the Court should grant summary judgment anyway based on a shifting and undefined "protectible mark" requirement that Defendants ask the Court to add into the statute. Mot. at 14-15 (citing *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) and quoting language taken out of context from trademark infringement cases); ECF No. 135 at 6 (Scanlon, J.) (rejecting similar arguments and granting Plaintiffs' motion to amend the complaint, observing that Defendants' cited decisions "only address trademark infringement, trade dress infringement and trademark dilution claims").[8]

In other words, to avoid the inescapable conclusion that Defendants' conduct violates the plain text of § 43(a)(1)(A), Defendants impermissibly "[e]ngraft[] onto § 43(a) a requirement"—

---

[8] Defendants' citations here are both to run-of-the-mill trademark infringement cases, where of course, in describing the elements of either a trademark infringement or unfair competition claim based on the infringement of such a mark, a court would require proof of a protectable mark. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 401 (2d Cir. 2005); *Hudson Furniture, Inc. v. Mizrahi*, 2023 WL 6214908, at *4 (S.D.N.Y. Sept. 25, 2023).

the supposed need to prove a protectable trademark or unregistered mark—without a "textual basis" to do so. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992). *Two Pesos* observed that § 43(a) "does not mention trademarks." *id*. The word "mark" does not appear in Lanham Act § 43(a) either. And "[i]t is not the province of the courts to add words to statutes that Congress has enacted." *Knight First Amend. Inst. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 331 (2d Cir. 2022); *see also Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212 (2020) (rejecting Second Circuit's requirement of willfulness as a precondition for disgorgement under Lanham Act for lacking textual basis). Defendants argue that *Two Pesos* "did not dispense with the protectable mark requirement for false affiliation claims," Mot. at 16, but *Two Pesos* does not discuss any "protectible mark" requirement at all. Rather, it found inherent distinctiveness even without secondary meaning to be sufficient for Lanham Act protection of trade dress and chastised the lower court for reading a secondary meaning requirement into the statute. The logic of the decision supports protection of the inherently distinctive pairing of Plaintiffs' business names with their addresses under the plain language of § 43(a)(1)(A).

Defendants' authorities do not support its suggestion that Plaintiffs must show infringement of some "protectible mark" distinct from their actual business name and address. In fact, Defendants' own authority, *Lehrman v. Lovo, Inc.*, "observe[d] that 'mark' in this context means, as it must, something more than an ordinary trademark." 790 F. Supp. 3d 348, 363 (S.D.N.Y. 2025); *see also id*. at 367 (observing "courts in this Circuit and others have long approved of claims involving mark-like devices such as a celebrity's 'image,' 'likeness,' 'persona,' or 'identity'");[9] *Walker v. Thompson*, 404 F. Supp. 3d 819, 824 (S.D.N.Y. 2019) (§ 43(a)

---

[9] *Lehrman's* holding in fact supports Plaintiffs' position. *Lehrman* held that "Plaintiffs voices are protectable *only to the extent that they function primarily as source identifiers* rather than as products themselves," and "Plaintiffs have not alleged that their voices are primarily significant as brands rather than as services to which brands might be attached." *Lehrman*, 790 F. Supp. 3d at 368. Here, Plaintiffs' information clearly functions as a source identifier.

"prohibits misappropriation of a person's name or likeness that is 'likely to cause confusion' about that person's association with a product or service.").

This is consistent with other Second Circuit and Supreme Court authority holding that "Section 43(a) 'goes beyond trademark protection,' to prohibit market behavior that may 'deceive consumers and impair a producer's goodwill,'" by disallowing "certain unfair trade practices prohibited by its text." *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 478 (2d Cir. 2005) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)). Therefore, the Lanham Act provides relief for claims "actionable under the broad heading of unfair competition" so long as the theory aligns with "[t]he language of subsection (A) of 15 U.S.C. § 1125(a)(1)," including by making "'actionable' 'confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.'" *Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 30 F.3d 348, 358-59 (2d Cir. 1994) (quoting *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 662 (2d Cir. 1979)).

