# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

GRACIE BAKED LLC, WECARE RG, INC., and MILLERCOBB LLC, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GIFTROCKET, INC., TREMENDOUS, INC., NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES, BENJAMIN KUBIC, SUNRISE BANKS, N.A., GIFTROCKET, LLC, TREMENDOUS LLC, and TREMENDOUS PARENT, INC.,

Defendants.

Case No. 22-CV-4019 (GRB) (VMS)

## PLAINTIFFS' OPPOSITION TO DEFENDANT SUNRISE BANKS N.A.'S MOTION FOR SUMMARY JUDGMENT

—served on January 20, 2026—

Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

Matthew Weinshall (Admitted *pro hac vice*)
Dayron Silverio (Admitted *pro hac vice*)
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 700
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurtst.com

*Attorneys for Plaintiffs and the Proposed Classes*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A.    Sunrise issued the passed-off good and was GiftRocket's "critical" partner. ................................................................................................. 2

    B.    Sunrise knew that GiftRocket continually tricked consumers into believing they were purchasing putative Class Members' actual gift cards. .............. 3

    C.    Sunrise allowed GiftRocket to continue misleading consumers ................. 5

    D.    GiftRocket's marketing was deceptive and the disclaimers were ineffective. ............................................................................................. 9

    E.    Sunrise ends its partnership with GiftRocket unrelated to the endless flood of confused customers and angry businesses. ........................................... 11

    F.    Plaintiffs add Sunrise to this lawsuit. ...................................................... 11

LEGAL STANDARD .................................................................................................. 12

ARGUMENT .............................................................................................................. 12

    II.    Plaintiffs Have Article III Standing to Sue Sunrise Banks ................................... 12

    A.    Gracie Baked and Café Ole have Article III standing. ............................. 12

    B.    Dimensions Massage has standing to sue Sunrise. ................................... 14

    III.    Sunrise Misunderstands False Advertising Injury ................................................ 17

    A.    The record shows Sunrise was an actual or likely cause of Plaintiffs' injuries. .................................................................................................. 17

    IV.    Plaintiffs Suffered Reputational Injury ................................................................ 19

    V.    Sunrise Banks' Additional Arguments Fail .......................................................... 20

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
   933 F.3d 202 (2d Cir. 2019) .................................................................. 15

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
   88 F.4th 344 (2d Cir. 2023) .................................................................. 16

*Bohnak v. Marsh & McLennan Companies, Inc.*,
   79 F.4th 276 (2d Cir. 2023) .................................................................. 13

*Carver v. City of New York*,
   621 F.3d 221 (2d Cir. 2010) .......................................................... 16, 17

*Chanel, Inc. v. WGACA, LLC*,
   2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) ........................................ 12

*Controls Se., Inc. v. QMax Indus., Inc.*,
   2024 WL 2163477 (W.D.N.C. May 14, 2024) ................................ 13, 14

*Cumberland Oil Corp. v. Thropp*,
   791 F.2d 1037 (2d Cir.1986) ................................................................ 18

*De Simone v. VSL Pharm., Inc.*,
   395 F. Supp. 3d 617 (D. Md. 2019) ..................................................... 14

*Gracie Baked LLC v. GiftRocket, Inc.*,
   2024 WL 5716217 (E.D.N.Y. Mar. 28, 2024) ...................................... 12

*Graybill v. City of New York*,
   247 F. Supp. 2d 345 (S.D.N.Y. 2002) .................................................. 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .............................................................................. 18

*Mazyck v. Long Island R. Co. (LIRR)*,
   896 F. Supp. 1330 (E.D.N.Y. 1995) ..................................................... 18

*McCabe v. Nat'l Presto Indus., Inc.*,
   2025 WL 2371080 (E.D.N.Y. Aug. 14, 2025) ...................................... 16

*Merck Eprova AG v. Gnosis S.p.A.*,
   760 F.3d 247 (2d Cir. 2014) ................................................................. 19

*Souza v. Exotic Island Enters., Inc.*,
   68 F.4th 99 (2d Cir. 2023) .............................................................. 17, 19

**Statutes**

15 U.S.C. § 1117 ...................................................................................... 15

**INTRODUCTION**

Defendant Sunrise Banks N.A.'s ("Sunrise" or the "Bank") Motion for Summary Judgment ("Mot.") abandons nearly all of the Sunrise-specific arguments that the Bank previewed for the Court in its request for a pre-motion conference. *See* ECF Nos. 285. There, Sunrise argued that "the only inference a reasonable juror could draw from the record is that Sunrise Banks worked to prevent confusion by requesting clarifying language on giftrocket.com." *Id*. at 3. As Plaintiffs Gracie Baked LLC ("Gracie Baked"), WeCare RG, Inc. ("Café Ole"), and Millercobb LLC ("Dimensions") observed in response, Sunrise's assertion was "belied by the fact that although Sunrise repeatedly observed customer confusion and requested clarifications on the website, it still allowed GiftRocket to make misleading use of other businesses names to market the product." ECF No. 286 at 3. Thus, Plaintiffs explained, "the only inference a reasonable juror could draw from the record is that Sunrise Banks was aware of customer confusion and how to fix the issue," but instead continued to support and profit from GiftRocket's deceptive scheme. *Id.*

