# EXHIBIT 13

## Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF NEW YORK
 3  _____
 4  GRACIE BAKED LLC, WECARE RG, INC., and
 5  MILLERCOBB LLC, on behalf of themselves
 6  and all others similarly situated,
 7       Plaintiffs,     Case No.:
 8       v.              22-CV-4019 (RPK)(VMS)
 9  GIFTROCKET, INC., TREMENDOUS, INC.,
10  NICHOLAS BAUM, KAPIL KALE, JONATHAN
11  PINES, BENJAMIN KUBIC, SUNRISE BANKS,
12  N.A., GIFTROCKET, LLC, TREMENDOUS LLC,
13  And TREMENDOUS PARENT, INC.,
14       Defendants.
15  _____
16            VIDEOTAPED DEPOSITION
17  _____
18  WITNESS:       TERI HODGETT
19  DATE:          Thursday, February 13, 2025
20  START TIME:    8:06 a.m., PT
21  END TIME:      2:36 p.m., PT
22  REMOTE LOCATION:    Remote Legal platform
23  PROCEEDINGS OFFICER:   Kindel McDermott, CDR-3527
24  JOB NO.:       33498
25            CONFIDENTIAL
```

## Page 2

```
 1            A P P E A R A N C E S
 2
 3  JANOVE PLLC
 4  500 7th Avenue
 5  Eighth Floor
 6  New York, New York 10018
 7  By:  LIANA VITALE, ESQUIRE
 8       liana@janove.law
 9  Appearing for Plaintiffs
10
11  GREENE ESPEL PLLP
12  222 South 9th Street
13  Suite 2200
14  Minneapolis, Minnesota 55402
15  By:  GINA TONN, ESQUIRE
16       gtonn@greeneespel.com
17  Appearing for Defendant, Sunrise Banks, N.A.
```

## Page 3

```
 1       A P P E A R A N C E S (Continued)
 2
 3  DTO LAW
 4  307 5th Avenue
 5  12th Floor
 6  New York, New York 10016
 7  By:  GRACE E. SCHMIDT, ESQUIRE
 8       gr@dtolaw.com
 9  Appearing for Defendants, GiftRocket Inc.,
10  Tremendous, Inc., Nicholas Baum, Kapil Kale,
11  Jonathan Pines, Benjamin Kubic, GiftRocket, LLC,
12  Tremendous LLC, and Tremendous Parent, Inc.
13
14  ALSO PRESENT:
15    Andrew Toftey, Observer, Sunrise Banks In-house
16    Counsel
```

## Page 4

```
 1            INDEX OF TESTIMONY
 2
 3  EXAMINATION OF TERI HODGETT:          PAGE
 4    By Ms. Vitale                        10
 5    By Ms. Schmidt                      207
```

Page 5

INDEX OF EXHIBITS

(available for download)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 190 | Notice of Deposition | 11 |
| 191 | Gift Transfer Program Agreement | 34 |
| 192 | First Addendum to Gift Transfer | 37 |
| 193 | Second Addendum to Gift Transfer | 37 |
| 194 | Third Addendum to Gift Transfer | 39 |
| 195 | Fourth Addendum to Gift Transfer | 40 |
| 196 | Fifth Addendum to Gift Transfer | 46 |
| 197 | Email from Nicolas Baum 8/20/2017 | 114 |
| 198 | Email from Nancy Degen 11/14/2017 | 128 |
| 199 | Email from Allison Koenig 3/16/2018 | 146 |
| 200 | Email Allison Koenig 3/16/2018 | 147 |
| 201 | Email from Aubrey Brosz 9/21/2018 | 151 |
| 202 | Email from Jeannie Bauer 11/26/2018 | 159 |
| 203 | Email from Mark Brown 3/18/2019 | 170 |
| 204 | Email from Aubrey Brosz 3/21/2018 | 178 |
| 205 | Email from Teri Hodgett 3/18/2019 | 182 |
| 206 | Email from Tyler Seydel 1/11/2022 | 196 |

Page 6

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties that the presence of the Referee be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved until the time of trial;

IT IS FURTHER STIPULATED AND AGREED that this deposition may be utilized for all purposes as provided by the Federal Rules of Civil Procedure;

AND FURTHER STIPULATED AND AGREED that all rights provided to all parties by the Federal Rules of Civil Procedure shall not be deemed waived and the appropriate sections of the Federal Rules of Civil Procedure shall be controlling with respect thereto.

Page 7

FEDERAL REMOTE STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys of record for all parties to the above-entitled action, that:

Pursuant to Rule 30(b)(4) of the Federal Rules of Civil Procedure, this deposition will be conducted by remote videoconference with the oath being administered remotely and a court reporter creating an accurate written record; that, if necessary, the parties agree that each witness can be identified with picture identification;

No attorney, nor any party or witness, shall capture any still photographs, nor record, by video or audio, any part of these deposition proceedings;

Each attorney agrees to instruct their witness that there is to be no communication with anyone outside of the identified and participating group, by chat, text, email, or other means during the deposition;

There shall be no other person in the room with the witness during their deposition;

Any phone or electronic device in the room with a witness shall be identified and not read, referred to, or otherwise used during the witness' deposition, unless agreed to by all counsel on record.

Page 8

PROCEEDINGS

THE PROCEEDINGS OFFICER: Good morning. We are now on the record. Today's date is February 13, 2025. The time is approximately 8:06 a.m., Pacific Time.

My name is Kindel McDermott, and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the deposition of Teri Hodgett, taken in the matter of Gracie Baked LLC, et al., versus GiftRocket, Incorporated, et al., Case Number 22-CV-4019 (RPK) (VMS), filed in the United States District Court, Eastern District of New York.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing attorney.

MS. VITALE: Liana Vitale, Janove PLLC, for Plaintiffs.

MS. TONN: Gina Tonn, Greene Espel PLLP, on behalf of Defendant, Sunrise Banks.

MS. SCHMIDT: Grace Schmidt, DTO Law, on behalf of all of the defendants except for Sunrise Banks.

THE PROCEEDINGS OFFICER: Thank you.

Page 9

1  This deposition is being taken remotely
2  on behalf of the plaintiff and is being conducted
3  pursuant to the procedural rules and laws governing this
4  matter.
5  As such, all parties agree to this means
6  of capturing the official record, which may include
7  recording by audio, audiovisual, and/or stenographic
8  means, and agree not to oppose admissibility of the
9  testimony in this proceeding on the basis of the
10 personnel or method by which the testimony was captured.
11 Further, all parties agree that the
12 deposition officer or person administering the oath may
13 be authorized to administer the oath under the rules
14 where they reside.
15 Do the parties so stipulate?
16 MS. VITALE:  Plaintiffs agree.
17 MS. TONN:  Yes.  On behalf of Sunrise
18 Banks, we agree as well.
19 MS. SCHMIDT:  Yes, on behalf of the
20 remaining defendants.
21 THE PROCEEDINGS OFFICER:  Thank you.  I
22 will now swear in the witness.
23 Ms. Hodgett, please raise your right
24 hand.
