# Plaintiff Exhibit 34

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---

GRACIE BAKED LLC, WECARE RG, INC., and MILLERCOBB LLC, on behalf of themselves and all others similarly situated,

Plaintiffs, Case No.:

v. 22-CV-4019 (RPK)(VMS)

GIFTROCKET, INC., TREMENDOUS, INC., NICHOLAS BAUM, KAPIL KALE, JONATHAN PINES, BENJAMIN KUBIC, SUNRISE BANKS, N.A., GIFTROCKET, LLC, TREMENDOUS LLC, And TREMENDOUS PARENT, INC.,

Defendants.

---

VIDEOTAPED DEPOSITION

---

WITNESS: TERI HODGETT

DATE: Thursday, February 13, 2025

START TIME: 8:06 a.m., PT

END TIME: 2:36 p.m., PT

REMOTE LOCATION: Remote Legal platform

PROCEEDINGS OFFICER: Kindel McDermott, CDR-3527

JOB NO.: 33498

CONFIDENTIAL

A P P E A R A N C E S

JANOVE PLLC
500 7th Avenue
Eighth Floor
New York, New York 10018
By: LIANA VITALE, ESQUIRE
liana@janove.law
Appearing for Plaintiffs

GREENE ESPEL PLLP
222 South 9th Street
Suite 2200
Minneapolis, Minnesota 55402
By: GINA TONN, ESQUIRE
gtonn@greeneespel.com
Appearing for Defendant, Sunrise Banks, N.A.

A P P E A R A N C E S (Continued)

DTO LAW
307 5th Avenue
12th Floor
New York, New York 10016
By: GRACE E. SCHMIDT, ESQUIRE
gr@dtolaw.com
Appearing for Defendants, GiftRocket Inc., Tremendous, Inc., Nicholas Baum, Kapil Kale, Jonathan Pines, Benjamin Kubic, GiftRocket, LLC, Tremendous LLC, and Tremendous Parent, Inc.

ALSO PRESENT:
Andrew Toftey, Observer, Sunrise Banks In-house Counsel

break? Are you -- no? Okay.

BY MS. VITALE:

Q Yeah. Sorry. If you need a break at any time, just let me know. I'll ask you to answer the pending question, but you can always take a break.

Okay. Was there anything else that you talked about with Michael Christians?

A Those are the main points that I remember talking to him about.

Q Okay. About how long did each of those calls last?

MS. TONN: Objection to form.

THE WITNESS: I would say approximately 15 to 30 minutes.

BY MS. VITALE:

Q Did you have any other communications like messages or emails to prepare for your deposition today?

MS. TONN: Objection to form.

THE WITNESS: Not that I recall, other than trying to contact them to schedule a meeting.

BY MS. VITALE:

Q Okay. If you look back at Exhibit 1, which is still up here, just at the very top of it, do you see where the names of the plaintiffs are listed, starting with Gracie Baked LLC?

A Yes. I do.
Q Did Sunrise Banks have any knowledge concerning Gracie Baked LLC before this action was filed?
A No. Not that I'm aware of. We didn't have any knowledge of them.
Q Okay. Did Sunrise Banks have any knowledge concerning WeCare RG, Inc. before this action was filed?
A Not that I'm aware of.
Q Did Sunrise Banks have any knowledge concerning Millercobb LLC before this action was filed?
A Not that I'm aware of.
Q What about Dimensions Massage Therapy?
A Not that I'm aware of.
Q And when you say "not that I'm aware of," did you do anything to confirm whether someone else at Sunrise may have knowledge?
A I did review -- I did review complaint information as that's typically how we would hear from merchants, and I was not able to find those names.
Q Okay. Now we're done talking about prep. Let's talk a little bit more about the GiftRocket relationship and some of the issues we are getting into.
When did Sunrise Banks first begin doing business with GiftRocket?

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Q Is there a formal document that memorializes that relationship, like an agreement that governed the business they were doing?

A There could be. There could be a signature card for the account, but again, I'm not sure if it stayed in the same account from when they first came in to when they moved over to our national fintech operations.

Q Okay. And you said that when they started working with treasury management department, they onboarded them as a typical ACH originator customer. What does that mean?

A So as a bank, we typically or we frequently get customers that originate ACH transactions. In the normal course of business, the funds are owned by that entity, and they have an ACH agreement, and they originate ACH transactions for their business purposes. And in this case, we believed GiftRocket should be under our national products, because they didn't own the funds in that account.

Q What is an ACH transaction?

A ACH stands for Automated Clearing House. So it's a process through which funds are moved through the Federal Reserve from one bank to another.

Q Is it effectively a money transfer?
A Effectively, yes, it is a transfer.
Q And so at some point in time, someone at Sunrise said, This is the wrong department, and GiftRocket was moved into the national products department; is that correct?
MS. TONN: Objection to form.
THE WITNESS: That is my understanding of what happened. Yes.
BY MS. VITALE:
Q What is the national products department?
A So our national products department oversees various relationships we have with fintech companies, prepaid card companies, certain lending companies, where we have to have a stronger oversight of those activities because we are typically the issuer of cards or the creditor on the loan.
Q Why does Sunrise need to have stronger oversight when it's the issuer of a card?
MS. TONN: Objection to form.
THE WITNESS: Because we have a third party involved in offering that product. So the regulatory standards are that we have -- we have to oversee our third parties and their actions and process with that because they are offering -- or they are

engaged in that product. And so we have to ensure, just like we would our own products, that all rules are being complied with.

BY MS. VITALE:

Q And so in the relationship that we're talking about with GiftRocket, GiftRocket is the third party that you're referring to; is that correct?

A That is correct.

Q What product did GiftRocket sell?

MS. TONN: Objection to form.

THE WITNESS: GiftRocket had a gift product that allowed consumers to send money to another individual as a gift.

BY MS. VITALE:

Q Did GiftRocket sell a gift card?

MS. TONN: Objection to form.

THE WITNESS: Eventually. I -- I'm not sure what year it started, but eventually GiftRocket did offer a gift card as a redemption option for the individual redeeming the gift. But that card was not issued through Sunrise Banks.

BY MS. VITALE:

Q Did GiftRocket sell a gift card that could be purchased from money on its website?

MS. TONN: Objection to form.

A Yes. There is a lot in this one.

Q So let's -- instead of me just asking you as I did for the others what's the purpose, where there was pretty much one or two purposes, let's go through each of them one by one. I'm looking at paragraph 2. Do you see that one?

A Yes. I do.

[redacted]

[redacted]

MS. TONN: Objection to form.
MS. SCHMIDT: Same objection.
THE WITNESS: Let me review for a moment, please. [redacted]

BY MS. VITALE:
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]

[redacted]

[redacted] [redacted]
[redacted] [redacted] [redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted]

[redacted]

BY MS. VITALE:

Q Time frame being 2020 to 2024?

A 2020 to 2022.

Q To 2022.

A In that case, through 2022. Yeah.

Q Is Sunrise Banks able to calculate the income for the period that preceded 2020?

A I am not aware that we can. We had changed financial systems around 2020. I had asked our CFO, and it did not appear we -- we were able to go back that far.