As Plaintiffs pointed out in prior briefing, under Defendants' flawed logic, the Lanham Act would allow them to sell fake gift certificates in the name of any business that did not have a "protectable mark," even listing the business name, address, and its photograph. But that interpretation of the Lanham Act cannot be squared with Second Circuit precedent making clear that "while [a] mark . . . may be generic and not entitled to trademark protection, [a] claim of unfair competition is not foreclosed." *Murphy Door Bed Co. v. Interior Sleep Sys.*, 874 F.2d 95, 102 (2d Cir. 1989); *see Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) (applying *Murphy* in § 43(a) claim for "Unfair Competition Involving Unregistrable Marks"); *Forschner Grp.*, 30 F.3d at 358–59 ("Regardless of whether a term is trademarked, a plaintiff may show that the term name is so associated with its goods that 'use of the same or similar term by

another company constitutes a representation that its goods come from the same source.'") (quoting *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir. 1956)) (cleaned up). For instance, the Second Circuit and others have expressly identified "passing off" as one example of misconduct that is "actionable under the broad heading of unfair competition" in the Lanham Act even without a protectable mark. *Forschner*, 30 F.3d at 358; *see Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939–40 (7th Cir. 1986) (where a business name was not a protected mark, § 43(a) still provided protection against "passing off").

This case is not Gracie Baked vs. Gracie Bakery. Defendants are using Plaintiffs' *actual* business name and address, along with other information taken from Plaintiffs' own Yelp profiles—this information intrinsically functions as a source identifier, and that is exactly why Defendants included it. This case also has nothing to do with the situation contemplated in the McCarthy Treatise, *see* Mot. at 16, which posits that "[a] plaintiff cannot disguise a § 43(a)(1)(a) *trademark infringement claim* as a false advertising § 43(a)(1)(b) claim. [10] Plaintiffs' separate false advertising claims under § 43(a)(1)(b) stand on their own, as explained below. And Plaintiffs have never asserted "trademark" infringement claims, as Judge Scanlon has already repeatedly explained to Defendants. *See* ECF No. 135 at 6 (Scanlon, J.) (granting Plaintiffs' motion to amend the complaint and observing that Defendants' cited decisions regarding the protectability of marks "only address trademark infringement, trade dress infringement and trademark dilution claims"); *see also* Ex. 219 at 25:9–26:02 (Scanlon, J.: "[T]hey're suggesting that the misidentification by

---

[10] *See* 4 McCarthy on Trademarks and Unfair Competition § 27:9.50 (5th ed.) (emphasis added). The cases cited by the McCarthy treatise all involve the use of similar tradenames. For example in *C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*, 2022 WL 2704506 (E.D.N.Y. July 12, 2022), ANALOG BKNY sought to enjoin the use of ANALOG BROOKLYN and in *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220 (3d Cir. 2017), Parks Sausage Company brought claims against Ball Park selling hot dogs with packaging proclaiming them "Park's Finest." Plaintiffs' claims here are different and based on information that specifically identifies Plaintiffs' businesses and falsely claims to sell Plaintiffs' gift cards. *See* ECF No. 106-9 at 26:2-6 (Scanlon, J.) ("So the fact that you have your business saying that you have something to do with the business at this certain address is enough. And that corporation owns its identification, it owns its name, and it owns the descriptive location, and that's it.").

your clients with these, you know, many, many businesses is by associating with their name and address. . . . [T]hey're saying they're not pursuing that aspect of the Lanham Act. They're pursuing this – the quoted aspect, which is the false association.").

Whether the phrase "Gracie Baked" standing alone is a protectable trademark is irrelevant to Plaintiffs' claims because Defendants' use of a phrase similar to "Gracie Baked" is not the reason for the likelihood of confusion here. When Defendants falsely sell "gift cards" or "gifts" for use at Plaintiffs' businesses, plainly such language is likely to cause consumers to be confused as to Plaintiffs' "affiliation, connection, or association" with GiftRocket and GiftRocket's "sponsorship, or approval of [Plaintiffs'] goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). Nothing more is required.

> **2.      Plaintiffs have consistently explained their legal theories in the face of Defendants' shifting arguments about what the Lanham Act requires.**

Plaintiffs have been clear from the inception of this case about the basis for their Lanham Act claims, which is as stated above. *See also* ECF Nos. 152, 279. Defendants initially argued in a motion to compel discovery that Plaintiffs had to prove they held valid trademarks to pursue their claims. ECF Nos. 72, 135. Judge Scanlon rejected these arguments and Defendants' related fishing expedition in trademark-related discovery. *See* Mar. 27, 2024 Minute Orders (Scanlon, J.). Defendants have now shifted their position to argue that Plaintiffs must demonstrate some other undefined type of "mark," and mistakenly assert that Plaintiffs "disavowed any claim predicated on a protectible mark." Mot. at 15.