Conceding the point, Sunrise Banks dropped the argument and now merely repeats the GiftRocket Defendants' mistaken factual and legal arguments regarding Plaintiffs' supposed lack of injury. Sunrise's only unique argument is that it should be absolved from liability because it stopped supporting new GiftRocket orders by June 2022, around the time the original complaint was filed, and before GiftRocket sold a fake gift card in the name of Plaintiff Dimensions in October 2022. But the evidence shows that all Plaintiffs were injured by the GiftRocket scheme, which diverted their customers to the GiftRocket website, and by the false association with the scam operated by GiftRocket. And these injuries, including the October 2022 sale lost to Dimensions, were the reasonable and foreseeable effects of Sunrise's years-long partnership with GiftRocket. The bank allowed GiftRocket to continue its intentionally false marketing of gift cards

to businesses, despite the Bank's compliance team's repeated requests that GiftRocket stop. *See* Ex. 29 ("The change we need to see is to remove [the phrase] Gift Card to XYZ Merchant"); Ex. 34, Sunrise Tr. 152:01-158:20; *see* 56.1 ¶¶ 106–65.

Further, Sunrise continued to do business with, and profit from, GiftRocket until March 2023, well after the date the fake Dimensions giftcard was sold. Given Sunrise's extensive knowledge and involvement in the GiftRocket scheme, it cannot escape liability to businesses that were harmed just because one specific injury occurred while it was in the process of transitioning the business to another bank. Sunrise's Motion should therefore be denied.

## BACKGROUND

### A.     Sunrise issued the passed-off good and was GiftRocket's "critical" partner.

Sunrise served as GiftRocket's banking partner from 2015 to 2022 and held funds for GiftRocket until March 2023. 56.1 ¶¶ 96–105. It was the issuer of the GiftRocket product. 56.1 ¶ 96. As GiftRocket put it, Sunrise was GiftRocket's "critical" banking partner, and the one that actually "owns and issues" the GiftRocket product, while GiftRocket merely "market[s], support[s]," and sell[s]" the product. Ex.  120; 56.1 ¶ 97. Sunrise held and then transferred the gifted funds that were sent through the GiftRocket.com website, and was paid a fee for each transaction. 56.1 ¶ 105. Sunrise made $1.2 million in revenue from GiftRocket through the duration of its partnership with GiftRocket, which ended in 2023. Ps. 56.1 ¶ 105. It made $875,000 in net income from 2020-2022 alone. 56.1 ¶ 105.

Sunrise was intimately involved in GiftRocket's operation, especially with respect to the deceptive marketing statements at issue in this case. 56.1 ¶¶ 98–104. It analyzed and provided direct commentary on the language on the GiftRocket website, including by marking up specific webpages, and through formal "Website Review Report Cards." 56.1 ¶¶ 98–99. Its client relations

team held "weekly GiftRocket Touch Base" meetings with Defendant Baum, 56.1 ¶ 100, and its "Third Party Risk" team created "National ACH Monthly Report[s]" that included a section tracking complaints about the GiftRocket program, 56.1 ¶ 101. It worked with GiftRocket to craft responses to complaints submitted directly to Sunrise Banks or via third-party services like the Better Business Bureau. 56.1 ¶ 104. Sunrise also formally reviewed the GiftRocket program in "Annual Reviews." 56.1 ¶ 102.

### B. Sunrise knew that GiftRocket continually tricked consumers into believing they were purchasing putative Class Members' actual gift cards.

The Sunrise–GiftRocket relationship was first discussed in July 2015 and formalized in December 2015. Ps 56.1 ¶ 122. As part of the onboarding process, Sunrise internally "discuss[ed] the various risks . . . [GiftRocket] brings to the Bank." Ex. 177; 56.1 ¶ 123. Multiple members of the compliance department at Sunrise flagged the obvious issue that the use of the term "gift card" on the GiftRocket.com website might cause problems, though Sunrise still allowed GiftRocket to continue to refer to its product as a "gift card." 56.1 ¶¶ 124–162. These concerns materialized almost immediately in the complaint logs, and the bank's initial concern with GiftRocket's misleading language continued throughout the entire relationship. *See, e.g.*, *id.*.

The complaint logs "enable[d] tracking of patterns for complaints and the associated customer service response and resolution times." Ex. 165. The complaint pattern that Sunrise consistently identified was customer confusion around whether the GiftRocket product was a merchant-branded gift card—*i.e.*, confusion over the putative Class Member's affiliation with or approval of the GiftRocket product, or the product's origin or sponsorship. 56.1 ¶ 113; Ex. 34, Sunrise Tr. 106:03-108:18; 109:21-111:02 (Sunrise identified trends of "customer dissatisfaction" and "the complaints where either they thought they were purchasing a merchant branded gift card or the recipient thought it was a merchant branded gift card."). Sunrise reviewed more than 700

complaints, and the vast majority of these complaints came from confused customers. 56.1 ¶ 109; Ex. 75. For instance, the log from December 2019 contains over two dozen entries stating, "Sender thought [they] [were] buying a direct gift card for the suggested business." Ex. 75 at 181–184. 56.1 ¶ 110. The pattern of confusion was impossible to miss, even when GiftRocket systematically underreported complaints and manipulated the language in the complaint logs to downplay consumer confusion. 56.1 ¶¶ 38–39.