25 Please state and spell your name for the

Page 10

1  record.
2  MS. HODGETT:  Teri Hodgett, T-E-R-I H-O-
3  D-G-E-T-T.
4  THE PROCEEDINGS OFFICER:  Do you swear or
5  affirm the testimony you are about to give will be the
6  truth, the whole truth, and nothing but the truth?
7  MS. HODGETT:  I do.
8  WHEREUPON,
9  T E R I  H O D G E T T,
10 having been called as a witness, being duly sworn by the
11 notary public present, testified as follows:
12 THE PROCEEDINGS OFFICER:  Thank you.
13 Ma'am, you may put your hand down.
14 And Counsel, we're ready to begin.
15 MS. VITALE:  Thank you.
16 EXAMINATION
17 BY MS. VITALE:
18 Q  Good morning.  You heard earlier, my name is
19 Liana Vitale.  We represent Plaintiffs in this
20 litigation.  You already stated your full name for the
21 record, so I won't ask you to repeat it.  Who else is
22 physically in the room with you today?
23 A  At this moment, just my attorney, Gina Tonn.
24 Q  Just you and Gina.
25 A  Yes.

Page 11

1  Q  And just we talked about earlier, we're
2  anticipating that another person from Sunrise may enter
3  the deposition at some point and they will identify
4  themselves, correct?
5  A  That is correct.
6  Q  And normally, I would ask you if you have a
7  cell phone, and I would ask you to turn it off, but my
8  understanding is that you have a situation today that
9  makes that difficult.  But are you able to put it out of
10 reach and agree not to consult it during the
11 questioning?
12 A  Yes.  I do.
13 Q  Have you been deposed before?
14 A  No.  I have not.
15 MS. VITALE:  Sam, can you please put up
16 as Exhibit 1 the notice of deposition?  Sorry.  It's
17 going to be Exhibit 190.  We've been trying to establish
18 non-overlapping exhibits, so we will start where we left
19 off previously.
20 (Exhibit 190 marked for identification.)
21 BY MS. VITALE:
22 Q  Have you seen this document before?
23 A  Just looking.  Yes.  I have seen this
24 document.
25 Q  What is it?

Page 12

1  A  This is the topics that Plaintiffs' counsel
2  has requested I be deposed on, is my understanding.
3  Q  Do you understand that you're here today to
4  testify on behalf of Sunrise Banks, the corporate
5  entity, as a 30(b)(6) witness?
6  A  Yes.  I do.
7  Q  And are you prepared to testify on all of the
8  topics listed in the notice, Exhibit 190?
9  MS. TONN:  Objection to form.  I would
10 just object to the extent that there are stated
11 objections and pending motion to compel on these topics.
12 THE WITNESS:  I am prepared to testify to
13 the topics that our counsel has agreed.
14 BY MS. VITALE:
15 Q  Which topics are you not prepared to testify
16 about today?
17 MS. TONN:  Objection to form.
18 THE WITNESS:  There -- I believe it would
19 be any topics that our legal counsel did not agree to
20 provide a witness to testify.  I believe -- I don't
21 remember exactly without the other document with the
22 responses in front of me, but some of the -- the later
23 topics.  I think 28, 27.  Those are the ones I remember.
24 BY MS. VITALE:
25 Q  Okay.  And there may be others, but they would

Page 25

1  Q   Is it effectively a money transfer?
2  A   **Effectively, yes, it is a transfer.**
3  Q   And so at some point in time, someone at
4  Sunrise said, This is the wrong department, and
5  GiftRocket was moved into the national products
6  department; is that correct?
7       MS. TONN: Objection to form.
8       THE WITNESS: That is my understanding of
9  what happened. Yes.
10 BY MS. VITALE:
11 Q   What is the national products department?
12 A   **So our national products department oversees**
13 **various relationships we have with fintech companies,**
14 **prepaid card companies, certain lending companies, where**
15 **we have to have a stronger oversight of those activities**
16 **because we are typically the issuer of cards or the**
17 **creditor on the loan.**
18 Q   Why does Sunrise need to have stronger
19 oversight when it's the issuer of a card?
20      MS. TONN: Objection to form.
21      THE WITNESS: Because we have a third
22 party involved in offering that product. So the
23 regulatory standards are that we have -- we have to
24 oversee our third parties and their actions and process
25 with that because they are offering -- or they are

Page 26

1  engaged in that product. And so we have to ensure, just
2  like we would our own products, that all rules are being
3  complied with.
4  BY MS. VITALE:
5  Q   And so in the relationship that we're talking
6  about with GiftRocket, GiftRocket is the third party
7  that you're referring to; is that correct?
8  A   **That is correct.**
9  Q   What product did GiftRocket sell?
10      MS. TONN: Objection to form.
11      THE WITNESS: GiftRocket had a gift
12 product that allowed consumers to send money to another
13 individual as a gift.
14 BY MS. VITALE:
15 Q   Did GiftRocket sell a gift card?
16      MS. TONN: Objection to form.
17      THE WITNESS: Eventually. I -- I'm not
18 sure what year it started, but eventually GiftRocket did
19 offer a gift card as a redemption option for the
20 individual redeeming the gift. But that card was not
21 issued through Sunrise Banks.
22 BY MS. VITALE:
23 Q   Did GiftRocket sell a gift card that could be
24 purchased from money on its website?
25      MS. TONN: Objection to form.

Page 27

1       MS. SCHMIDT: Same objection.
2       THE WITNESS: I'm sorry. Could you
3  repeat that? That could be purchased on its website?
4  Is that what you said?
5  BY MS. VITALE:
6  Q   Yeah. I'm just trying to understand. I asked
7  you, did GiftRocket sell gift cards? And you answered
8  by telling me that there was a gift card redemption
9  option at some point in time that came into play on the
10 website.
11      And I'm trying to ask you separate from this
12 redemption option that eventually came into play, right,
13 like assuming that by sale of a gift card, I'm not
14 talking about a redemption option because that's
15 something else. I'm just asking, did GiftRocket sell a
16 gift card?
17      MS. TONN: Objection to form.
18      THE WITNESS: GiftRocket did not sell an
19 actual gift card that I'm aware of.
20 BY MS. VITALE:
21 Q   How did people buy the GiftRocket product?
22      MS. TONN: Objection to form.
23      MS. SCHMIDT: Objection.
24      THE WITNESS: So consumers would go on to
25 GiftRocket's website. They would -- they could make a

Page 28

1  suggestion as to where they wanted the receiver of that
2  gift to purchase the money. The money would come to
3  Sunrise. They'd pay for that gift.
4       And then the redeemer, they had options.
5  They could send a physical greeting card with the
6  information on how to redeem, an email, possibly a print
7  option. I can't remember all of the different ways that
8  got sent to the -- to the recipient.
9  BY MS. VITALE:
10 Q   And you alluded to this, but what was Sunrise
11 Banks' role in that transaction?
12 A   **Sunrise's role was to facilitate the movement**
13 **of the money.**
14 Q   What do you mean by "facilitate the movement
15 of the money"? Can you describe more precisely what was
16 done by Sunrise Banks?