Q Is there other information available that you could use to calculate that number, even if the number can't be pulled from the system you're using now?

MS. TONN: Objection to form.

THE WITNESS: It could potentially be estimated. I don't know if a concrete number could be given prior to that time.

BY MS. VITALE:

Q Are you able to give an estimate sitting here today?

MS. TONN: Objection to form.

to the operations team and he did oversee our fintech operations, which would include the operational aspects of GiftRocket, the money movement, reconciliation, things like that.

At some point, and I -- I don't remember the year that this occurred, but at some point, during that relationship he did take on the client relationship managers for national products, which would include GiftRocket's compliance -- or client relationship manager, and would be responsible for that overall relationship.

Q What about Jody Ackerman?

A Jody Ackerman was their client relationship manager. She left -- I -- I don't know exact dates. I think sometime in 2017, Jody left.

Q What were her responsibilities with respect to GiftRocket at the time she was there as a client relations manager?

A So client relationship managers just manage the relationship with the partner. They are the first point of contact for the partner. They are the ones that communicate compliance reviews and work with partners on ensuring they are following up on findings. They will work with them on any operational issues that we may or may not have, talk to them about their growth

plans.

Generally, just that first point of contact for GiftRocket.

Q Do the compliance relationship managers have any decision-making authority or they mostly just communicate decisions that are made by other people?

MS. TONN: Objection to form.

THE WITNESS: The client relationship managers, I would say generally don't have decision making authority. There may be some decisions that they can make, but -- but generally, that's not their role.

BY MS. VITALE:

Q What about Joan Herman? What were her roles and responsibilities related to GiftRocket?

A I don't (indiscernible - audio disruption) Joan's actual title when she was here, but she was, I guess an equivalent would be like a director of the national products team and department. So she oversaw all third-party national products relationships, and was sales and was -- was responsible for bringing on new partners.

Q Can you tell me any specific responsibilities that she had with respect to GiftRocket?

A Joan would have been responsible for the overall relationship of GiftRocket and ensuring they

were -- so essentially overseeing the CRMs, I guess. And again, working with them on any issues they had, any issues we had. And in -- in that case, decision-making authority, Joan had as well.

Q Just to be clear, when you say CRMs, you mean the client relationship managers like Jody Ackerman?

A Yes. CRMs as client relationship manager.

Q And you mentioned that Joan would have decision-making authority; is that correct?

A Yes. That is correct.

Q For what types of issues would Joan have decision-making authority with respect to GiftRocket?

A So generally, what that -- that position would have decision making authority on is pricing of contracts. In some cases, we let the business line make risk-based decisions regarding partners. She would have some decision-making input at least to renew or terminate contracts, high level, things like that.

Q When you say some risk-based decision making, are you referring to anything specific?

MS. TONN: Objection to form.

You cut out in the middle of that question.

MS. VITALE: Sorry.

THE WITNESS: Yeah. Apologies. Could

you repeat that?

BY MS. VITALE:

Q No. Thank you for asking. Yeah. I'm trying to understand what you meant when you said sometimes she would have risk-based decision making. What specific risk-based decision making would Joan have with respect to GiftRocket?

A So there were times, at least at the beginning of the GiftRocket relationship, where if the compliance team had concerns, there were certain situations where we would explain the risk to the business line and let the business line accept the risk.

Q Is it correct to say that if compliance identified a risk, it was the business line that had the ultimate decision-making authority over whether or not Sunrise Banks would accept that risk in a business relationship?

MS. TONN: Objection to form. And also, objection outside the scope if it's not about GiftRocket.

THE WITNESS: I would say it would depend on the level of risk. The compliance team could certainly escalate it through the risk department if necessary. But some risks, the business decision was -- or the business line was allowed to accept the risk.

BY MS. VITALE:

Q Is that a sort of case-by-case decision making process, or is there some guidance about which risks fall into which category?

MS. TONN: Objection to form and scope again.

THE WITNESS: My understanding is it was case by case. This isn't something that we do currently anymore. It's something we did at the time of starting the GiftRocket relationship. So my understanding at that time is it was case by case.

BY MS. VITALE:

Q By that, do you mean that at this point in time, business is never allowed to make decisions about whether a risk is acceptable?

MS. TONN: Objection to form.

THE WITNESS: I would say at this point in time, if there is a disagreement between the risk team and the business line, the decision would be made by a management committee.

BY MS. VITALE:

Q All right. Going back to the list of names that you guys gave us, Teri Hodgett, that's you, I think I have a good understanding of your roles and responsibilities with respect to GiftRocket. Is there

any roles or responsibilities you have with respect to GiftRocket that we haven't talked about already?

A No. Not that I can think of.

Q Mark Brown, can you tell me what his roles and responsibilities were with respect to GiftRocket?

A When Mark Brown was hired, he was hired as an analyst. So he worked on -- with the analyst that did complaint reviews and website reviews and marketing approvals. When he became the assistant manager, then the compliance analyst reported to him.

So again, in that case, he was sort of their first escalation point if they had an issue. I think when he was first promoted, between the two of us, we both reviewed reports, but he could review those reports as well.

Q What about Sherri Baseley? What were her roles and responsibilities with respect to GiftRocket?

A So Sherri Baseley was a CRM, similar to Jody Ackerman. I believe that Sherri Baseley took over the relationship when Jody left. And then Sherri, I believe, took it over again when Aubrey Brosz left, who if I remember correctly, was hired to replace Jody.

Q And so Sherri Baseley and also Aubrey Brosz would have had roughly the same roles and responsibilities as what you told me for Jody Ackerman;

is that correct?
A Yes. That is correct.
Q With respect to GiftRocket?
A Yes.
Q (Indiscernible) Heather Schumacher, what were her roles and responsibilities with respect to GiftRocket?
A So Heather Schumacher, again, I don't know her or what her exact title was at the time, but she oversaw our fintech operations. So not like the CRMs, but just the operational side. Again, the money movement, the reconciliation.
Heather was eventually promoted to chief operating officer, I think, in 2018, still managing the fintech operations. And then she left, I believe, in late 2018 or early 2019.
Q Are you aware of any specific interactions between her and GiftRocket?
A I am not aware of specific interactions.
Q Maria Wilkinson, what are her roles and responsibilities with respect to GiftRocket?
A Maria was also on the fintech operations team working on -- with respect to GiftRocket, I believe it would have been working on reconciliation.
Q Do you know if she ever moved into a different

think it's supposed to be. There could be a system issue somewhere. Just various -- they just help us identify things that we may not be aware of otherwise.

Q Stepping back, what process was followed with respect to the complaint logs received from GiftRocket? So GiftRocket would send a complaint log on a monthly basis to Sunrise Banks, correct?

A That's correct.

Q Who at Sunrise Banks would receive that?

A I believe the complaint log went to the CRM, which was then sent on to the compliance department. It's possible they had the compliance emailed directly. I'm not sure exactly which process, but it would be one of those two.

Q Would someone at Sunrise Banks review every complaint log?

A The compliance team reviews the complaint logs, all of them.

Q Is there a time period in which the compliance team is supposed to review them?

MS. TONN: Objection to form.

THE WITNESS: There's not a defined period. Just within a reasonable time of receiving the complaint log.