But Plaintiffs have always contended that their names and address, scraped from Yelp and pared together, are "protectible" under the Lanham Act against Defendants' predatory and deceptive usages. Defendants' own citations establish that Plaintiffs simply and consistently argued that their claims "do not require any individualized inquiries into class members'

'*trademarks*' or similar concepts regarding a mark" and "there is no reason for Plaintiffs to identify their '*trademark[s] and/or Tradenames*." Mot. at 17 (citing ECF No. 275 at 4 and ECF No. 151 at 2–5) (emphasis added); *see also* Mot. at 18 (quoting Judge Kovner explaining to Defendants that "[P]laintiff is saying our claim is not based on the theory that you are *infringing on any trademark or service mark*") (emphasis added); Ex. 218 at 22:20-23 (Kovner, J.: "So you said what are your trademarks or service marks and plaintiff is saying our claim is not based on the theory that you are infringing on any trademark or service mark.").[11] That remains Plaintiffs position, Defendants have always had full knowledge of and access to the Yelp information they used on their own website, and there is no "about-face" or "unfair[] advantage" in allowing Plaintiffs to pursue these arguments. *Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (no judicial estoppel when not "clearly inconsistent with its earlier position.").

### 3.      Plaintiffs have shown a likelihood of confusion.

As to likelihood of confusion, Defendants rely on the same mistaken argument that "there is no evidence anyone saw any statement about [Plaintiffs Gracie Baked and WeCare] on giftrocket.com." *See* Mot. at 18. The record directly contradicts this assertion, as explained above.

For Dimensions, though Defendants admit that one customer who bought a GiftRocket intended to purchase a gift card to Dimensions (as evidenced by the fact that she returned it and purchased a Dimensions Massage gift card when she found out what GiftRocket had actually sold her), they argue that "one instance of confusion 'does not establish actual or likely confusion of an appreciable number of consumers.'" Mot. at 19 n.11 (quoting *Flushing Bank v. Green Dot Corp*., 138 F. Supp. 3d 561, 580 (S.D.N.Y. 2015)). This misstates the law, which is simply that one confused customer out of a large number of unconfused customers does not establish likelihood

---

[11] *See* ECF Nos. 109-19 at 21-22 ("Even if a mark *were* required, evidence common to every class member . . . would demonstrate the ownership of a protectable mark, as Plaintiffs' have already explained in previous filings."); No. 74.

of confusion. Thus, in *Flushing Bank*, the "denominator"—"many millions"—was "important," because "only a dozen or so people . . . were confused . . . indicates an extremely low level of confusion." *Flushing Bank*, 138 F. Supp. 3d at 581.[12] Here, in contrast, the denominator of actual purchases of a GiftRocket to Dimensions is one. And that user was actually confused as to the association of Dimension with GiftRocket, explaining that she wanted a refund because "the place I purchased this for says they are not associated with you." Ex. 208.

Further, the record here is replete with evidence that *many* consumers were confused in the same way by Defendants' scheme. 56.1 ¶¶ 37–50, 59–69, 106–56. And because every business's information was displayed using the same template webpages, this evidence applies with equal force to establish confusion with respect to every Plaintiff. *First*, the GiftRocket website was so obviously designed to confuse consumers that a police department felt it necessary to issue a "scam alert" warning consumers not to be fooled. 56.1 ¶ 48; Ex. 30. *Second*, Sunrise Banks repeatedly warned Defendants that the website was confusing consumers, and that Defendants' poorly-worded disclosures were ineffective. 56.1 ¶¶ 106–56. *Third*, there is the evidence that Sunrise relied on to reach its conclusion: a vast collection of consumer complaints stating that they were confused or misled or had been defrauded. *Id.* Exs. 75, 78–89. *Fourth*, there is Defendants' bad faith SEO strategy and eternal battle with Sunrise to keep businesses listed on the website without their consent and to avoid or water down corrective language. 56.1 ¶¶ 127–53. "[W]here a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." *Johnson & Johnson * Merck Consumer Pharm. Co. v.*

---

[12] Defendants' reliance on *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 524 (S.D.N.Y. 2008) is similarly misplaced, where there was only one instance of actual confusion but no other evidence on confusion.

*Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (quotations omitted).[13]

Defendants next misapply the *Polaroid* test. The *Polaroid* "factors are neither exhaustive nor applied mechanically" because "the ultimate question under [*Polaroid*] is the likelihood of consumer confusion." *Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 110, 116 (2d Cir. 2023) (court's alteration). A reasonable juror would conclude that consumers are likely to be confused as to Plaintiffs' association with GiftRocket based on the evidence described above. In any event, every relevant *Polaroid* factor demonstrates the likelihood of confusion.

As to the mark factors (factors 1-3), Defendants specifically (and falsely) identified Plaintiffs' actual businesses, and so the "strength of the mark"—*i.e.*, its ability to identify the business at issue—clearly favors Plaintiffs, as do similarity and proximity. *Cf. Electra*, 987 F.3d at 258 (finding that lower court "properly analyzed the record of each Appellant's public prominence to determine the strength of their marks, because among other reasons, the advertisements at issue provided *no information identifying Appellants other than their pictures*") (emphasis added). In *Electra*, the "mark" was just someone's picture. So of course, a picture alone would not be likely to cause confusion unless we asked the corollary question—how famous is that person's face? But the mark's strength would be irrelevant if there were additional "information identifying [plaintiffs] other than their pictures." *See id.* That is exactly what Defendants used here, identifying Plaintiffs by their name, address, and Yelp profile information to deceive consumers into believing that GiftRocket sold their gift cards.

---

[13] *See also Paddington Corp. v. Attiki Importers & Dists., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993) ("Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion."); *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1136 (2d Cir. 1982) ("[B]y intentionally imitating the plaintiff's Ultrasuede mark and trade dress, defendants implicitly stated that they believed that they could create a likelihood of confusion among consumers as to the source of their product and that they could profit thereby. Accordingly, ... we should take them at their word."). In light of the substantial evidence of actual customers confusion, no expert opinion or "consumer response data" is needed. *See Elnicky Enters., Inc. v. Spotlight Presents, Inc.*, 1981 WL 48202, at *6 (S.D.N.Y. July 17, 1981).

The bridging the gap (factor 4) is irrelevant. Confusion here has nothing to do with Plaintiff Gracie Baked or any other business's potential to "bridge" a competitive "gap" by also starting an online gift card scam. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) ("bridging the gap factor [was] irrelevant"). Actual confusion (factor 5) is well documented, *see supra*. And the facts refute Defendants' claim the "intent" factor (factor 6) favors them because "GiftRocket undertook significant efforts to ***prevent*** consumer confusion, including by adding express disclosures and a checkbox to giftrocket.com." Mot. at 20. In reality, GiftRocket repeatedly fought Sunrise Banks over proposed clarifications to the website and watered down or failed to implement changes, and did not care that it was deliberately angering businesses, one of its most common issues. 56.1 ¶ 44–72. Defendants then removed this checkbox once Sunrise informed them of its intent to stop partnering with GiftRocket. *See* 56.1 ¶ 163; GR Defts' 56.1 ¶ 46. GiftRocket even manipulating its reporting of complaints to Sunrise, even omitting "90%" of the complaints or not reporting any complaints for months on end. Ex. 76; 56.1 ¶¶ 38–39.

## B. The evidence supports all three Plaintiffs' false advertising claims.

Defendants also incorrectly argue that Plaintiffs' false advertising claims fail because Plaintiffs have not shown "injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentation." Mot. at 20. First, Defendants' entire business model was designed to and did divert business from Plaintiffs and other class members: Plaintiffs have shown that when Defendants lost access to Plaintiffs' (and other class members) Yelp profiles GiftRocket suffered ***an astounding 75% decrease in revenues***, even after replacing the Yelp profiles with Google profiles from non-consenting businesses. 56.1 ¶¶ 91–92. The obvious inference is that Defendants' profits were driven almost exclusively by their unauthorized use of Plaintiffs' (and other class members') business information, thus the sales were self-evidently diverted from Plaintiffs. This is consistent with other record evidence that Defendants'

search engine strategy makes it "rank as a top result for ~1m businesses," and as the number two result for individuals searching for "<business name> + gift card." Ex. 64 at 7. And it is consistent with the endless stream of customer complaints saying they thought they were purchasing a gift card to a putative Class Member business. 56.1 ¶¶ 37–50, 59–69, 106–56. Further, Defendants' mistaken assertions that there is no evidence anyone saw Gracie Baked or Café Ole on the GiftRocket website or in its search results fails based on the evidence noted in Section I.A, above.