In addition, Sunrise was repeatedly contacted directly by consumers confused about the GiftRocket product and businesses that wanted to be removed from the GiftRocket.com website. 56.1 ¶ 111. Sunrise Banks also received notices from state attorneys general who received customer complaints. 56.1 ¶ 112.

Bank employees from the compliance team all the way up to the Board of Directors knew that GiftRocket was misleading both the purchasers and recipients of gift cards into believing they purchased a gift card to a specific business. 56.1 ¶¶ 106–121. Beginning in 2017, Sunrise Banks created an "annual report" that was sent to Sunrise's board containing information on the number and substance of complaints about the GiftRocket program. 56.1 ¶ 115. These reports noted that "the majority of GiftRocket complaints center around customer confusion of the product." Ex. 166 at 10; 56.1 ¶ 117. Sunrise Banks' February 2017 Management Risk Committee meeting also discussed customer confusion surrounding the GiftRocket.com website. 56.1 ¶ 117. In addition, Sunrise compiled multiple memoranda on the amount of customer confusion regarding the GiftRocket product and the GiftRocket.com website. 56.1 ¶ 117. For instance, one memorandum intended to be shared with GiftRocket, "summarize[d]" the bank's "concern with the continued number of complaints related to customers unclear about the product and thinking they are buying a merchant branded card." Ex. 171; *see* 56.1 ¶ 118. Sunrise also compiled a "Monthly Prepaid

Compliance Dashboard" for presentation at its National Products Approval Committee meetings, which included information on the number of complaints related to the GiftRocket program as well as GiftRocket's compliance rating. 56.1 ¶ 119.

### C. Sunrise allowed GiftRocket to continue misleading consumers.

The Bank raised these issues internally and directly to GiftRocket, through phone calls, emails, and various other documents. *See, e.g.*, 56.1 ¶¶ 125–28; *see generally id.* ¶¶ 126. For instance, in response to the question as to whether a Sunrise compliance team member told Defendant Baum that she "really didn't want you to use the phrase 'gift card,'" he testified, "Yes. My recollection is that she would bring it up independently on phone calls." Ex. 19, Baum Tr. 38:4-9. The bank's business and compliance teams had differing views on GiftRocket's continued use of misleading language. Compliance would flag concerning trends and deceptive website language, and escalate issues to the bank's National Products Approval Committee when GiftRocket resisted changes. But Sunrise management would overrule compliance and make the ultimate decision to allow GiftRocket to continue its deception with only minor and ineffective changes to the website. 56.1 ¶¶ 120–21.

Thus, although Sunrise knew that GiftRocket's marketing deceived consumers, it let GiftRocket ignore or water down the Bank's repeated suggestions to correct the false and misleading language. In January 2016, only a month into their partnership, the bank's compliance team again raised concerns about GiftRocket's use of the phrase "gift card." 56. 1 ¶ 126. Ex. 181 at 3 ("[S]ince it is not a gift card, advertising it as such is what really introduces the risk"). By April 2016, the compliance team was asking GiftRocket to stop using the phrase "gift card," but given pushback by Nick Baum, it allowed GiftRocket to try out additional disclosure language. 56.1 ¶ 127. Throughout April and May 2016, members of Sunrise Banks' compliance team

provided direct feedback on GiftRocket's disclosure language. 56. 1 ¶ 128.

Sunrise soon realized that the additional disclaimer language was ineffective (as the GiftRocket Defendants intended because deceiving customers is how GiftRocket made money). 56.1 ¶¶ 129–34. In December 2016, the compliance team again raised concerns about GiftRocket.com's misleading use of the phrase "gift card" paired with a non-consenting business's information. 56. 1 ¶ 129–30. Sunrise observed that if "the end recipient would receive a 'gift card' to the/their business - we need to be mindful that if consumers 'think' they are getting a gift card that **there is obviously confusion**." Ex. 189. Then, after Defendant Baum explained to Sunrise Banks that businesses were listed on GiftRocket.com "through Yelp's API," Ex. 190; *see* 56.1 ¶ 131, Sunrise Bank's relationship manager came to the obvious conclusion that GiftRocket should "remove the Yelp feed immediately." Ex. 192; *see also* Ex. 193 ("what you need to stop doing immediately is putting merchant names on your website. If you have permission that is a different story but I would not put merchants out there just cause they have a rating on Yelp.").

Despite this, Sunrise continued to allow GiftRocket to use the Yelp API and list businesses without consent, 56.1 ¶ 132, stating "at this time we can work with current website and amend the language to be more clear," including by adding disclaimer language. Ex. 194. Defendant Baum implemented some of the disclaimer language and changes to the website that Sunrise requested, but rejected other requests, such as the bank's request that GiftRocket put an asterisk next to the term "gift card." 56.1 ¶ 132.