17      MS. TONN: Objection to form.
18      THE WITNESS: So the -- Sunrise was --
19 when the purchaser made the purchase, the money would
20 come in to Sunrise-owned account. When a redeemer
21 wanted to redeem the funds, Sunrise would send the money
22 out either to the redeemer, to their bank account, or to
23 what other -- whatever other option they chose to redeem
24 those funds.
25      So we facilitated that typically ACH

Page 29

1  transaction as the originating depository institution.
2  BY MS. VITALE:
3  Q   What if the recipient never received -- never
4  -- I'm sorry.  Strike that.
5       What if the recipient never redeemed the gift?
6  What happened then with the funds?
7       MS. TONN:  Objection to form.
8       THE WITNESS:  My understanding is the
9  gift expired after three years.  I am not sure if we
10 escheated those funds to the state.
11 BY MS. VITALE:
12 Q   When you say "I am not sure if we escheated
13 those funds to the state," do you mean you think that
14 happened or you have no idea what happened to those
15 funds?
16      MS. TONN:  Objection to form.
17      THE WITNESS:  I do not know what happened
18 to those funds.  I just know that typically, when we
19 have unredeemed gifts, it varies by state, but typically
20 they are escheated to the state as unclaimed property.
21 BY MS. VITALE:
22 Q   Is it possible that they went to GiftRocket
23 instead?
24      MS. TONN:  Objection to form.
25      THE WITNESS:  I don't know the answer to

Page 30

1  that question.
2  BY MS. VITALE:
3  Q   Who would know the answer to that question?
4       MS. TONN:  Objection to form.
5       THE WITNESS:  Somebody in our fintech
6  operations may know the answer to that question.
7  BY MS. VITALE:
8  Q   Is there a specific person you would ask if
9  you wanted to know the answer to that question?
10 A   There is.
11 Q   Who is that person?
12 A   I would ask Michael Christians.
13 Q   Is it correct to say that Sunrise Banks was
14 the issuer of the GiftRocket product?
15 A   We did consider ourselves the issuer of that
16 product.
17 Q   What does it mean to be the issuer in that
18 context?
19 A   In this case, because we are a bank and we
20 have the ability to transmit money, it was facilitating
21 the -- again, the money movement, the purchase by the
22 consumer, and then getting that money to the recipient.
23 Q   Is it also correct to say that Sunrise Banks
24 was the sponsor of the GiftRocket product?
25 A   We do use the word "sponsor" internally.  It's

Page 31

1  a standard term that we use in particularly the prepaid
2  space.
3  Q   Is there a difference in meaning between
4  issuer and sponsor in this context?
5  A   In this context, they would both mean that we
6  were the one transmitting the money.
7  Q   Is there any reason why Sunrise would prefer
8  one term over the other?
9  A   No.  There isn't.
10 Q   Did you testify that Sunrise holds the funds
11 until the recipient redeems the GiftRocket?  Is that
12 correct?
13 A   That is correct.  We hold the funds in an
14 account.  A holding account is what we call it, I
15 believe.
16 Q   Who owns those funds?
17      MS. TONN:  Objection to form.
18      THE WITNESS:  Sunrise Banks is the owner
19 of those funds.
20 BY MS. VITALE:
21 Q   Does Sunrise assume risk on each GiftRocket
22 transaction?
23      MS. TONN:  Objection to form.
24      THE WITNESS:  I would say it depends on
25 the type of risk that you're talking about.  Banks are

Page 32

1  subjected to all different kinds of risks.  There's ACH
2  risk, regulatory risk.  It would depend on the specific
3  risk you're referring to, whether it applied to each
4  individual transaction.
5  BY MS. VITALE:
6  Q   That was going to actually be my question to
7  you, which was, what type of risks?  So based on your
8  response, is it correct to say that Sunrise does assume
9  risk on each GiftRocket transaction?
10      MS. TONN:  Objection to form.
11      THE WITNESS:  Again, I would say
12 depending on the type of risk, there is risk with each
13 transaction.  But it would -- again, it would depend on
14 the specific type of risk that we're referring to.
15 BY MS. VITALE:
16 Q   What type of risk does Sunrise assume on each
17 GiftRocket transaction?
18      MS. TONN:  Objection to form.
19      THE WITNESS:  I would say each
20 transaction specifically, we do have ACH risk, just in
21 the -- in the sense that the funds are in the bank and
22 the ACH file is completed correctly and we're complying
23 with NACHA rules.
24 BY MS. VITALE:
25 Q   I'm sorry.  What was the last -- what rules?

Page 69

1  complexity of regulations.
2  BY MS. VITALE:
3      Q    And my question is just whether a higher
4  number and higher complexity correlates to a higher
5  level of risk.
6          MS. TONN:  Objection to form.
7          THE WITNESS:  Generally, higher
8  complexity could apply to -- apply a higher level of
9  risk, but it is not just one factor that determines that
10 risk.  It's looking at the product overall, and the
11 relationship.
12 BY MS. VITALE:
13     Q    You also mentioned the sort of amount of
14 reliance on the third party to comply with the
15 regulations is a factor that Sunrise Banks would
16 evaluate; is that correct?
17         MS. SCHMIDT:  Objection to form.
18         THE WITNESS:  That is correct.  And
19 that's typically based on the type of product that's
20 being offered.
21 BY MS. VITALE:
22     Q    And is it correct to say that the more Sunrise
23 Banks has to rely on the third party to comply with
24 regulations, the higher the risk?
25         MS. TONN:  Objection to form.

Page 70

1          THE WITNESS:  Yes.  The way that risk
2  assessment was structured at the time, there are certain
3  regulations and requirements that we are dependent on
4  the third party for.  So those typically had a higher
5  risk rating than others.
6  BY MS. VITALE:
7      Q    Do you know if Sunrise Banks ever provided
8  policies or operating procedures to GiftRocket?
9      A    I can't say specifically on GiftRocket at the
10 time of origination, but our risk team does have various
11 procedures and guidelines that we do provide to our
12 partners that I -- I know was provided to GiftRocket
13 over the course of the relationship.
14     Q    What type of policies and procedures did
15 Sunrise Banks provide to GiftRocket over the course of
16 the relationship?
17     A    So I know we would have provided a complaint
18 procedure resolution, and we would have provided guides
19 on monitoring for anti-money laundering, potentially
20 some other ones.  Those are -- those are the ones that
21 are probably most applicable to GiftRocket that I can
22 think of off the top of my head.
23     Q    Did Sunrise Banks require GiftRocket to follow
24 the policies and procedures that Sunrise Banks provided
25 to it?

Page 71

1          MS. TONN:  Objection to form.
2          MS. SCHMIDT:  Same objection.
3          THE WITNESS:  We do require our partners
4  to comply and follow the guide -- the guides that we
5  provide to them.
6  BY MS. VITALE:
7      Q    What does Sunrise Banks do, if anything, to
8  check whether its partners are following the guides that
9  are provided to them?