BY MS. VITALE:

Q Typically speaking, when Sunrise Banks received a complaint log from GiftRocket, how soon after receiving it would they review the complaint log?
A I do not have the information as to how quickly it was reviewed. I would say typically, normal process, within a couple of weeks after receiving it.
Q Do you know which individuals at Sunrise Banks reviewed the GiftRocket complaint logs?
MS. TONN: Objection to form.
THE WITNESS: So the actual review of the complaint log when it comes in would be done by a compliance analyst. So those people, to the extent we've talked about them, Jeannie Bauer, Danielle Campbell, Mark Brown. Those are off the top of my head, the ones that I know that would be doing the detailed review of the complaint log.
BY MS. VITALE:
Q Would Jody Ackerman also have reviewed GiftRocket complaint logs?
A She wouldn't have been required to do it as part of her job description. She may have done it on her own. I don't know.
Q So the CRM receives a complaint log and they review it within a couple of weeks. Is there any action item that should be taken by the CRM after reviewing the

complaint log?

MS. TONN: Objection to form.

THE WITNESS: The CRM is not the one responsible for reviewing the complaint log. It's the compliance analyst that's responsible for reviewing it. They -- they do maintain a trending document. And so we're looking at the volume of complaints over time, and that is reported to a management committee each month.

BY MS. VITALE:

Q Okay. Thank you for that correction about the compliance analyst. So the compliance analyst reviews it and then they maintain a trending document. Is that what you said?

A That's correct. Yes.

Q Is that the title of the document, trending document, or does it have some other more formal title?

A I am not sure exactly what the title of the document is. It is probably something along the lines of complaint trending, but I'm not sure the exact title.

Q Do you know if Sunrise Banks has produced these complaint trending documents to us in this litigation?

MS. TONN: Objection to form. And outside -- outside the scope.

You can answer if you know in your

personal capacity.
THE WITNESS: I believe that they have, but I can't say for sure whether they have.
BY MS. VITALE:
Q Okay. So what type of information would the compliance analyst put in the complaint trending document after reviewing the complaint log from GiftRocket?
A The trending document is typically logging the number of complaints into various categories, so we can understand the types of complaints that are coming in each month.
Q Why does Sunrise Banks want to understand the type of complaints that are coming in each month?
A So as stated previously, if there's -- it can help us identify if the product is not working properly, if there's customer confusion, if it's a customer service issue. Putting it in category buckets helps us identify those trends.
Q Did Sunrise ever suspect that GiftRocket was not including all relevant information in the complaint logs?
MS. SCHMIDT: Objection to form.
THE WITNESS: We did not suspect that we were not receiving all complaints in the complaint logs.

BY MS. VITALE:
Q Does Sunrise now believe that GiftRocket was leaving information off the complaint logs?
MS. SCHMIDT: Objection to --
MS. TONN: Objection to form. Objection to form.
THE WITNESS: It's our understanding now that complaints were being left off the complaint log.
BY MS. VITALE:
Q If GiftRocket was leaving complaints off the complaint logs, does that mean that Sunrise's analyses would be undercounting the amount of complaints that were actually received?
MS. SCHMIDT: Objection to form.
MS. TONN: Same objection.
THE WITNESS: Without having all of the complaints that were submitted to GiftRocket, our trend analysis would be understated.
BY MS. VITALE:
Q Does GiftRocket have discretion about what types of complaints it should or should not include on the complaint log?
MS. SCHMIDT: Objection to form.
MS. TONN: Objection to form. And also, objection outside the scope.

THE WITNESS: Sunrise has a complaint document, a complaint procedure that defines or indicates how Sunrise defines a complaint that partners are expected to use the same definition as well.

BY MS. VITALE:

Q Does Sunrise do anything to check whether GiftRocket was accurately reporting complaints in the complaint logs?

MS. SCHMIDT: Objection to form.

THE WITNESS: Yes. We do. As part of our annual review, we receive a sample of customer service emails and phone call recordings, review those, listen to them. If we hear a complaint, we will track it to the complaint log.

And I should say additionally, any complaints that were received directly by Sunrise through a third party, say the BBB or our regulator, we would confirm that that complaint was on their log as well.

BY MS. VITALE:

Q Okay. Did Sunrise Banks identify any trends based on its review of the GiftRocket complaint logs?

MS. TONN: Objection to form.

THE WITNESS: The complaint trend that was identified with GiftRocket was customer

dissatisfaction.

BY MS. VITALE:

Q What were the customers of GiftRocket dissatisfied about?

MS. TONN: Objection to form.

MS. SCHMIDT: Same objection.

THE WITNESS: The complaints that -- that had the higher trend were around confusion about the product and whether they were getting a merchant branded gift card.

BY MS. VITALE:

Q So the customers were dissatisfied because they thought they were buying a merchant branded gift card, but in fact they were not; is that correct?

MS. SCHMIDT: Objection to form.

MS. TONN: Same objection.

THE WITNESS: Yeah. The complaints were either they thought they were purchasing a merchant branded gift card or the recipient thought it was a merchant branded gift card.

BY MS. VITALE:

Q Did Sunrise Banks observe any other trends based on its review of the GiftRocket complaint logs?

MS. TONN: Objection to form.

THE WITNESS: Not to my recollection.

Without looking at the -- the complaint logs, I know that was the one that was focused on the most.

BY MS. VITALE:

Q Does it refresh your recollection if I ask you specifically, was there a trend of businesses complaining that they've been listed on the GiftRocket website without their consent and asking to be removed?

MS. SCHMIDT: Objection to form.

MS. TONN: Same objection.

THE WITNESS: I do know that we received complaints regarding merchants complaining about being on the website. I can't say whether it was identified as a -- as a trend that we felt was significant to address.

BY MS. VITALE:

Q Sunrise Banks is aware that the GiftRocket website was using the phrase "gift card" to describe the GiftRocket product, correct?

MS. TONN: Objection to form.

THE WITNESS: We did know that the -- the website stated the phrase "gift card" and used the word "gift card."

BY MS. VITALE:

Q And Sunrise Banks is also aware that the GiftRocket website displayed information about millions

of businesses that were not affiliated with GiftRocket; is that correct?

MS. TONN: Objection to form.

MS. SCHMIDT: Same objection.

THE WITNESS: We understood that GiftRocket had a Yelp feed that would include business names on the website.

BY MS. VITALE:

Q And did Sunrise Banks also understand that GiftRocket didn't have permission from any of those businesses to display those business names on the website?

MS. TONN: Objection to form.

MS. SCHMIDT: Objection.

THE WITNESS: Sunrise was not aware of the agreement with Yelp or how that was set up. So we did not know whether that connection with Yelp allowed that or not, as far as I'm aware.

BY MS. VITALE:

Q Did Sunrise Banks consider whether the fact that a business would call in and say, Hey, I'm listed on the website and I'm going to sue you if you don't take me down right away because you don't have permission to list my business name, would indicate that they don't have permission to use the business's name

through the Yelp feed?

MS. TONN: Objection to form.

MS. SCHMIDT: Objection to form.