The evidence is even more compelling as to Plaintiff Dimensions: it is undisputed that a customer intended to purchase a $100 gift card to Dimensions, but, after a negative experience with GiftRocket, the customer instead purchased a gift card from Dimensions in a lesser amount. 56.1 ¶¶ 182–84. A reasonable juror could easily conclude that this evidences both a loss of sale and a reputational injury. (Dimensions was also injured by the time and effort required to address the situation and investigate Defendant's scam.) Defendants' assertion that there is "no evidence" about what the user saw or relied on is obviously inaccurate—she purchased the GiftRocket through the GiftRocket website (the only place they were sold) and relied on the same false statements presented by Defendants on all of their identical template website pages. It is undisputed that there are only two versions of the GiftRocket landing page that Ms. Riley could have seen to complete the transaction. Either she viewed the mobile version that explicitly and falsely stated "Buy a Dimensions Massage Therapy Gift Card." Or she viewed the equally misleading desktop version that said: "Buy a Dimensions Massage Therapy Gift" right below a navigation flow that said "Gift Cards > Austin Gift Cards > Massage Therapy > Dimensions Massage Therapy." 56.1 ¶ 185.[14]

---

[14] The fact that Defendants removed the word "gift card" from desktop (but not mobile) webpages by the time Ms. Riley purchased the GiftRocket only serves to confirm that this change did nothing to dispel their deliberate deception, as consumers like Ms. Riley continued to be deceived. *See, e.g.* Ex. 6 ("I've bought the Watch Station egiftcard for

Regardless of which version Ms. Riley saw, a reasonable juror would likely conclude that Defendants' false advertising misled her into believing she was purchasing a gift card product that could be used at Dimensions. It is undisputed that Ms. Riley in fact attempted to use the GiftRocket at Dimensions and was informed the business did not accept GiftRockets. 56.1 ¶ 182. It is also undisputed that Ms. Riley then demanded a refund from GiftRocket because "the place I purchased this for says they are not associated with you." Ex. 208; Ps. 56.1 ¶ 184. And given her clear intent to purchase a gift card to Dimension Massage and not a GiftRocket, a reasonable juror could also conclude that Ms. Riley arrived at GiftRocket.com in the same way as the majority of its visitors— through an internet search that generated results falsely suggesting GiftRocket sold giftcards to Dimensions Massage. 56.1 ¶¶ 90–91, 186.

Second, all three Plaintiffs also suffered reputational injuries, including the loss of control of reputation, and by being associated with a website that is subject to negative online reviews, upset customers, and a police "SCAM ALERT." *See* Ps 56.1 ¶¶ 41–48, Millercobb Tr. 63:5-7 ("They have used my brand and associated it with . . . a fraudulent company that has a terrible reputation."); *Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *8 (S.D.N.Y. Dec. 5, 2019) ("[Plaintiff's] reputation is likely to be injured when those consumers receive potentially sub-par services from a company they associate with [it]."), *r&r adopted*, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022). Indeed, as illustrated by the concerns of one of GiftRocket's potential corporate partners, being associated with GiftRocket risks being connected with "scammers" as per GiftRocket's "terrible" reviews, which are "the first thing that pops up in" search results for GiftRocket. *See* Ex. 59; 56.1 ¶¶ 68–72; *see, also, e.g.*, Ex. 103 (employees discussing that GiftRocket has "so many bad reviews" causing the Tremendous business line to lose deals).

---

my sister. It says clearly on your website: Buy a watch station gift. . . . She wants an e gift card that she can use at Watch station and this is really misleading.").

Third, Defendants are also wrong about what the law requires. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) did not hold that a false advertising plaintiff must always prove specifically identifiable lost sales that went instead to a defendant. Rather, *Lexmark* "is entirely consistent" with Second Circuit precedent, *see Souza*, 68 F.4th at 119, which "'permits a district court to award a defendant's full profits based solely on deterrence'" even if a plaintiff does not actually identify someone "who wished to buy the plaintiff's goods [that has] been actually misled into buying the defendant's." *4 Pillar*, 933 F.3d at 211–14 (rejecting argument "that our case law demands that a Lanham Act plaintiff seeking an award of an infringer's profits prove actual consumer confusion" and affirming disgorgement of full profits even though "Plaintiffs introduced *no evidence of actual consumer confusion*, and where *Plaintiffs' gross sales actually increased* during the years that Defendants marketed infringing products")) (emphasis added). In other words, a plaintiff can sustain a false advertising claim by demonstrating that Defendants "proximately caused actual or **likely** 'economic or reputational' injury," which Plaintiffs show here. *Souza*, 68 F.4th at 120 (emphasis added) (quoting *Lexmark,* 572 U.S. at 133).