This pattern continued throughout the relationship. Sunrise would point out that the website was clearly misleading consumers and propose corrective measures, including removal of the Yelp feed. But it always relented after pushback from Defendant Baum, instead accepting trivial changes to disclaimers and the website, which the bank knew were ineffective in stopping the

endless flow of customer confusion. 56.1 ¶¶ 135–157. To illustrate:

- January 2017: the disclaimer on the GiftRocket.com website was "not working as well as intended" and repeated customer and merchant complaints "demonstrate[d] how misleading the website appears to be for our customers." Ex. 15.

- January 2017: "bottom line, [GiftRocket] should not advertise it as a card **and not include business images or names they do not have express consent to use**." Ex. 24 (emphasis added).

- February 2017: disclaimer language "is not working as well as intended" and "ideally **we pull down the merchant suggestions.**" Ex. 170 (emphasis added).

- June 2017: "Did GiftRocket finally remove the links to Yelp for restaurant's?", and GiftRocket "continue[s] to have confusion." Ex. 25.

- September 2017: "more than 50% of complaints received this year are related to confusion about the product." Ex. 200.

- 2018: "Complaint trends have revolved around the following categories: customers that wanted or thought they had purchased a merchant branded gift card, customers that tried unsuccessfully to use their gift card as a gift card with a merchant, merchants asking to be removed from the Partner's site." Ex. 201.

- March 2018: "[GiftRocket] *feels like a bait and switch--I am going to tell you I am giving you a gift card, but really it is not*. . . . [GiftRocket] *of course do not want to change because only by including 'gift card' do they get to the top of the list in all the Google searches*." Ex. 100 (emphasis added).

- September 2018: "The change we need to see is to remove Gift Card to XYZ Merchant" because it "related to user confusion when a shopper browses by merchant and then the page header reads 'Buy Gift Card to ABC Company'. This is the same page that appears if a Google Search for ABC Company Gift Card is done – *which again we feel is misleading*…." Ex. 29 (emphasis added); *see* Sunrise Tr. 152:01-158:20.

The Bank did not require GiftRocket to make these corrective changes. In November 2018, Sunrise Banks finally requested that they "would like the word 'card' gone completely." Ex. 203. As usual, Defendant Baum resisted and Sunrise Banks ultimately ignored its compliance team's request and allowed GiftRocket to continue to use these phrases in search results and on its website, despite continued confusion. *See* 56. 1 ¶ 146. Because GiftRocket did not implement meaningful changers, in a "Complaint & Dispute Volume" quarterly report for October to December 2018,

Sunrise yet again observed "clear confusion of customers regarding what they are purchasing" and that "attempts at website changes **have made no impact on consumer understanding**." Ex. 16.

The trend of endless confusion continued throughout 2019, 2020, and 2021. 56.1 ¶¶ 149–154; *see* Ex. 134 (Sunrise' 2019 annual review of GiftRocket noted "consistent complaints regarding customer confusion" and "requested that the product no longer be referred to as a 'gift card' on the website or in any marketing material."). In March 2019, a Sunrise employee observed that despite minor website changes, "I think they will still have issues with retailers." Ex. 26. Her supervisor responded that "eventual removal of businesses" from the GiftRocket.com website "will be phase 2." *Id.*

But phase 2 never happened and GiftRocket continued to use other businesses on its website without their consent, even though Sunrise's compliance team continued to observe complaints about confusion through 2021. 56.1 ¶ 155. For instance, in December 2019, a compliance team member "noticed . . . GiftRocket [is] still receiving a large number of complaints regarding customers thinking they were buying an actual gift card, not what they actually got" and that this has "been an ongoing issue." Ex. 111; *see also* Ex. 126. In January 2021, a member of the compliance team stated that "As long as I have been in compliance, there been an issue with consumers not understanding how the GiftRocket [ ] products work." Ex. 17. And in May 2021, a member of the compliance team stated that "I still think we have a problem with this program advertising the product as a gift card when it is a money transmission service very light on the gift card piece…" Ex. 18.

Sunrise was also fully aware that Defendants' anemic and vague disclaimer language like that the "GiftRocket Gift Card is not accepted at any third party merchant" would not actually help mitigate confusion. *See* GR Defs' 56.1 ¶ 45. As a Sunrise compliance analyst explained:

> I feel like 'third-party merchant' will not be clear enough, in particular because they provide a third party merchant off to the right under Order Details. The purchaser may read this as they cannot use the card at any other merchant but Little Star Pizza. It should read more specifically like: The GiftRocket Gift Card is not sponsored by the merchant you suggested during the purchase process (if applicable).

Ex. 14. And as Defendants' own declarant witness explained at her deposition, in this context "you would need to be clearer than that" and tell consumers that "This is not a gift card to whatever business you're buying it for." Ex. 13, Benton Tr. 77:1-5. Of course, Defendants **never** implemented this type of language because it might have actually worked to alert customers that the GiftRocket was not an actual merchant-branded gift card, and customer confusion is what drove all of their sales. For years, Sunrise instead continued to allow GiftRocket to use the statement "XYZ Company Gift Card" in marketing, even though it was a "misrepresentation." Ex. 164, Ackerman Tr. 174:09-14.