10         MS. TONN:  Objection to form.  And object
11 to outside the scope, to the extent it's not about
12 GiftRocket.
13 BY MS. VITALE:
14     Q    Yeah.  I'll -- actually, here, I'll address
15 that by saying, do you know, with respect to GiftRocket
16 specifically, what did Sunrise Banks do to check whether
17 GiftRocket was following the guides that were provided
18 to them by Sunrise Banks?
19         MS. SCHMIDT:  Objection to form.
20         MS. TONN:  Same objection.
21         THE WITNESS:  We have various oversight
22 and review procedures that we would have had over
23 GiftRocket.  It would have included annual reviews of
24 the program as a whole.  Annual or potentially more
25 frequent website reviews.  We review marketing material.

Page 72

1  We review complaints.  And those are, I'd say, the main
2  -- the main points of what we would look at.
3  BY MS. VITALE:
4      Q    Who at Sunrise Banks was responsible for
5  performing those reviews?  Was it the same person for
6  all of them or the same department?
7          MS. TONN:  Objection to form.
8          THE WITNESS:  All of the reviews that I
9  mentioned were done by the compliance team.
10 BY MS. VITALE:
11     Q    You said there's an annual review of the
12 program as a whole; is that correct?
13     A    That is correct.
14     Q    What does that review encompass?
15     A    It depends on the product.  For GiftRocket, in
16 general, it would include a review of GiftRocket's
17 policies and procedures.  We would include transaction
18 testing.  So following the purchase of a gift from
19 purchase to redemption, to understand that process.  I'd
20 say those are the main things specifically for the
21 GiftRocket program in that annual review specifically.
22 AML, anti-money laundering processes as well.
23     Q    Is it correct to say that Sunrise Banks
24 performed that annual review for every year that it did
25 business with GiftRocket?

19 (73 - 76)

CONFIDENTIAL

Page 73

1  A  I believe -- and I'd have to verify. I
2  believe we did not do a review in 2021 because that
3  program was winding down. But generally, every year we
4  would have done that review.
5  Q  And that review would have been conducted by
6  the compliance team?
7       MS. TONN: Objection to form.
8  BY MS. VITALE:
9  Q  Is that correct?
10  A  The annual review is performed by the
11  compliance team. Yes.
12  Q  How long would it take the compliance team to
13  perform an annual review on GiftRocket, generally
14  speaking?
15  A  I would say it depends on how quickly we
16  received the documents, and if there were follow-up
17  questions. I would say in general, an annual review can
18  take anywhere from two to six weeks.
19  Q  How many hours would be approximately spent by
20  Sunrise Banks' employees working on that annual review?
21  A  If I had to estimate -- and I don't have the
22  numbers in front of me. If I had to estimate for
23  GiftRocket specifically, maybe 40 hours. That's just an
24  estimate.
25  Q  Do you know whether the GiftRocket annual

Page 74

1  reviews typically took more or less time than other
2  annual reviews?
3       MS. TONN: Objection to form. And
4  outside the scope.
5       MS. SCHMIDT: Objection to form.
6       THE WITNESS: I do not know specifically
7  how long GiftRocket reviews took.
8  BY MS. VITALE:
9  Q  Right. I understand that, and I'm just asking
10  you for a rough estimation. But my question was
11  actually just how they compared to other reviews. Like,
12  regardless of how long each of them took, do you have
13  any understanding of whether the time spent on their
14  reviews was average, less than average, or above
15  average?
16       MS. TONN: I'll object to scope again.
17       MS. SCHMIDT: Objection.
18       MS. TONN: You can answer if you know in
19  your personal capacity.
20       THE WITNESS: As compared to other annual
21  review -- annual reviews for other partners, again, it
22  would depend on the product. I would say GiftRocket may
23  be on the lower side just because there's a lot of regs
24  that don't apply to GiftRocket that apply to some of our
25  other partners.

Page 75

1  BY MS. VITALE:
2  Q  Would there be some type of written
3  documentation that was generated, documenting the
4  results of the annual review?
5  A  Yes. There is a report at the end of each
6  annual review.
7  Q  That's drafted by Sunrise Banks; is that
8  correct?
9  A  That is correct. The findings are drafted by
10  Sunrise Banks and the responses to our findings are
11  drafted by the partner.
12  Q  So Sunrise Banks prepares an annual review
13  report with findings and then shares it with the
14  business partner; is that correct?
15  A  That is correct.
16  Q  And the partner will then provide responses to
17  the findings; is that correct?
18  A  That is correct.
19  Q  Does Sunrise Banks then respond to the
20  responses provided by the partner?
21  A  Sometimes we do. Yes.
22  Q  In what circumstances would Sunrise respond?
23       MS. TONN: Objection to form. And
24  outside the scope to the extent is not about GiftRocket.
25       THE WITNESS: I can't speak to any

Page 76

1  specific responses back to GiftRocket without reviewing
2  the reports. But just in general, the process, we may
3  respond if we don't agree with their proposed resolution
4  or we don't agree with their timeline.
5  BY MS. VITALE:
6  Q  And if there's a disagreement between the
7  partner and Sunrise Banks, how is that resolved?
8       MS. TONN: Objection to form. And
9  objection to scope.
10       THE WITNESS: It would depend on the
11  level of risk that that particular finding represents to
12  the bank. We have different thresholds of whether it
13  can be approved by a manager or if it has to go all the
14  way to a management committee.
15  BY MS. VITALE:
16  Q  Who makes the initial evaluation of what level
17  of risk they're dealing with and who it needs to be
18  escalated to?
19       MS. TONN: Objection to form and to scope
20  again.
21       THE WITNESS: So the compliance team,
22  current process, does risk rate findings.
23  BY MS. VITALE:
24  Q  So that decision is made by the team that does
25  the annual review, and it's included in the annual

Remote Legal Court Reporting
646.461.3400   info@remotelegal.com

**Page 109**

1 THE WITNESS: Sunrise has a complaint
2 document, a complaint procedure that defines or
3 indicates how Sunrise defines a complaint that partners
4 are expected to use the same definition as well.
5 BY MS. VITALE:
6 Q Does Sunrise do anything to check whether
7 GiftRocket was accurately reporting complaints in the
8 complaint logs?
9 MS. SCHMIDT: Objection to form.
10 THE WITNESS: Yes. We do. As part of
11 our annual review, we receive a sample of customer
12 service emails and phone call recordings, review those,
13 listen to them. If we hear a complaint, we will track
14 it to the complaint log.
15 And I should say additionally, any
16 complaints that were received directly by Sunrise
17 through a third party, say the BBB or our regulator, we
18 would confirm that that complaint was on their log as
19 well.
20 BY MS. VITALE:
21 Q Okay. Did Sunrise Banks identify any trends
22 based on its review of the GiftRocket complaint logs?
23 MS. TONN: Objection to form.
24 THE WITNESS: The complaint trend that
25 was identified with GiftRocket was customer

**Page 110**

1 dissatisfaction.
2 BY MS. VITALE:
3 Q What were the customers of GiftRocket
4 dissatisfied about?
5 MS. TONN: Objection to form.
6 MS. SCHMIDT: Same objection.
7 THE WITNESS: The complaints that -- that
8 had the higher trend were around confusion about the
9 product and whether they were getting a merchant branded
10 gift card.