THE WITNESS: So a complaint that said that, we would understand that the business believed they hadn't provided permission. But again, I don't know what the agreements for businesses being on Yelp or that agreement between Yelp and GiftRocket for using that feed was.

BY MS. VITALE:

[redacted]

BY MS. VITALE:

Q I'll show you a few documents.

THE PROCEEDINGS OFFICER: Just to let you know, we will be on Exhibit 197.

MS. VITALE: Thank you. You knew I was going to mess it up if you didn't tell me. I appreciate that.

THE PROCEEDINGS OFFICER: Absolutely.

MS. VITALE: All right. Let's start with GiftRocket or GR_0011875. Let me see if Sam can help me pull that up.

(Exhibit 197 marked for identification.)

BY MS. VITALE:

Q Do you want to take a minute and look at this document?

A Yes, please. Okay. I've reviewed it. Thank you.

Q And do you recognize this document?

A This is, I believe, the first time I have seen this email. I have seen the third page.

Q Which is the memorandum attached to the email; is that correct?

A That's correct.

Q Actually, before -- let me set that aside for now. Before we talk about that, let's just ask, did Sunrise Banks require GiftRocket to make changes to its website?

MS. TONN: Objection to form.

THE WITNESS: Sunrise Banks made requests to GiftRocket to make changes to the website.

BY MS. VITALE:

Q Did Sunrise Banks have the ability to require

GiftRocket to make changes to the website?

MS. TONN: Same objection.

THE WITNESS: Whether we could require it is likely a question on what the contract legally, specifically allows us. If we felt the issue was in breach of the contract, we could follow that. But we are fairly limited in forcing changes to the website because GiftRocket does have control over the website.

BY MS. VITALE:

Q Was there ever an instance where Sunrise Banks said, We absolutely require you to make this change to the website, and GiftRocket refused to make it?

MS. SCHMIDT: Objection to form.

MS. TONN: Objection to form as well.

THE WITNESS: There were times where we requested changes and we agreed on making different changes than what Sunrise had initially requested. I cannot think of an instance where we said you absolutely have to do this, and they flat out refused without further negotiation of how we can mitigate risk.

BY MS. VITALE:

Q So leaving aside the issue of whether Sunrise under the contract could actually require GiftRocket to make changes to its website, was it true as a general matter that when Sunrise asked GiftRocket to make

issue, typically, what the process would be is our suggestions would go back to GiftRocket. We would connect. We would come to an agreement. In this case, I likely would have been involved in approving the language as the manager at that time that we agreed on.

Q And would there be any written record that you approved of specific language?

A Only if it came through email. There's no requirement that my approval be in writing.

Q I can set that one aside. Let's look at SB008791. It's a short email, but it has a memo attached to it. So if you want to take a minute and look at it.

A Okay.

THE PROCEEDINGS OFFICER: So I just -- sorry to interject here. I just saw that there was another stamp of Plaintiff Exhibit 166 on the right.

MS. VITALE: Oh, thank you so much. Let's -- is it possible to remove the Exhibit 199 and go with Exhibit 166?

THE PROCEEDINGS OFFICER: I sure can. Yes.

MS. VITALE: Thank you so much for flagging that.

THE PROCEEDINGS OFFICER: Of course.

MS. VITALE: You should come to all of my depos, and I would be much better at this.
THE PROCEEDINGS OFFICER: I'm just happy to help.
MS. VITALE: Thank you.
THE WITNESS: Okay. I've reviewed.
BY MS. VITALE:
Q Okay. So I have a couple of different things I want to ask about this. First, just, do you recognize this is an email from Tyler Seydel to Amanda Swoverland on February 26, 2018? That's the cover email. Do you see that?
A Yes. I do.
Q And then he's attaching a memorandum, February 21, 2018 memorandum from you and Tyler Seydel to Jeannie Bauer, correct?
A The memo is from Jeannie to Tyler and I, but yes, that's the memo.
Q Thank you. I swear I'm not testing to see if you're getting these things, but you've been -- you've been very good at catching them. Okay. So the memo is to you and Tyler and it's from Jeannie Bauer, correct?
A That's correct.
Q First thing on the -- on the email, it says, I made some redlines in here to capture my thoughts, feel

free to add anything/ask any questions - I'm guessing that this would go through NPAC? What is NPAC?

A NPAC, I also -- I will probably refer to it as NPAC just for reference. It stands for National Products Approval Committee. That is our management committee that oversees our national products business line.

[redacted]

Q Who was on the National Product Approval Committee in February 2018?

A So it -- it has changed significantly. So typically, it's members of our executive team that are on National Products Approval Committee.

In 2018, to the best of my recollection,

Amanda Swoverland was on there, Mike Porcello, who was our chief credit officer, Nichol Beckstrand, who was our president at the time, Brian Tordsen, who as we mentioned before, oversaw our National Products Committee. Those are the main ones that I can remember at this point in time.

Potentially, David Reiling, who is our CEO, he was on that committee for a period of time, but I can't remember the exact dates that he was on there.

Q Is there anyone else who was on the National Product Approval Committee during the time period that Sunrise Banks was doing business with GiftRocket?

A So the -- the voting members of that committee do change as the executive team changes, or as the individual overseeing national products change. So as people have come and gone, Melodie Carlson, who was our COO, chief operating officer, was on there at one point in time.

I became a voting member of NPAC in 2021. Bryan Toft, who was our chief revenue officer, oversaw the fintech division for a period of time, so he was a voting member during GiftRocket. But generally, those are the positions. And as the executive team changes, those are the positions that sit on there.

Q How often would the National Product Approval

Committee receive updates with respect to GiftRocket-related issues?

A So the standard reporting for all partners is monthly from the compliance and BSA teams as well as monthly for our third-party risk teams. And beyond that, issues with any partner could be reported as they come up. There would be no particular frequency.

Q So is it correct to say that every month, the National Product Approval Committee would receive an update on GiftRocket?

MS. TONN: Objection to form.

THE WITNESS: It would receive potentially information on any outstanding findings that they had. If an annual review had been completed since the last NPAC meeting, they'd get an update on that annual review. The regular reporting is not necessarily extremely partner specific. It's a report of the whole portfolio. And as things change with partners, those would be added.

BY MS. VITALE:

Q We talked about the trend of customer confusion related to the GiftRocket website. Is that something that would have been reported to the National Product Approval Committee?

A We did report details on complaints that the

bank received directly for our national products partner. So any complaints were detailed out. Without looking at the actual documents from NPAC, I don't recall if complaint volumes were included in each report, but to the extent there -- that there were concerns that they felt needed to be escalated, they'd be included.

[redacted]

Q Is there any person or entity that supervises NPAC or is that sort of the highest point in the chain of escalation?

A Our NPAC committee does report to a board committee. In 2018, I believe it was called our National Products and Innovation Board Committee.

Q Do you know if that committee was ever presented with updates related to GiftRocket?

A I do know that committee did receive portfolio

level reports. I can't recall if any specific GiftRocket issues went to that committee.

Q Sorry. So I got a little off my Exhibit 166 here because I was trying to understand his reference to NPAC. So he's saying -- Tyler Seydel is saying in this February 26, 2018 email attaching the memorandum, I am guessing that this would go through NPAC. Do you know why this would go through NPAC?