Defendants also misconstrue *Souza*, which supports Plaintiffs' position. In *Souza*, plaintiffs were professional models who brought Lanham Act claims against defendants for using their pictures in social media posts to promote the strip club. 68 F.4th at 106–07. There, the images of plaintiffs alone did not support any likelihood of confusion as there was "next to no evidence of recognizability" and no evidence of "actual confusion." *Id.*at 112-13. As to claimed reputational harm, plaintiffs had no evidence that a potential customer "ever saw the posts in question, *or was likely to see the posts*, or ever mentioned the posts." *Id.* at 120 (emphasis added). Here, in contrast, the GiftRocket Defendants are not just using an image that cannot be identified as belonging to Plaintiffs. Rather, they are using Plaintiffs' business names and actual locations paired with

specific phrases intentionally designed to make consumers believe that they can purchase gift cards for use at Plaintiffs' businesses. And there *is* substantial evidence that consumers saw these false statements, as the intended result of Defendants' SEO strategy, which made it highly likely that they would be seen.

### C.  Plaintiffs will prevail on their claims for injunctive relief.

Even if Plaintiffs had not marshalled substantial evidence of Lanham Act injury, Plaintiffs' claims for injunctive relief can still proceed. Under the Trademark Modernization Act of 2020, which provides that Plaintiffs seeking injunctive relief "to prevent a violation of [Lanham Act § 43(a)]" "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation." 15 U.S.C. § 1116(a). Courts routinely enter permanent injunctions by applying this presumption.[15] Plaintiffs are entitled to enjoin Defendants from their deceptive marketing that is likely to confuse or mislead consumers.

### D.  Plaintiffs' state law claims may proceed.

Defendants argue only that Plaintiffs' common law unfair competition claims fail only because their Lanham Act claims fail. *See* Mot. at 22. So, their motion as to those claims should also be denied. And their argument that Plaintiff Gracie Baked's GBL claims fail for lack of injury, *see id.* at 23, ignores the evidence and law of reputational injury. *See also New York City Triathlon, LLC v. NYC Triathlon Club, Inc*., 704 F. Supp. 2d 305, 325 n.7 (S.D.N.Y. 2010) (sustaining GBL claim where "Defendant's . . . suggesting an affiliation with Plaintiff when no such affiliation exists, is misleading to New York consumers. It also harms Plaintiff."); *Burberry Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *16 (S.D.N.Y. June 10, 2009) (finding sufficient injury of the

---

[15] *See, e.g.*, *Ghost L.L.C. v. Ghost Fitness NYC, LLC,* 2025 WL 2487826, at *13 (E.D.N.Y. Aug. 29, 2025)*, r&r adopted,* 2025 WL 2772887 (E.D.N.Y. Sept. 26, 2025); *Ultra Recs. LLC v. Ultra Int'l Music Publ'g*, 2025 WL 602943, at *6 (S.D.N.Y. Feb. 25, 2025); *Hudson Furniture, Inc. v. Mizrahi*, 2024 WL 565095, at *16 (S.D.N.Y. Feb. 7, 2024).

"plac[ement] into the stream of commerce goods likely to confuse consumers.").

## IV. Plaintiffs' Claims for Injunctive Relief Are Not Moot.

Defendants' voluntary cessation of GiftRocket.com years into litigation and their bare promise not to start it again, *see* Mot. at 24, cannot moot Plaintiffs' claims. Defendants carry a "formidable burden" to show that it is "absolutely clear that" their "violations could not reasonably be expected to recur." *Pinkhasov v. Vernikov*, 2024 WL 2188356, at *7 (E.D.N.Y. May 15, 2024) (quotations and citations omitted). Otherwise, a defendant could "strategically paus[e] their wrongdoing, get[] a case dismissed as moot, and then begin[] it again after the suit ends." *Klein v. Qlik Techs., Inc.*, 906 F.3d 215, 224 (2d Cir. 2018).