### D. GiftRocket's marketing was deceptive and the disclaimers were ineffective.

As Sunrise repeatedly observed, the marketing language it allowed GiftRocket to use is obviously confusing. Consumers who read "Buy a [Business Name] Gift Card" and "Buy a gift card to [business name]," are likely to expect what the words say—that they're buying a putative Class Member's gift card. 56.1 ¶ 158. GiftRocket used this exact same phrasing in Google search results and the mobile version of its website the **entire time** it was in business. 56.1 ¶ 159.

In April 2019, GiftRocket modified the phrase "Buy Gift Card to [Business Name]" *only in the desktop version* of the website. 56.1 ¶ 156; GR Defts' 56.1 ¶ 40. With Sunrise's approval, GiftRocket changed the phrase to read "Buy a [Business Name] Gift." This false statement was juxtaposed near the repeated use of the phrase "gift cards," and did nothing to mitigate confusion.



*See, e.g.*, Ex. 6 ("I've bought the Watch Station egiftcard for my sister. It says clearly on your website: Buy a watch station gift.... She wants an e gift card that she can use at Watch station and this is really misleading."). Further, Sunrise Banks did not require changes to the mobile version of the website, even though the language is obviously equally misleading whether read on a desktop or a phone. Nor did it require further changes to the desktop version of the website, even after acknowledging that these minor changes in 2019 did not stop confusion. 56.1 ¶¶ 149–54. In fact, Sunrise approved of the April 2019 changes to the desktop version only *despite acknowledging GiftRocket "would still have issues with retailers"* and that *"they may have to fight with a few retailers." Exs.* 126, 204 (emphasis added)

And Sunrise also did not require GiftRocket to remove the metatags that caused the original misleading phrases to appear in Google search results. Given that upwards of 70% of GiftRocket's traffic originated from search results and GiftRocket's SEO search strategy, most of GiftRocket's consumers—even those viewing GiftRocket on the updated desktop version—would have first seen a search result advertising "Buy a [Business Name] Gift Card" and "Buy a gift card to [business name]":



*See* 56.1 ¶¶ 20, 162.

The reason the bank allowed rampant customer confusion to go unchecked despite its compliance department's concerns was simply money: pretending GiftRocket sold putative Class Members' gift cards was how GiftRocket—and, thus, the bank—made money. 56.1 ¶ 165. *See* Ex. 96, GR_0049698 (Defendant Kubic asking a longstanding GiftRocket employee "do we have any sort of page on GR letting business owners know where they can ask to have their business removed," and the employee responded, "we do not...i think this is essentially because that's how GR makes money."); Ex. 23 (Defendant Baum directing a GiftRocket employee to change language on Sunrise complaint logs describing consumer complaints of people who wanted "actual gift cards" to specific businesses but instead were tricked into buying a GiftRocket because "we're positioning our product as a gift card and don't want to detract from that.").

### E. Sunrise ends its partnership with GiftRocket unrelated to the endless flood of confused customers and angry businesses.

Sunrise Banks provided GiftRocket with a notice of termination on September 1, 2021. 56.1 ¶ 153. But Sunrise Banks continued to actively partner with GiftRocket until June 2022, and still held funds for GiftRocket through March 2023. 56.1 ¶ 96 Sunrise insists that it terminated the program due to GiftRocket's reconciliation issues and because of GiftRocket's shift to more corporate sales, and not because of the flood of complaints and concerns raised by its compliance department. 56.1 ¶ 164.

### F. Plaintiffs add Sunrise to this lawsuit.

Because of Sunrise Banks' extensive role in injuring Plaintiffs and the proposed class members, and based on what discovery revealed in the case, Plaintiffs moved to amend the complaint to add Sunrise Banks as a defendant. ECF No. 65 (PMC Letter); ECF No. 96 (Motion to Amend); First Amended Complaint, ECF No. 53, FAC ¶¶ 153–213 (detailing Sunrise Banks's role and extensive knowledge of GiftRocket's intentional deception of consumers).

Defendants opposed the motion, making some of the same arguments raised in their summary judgment briefing. Plaintiffs argued theories of direct, vicarious, and contributory liability, and Judge Scanlon rejected Defendants' futility arguments based on failing to allege a protectible mark. *Gracie Baked LLC v. GiftRocket, Inc.*, 2024 WL 5716217 (E.D.N.Y. Mar. 28, 2024) (Scanlon, J.). As Judge Scanlon observed, Defendants' authorities in opposition "either only address trademark infringement, trade dress infringement and trademark dilution claims, or the portions of these decisions on which Defendants rely address only those categories of claims." *Id.* at *3. Moreover, the one decision Defendants cited that "addresses a trademark infringement claim and an unfair-competition and false-designation-of-origin claim in tandem" was not "of course, [] binding on this Court." *Id.* at *3 & n.4. Judge Scanlon also recognized Plaintiffs' alternative theory "that they have alleged Sunrise's use of Plaintiffs' marks in commerce." *Id.* at *3.

## LEGAL STANDARD

In assessing a summary judgment motion, the court "must construe all the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in that party's favor' and against the motion." *Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931, at *5 (S.D.N.Y. Mar. 28, 2022) (cleaned up).