11 BY MS. VITALE:
12 Q So the customers were dissatisfied because
13 they thought they were buying a merchant branded gift
14 card, but in fact they were not; is that correct?
15 MS. SCHMIDT: Objection to form.
16 MS. TONN: Same objection.
17 THE WITNESS: Yeah. The complaints were
18 either they thought they were purchasing a merchant
19 branded gift card or the recipient thought it was a
20 merchant branded gift card.
21 BY MS. VITALE:
22 Q Did Sunrise Banks observe any other trends
23 based on its review of the GiftRocket complaint logs?
24 MS. TONN: Objection to form.
25 THE WITNESS: Not to my recollection.

**Page 111**

1 Without looking at the -- the complaint logs, I know
2 that was the one that was focused on the most.
3 BY MS. VITALE:
4 Q Does it refresh your recollection if I ask you
5 specifically, was there a trend of businesses
6 complaining that they've been listed on the GiftRocket
7 website without their consent and asking to be removed?
8 MS. SCHMIDT: Objection to form.
9 MS. TONN: Same objection.
10 THE WITNESS: I do know that we received
11 complaints regarding merchants complaining about being
12 on the website. I can't say whether it was identified
13 as a -- as a trend that we felt was significant to
14 address.
15 BY MS. VITALE:
16 Q Sunrise Banks is aware that the GiftRocket
17 website was using the phrase "gift card" to describe the
18 GiftRocket product, correct?
19 MS. TONN: Objection to form.
20 THE WITNESS: We did know that the -- the
21 website stated the phrase "gift card" and used the word
22 "gift card."
23 BY MS. VITALE:
24 Q And Sunrise Banks is also aware that the
25 GiftRocket website displayed information about millions

**Page 112**

1 of businesses that were not affiliated with GiftRocket;
2 is that correct?
3 MS. TONN: Objection to form.
4 MS. SCHMIDT: Same objection.
5 THE WITNESS: We understood that
6 GiftRocket had a Yelp feed that would include business
7 names on the website.
8 BY MS. VITALE:
9 Q And did Sunrise Banks also understand that
10 GiftRocket didn't have permission from any of those
11 businesses to display those business names on the
12 website?
13 MS. TONN: Objection to form.
14 MS. SCHMIDT: Objection.
15 THE WITNESS: Sunrise was not aware of
16 the agreement with Yelp or how that was set up. So we
17 did not know whether that connection with Yelp allowed
18 that or not, as far as I'm aware.
19 BY MS. VITALE:
20 Q Did Sunrise Banks consider whether the fact
21 that a business would call in and say, Hey, I'm listed
22 on the website and I'm going to sue you if you don't
23 take me down right away because you don't have
24 permission to list my business name, would indicate that
25 they don't have permission to use the business's name

Page 113

1 through the Yelp feed?
2      MS. TONN: Objection to form.
3      MS. SCHMIDT: Objection to form.
4      THE WITNESS: So a complaint that said
5 that, we would understand that the business believed
6 they hadn't provided permission. But again, I don't
7 know what the agreements for businesses being on Yelp or
8 that agreement between Yelp and GiftRocket for using
9 that feed was.
10 BY MS. VITALE:
11   Q  Does Sunrise Banks understand that GiftRocket
12 doesn't have any direct permission from the businesses
13 themselves to use their names on the GiftRocket website?
14      MS. TONN: Objection to form.
15      MS. SCHMIDT: Objection to --
16      THE WITNESS: It is our understanding
17 they did not have permission directly from the
18 businesses.
19 BY MS. VITALE:
20   Q  I'll show you a few documents.
21      THE PROCEEDINGS OFFICER: Just to let you
22 know, we will be on Exhibit 197.
23      MS. VITALE: Thank you. You knew I was
24 going to mess it up if you didn't tell me. I appreciate
25 that.

Page 114

1      THE PROCEEDINGS OFFICER: Absolutely.
2      MS. VITALE: All right. Let's start with
3 GiftRocket or GR_0011875. Let me see if Sam can help me
4 pull that up.
5      (Exhibit 197 marked for identification.)
6 BY MS. VITALE:
7   Q  Do you want to take a minute and look at this
8 document?
9   A  Yes, please. Okay. I've reviewed it. Thank
10 you.
11   Q  And do you recognize this document?
12   A  This is, I believe, the first time I have seen
13 this email. I have seen the third page.
14   Q  Which is the memorandum attached to the email;
15 is that correct?
16   A  That's correct.
17   Q  Actually, before -- let me set that aside for
18 now. Before we talk about that, let's just ask, did
19 Sunrise Banks require GiftRocket to make changes to its
20 website?
21      MS. TONN: Objection to form.
22      THE WITNESS: Sunrise Banks made requests
23 to GiftRocket to make changes to the website.
24 BY MS. VITALE:
25   Q  Did Sunrise Banks have the ability to require

Page 115

1 GiftRocket to make changes to the website?
2      MS. TONN: Same objection.
3      THE WITNESS: Whether we could require it
4 is likely a question on what the contract legally,
5 specifically allows us. If we felt the issue was in
6 breach of the contract, we could follow that. But we
7 are fairly limited in forcing changes to the website
8 because GiftRocket does have control over the website.
9 BY MS. VITALE:
10   Q  Was there ever an instance where Sunrise Banks
11 said, We absolutely require you to make this change to
12 the website, and GiftRocket refused to make it?
13      MS. SCHMIDT: Objection to form.
14      MS. TONN: Objection to form as well.
15      THE WITNESS: There were times where we
16 requested changes and we agreed on making different
17 changes than what Sunrise had initially requested. I
18 cannot think of an instance where we said you absolutely
19 have to do this, and they flat out refused without
20 further negotiation of how we can mitigate risk.
21 BY MS. VITALE:
22   Q  So leaving aside the issue of whether Sunrise
23 under the contract could actually require GiftRocket to
24 make changes to its website, was it true as a general
25 matter that when Sunrise asked GiftRocket to make

Page 116

1 changes, changes would be made?
2      MS. TONN: Objection to form.
3      MS. SCHMIDT: Objection.
4      THE WITNESS: So generally, when we
5 request changes or would request changes to a GiftRocket
6 website, we would expect that we would be made, but we
7 would also expect that GiftRocket may come back with
8 other suggestions that we would discuss with them.
9 BY MS. VITALE:
10   Q  Can you tell me any specific changes that
11 Sunrise Banks asked GiftRocket to make to the GiftRocket
12 website?
13      MS. TONN: Objection to form.
14      THE WITNESS: Some changes that I can
15 remember without looking at all the documents are -- I
16 mean, we have -- here in this case, we have -- have
17 asked them to include an acknowledgement at checkout for
18 the purchaser that they were not purchasing a merchant
19 branded gift card.
20      We requested a particular disclosure that
21 they had about the CARD Act to be moved up higher on the
22 website. And eventually, I think around 2018, we did
23 request for the word "card" to be removed completely
24 from the website.