A While I can't speak for Tyler, what I know about processes, I can say the request is for them to remove "card," and we are already well aware that GiftRocket did not want to remove "card."

And so we wanted to take it through our management committee to either get approval to say that yes, our management committee to GiftRocket is wanting that change made, or potentially the management committee could accept the risk of keeping it on there.

Q And just to clarify, because you said, I don't know what Tyler thinks about things, when I say "you," I am intending, because this is a 30(b)(6) deposition, to be asking about the knowledge of Sunrise Banks, and not about you individually. And I realized I should have clarified that. But I'm clarifying that now.

So when I ask you a question, you know, do you know what this is, I'm asking you as Sunrise Banks, not

you, Teri Hodgett, just for clarification purposes.
And then Tyler also writes, Feel we should kick it past Brian first of course. Why would it make sense to kick it past Brian first?
A He would be referring to Brian Tordsen in that case. And Brian Tordsen was the individual, again, responsible for national products. So anytime, particularly when we're going to make requests that we know a partner probably is not going to like, we would want to ensure that that relationship manager is involved and understanding that that is going to go to that committee and they're prepared.
Q And Brian is the relationship manager responsible for the GiftRocket relationship; is that correct? At this point in time.
A His title was not relationship manager. Again, he was an executive vice president, but he was essentially the head of the national products division. So when I say -- he'd be the person that's ultimately responsible for all of the relationships.
Q So then if you scroll down on the exhibit to the memorandum, got a couple questions. First, there's this proposed procedural changes section, and there's a gift card disclosure section in that paragraph.
And do you see in gift card disclosure, it

wanted them to do it. I can say there would have been discussion about that. But whether a formal request was made, I -- I'm not sure.

BY MS. VITALE:

Q So Sunrise Banks identified removing the merchant associations from the website as a fix that could help address the customer confusion and merchant complaints related to the website, correct?

MS. TONN: Objection to form.

MS. SCHMIDT: Objection to form.

THE WITNESS: We did believe that removing the names of merchants or in other words, allowing the purchaser to suggest where the recipient spend using a specific business name could help with customer confusion when purchasing the gift or redeeming the gift.

BY MS. VITALE:

Q But you can't testify right now about whether that request was ever formally made to GiftRocket; is that correct?

MS. TONN: Objection to form and -- objection to form to the extent that you're asking her to have memorized all the requests that were made.

THE WITNESS: So I --

MS. VITALE: I mean, it's a repeated

concern that has been repeated over and over in multiple documents. So I'm not asking her to memorize every request that was made. I'm just asking whether she knows, right, that certain thematic problems that came up over and over and fixes were proposed, whether those were ever conveyed to GiftRocket.

I'll ask the question again so that it's not, you know, tied up in my response to Gina.

BY MS. VITALE:

Q But do you know whether Sunrise Banks ever requested that GiftRocket remove the merchant associations from the GiftRocket website?

MS. TONN: And I'll objective form and scope again.

THE WITNESS: So I would consider a formal request to be a request where we are not willing to negotiate on that request. When I say I don't know if we made a formal request, that's what I'm referring to. I don't know if we took a hard stance on it.

I do think that there was discussion -- I do believe there was discussion about the removal of merchant from the website and whether that would be an option that GiftRocket was open to.

BY MS. VITALE:

Q Okay. Discussion between GiftRocket and

Sunrise Banks on that topic, correct?

A That's correct.

Q As opposed to just internal Sunrise Banks communications.

A That's correct. Yes.

[redacted]

Q Do you know other Sunrise Banks also made a formal request that GiftRocket remove the phrase "gift card" from its meta tags so that the phrase "gift card" would not appear in Google Search results?

MS. TONN: Objection to form. And objection to scope.

MS. SCHMIDT: Objection to form.

THE WITNESS: I do not recall if we discussed meta tags.

BY MS. VITALE:

Q Does Sunrise Banks understand that when a person goes on the Google website and enters a business

name and gift card, they'll be presented with a search result for the GiftRocket website that says something like buy a business name gift card?

MS. TONN: Objection to form and scope.

THE WITNESS: I'm sorry. Could you repeat the question?

BY MS. VITALE:

Q I'll show you -- actually, I'll show you a document later because I think it'll be easier to do with a document in front of us.

A Okay.

Q So we can just strike that for now. Let's set this document aside. Actually, we've been going for about an hour. Would you like to take a quick break?

A Sure.

Q Okay. You want to come back in 5 minutes, 10 minutes?

MS. TONN: Let's say --

(Off the record.)

THE PROCEEDINGS OFFICER: Back on the record at 12:28 p.m., Pacific Time.

MS. VITALE: I would ask Sam to put up SB010670.

THE PROCEEDINGS OFFICER: And would you like this exhibit marked 199 or would it be 167, I

guess?

MS. VITALE: I think 199. Let's have a look at it and make sure. But I'm anticipating 199 because I don't think that it goes with the one from the other. I'm actually changing gears here for a second. It's SB010670. It's not related to the other document we were just looking at.

THE PROCEEDINGS OFFICER: Perfect. Thank you.

MS. VITALE: Thank you. And I believe it will be Exhibit 199.

THE PROCEEDINGS OFFICER: Perfect. Yeah. That's what we're on. Thank you.

(Exhibit 199 marked for identification.)

MS. VITALE: Thank you.

BY MS. VITALE:

Q So I found this while we were on break, and earlier you had mentioned the -- let me see. So this is the one I'm trying to get. Earlier, we were talking about the NPAC meetings. And this is just -- this is a meeting agenda and then it has a list of voting members.

And I wondered if you could just confirm that these would be the people we were talking about earlier when we were talking about the NPAC Committee, and who would be sitting on it. A document like this, when it

A So the third-party risk annual review is slightly different than the compliance annual reviews that I was talking about. Our third-party risk team -- I -- I mentioned this earlier, with what we consider with partners, but just the various types of risks that are present and the ratings for those risks regarding that particular partner.

Q So the third-party risk annual review is a separate review conducted by a different department from compliance; is that correct?

A It is. The compliance reviews do factor into that compliance risk rating for third-party risk, but it is a different type of review.

Q Do they factor in the line item that says, Compliance Risk: Medium?

A Yes. That rating is received from the compliance team to the third-party risk team and is based on a monthly risk assessment of the partner that's done by the compliance team.

Q Who on the compliance team performs that monthly risk review?

MS. TONN: Objection to form.

THE WITNESS: With this date of November 2017, that likely would have been Nancy Degen that did that.

BY MS. VITALE:
Q And then it references annual compliance review. Is that the review that we were talking about earlier that's conducted by the compliance department on an annual basis?
A That is correct.
Q It says, Was completed 12/27/2017 and rated Unsatisfactory. There were 11 technical exceptions found and 2 major concerns. Do you see that?
A Yes. I do.
Q What were the two major concerns?
MS. TONN: Objection to form. And outside the scope. Again, to the extent that you're asking her to have memorized all this information without a document.
THE WITNESS: I would have to look at that specific annual review report to know what the two major concerns were.
MS. VITALE: Okay. We can set that one aside. That was 200, which puts us up to 201. Sam, can you put up SB021862?
(Exhibit 201 marked for identification.)
THE WITNESS: Okay. I have reviewed.
BY MS. VITALE:
Q What is this document?