Defendants cannot make this showing. Their promises in declarations not to restart GiftRocket.com do not suffice, especially when they still insist there was nothing wrong with their conduct.[16] *See Pinkhasov*, 2024 WL 2188356, at *5 (collecting Supreme Court precedent "forecloses mootness based on . . . declarations"); *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385 (E.D.N.Y. 2021) ("A promise not to sell . . . does not mitigate this risk, particularly where Defendants continue to dispute that any of the masks it has sold or offered for sale were, in fact, counterfeit.").[17] Defendants contend that they shut down GiftRocket.com primarily because it was no longer profitable. *See* Mot. at 8. But in Defendant Baum's view, GiftRocket needs only pay Yelp for a subscription to reinstitute API access, which could restore

---

[16] After Plaintiffs pointed out in their class certification briefing and in response to Defendants' PMC letter that the Individual Defendants declarations (less Kubic) merely stated they did not have an "intention" to restart GiftRocket, *see* ECF Nos. 279 at 19; 273 at 2, all four individual defendants, now with Kubic, have submitted updated declarations with stronger language. Clearly these declarations reflect no heartfelt commitment to change, but rather a transparent strategy to avoid liability for their misconduct. *Cf. Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 662 (S.D.N.Y. 2013) (Defendants' "probing of what it can get away with presents a cognizable danger of recurrent violation.") (cleaned up).

[17] *See also Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp.3d 361 at 372 (S.D.N.Y. Sep. 28, 2018); *Farez-Espinoza v. Napolitano*, 2009 WL 1118098, at *4 (S.D.N.Y. Apr. 27, 2009); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809, at *6 (S.D.N.Y. May 8, 2003) ("A defendant['s] promise to stop selling the offending products, while perhaps a nice gesture, does not prevent a federal district court from ordering it to act pursuant to a party's request for injunctive relief.").

profitability. 56.1 ¶¶ 192 –93. And even without Yelp, as Baum testified, if Defendants "had prioritized some work," "like maintaining the directory structure and SEO," to make sure searches related to the non-consenting businesses led consumers to GiftRocket.com, they "could have maintained the sales." Baum Tr. 197:8-24; 206:16-208:6. So Defendants have everything else they need to easily restart their unlawful activities, including the same employees who operated the website and advocated for it to continue to run. 56. 1 ¶¶ 189– 94; 14–16. After all, GiftRocket.com requires only very little to operate, running on "autopilot," and can easily make them "free money" once again. 56.1 ¶¶ 189–94.

This situation is nothing like Defendants' authorities. In *Pegasystems Inc. v. Appian Corp.*, 633 F. Supp. 3d 456 (D. Mass. 2022), the defendant removed the content from its website and ceased distributing it "once [the plaintiff] filed this lawsuit." *Id.* at 472. Here, Defendants did not stop operating GiftRocket.com until two and a half years into this litigation. Nor did GiftRocket.com stop operating "for reasons wholly unrelated to this litigation." *Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 145 F.4th 212, 224 (2d Cir. 2025). Rather, Defendants' profits decreased when they lost access to putative Class Members' Yelp information, which occurred after Yelp learned of this litigation through a subpoena. 56.1 ¶ 26. And Defendants may wish to return to return to the good old days when GiftRocket's success with SEO landing pages operated as "referral juice" and "corporate lead gen" for Defendants to create value for their "Tremendous" line of business. *See* 56.1 ¶¶ 10–16.[18]

## CONCLUSION

For the foregoing reasons, this Court should deny the GiftRocket Defendants' Motion.

---

[18] Further, while Defendants claim they wish to focus on the "Tremendous" product, that product is currently involved in multiple lawsuits for siphoning funds from class settlements. *See* Law.com, *Five More Lawsuits Allege Fraud, Kickbacks in Class Action Settlements* (Dec. 2, 2025)

Respectfully submitted,

By: */s/ Raphael Janove*
Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law


Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

Dated: January 20, 2026

Matthew Weinshall (Admitted *pro hac vice*)
Dayron Silverio (Admitted *pro hac vice)*
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 700
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurst.com


*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 8,678 words, including footnotes but excluding text specified in Rule 7.1(c), and that this comports with the page limit set by the Court's Nov. 18, 2025 Order.

Dated: January 20, 2026

*/s Raphael Janove*

Raphael Janove