## ARGUMENT

### II.    Plaintiffs Have Article III Standing to Sue Sunrise Banks

### A.    Gracie Baked and Café Ole have Article III standing.

Sunrise Banks repeats the GiftRocket Defendants flawed standing arguments, contending that there is no injury and therefore no standing for Plaintiffs' Lanham Act claims because "no one ever saw the names Gracie Baked or WeCare on giftrocket.com" so "those entities simply cannot have been injured by the presence of their names." Mot. at 5.

This argument is both factually and legally incorrect. Evidence shows that consumers ran searches for Plaintiffs' business names and then clicked links to take them to the GiftRocket website. 56.1 ¶ 25, 90–91, 186. A reasonable inference is that those consumers did see Plaintiffs' business names on the GiftRocket website or, at a minimum, on the search results, which, because of the SEO metatags used by GiftRocket, contained the same false language stating that GiftRocket sold putative Class Members' gift cards. 56.1 ¶¶ 20, 89–92. Likewise, the fact that millions of people visited GiftRocket.com's website and that its SEO strategy was intentionally designed to get users searching for businesses like Plaintiffs to see search results misdirecting them to GiftRocket is further evidence that would support a finding that Plaintiffs' names were viewed in connection with the GiftRocket website, or at a minimum were highly likely to be viewed.

Plaintiffs therefore "face[] an imminent risk of injury—that is, a 'substantial risk that the harm will occur.'" *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 288 (2d Cir. 2023). *Controls Se., Inc. v. QMax Indus., Inc.*, 2024 WL 2163477, at *4 (W.D.N.C. May 14, 2024), directly rejects Defendants' flawed standing analysis. As here, the defendants there "argue[d] that [the plaintiff] cannot show injury and causation because [it] has not produced evidence from a single person or entity stating that it was confused or misled about [defendant's] product photos or marketing claims, that it relied on those photos or marketing claims in making a purchasing decision, or that any actual or prospective customer even viewed the photos and charts that CSI mined from QMax's website." *Id*. at *4. The Court rejected this argument, explaining that "[i]f, taking the facts and inferences in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Plaintiff's injury is 'actual <u>or</u> imminent,' Plaintiff's claim survives a summary judgment for lack of standing." *Id*. (emphasis original). The Court cited the plain language of Section 15 U.S.C. § 1125(a)(1), which "does not require evidence of <u>actual</u> financial injury, but

instead only a <u>likelihood</u> of injury." *Id.* (emphasis in original) (evidence of "likely" harm sufficient "to avoid summary judgment for lack of standing").[1]

## B. Dimensions Massage has standing to sue Sunrise.

As to Dimensions, it has standing for the same reasons as the other Plaintiffs. And there is even more direct evidence that a consumer saw its information misrepresented on the GiftRocket website, was deceived into buying a fake gift card, and later purchased a gift card from Dimensions but in a lesser amount. 56.1 ¶¶ 181–84. Sunrise Banks "does not concede" these are injuries sufficient to support standing, and finds it "hard to imagine any harm flowed from this," Mot. at 7, despite years of warning GiftRocket that exactly these types of harms were likely to be caused by its deceptive marketing and suggesting that GiftRocket make changes to address it.

Regardless of what Sunrise concedes or can imagine, it is undisputed that a customer wanted to patronize Dimensions' business, but Defendants tricked her into spending $100 on GiftRocket.com. 56.1 ¶ 182–84. The harm caused by GiftRocket's diverting a Dimensions Massage customer and selling her a fake giftcard to the business is not erased by refunding it. Dimensions was harmed (a) by the loss of control over its reputation and business name, including the perceived association with a scam website like GiftRocket; (b) by the negative experience for its customer, and the time Dimensions had to spend to address the situation and investigate Defendants' scheme; and (c) by the loss of at least $10 in business—because the customer spent less money ($90 versus $100 plus fees) when she purchased an actual Dimensions giftcard after her negative experience with GiftRocket. 56.1 ¶ 187. These injuries could only have been caused by the misleading language on GiftRocket's website (the only place its product is sold). And it is

---

[1] The Court also cited *De Simone v. VSL Pharm., Inc.*, 395 F. Supp. 3d 617, 628 (D. Md. 2019), *aff'd in relevant part*, 847 F. App'x 174 (4th Cir. 2021) ("[T]he statute permits false advertising actions based on the threat of injury alone .... proof of injury or likelihood of injury does not require proof of actual damages.")

not necessary to identify the exact misleading language that GiftRocket used to trick the customer into making the purchase—particularly when the record contains mountains of evidence concerning what language on the website confused customers and a reasonable juror can easily conclude that this customer was confused in the same way by the same stock language.

Sunrise's (and the GiftRocket Defendants') argument only goes to the *amount* Dimensions might recover in this matter—not whether it was injured in the first place. For disgorgement, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only." 15 U.S.C. § 1117(a). Dimensions can point to the sale of a fake gift card in its name. Defendants can then point to evidence of the refund to carry its burden to show a deduction, and the court, in its equitable discretion, can disallow the deduction or nonetheless still enhance the disgorgement award to deter Sunrise's wilful misconduct. *See, e.g.*, *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 213–14 (2d Cir. 2019).