25 BY MS. VITALE:

Page 117

1   Q   Do you remember any other changes that Sunrise
2   Banks requested to the GiftRocket website?
3   A   I am certain there were other changes, but I
4   don't remember them off the top of my head.
5   Q   Do you know if Sunrise Banks asked GiftRocket
6   to remove the Yelp feed and the other businesses'
7   information from the website?
8   A   In reviewing some emails in preparation, I do
9   believe there were some emails at the origination of the
10  relationship that that request was made.
11  Q   Do you know why that request was not
12  implemented?
13  A   I do not know at that time why that request
14  was not implemented.  In reviewing the emails, it does
15  seem that GiftRocket felt that that was critical to
16  their business to keep on there.
17  Q   Do you know why they felt it was critical to
18  their business to keep on there?
19      MS. TONN:  Objection to form.
20      MS. SCHMIDT:  Objection to form.
21      THE WITNESS:  Without reviewing that
22  specific email that stated it, I couldn't answer that
23  question.
24  BY MS. VITALE:
25  Q   Okay.  Let's go back now to the document we

Page 118

1   were looking at, Exhibit 197.  And I think you told me
2   you recognize the memo but not the cover email.  The
3   cover email is a September 20, 2017 email from Nick Baum
4   to Sherri Baseley, correct?
5   A   Yes.  That's what I see.
6   Q   Remind me, what was Sherri Baseley's position
7   at Sunrise Banks?
8   A   At this time, Sherri would have been the
9   client relationship manager for GiftRocket.
10  Q   And below that top email is an email message
11  from Jeannie Bauer to nbaum@giftrocket.com, Cc:  Sherri
12  Baseley, and a compliance email address.  Do you see
13  that?
14  A   Yes.  I do.
15  Q   This email address, compliance@sunrisebanks,
16  do you know who received those emails?
17  A   That would be the compliance team.  So the
18  compliance analysts as well as the compliance manager.
19  Q   The ones that were specifically assigned to
20  GiftRocket or the entire department?
21  A   The entire department.
22  Q   Would that include whoever was at the top, the
23  director of compliance?
24  A   So at this time, I don't remember if it
25  included Tyler Seydel, who would have been the director.

Page 119

1   I believe that it did.  I do know myself as the
2   compliance manager is on there.
3   Q   Did you have any involvement in preparing the
4   memo that is attached to the email?
5   A   Not that I recall.  I saw this -- this memo as
6   part of the preparation, but I don't recall if I
7   reviewed this prior to sending it out or not.
8   Q   Do you know if it was typical for the
9   compliance analysts that were working with GiftRocket to
10  prepare memos to discuss their findings?
11  A   In some cases, yes, we would prepare memos,
12  particularly if it was happening outside of an annual
13  review where we would have a finding.
14  Q   Does it indicate anything about the
15  communication that they put it into a memo form instead
16  of putting in an email or some more informal way of
17  memorializing what was written?
18      MS. TONN:  Objection to form.
19      MS. SCHMIDT:  Same objection.
20      THE WITNESS:  I -- well, I can't speak
21  for the specific memo and why this was done in memo form
22  versus email.  I can say that typically, when a memo is
23  done, it's -- we know that there might be some
24  disagreement, and so we want to include as much
25  information for the rationale for the request as

Page 120

1   possible.
2   BY MS. VITALE:
3   Q   And do you -- do you recall whether in general
4   with the GiftRocket relationship there was disagreement
5   about Sunrise Banks' proposed changes to the website?
6       MS. TONN:  Objection to form.
7       MS. SCHMIDT:  Objection to form.
8       THE WITNESS:  Regarding this specific
9   issue, I don't know what or whether GiftRocket had
10  specific objections.  The only objection I remember them
11  having was to remove the word "card."
12  BY MS. VITALE:
13  Q   Why were they opposed to removing the word
14  "card"?
15      MS. SCHMIDT:  Objection to form.
16      MS. TONN:  Objection to form.
17      THE WITNESS:  I'm sorry.  You broke up at
18  the beginning.  Could you repeat that?
19  BY MS. VITALE:
20  Q   Why was GiftRocket opposed to removing the
21  word "card" from the GiftRocket website?
22      MS. SCHMIDT:  Objection to --
23      MS. TONN:  Objection to form.
24      THE WITNESS:  So my understanding was
25  they felt it was critical for search engine

Page 121

1 optimization.
2 BY MS. VITALE:
3    Q   Do you know why it was critical for search
4 engine optimization?
5         MS. TONN: Objection to form. Also,
6 objection. Outside the scope.
7         MS. SCHMIDT: Objection -- apologies.
8 Objection to form.
9         THE WITNESS: I do not know why they felt
10 that was critical.
11 BY MS. VITALE:
12    Q   They're saying that they want people who
13 search for a gift card in Google to be directed to the
14 GiftRocket website, and that's hard to accomplish if the
15 website doesn't include the word "gift card"?
16         MS. TONN: Objection to form. And
17 outside the scope.
18         MS. SCHMIDT: Objection to form.
19         THE WITNESS: I didn't get into detail to
20 what I recall with GiftRocket about why that was
21 important, so I can't say and I can't speak for
22 GiftRocket on why they felt that was important.
23 BY MS. VITALE:
24    Q   All right. Going back to the document that I
25 put up a while back, you see that Jeannie writes, Good

Page 122

1 morning Nick, please find attached a memo we have
2 drafted noting our concern with the continued number of
3 Gift Rocket complaints related to customers being
4 unclear about the product and thinking they were
5 purchasing a merchant branded gift card.
6         While the number of complaints is not
7 necessarily excessive, the fact that more than 50
8 percent of complaints received this year are related to
9 confusion about the product, we feel a modification is
10 needed.
11         Do you see that?
12    A   Yes. I do.
13    Q   So is she telling Nick that Sunrise thinks
14 there's customer confusion about whether or not
15 GiftRocket is selling a merchant brand aid gift card?
16         MS. TONN: Objection to form.
17         MS. SCHMIDT: Objection.
18         THE WITNESS: So she is stating that the
19 complaints indicate that there is confusion about the
20 product and whether they are receiving or purchasing, in
21 this case, a merchant branded gift card.
22 BY MS. VITALE:
23    Q   And so Sunrise Banks is proposing
24 modifications to the GiftRocket website to address that
25 confusion; is that correct?

Page 123

1    A   That is correct.
2    Q   And in this email she writes, They understand
3 that GiftRocket wants to keep the word "card" on the
4 site for search purposes, so our -- I think she means
5 Sunrise Banks' request is to add an additional screen to
6 the checkout process. Do you see that?
7    A   Yes. I do.
8    Q   Does that accurately describe the change that
9 Sunrise Banks proposed at this point in time?
10    A   Regarding the pop-up, yes. I don't remember
11 the specific issue from that point in time, but based on
12 this email, I would agree with what Jeannie put in here
13 that that was the request that we were asking them to
14 make regarding the pop-up specifically.
15    Q   Did GiftRocket implement that change?
16    A   I don't remember off the top of my head. I
17 don't remember if they implemented a pop-up or if this
18 is the point where we asked them to include a specific
19 checkbox at checkout for the purchaser to acknowledge.