A This document appears to be communication to GiftRocket. It looks like we identified that there were still spots on their website that stated "gift card." I'm trying to confirm how we -- I can't tell from this email whether this was identified during a website review or something else, but it looks like we are seeing that the term "gift card" is still on their website and are requesting them to change that.

Q Okay. And if you turn to the second page of the document or if you slide your scroller so that you can see the second page of the document, it's presenting Google Search results. Do you see that?

A That's correct. Yes.

Q So it looks like someone at Sunrise Banks typed in, zuni cafe gift card, into the search engine. Do you see that?

A Yes.

Q And the third result is for the GiftRocket website, correct?

A That is correct.

Q And what it shows in the search results is a header that says, Zuni Cafe Gift Cards and Gift Certificates, correct?

A That's correct.

Q Then a link to the GiftRocket website,

correct?

A That's correct.

Q And then it says, Buy a gift card to Zuni Cafe. Send it online to anyone, instantly, correct?

A That's correct.

Q Did Sunrise Banks tell GiftRocket that it needed to remove these references to gift card from the Google Search results?

MS. TONN: Objection to form.

THE WITNESS: It -- sorry. Let me look at this again quick. It does look like we are asking them to update that language so it doesn't say gift card to a specific merchant.

BY MS. VITALE:

Q And so this is in the email from Audrey to Nick Baum, correct?

A Yes.

Q She writes, Sunrise Banks is still concerned about the misleading header statements for the ACH Gift vendors. Do you see that?

A Yes. I do.

Q And there she seems to be referring to language on the GiftRocket website. She's put a square around, Buy Gift Card to Zuni Cafe, in bold print in the header; do you agree?

A Which page are you looking at?
Q Page 2. The top part is the Google Search results, and the bottom part appears to be a screenshot from the GiftRocket website. Do you agree?
A Yes.
Q And so when Audrey writes, Sunrise Banks is still concerned about the misleading header statements for the ACH Gift vendors, is she referring to the header statement "Buy Gift Card to Zuni Cafe" at the top of the web page that has a box around it with a line and an arrow that says, Please update language on this page?
MS. TONN: Objection to form.
MS. SCHMIDT: Objection.
THE WITNESS: So it looks to me like we're requesting the change to how it shows up in the search results. I do see that there's a screenshot of the website, but I'm not seeing that phrase specifically on their website.
BY MS. VITALE:
Q If I can do the drag to screen. I think I can drag your screen to my screen.
MS. VITALE: Sam, can you help with that, so that we're looking at page 2?
THE PROCEEDINGS OFFICER: Up at the top right, there should be, yeah, "Bring All To Me."

MS. TONN: You know what?

BY MS. VITALE:

Q So on this page -- sorry. I know the scrolling makes it hard to know what page is what page, especially when two things are on the same page. I'm asking about the bottom half of this page that has the Bates label SB021863. And --

A Yes. I do see that. Initially, when I looked at this, that to me looked like a text box that was added. But I do see it does appear to be that that's the header of that web page.

Q And Sunrise Banks is asking GiftRocket to remove that header, correct?

MS. TONN: Objection to form.

THE WITNESS: We are removing or we are -- we are requesting them to change the language of that header.

BY MS. VITALE:

Q Right. When she says, Sunrise Banks is still concerned about the misleading header statements for the ACH Gift vendors, do you understand her to be referring to that language inside the box "Buy Gift Card to Zuni Cafe" on page 2?

MS. SCHMIDT: Objection to form.

MS. TONN: Same objection.

THE WITNESS: I understand the request to be them -- requesting them to change the language of that header on that web page.

BY MS. VITALE:

Q I'm just trying to be clear on when she says, Sunrise Banks is still concerned about the misleading header statements for the ACH Gift vendors, what misleading header statements for the ACH gift vendors is she referring to there?

MS. SCHMIDT: Objection.

MS. TONN: Objection to form.

You cut out a little bit at the beginning of that question. I'm sorry.

MS. VITALE: Thanks. I'll ask it again so it's clear.

BY MS. VITALE:

Q Where Aubrey Brosz writes, Sunrise Banks is still concerned about the misleading header statements for the ACH Gift vendors, what misleading header statements for the ACH Gift vendors is she referring to?

MS. TONN: Objection to form.

MS. SCHMIDT: Same objection. And also, objection to scope.

THE WITNESS: My understanding of that statement in the email is that she is referring to the

header on the website on the bottom half of page 2.

BY MS. VITALE:

Q Which reads, Buy Gift Card to Zuni Cafe, correct?

A That is correct.

Q Then later in the same email, she goes on to say, This is the same page that appears if a Google Search for ABC Company Gift Card is done - which again we feel is misleading. Do you see that?

A Yes. I do.

Q And then she writes, We have attached an example. Is that a reference to the Google Search result that's at the top of page 2?

MS. TONN: Objection to form.

MS. SCHMIDT: Objection to form.

THE WITNESS: That is how I understand.

BY MS. VITALE:

Q Okay. I'll withdraw that. Okay.

What Google Search result is Aubrey Brosz telling Nick Baum, Sunrise Banks feels is misleading?

MS. TONN: Objection to form. And objection --

MS. SCHMIDT: Objection -- and outside the scope.

THE WITNESS: I read that email to

understand that she's referring to the screenshot on the top of page 2 of that document.

BY MS. VITALE:

Q And the search result for the GiftRocket website that says, Buy a Gift Card to Zuni Cafe, correct?

A That's correct.

MS. SCHMIDT: Objection.

BY MS. VITALE:

Q Having now looked at these documents, you can better understand what I'm asking about the Google Search results. Did Sunrise Banks ask GiftRocket to remove references to gift card from the Google Search results?

A So I'm not an expert on metadata when it comes to Internet web searches. I read this email to believe that the fact that their header says, Buy Gift Card to Zuni Cafe, could be what's influencing that Google Search result. I, again, don't know that we had specific discussions about metadata.

Q Let's take that one down and look at another document, which is SB015302.

MS. VITALE: I believe that that will be Exhibit 203.

THE PROCEEDINGS OFFICER: 202.

MS. VITALE: 202.
THE PROCEEDINGS OFFICER: Close.
MS. VITALE: So close. Did I mark the last one or did we just show it?
THE PROCEEDINGS OFFICER: I believe it did get marked. Let me see. Yeah. 200. 201. Yeah. 201 was marked.
MS. VITALE: Thank you. This one is going to be Exhibit 202.
THE WITNESS: Okay.
(Exhibit 202 marked for identification.)
BY MS. VITALE:
Q What is this document?
A This is an email from Jeannie Bauer to Aubrey Brosz talking about GiftRocket website changes.
Q And you're copied on the email, correct?
A Yes. I am.
Q It's dated November 26, 2018; is that right?
A Yes.
Q Do you see in the third paragraph, Jeannie writes to Aubrey, With -- sorry. Let's start one more so we know who we're talking about. In the second paragraph, Jeannie writes, With regard to the changes for Giftly and Gift Rocket - They can use gift card in their meta tag (which is a new term for me), but on the

websites they have to remove it from the product name - obviously can you it for the actual gift cards they provide if that is how folks redeem their gifts.