Sunrise also argues that despite years of supporting the GiftRocket scam, Dimensions' injury is not fairly traceable to Sunrise because "[b]y the time of that transaction, Sunrise Banks no longer had any role monitoring or reviewing the GiftRocket website or customer complaints. And another bank—not Sunrise Banks—supported the sale and distribution of new GiftRocket prepaid gifts." *See* Mot. at 13. This language is carefully crafted to avoid mentioning that at the time of the transaction, Sunrise was ***still*** holding funds for GiftRocket and paying breakage revenue to GiftRocket. 56.1 ¶ 96. And it ignores that GiftRocket was only able to establish and grow its scam operations because Sunrise supported it for years, and only able to continue its scheme because Sunrise never required it to implement effective changes to its website and instead facilitated the transfer of operations to another bank, knowing the GiftRocket scam would continue to damage businesses like Plaintiff Dimensions.

Dimensions easily satisfies the fairly-traceable standard: it "requires no more than *de facto* causality, a standard that is, of course, lower than for proximate causation," and can also be met when a defendant's acts "had a 'predictable effect' on the decisions of relevant third parties." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 353 (2d Cir. 2023) (citations omitted). Causation for the purposes of standing also exists where even if a defendant's acts were not the "very last step in the chain of causation," where a defendant's acts had a "determinative or coercive effect upon the action of someone else who directly caused the claimed injury." *Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010) (citations and quotations omitted). That is because "[c]ausation turns on the degree to which the defendant's actions constrained or influenced the decision of the final actor in the chain of causation." *McCabe v. Nat'l Presto Indus., Inc.*, 2025 WL 2371080, at \*3 (E.D.N.Y. Aug. 14, 2025).

Dimensions was founded in December 2019 and listed on Yelp around the same time. 56.1 ¶ 24. Because it was on Yelp, it would have been listed on the stock GiftRocket.com webpages and stock SEO search results for years while Sunrise was GiftRocket's "critical" banking partner. Sunrise's argument that it has no "determinative or coercive" effect on GiftRocket's ability to operate after June 2022 is not supported by the record. Sunrise was "critical" to GiftRocket's business and continued to work with GiftRocket to maintain aspects of the business even after the transition, including in October 2022. 56.1 ¶ 96. Sunrise knew that GiftRocket's website was misleading and created "UDAAP concerns," but never stopped GiftRocket and instead helped it smoothly transition to another bank so that it could continue to deceive consumers. And Sunrise still held balances on outstanding GiftRocket gifts through March 2023, months after the Dimensions GiftRocket purchase, yet another way in which it both profited from and supported GiftRocket's ongoing existence and continued deception of consumers. 56.1 ¶ 96.

Dimensions can therefore "fairly trace" its injury—the sale in December 2022 of the "gift card"—to the years of Sunrise Banks allowing GiftRocket to use misleading and false language regarding the sales of putative Class Member gift cards, despite the bank's compliance teams' *years* of raising concerns about GiftRocket's confusion. Sunrise's years-long partnership and permissive attitude allowing GiftRocket to grow its business and intentionally deceive the public had a predictable or determinative effect that a potential Dimensions' customer would actually be misled and spend funds at GiftRocket instead. *See Carver,* 621 F.3d at 227 (standing to sue where injury was caused by a defendant's "prior conduct"). And the sale was made at a time when Sunrise was still supporting the GiftRocket business, even if in a more limited capacity. All Plaintiffs have shown injuries sufficient to maintain standing, and Dimensions has shown additional evidence of injury that is fairly traceable to Sunrise.

III.    **Sunrise Misunderstands False Advertising Injury**

A.      **The record shows Sunrise was an actual or likely cause of Plaintiffs' injuries.**

Sunrise also repeats the GiftRocket Defendants' flawed factual and legal arguments regarding the supposed lack of false advertising injury. *See* Mot. at 7-8. Sunrise's argument that "Plaintiffs cannot rely on their own assertions of reputational injury alone," Mot. at 8, ignores the evidence that individuals saw Gracie Baked and WeCare on GiftRocket.com and in search results, and that people were also likely to have seen them in search results given GiftRocket's SEO strategy. *See, e.g.,* 56.1 ¶ 162. Thus, unlike *Souza*, there is evidence "'in the record to suggest that'" a customer "'saw the posts in question, or was likely to see the posts.'" *See* Mot. at 10 (quoting *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 120 (2d Cir. 2023)).

The evidence of injury to Dimension is even stronger. It is undisputed that a Dimensions customer visited the GiftRocket website and attempted to purchase a Dimensions gift card.

Dimensions lost a sale the moment the customer bought a GiftRocket falsely believing it could be used at Dimensions. That Defendants ultimately refunded the customer the purchase amount— after Dimensions was further injured when it had to expend time and resources trying to mitigate the reputational damage of being falsely affiliated with GiftRocket and investigating GiftRocket's misuse of its business information—does not erase the injury. Further, the GiftRocket was for $100 (plus fees) while the customer only spent $90 at Dimensions after interacting with GiftRocket. 56.1¶ 187.