20    Q   What's the difference between a pop-up and a
21 checkbox?
22    A   A pop-up would be just as you think of a
23 website, another little box pops up with a disclaimer,
24 and a checkbox is as they're checking out before they
25 can complete that -- or before they can complete that

Page 124

1 checkout, they have to indicate and check that box that
2 they acknowledge they're not purchasing a merchant
3 branded gift card.
4    Q   In the top email, Nick asked to set up a call
5 with compliance, correct?
6    A   As I read that email, it sounds like Nick is
7 requesting to talk with Sherri prior to talking to
8 compliance.
9    Q   Did Nick talk to Sherri about this before
10 talking about it with compliance?
11         MS. TONN: Objection to form. And
12 outside the scope.
13         THE WITNESS: I wouldn't know if they had
14 a conversation or not.
15         MS. VITALE: Okay. We have multiple
16 topics about GiftRocket complaints and Sunrise
17 communications about GiftRocket complaints. So I hope
18 you're not going to object to every question about
19 GiftRocket customer confusion and complaints as being
20 outside the scope, because they're clearly in the scope.
21         And I don't want to debate it with you,
22 but I'm just going to put it on the record that we
23 disagree with these scope objections, especially for
24 items that are very clearly within the scope of the
25 topics.

Page 153

1 correct?
2 A That's correct.
3 Q And then it says, Buy a gift card to Zuni
4 Cafe. Send it online to anyone, instantly, correct?
5 A That's correct.
6 Q Did Sunrise Banks tell GiftRocket that it
7 needed to remove these references to gift card from the
8 Google Search results?
9 MS. TONN: Objection to form.
10 THE WITNESS: It -- sorry. Let me look
11 at this again quick. It does look like we are asking
12 them to update that language so it doesn't say gift card
13 to a specific merchant.
14 BY MS. VITALE:
15 Q And so this is in the email from Audrey to
16 Nick Baum, correct?
17 A Yes.
18 Q She writes, Sunrise Banks is still concerned
19 about the misleading header statements for the ACH Gift
20 vendors. Do you see that?
21 A Yes. I do.
22 Q And there she seems to be referring to
23 language on the GiftRocket website. She's put a square
24 around, Buy Gift Card to Zuni Cafe, in bold print in the
25 header; do you agree?

Page 154

1 A Which page are you looking at?
2 Q Page 2. The top part is the Google Search
3 results, and the bottom part appears to be a screenshot
4 from the GiftRocket website. Do you agree?
5 A Yes.
6 Q And so when Audrey writes, Sunrise Banks is
7 still concerned about the misleading header statements
8 for the ACH Gift vendors, is she referring to the header
9 statement "Buy Gift Card to Zuni Cafe" at the top of the
10 web page that has a box around it with a line and an
11 arrow that says, Please update language on this page?
12 MS. TONN: Objection to form.
13 MS. SCHMIDT: Objection.
14 THE WITNESS: So it looks to me like
15 we're requesting the change to how it shows up in the
16 search results. I do see that there's a screenshot of
17 the website, but I'm not seeing that phrase specifically
18 on their website.
19 BY MS. VITALE:
20 Q If I can do the drag to screen. I think I can
21 drag your screen to my screen.
22 MS. VITALE: Sam, can you help with that,
23 so that we're looking at page 2?
24 THE PROCEEDINGS OFFICER: Up at the top
25 right, there should be, yeah, "Bring All To Me."

Page 155

1 MS. TONN: You know what?
2 BY MS. VITALE:
3 Q So on this page -- sorry. I know the
4 scrolling makes it hard to know what page is what page,
5 especially when two things are on the same page. I'm
6 asking about the bottom half of this page that has the
7 Bates label SB021863. And --
8 A Yes. I do see that. Initially, when I looked
9 at this, that to me looked like a text box that was
10 added. But I do see it does appear to be that that's
11 the header of that web page.
12 Q And Sunrise Banks is asking GiftRocket to
13 remove that header, correct?
14 MS. TONN: Objection to form.
15 THE WITNESS: We are removing or we are -
16 - we are requesting them to change the language of that
17 header.
18 BY MS. VITALE:
19 Q Right. When she says, Sunrise Banks is still
20 concerned about the misleading header statements for the
21 ACH Gift vendors, do you understand her to be referring
22 to that language inside the box "Buy Gift Card to Zuni
23 Cafe" on page 2?
24 MS. SCHMIDT: Objection to form.
25 MS. TONN: Same objection.

Page 156

1 THE WITNESS: I understand the request to
2 be them -- requesting them to change the language of
3 that header on that web page.
4 BY MS. VITALE:
5 Q I'm just trying to be clear on when she says,
6 Sunrise Banks is still concerned about the misleading
7 header statements for the ACH Gift vendors, what
8 misleading header statements for the ACH gift vendors is
9 she referring to there?
10 MS. SCHMIDT: Objection.
11 MS. TONN: Objection to form.
12 You cut out a little bit at the beginning
13 of that question. I'm sorry.
14 MS. VITALE: Thanks. I'll ask it again
15 so it's clear.
16 BY MS. VITALE:
17 Q Where Aubrey Brosz writes, Sunrise Banks is
18 still concerned about the misleading header statements
19 for the ACH Gift vendors, what misleading header
20 statements for the ACH Gift vendors is she referring to?
21 MS. TONN: Objection to form.
22 MS. SCHMIDT: Same objection. And also,
23 objection to scope.
24 THE WITNESS: My understanding of that
25 statement in the email is that she is referring to the

Page 157

1 header on the website on the bottom half of page 2.
2 BY MS. VITALE:
3   Q   Which reads, Buy Gift Card to Zuni Cafe,
4 correct?
5   **A   That is correct.**
6   Q   Then later in the same email, she goes on to
7 say, This is the same page that appears if a Google
8 Search for ABC Company Gift Card is done - which again
9 we feel is misleading. Do you see that?
10  **A   Yes. I do.**
11  Q   And then she writes, We have attached an
12 example. Is that a reference to the Google Search
13 result that's at the top of page 2?
14        MS. TONN: Objection to form.
15        MS. SCHMIDT: Objection to form.
16        THE WITNESS: That is how I understand.
17 BY MS. VITALE:
18  Q   Okay. I'll withdraw that. Okay.
19      What Google Search result is Aubrey Brosz
20 telling Nick Baum, Sunrise Banks feels is misleading?
21        MS. TONN: Objection to form. And
22 objection --
23        MS. SCHMIDT: Objection -- and outside
24 the scope.
25        THE WITNESS: I read that email to

Page 158

1 understand that she's referring to the screenshot on the
2 top of page 2 of that document.
3 BY MS. VITALE:
4   Q   And the search result for the GiftRocket
5 website that says, Buy a Gift Card to Zuni Cafe,
6 correct?
7   **A   That's correct.**
8         MS. SCHMIDT: Objection.
9 BY MS. VITALE:
10  Q   Having now looked at these documents, you can
11 better understand what I'm asking about the Google
12 Search results. Did Sunrise Banks ask GiftRocket to
13 remove references to gift card from the Google Search
14 results?