Do you see that?

A Yes. I do.

Q What does she mean when she says, They can use gift card in their meta tag --

MS. TONN: Objection to form. And outside the scope.

BY MS. VITALE:

Q -- on the websites they have to remove it?

MS. TONN: Oh, sorry. Objection to form. And outside the scope.

I'm sorry. Liana, I thought you were done.

MS. VITALE: It's fine.

MS. SCHMIDT: Same objections.

MS. VITALE: I'm -- it's getting late in the day and there are many people talking.

MS. TONN: Do you want to restate your question or?

MS. VITALE: Yeah. And then you guys can restate your objections, but we'll all do it one at a time.

BY MS. VITALE:

Q My question is, what does it mean they can use gift card in their meta tag?

MS. TONN: Objection to form. And outside the scope.

MS. SCHMIDT: Also, objection to form. And outside the scope.

THE WITNESS: So it means just what it says, that they can use the term "gift card" in their meta tag. Again, I'm not an Internet search engine expert, so I can't necessarily explain how that works, but we are allowing them to keep that phrase based on this email in the meta tag.

BY MS. VITALE:

Q Does Sunrise Banks understand that using the phrase "gift card" in the meta tag on the GiftRocket website is what causes the search results shown on Google to have the phrase "buy a gift card"?

MS. TONN: Objection to form. And outside the scope.

MS. SCHMIDT: Same objections.

THE WITNESS: I can't say that we are totally understanding of how meta tags work. I would say we do understand that it would have an impact on search results, but how specifically it impacts that, I don't know.

BY MS. VITALE:

Q So the document that we looked at previously, Exhibit 201, where Aubrey told Nick Baum that they need to remove the phrase "Buy Gift Card to Zuni Cafe" from the Google Search results. Do you remember that?

A Yes.

MS. TONN: Objection to form.

THE WITNESS: I remember.

BY MS. VITALE:

Q Is Sunrise now -- is Sunrise now withdrawing that instruction by saying, They can use gift card in their meta tag?

MS. TONN: Objection to form.

MS. SCHMIDT: Also, objection --

THE WITNESS: As I stated -- as I stated previously, I'm not sure whether that request to remove from Google Search results was referring to the meta tag or simply referring to the fact that it was stating exactly what the header said.

BY MS. VITALE:

Q Okay. So leaving aside the question of how exactly that information gets into the Google Search results, did Sunrise Banks tell GiftRocket it was okay to use phrases like "Buy Gift Card to Zuni Cafe" in Google Search results?

MS. TONN: Objection to form. And outside the scope.

MS. SCHMIDT: Same two objections.

THE WITNESS: Based on this information, we said it was okay to use the term "gift card" in their meta tag. I don't see anywhere we said -- where we said they could say, Gift card to a specific business, anywhere on their website or in Google Search results.

BY MS. VITALE:

Q So is it Sunrise Banks' position that GiftRocket was not permitted to have Google Search results that use phrases such as the ones that were shown in the exhibit we just looked at, Exhibit 1 -- or 201?

MS. TONN: Objection to form. And outside the scope.

Ms. Hodgett isn't here to testify about how Google Search results work.

MS. SCHMIDT: Same two --

MS. VITALE: Gina, I'm -- all right. Hold on. I'm going to actually respond to that because you keep saying outside the scope. It's not outside the scope. It's about what's on the GiftRocket website. It comes from their meta tags.

Like, whether the witness understands

that or not, we all understand that the meta tags are on the GiftRocket website. And so that information being displayed is obviously within the scope of the topic about what information is allowed to be on the GiftRocket website or requested to be on it or removed on it. Like it's within the scope, right?

The witness seems not to be prepared, or maybe Sunrise really, as a bank, doesn't understand how the meta tags in the website work, right? But the question is clearly within the scope.

And also, I don't really understand why Grace is now imposing scope objections other than to take up time and space on the transcript because she's not here representing Sunrise. So I -- yeah. Like, it's fine if you want to have a scope objection, but let's try to have ones that are reasonably correlated with reality.

MS. TONN: Well, and just to respond to that briefly and then I think we can move on and deal with this later if we need to, but the objection is to the fact that this question is going outside the topic about the GiftRocket website, which to our understanding is limited to what's on the gift card -- GiftRocket website that Sunrise would have been able to review any background -- any background data or how that worked on

the back end about how it showed up in Google Search results, my position is that that's outside the scope about -- of the topic about Gift -- excuse me. Website reviews.

MS. VITALE: Okay. I mean, some of these things, maybe it just needs to be clarified. And there's a couple little other parts of testimony that if it's just a clarification, we just want to have an accurate record, right? We're not trying to have her testify about things that aren't what happened or what Sunrise understand.

Right now, it's not really clear to me. I guess, we had an agreement about the scope that we didn't both understand because meta tags are clearly part of a website, and I'm pretty sure that anyone can look at them. So I don't know how Sunrise would have been able to look at the meta tags on the website.

But if she's not prepared, I guess because of us having, you know, missed this misunderstanding about what was within or without the scope of the topic on reviewing the website, that's fine. And, you know, if a clarification needs to be made, we can just work together to make it, and that's fine.

I just don't -- if she can give the

testimony, I want her to be able to give it. So I'm trying to ask questions that will get to that. And I think maybe we can wrap this up because it sounds like -- let's go back to question and answer.

MS. SCHMIDT: Just really quickly on the record, and I'm not trying to take up too much time. I just wanted to say as far as I'm aware, there's no rule against my objecting outside the scope, but if you're aware of one, please let me know.

And second of all, the reason why I was objecting as to outside the scope because you're asking a 30(b)(6) witness for an interpretation of a specific document which strikes me as outside of the scope.

MS. VITALE: I think it's more that you have no stake or reason to be opining on what the Sunrise witness who you don't represent will testify in their corporate capacity. Okay. Maybe we should have gone off the record for that, but let's try to get back on track. Just --

MS. TONN: And just to -- are you going to re-ask the question?

MS. VITALE: I was going to try to ask some question that would at least enable us to all be clear on what Sunrise is or isn't able to testify today about the meta tags. And if you want to make a

statement that will address that, I would be fine with that, too. That would be my goal. Yeah.

MS. TONN: I think -- I think that the discussion about the scope of the topics and the understanding of the topic related to review of the website is -- that's our position, is just that the topic is -- was specific to the GiftRocket website, not related to anything that happened with Google Search results.

But I understand that your reading of that topic may have been slightly different. And so I think at this point, it makes sense to just move forward, and if there's any discussion that needs to happen later about that topic, I think it can happen off the record, as you just noted.

MS. VITALE: Okay. I think we're fine with that. I think that makes sense given where we are.