Sunrise played a role even though it was in the process of winding down its relationship with GiftRocket. Because of the improper use of Class Members' actual Yelp profiles at the time of the transaction, a reasonable juror could conclude that Dimensions was listed on GiftRocket.com while Sunrise was still an active participant in the scheme, and while Sunrise continued to support aspects of the business in December 2022. Sunrise is therefore the "proximate cause" of Dimension's injury, as the injury "has a sufficiently close connection to the conduct the [Lanham Act] prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) In other words, Dimensions' injury was the "expected, natural or foreseeable consequences of [Sunrise's] wrongful conduct. *See Graybill v. City of New York*, 247 F. Supp. 2d 345, 351 (S.D.N.Y. 2002) (citing, *inter alia*, *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir.1986)). And "[i]t is not necessary that the misconduct of two or more tortfeasors be simultaneous. One defendant may create a situation upon which the other may act later to cause the harm." *Mazyck v. Long Island R. Co. (LIRR)*, 896 F. Supp. 1330, 1333 (E.D.N.Y. 1995) (court's alteration) (citation and quotations omitted). Sunrise foresaw that GiftRocket's website would cause the type of harm that was suffered by Dimensions, yet it supported GiftRocket anyway.

Plaintiffs thus need not rely on any presumption of false-advertising injury, contrary to

Defendants' contentions. Mot. at 11. That said, the logic of presumption applies perfectly here. Selling (falsely) a Class Member's giftcard is clearly a form of "direct competition"; GiftRocket is purporting to sell a product that would normally always generate profit for the business, and in doing so self-evidently diverts a sale away from the Class Member. *See, e.g.*, *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259–61 (2d Cir. 2014) (discussing rationale behind limiting the presumption to "[a] misleading comparison to a specific competing product," which is to "ensure that a plaintiff's injury is not speculative," and explaining that where "a plaintiff has met its burden of proving deliberate deception in the context of a two-player market, it is appropriate to utilize a presumption of injury. This is the case even if it is not a classic instance of comparative advertising … [because] utilization of a presumption of injury carries no risk of speculative injury") (citation omitted). Because Defendants stole Class Member customers by passing off their product as Class Members' own gift cards, the presumption should apply.

## IV. Plaintiffs Suffered Reputational Injury

Each Plaintiff also testified about their knowledge of Sunrise and its role in harming them. 56.1 ¶¶ 177, 179, 188. Plaintiffs have also shown reputational injury by being associated with a website with negative reviews. This is not speculative—GiftRocket Defendants themselves repeatedly acknowledged that GiftRocket's negative reviews and online reputation for a "scam" caused Defendants to lose potential business partners. 56.1 ¶¶ 69–72, *see, e.g.* Ex. 103 (discussing GiftRocket has "so many bad reviews" which has resulted in Tremendous losing deals). This is a "commercial interest" in reputation. *See Souza*, 68 F.4th at 119.

And Sunrise concedes that loss of control of reputation at least suffices for Plaintiffs' false affiliation claim. *See* Mot. at 13. But Sunrise repeats its mistaken view of the record, claiming that "[t]here is no evidence that any of that ever actually or probably happened." *See id.* Once again,

the record shows users would have gone to GiftRocket.com after seeing Plaintiffs in search results, and that Defendants' public website was designed to make this happen. 56.1 ¶ 162 And incredulously, Sunrise claims "there is no admissible evidence in the record about that customer's, or any other customer's, confusion over a potential affiliation between Dimensions Massage and GiftRocket." *Id.* But a reasonable juror can conclude, based on GiftRocket.com's operation and its intentional misstatements that the Dimensions customer was likely confused. Or they can take that customer's word for it. Ex. 208 ("[T]he place I purchased this for says they are not associated with you."); *see* F.R.E 803(3) (state of mind exception to hearsay).

## V. Sunrise Banks' Additional Arguments Fail

Sunrise Banks lastly "joins" the GiftRocket Defendants' arguments about a protectable mark, which fail for the same reasons stated in Plaintiffs' opposition to the GiftRocket Motion. *See* Mot. at 13-14. As to injunctive relief, while it is still warranted against the GiftRocket Defendants, Plaintiffs no longer seek such relief against Sunrise as discovery has shown the Bank would be unable to easily recreate the scheme on its own without any assistance from the GiftRocket Defendants. Therefore, an injunction against the GiftRocket Defendants should provide sufficient protection against any further harm caused by Sunrise Banks.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant Sunrise Bank's Motion for Summary Judgment.

Respectfully submitted,

By: */s/ Raphael Janove*
Raphael Janove
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law


Liana Vitale
**JANOVE PLLC**
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
(805) 505-9550
liana@janove.law

Dated: January 20, 2026

Matthew Weinshall (Admitted *pro hac vice*)
Dayron Silverio (Admitted *pro hac vice)*
**PODHURST ORSECK, P.A.**
2525 Ponce de Leon Blvd., Ste. 700
Coral Gables, FL 33134
(305) 358-2800
mweinshall@podhurst.com
dsilverio@podhurtst.com


*Attorneys for Plaintiffs and the Proposed Classes*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(c), I hereby certify that this brief contains 6,371 words, including footnotes but excluding text specified in Rule 7.1(c).

Dated: January 20, 2026

*/s/ Raphael Janove*

Raphael Janove