15  **A   So I'm not an expert on metadata when it comes
16 to Internet web searches. I read this email to believe
17 that the fact that their header says, Buy Gift Card to
18 Zuni Cafe, could be what's influencing that Google
19 Search result. I, again, don't know that we had
20 specific discussions about metadata.**
21  Q   Let's take that one down and look at another
22 document, which is SB015302.
23        MS. VITALE: I believe that that will be
24 Exhibit 203.
25        THE PROCEEDINGS OFFICER: 202.

Page 159

1         MS. VITALE: 202.
2         THE PROCEEDINGS OFFICER: Close.
3         MS. VITALE: So close. Did I mark the
4 last one or did we just show it?
5         THE PROCEEDINGS OFFICER: I believe it
6 did get marked. Let me see. Yeah. 200. 201. Yeah.
7 201 was marked.
8         MS. VITALE: Thank you. This one is
9 going to be Exhibit 202.
10        THE WITNESS: Okay.
11        (Exhibit 202 marked for identification.)
12 BY MS. VITALE:
13  Q   What is this document?
14  **A   This is an email from Jeannie Bauer to Aubrey
15 Brosz talking about GiftRocket website changes.**
16  Q   And you're copied on the email, correct?
17  **A   Yes. I am.**
18  Q   It's dated November 26, 2018; is that right?
19  **A   Yes.**
20  Q   Do you see in the third paragraph, Jeannie
21 writes to Aubrey, With -- sorry. Let's start one more
22 so we know who we're talking about. In the second
23 paragraph, Jeannie writes, With regard to the changes
24 for Giftly and Gift Rocket - They can use gift card in
25 their meta tag (which is a new term for me), but on the

Page 160

1 websites they have to remove it from the product name -
2 obviously can you it for the actual gift cards they
3 provide if that is how folks redeem their gifts.
4       Do you see that?
5   **A   Yes. I do.**
6   Q   What does she mean when she says, They can use
7 gift card in their meta tag --
8         MS. TONN: Objection to form. And
9 outside the scope.
10 BY MS. VITALE:
11  Q   -- on the websites they have to remove it?
12        MS. TONN: Oh, sorry. Objection to form.
13 And outside the scope.
14        I'm sorry. Liana, I thought you were
15 done.
16        MS. VITALE: It's fine.
17        MS. SCHMIDT: Same objections.
18        MS. VITALE: I'm -- it's getting late in
19 the day and there are many people talking.
20        MS. TONN: Do you want to restate your
21 question or?
22        MS. VITALE: Yeah. And then you guys can
23 restate your objections, but we'll all do it one at a
24 time.
25 BY MS. VITALE:

Page 161

1  Q   My question is, what does it mean they can use
2  gift card in their meta tag?
3       MS. TONN:  Objection to form.  And
4  outside the scope.
5       MS. SCHMIDT:  Also, objection to form.
6  And outside the scope.
7       THE WITNESS:  So it means just what it
8  says, that they can use the term "gift card" in their
9  meta tag.  Again, I'm not an Internet search engine
10 expert, so I can't necessarily explain how that works,
11 but we are allowing them to keep that phrase based on
12 this email in the meta tag.
13 BY MS. VITALE:
14  Q   Does Sunrise Banks understand that using the
15 phrase "gift card" in the meta tag on the GiftRocket
16 website is what causes the search results shown on
17 Google to have the phrase "buy a gift card"?
18      MS. TONN:  Objection to form.  And
19 outside the scope.
20      MS. SCHMIDT:  Same objections.
21      THE WITNESS:  I can't say that we are
22 totally understanding of how meta tags work.  I would
23 say we do understand that it would have an impact on
24 search results, but how specifically it impacts that, I
25 don't know.

Page 162

1  BY MS. VITALE:
2  Q   So the document that we looked at previously,
3  Exhibit 201, where Aubrey told Nick Baum that they need
4  to remove the phrase "Buy Gift Card to Zuni Cafe" from
5  the Google Search results.  Do you remember that?
6  A   Yes.
7       MS. TONN:  Objection to form.
8       THE WITNESS:  I remember.
9  BY MS. VITALE:
10  Q   Is Sunrise now -- is Sunrise now withdrawing
11 that instruction by saying, They can use gift card in
12 their meta tag?
13      MS. TONN:  Objection to form.
14      MS. SCHMIDT:  Also, objection --
15      THE WITNESS:  As I stated -- as I stated
16 previously, I'm not sure whether that request to remove
17 from Google Search results was referring to the meta tag
18 or simply referring to the fact that it was stating
19 exactly what the header said.
20 BY MS. VITALE:
21  Q   Okay.  So leaving aside the question of how
22 exactly that information gets into the Google Search
23 results, did Sunrise Banks tell GiftRocket it was okay
24 to use phrases like "Buy Gift Card to Zuni Cafe" in
25 Google Search results?

Page 163

1       MS. TONN:  Objection to form.  And
2  outside the scope.
3       MS. SCHMIDT:  Same two objections.
4       THE WITNESS:  Based on this information,
5  we said it was okay to use the term "gift card" in their
6  meta tag.  I don't see anywhere we said -- where we said
7  they could say, Gift card to a specific business,
8  anywhere on their website or in Google Search results.
9  BY MS. VITALE:
10  Q   So is it Sunrise Banks' position that
11 GiftRocket was not permitted to have Google Search
12 results that use phrases such as the ones that were
13 shown in the exhibit we just looked at, Exhibit 1 -- or
14 201?
15      MS. TONN:  Objection to form.  And
16 outside the scope.
17      Ms. Hodgett isn't here to testify about
18 how Google Search results work.
19      MS. SCHMIDT:  Same two --
20      MS. VITALE:  Gina, I'm -- all right.
21 Hold on.  I'm going to actually respond to that because
22 you keep saying outside the scope.  It's not outside the
23 scope.  It's about what's on the GiftRocket website.  It
24 comes from their meta tags.
25      Like, whether the witness understands

Page 164

1  that or not, we all understand that the meta tags are on
2  the GiftRocket website.  And so that information being
3  displayed is obviously within the scope of the topic
4  about what information is allowed to be on the
5  GiftRocket website or requested to be on it or removed
6  on it.  Like it's within the scope, right?
7       The witness seems not to be prepared, or
8  maybe Sunrise really, as a bank, doesn't understand how
9  the meta tags in the website work, right?  But the
10 question is clearly within the scope.
11      And also, I don't really understand why
12 Grace is now imposing scope objections other than to
13 take up time and space on the transcript because she's
14 not here representing Sunrise.  So I -- yeah.  Like,
15 it's fine if you want to have a scope objection, but
16 let's try to have ones that are reasonably correlated
17 with reality.
18      MS. TONN:  Well, and just to respond to
19 that briefly and then I think we can move on and deal
20 with this later if we need to, but the objection is to
21 the fact that this question is going outside the topic
22 about the GiftRocket website, which to our understanding
23 is limited to what's on the gift card -- GiftRocket
24 website that Sunrise would have been able to review any
25 background -- any background data or how that worked on