BY MS. VITALE:

Q Let's see. Let me try to switch gears then. Give me a second. Actually here, let's stick with this email. Move on from the meta tag discussion. There's this statement at the bottom, Teri and I will be on the call (s) for sure and we will add Tyler if he is available, but he indicated his schedule is quite full so likely he will not be available but that the project

needs to move ahead.
Do you see that?
A Yes. I see that.
Q Do you know what calls are being referenced here that you'll be on?
MS. TONN: Objection to form. And outside the scope.
You can answer in your personal capacity if you know.
THE WITNESS: I would say the call would be related to this email and the topic of this document.
BY MS. VITALE:
Q Okay. To be clear, this document is talking about using gift card in the meta tags. This is a topic that we've, I think, agreed to table. But it's also talking about, in my understanding, removing "gift card" from the GiftRocket website, which is something that I think you can testify about. Do you read this email differently?
MS. TONN: Objection to form.
THE WITNESS: I would read this email to talk about the meta tag as well as potentially any other changes that we were asking them to make with regard to the use of "card" on their website.
MS. SCHMIDT: Ms. Hodgett, if you could

just pause a moment so I can also object, I'd greatly appreciate it.

THE WITNESS: Yes.

MS. SCHMIDT: Thank you.

BY MS. VITALE:

[redacted]

[redacted]

MS. VITALE: And set that one aside. Let's look at SB021865.

(Exhibit 203 marked for identification.)

MS. TONN: Do you need a break?

MS. VITALE: Do you want to take a break? I heard someone mentioning breaks.

MS. TONN: Yeah. I'm sorry. I just asked the witness if she needed a break and she said no.

MS. VITALE: Okay.

BY MS. VITALE:

Q Yeah. Just let me know if you need a break at any time for any reason.

A Yes. Okay. I reviewed it.

Q Do you recognize this document?

A I can see that I was copied on it. I don't necessarily recall it, but -- and I did not look at this email for preparation.

Q So Exhibit 203 is an email chain. March 18, 2019 is the date at the top. The email at the bottom starts a day or two earlier. Three days, technically. Let's start at the bottom and go up. Do you see that the bottom email is an email from Nick Baum on March 15, 2019 to Aubrey Brosz, and he sends her the updates to the GiftRocket website?

A Yes. I see that.

Q And Audrey -- Aubrey forwards it to the collateral@sunrisebanks.com email address. Do you see that?

A Yes. I see that.

Q Who receives emails sent to collateral@sunrisebanks.com?

MS. TONN: Objection to form. And outside the scope.

MS. SCHMIDT: Same objections.

THE WITNESS: The compliance -- I'm sorry, Grace.

MS. SCHMIDT: Go ahead. Thanks.

THE WITNESS: Okay. Sorry.

The compliance analysts receive it as well as the compliance manager and myself. I'm trying to remember what my title was at that time, but.

BY MS. VITALE:

Q How is it different from the compliance@sunrisebanks.com email address?

MS. TONN: Same objections.

THE WITNESS: The individuals are the same. The same people have access to it. They're just used for different purposes.

BY MS. VITALE:

Q So why is she sending this update about the GiftRocket website to the collateral@sunrisebanks.com email address?

MS. TONN: Objection. Outside the scope.

MS. SCHMIDT: Objection --

MS. TONN: You can answer if you know.

MS. SCHMIDT: Same two objections.

GiftRocket's contractual relationship with Sunrise Banks, including but not limited to, why the contract between the two entities was not renewed or extended, when the contractual relationship officially ended, the wind-down process of this contractual relationship, Sunrise Banks' role in the transition to GiftRocket's replacement banking partner, and what the GiftRocket-Sunrise Banks relationship currently is.

Do you see that?

A Yes. I do.

Q Are you here today as 30(b)(6) witness prepared to testify on this topic?

MS. TONN: Objection to form. And I'll just object that this document does not include our objections. And so to the extent there were -- there are objections stated to this topic, that's outside the scope of the testimony today.

MS. SCHMIDT: Objection to form.

MS. VITALE: What is the basis for your objection, Grace?

MS. SCHMIDT: No. I just -- apologies. I just totally blanked out. But I thought that -- can you -- can you repeat the question? I'm sorry. I just looked right after I objected.

MS. VITALE: Okay.

BY MS. VITALE:

Q My question is, are you here today as 30(b)(6) witness prepared to testify on this topic? Topic Number 22 in Exhibit 190?

MS. SCHMIDT: Oh, sorry. I misheard. I can withdraw the objection.

MS. TONN: And I'll just renew my objection about the fact that there were stated objections to this topic that are not included in this document.

MS. SCHMIDT: Oh, thank you.

MS. VITALE: If you want, I can put your objections in, but my understanding from meeting and conferring with Faris and reading your objections is the witness is prepared to testify on this topic. Do you have a different understanding?

MS. TONN: No. My point is that we do have objections about the reasonableness and of preparation and that it is -- needs to be reasonably -- the witness is prepared to testify to the extent reasonable -- that it was reasonable to prepare her on this topic.

MS. VITALE: Okay. Understood.

BY MS. VITALE:

Q We talked earlier about some of the agreements

and the fact that GiftRocket and Sunrise Banks terminated their agreement and no longer do business together; is that correct?

A Yes. That's correct. Our agreement's been terminated.

Q Who decided to end the relationship?

A Sunrise Banks did.

[redacted]

Q Was there any discussion of whether Sunrise Banks could continue to service one side of the business but not the other aspect of the business that you said Sunrise Banks didn't want to service?

A No. I don't believe there was discussion

about keeping one and not the other.

Q Do you know who at Sunrise Banks made the decision to terminate the relationship with GiftRocket?

A The decision would have been a decision made by the executive team.

Q Who's on the executive team?

A In 2021, at this time, it would have been myself, Bryan Toft, Melodie Carlson, Becca Hoeft, Kevin Valois, Todd Sharkey, Mike Porcello.

MS. VITALE: I'm going to ask Sam to put up a document. It's Bates labeled SB012639. And I would take help with the exhibit number if that's being offered.

THE PROCEEDINGS OFFICER: We're going to be at 206.

MS. VITALE: It's going to be Exhibit 206. Thank you very much.

THE PROCEEDINGS OFFICER: Oh, there does appear to be a Plaintiffs' Exhibit 177 already.

MS. VITALE: All right. Let's go with Exhibit 177 for SB012639. Thank you. Now it's disappeared again. Oh, that was the wrong exhibit.

THE PROCEEDINGS OFFICER: Oh, okay.

MS. VITALE: Let's just start from scratch. It wasn't my best exhibit effort.

THE PROCEEDINGS OFFICER: So looks like the exhibit will still be 206 then, as long as there's not a previous stamp.

MS. VITALE: I'm not going to say anything until I see it. I'm going to learn from the last one.

I'm being informed that it was actually previously marked.

THE PROCEEDINGS OFFICER: Okay. Perfect.

MS. VITALE: So we'll get the marked version and put that up.

THE PROCEEDINGS OFFICER: And it was Exhibit 177, if that's helpful.

MS. VITALE: I think it's going to be a different number, but I'm not sure. This is the last deposition in this case. So it has the most complicated series of pre-existing exhibits to manage.

THE PROCEEDINGS OFFICER: Yeah. I can imagine.

MS. VITALE: It just takes him one minute. Yeah. It's going well with you here to help.

THE PROCEEDINGS OFFICER: I'm glad I'm able to help, though.

MS. VITALE: Me too.

THE PROCEEDINGS OFFICER: Here we go.